UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 19 CR 725(JPO)

IGOR FRUMAN,

Defendant. Hearing

------------------------------x

New York, N.Y.
November 1, 2019
11:30 a.m.

Before:

HON. J. PAUL OETKEN,

District Judge

APPEARANCES

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
BY: NICOLAS LANDSMAN ROOS
REBEKAH A. DONALESKI
DOUGLAS ZOLKIN
Assistant United States Attorneys

CADWALADER WICKERSHAM & TAFT, LLP
Attorneys for Defendant
BY: TODD BLANCHE

Also Present: PTSO John Moscato

(Case called)

THE COURT: Let me just confirm that Mr. Fruman voluntarily waives his appearance for this matter.

MR. BLANCHE: He does, your Honor.

THE COURT: Thank you.

I scheduled this bail modification hearing in response to a letter dated October 30th from counsel for Mr. Fruman.

Mr. Blanche.

MR. BLANCHE: Yes. Thank you, your Honor.

I have discussed this briefly with the government prior to our conference before your Honor last week and then again since the last conference I was relatively new to the matter and wanted to gather facts before making the application that I made a couple days ago. The basis of the application and what we're asking for the Court to do is not change the bond in any way except for the Court to remove two of the current conditions, which is home detention and electronic monitoring. The reason for that is simple. It is that in my view they simply are not necessary to guarantee to reasonably assure that Mr. Fruman shows up in court whenever he is directed to do so.

As your Honor is aware, the charges in this case stem from various charges that Mr. Furman is taking seriously. I am not here today contesting the seriousness of the charges nor the strength of the government's case. I haven't seen the

evidence. We do not have discovery yet, but that is not the reason for my motion. Rather, it's that Mr. Fruman has been in the United States for 25 years and he has been a United States citizen for 15 years and he simply is not a flight risk. Everybody agrees that he doesn't need to be detained and that there are conditions your Honor set to reasonably assure that he shows up in court. The question is whether they are the least restrictive conditions. Here, the government and the Court have agreed Mr. Fruman can live outside of this district. He lives in his home in Florida. He can travel to this district. Go to the airport and get on a plane and come here whenever directed. He can come here and meet with me. He can come here and stay in a hotel without any issues. But when he is home, he has to stay in his apartment 24 hours a day. In my view, your Honor, the government has asked for too much with that.

Mr. Fruman has three kids who live with him. He is the primary caretaker of those kids. One is in high school. One is in middle school. One is in elementary school. He lives with them alone. He is in the process of getting a divorce from his wife who doesn't live in the apartment. So he needs to take care of his kids. He needs to be able to not only take care of them to school and deal with their lives but also be a dad to them. He also has an elderly mother who has serious health problems who lives nearby. She has difficulty doing

basic things like going to the store, which is something that Mr. Fruman helps her with. Certainly his life as it exists in Miami today he needs to be able to do those things.

I don't know what is in the government's mind, your Honor. We will hear from them in a minute, but it seems to me that one of the reasons why everybody agreed to home detention with electronic monitoring is the now off the recorded fact that Mr. Fruman was arrested at Dulles airport with a one-way ticket to Vienna. The only admissibility of that is that he as fleeing the country. I don't believe the government disputes this, that that is completely false. There is absolutely zero evidence that Mr. Fruman was leaving the United States and not intending to come back.

THE COURT: Is it false that he had a one-way ticket to Vienna.

MR. BLANCHE: Pardon me?

THE COURT: Is it false that he had a one-way ticket to Vienna?

MR. BLANCHE: No. That is absolutely true. It is false that he was not going to come back. He travels internationally regularly as pretrial service notes, but often doesn't know exactly when he is coming back.

THE COURT: So you are saying he had a one-way ticket, but he was going to book other tickets and come back?

MR. BLANCHE: To come book, which is consistent with

what he almost always does. Indeed, there are text messages, your Honor. He uses an assistant and travel agent discussing that in this particular case the one-way ticket was significantly cheaper and less expensive than a round-trip. I have the text messages, your Honor. I am happy to share them with you and government if they want. I believe they have them from the phones that they took three weeks ago.

The bottom line is the one-way ticket was about $8,000 and a round-trip ticket was $20,000. And because Mr. Fruman and Mr. Parnas didn't know when they were going to return, there was no reason to schedule a round-trip. Again, I will wait to hear from the government, but that is consistent with the history of Mr. Fruman and Mr. Parnas's travel. They don't always book a round-trip. Indeed, it is not unusual to just book a one-way trip if you don't know exactly when you are coming back. I believe the trip was booked a day before or two days before they were going to travel, which again is consistent with their travel history.

So he just was not fleeing the country. If you remove that from the equation and the headline and you look at the rest of the facts and circumstances of this case, there is already an extraordinary large bond, a million dollars, fully secured by his house, which he has lived in for our over 14 years. We'll get to the other cosigners in a moment, your Honor, but it was cosigned by his son who is a 28-year-old

American citizen working very hard in Manhattan as a young man and the idea that Mr. Fruman would flee and potentially financially destroy his son's life I believe there is no evidence to support that.

He also has his entire life in the United States, your Honor. The Pretrial Services report correctly notes that he travels a lot. That is true. It also talks about some ties outside the United States. Those family ties are extremely remote and distant. He doesn't have any regular communication with family outside of the United States. His soon-to-be ex-wife has family outside the United States, but they are getting divorced.

So at the end of the day, I suppose it is an odd request because we just agreed to it last week; but at the end of the day, the law requires the least restrictive conditions be imposed. And requiring him to sit in his apartment in Miami 24 hours a day to guarantee your Honor that he shows up here when directed is not necessary in my view. Your Honor, I have spoken with the pretrial services officer in Miami, who has been supervising him not very long but since he was released. I have his contact information if your Honor would like to speak with him. But he has been completely compliant and very responsive and doing everything he is supposed to do on bail.

Again, I suppose we will hear the government's position; but I have also spoken with other people who were

familiar with the trip that Mr. Fruman was taking, and he was coming back. Again, if you remove whether he was fleeing to Vienna, which by the way has an extradition treaty with the United States so that would be a pretty poor choice of a country to fleet to, but when you remove that from the argument, in my view it is a much simpler case given his history. He is a United States citizen and has been for 15 years. He has never had any contact with the criminal justice system. He has assets in the United States. He has bank accounts in the United States. He has partial ownership of businesses in the United States.

To be sure, your Honor, he does have some interest outside the United States. I am not saying he doesn't, but the question is a million-dollar bond with all the conditions that we discussed enough, and in my view it's more than enough. I am not asking to lower the bond. I am not asking that he be allowed to have communication with his co-defendants or that his supervision be adjusted. I am just asking your Honor to allow him to live his life in Miami without being constrained and having to stay inside.

I can address the cosigner issue now.

THE COURT: Why don't we do that after.

MR. BLANCHE: Sure.

THE COURT: To be clear you said based on information we have learned after we agreed to this condition, the

information that you learned is what?

MR. BLANCHE: Well, I have learned that indeed he wasn't fleeing. I spoke with people who were familiar with the trip. I also have documentary evidence that supports that, which I didn't have until just before I made the application, your Honor.

THE COURT: Okay.

MR. BLANCHE: I haven't spent a ton of time with Mr. Fruman so I didn't know as much about his circumstances, his family and his life as I did after the conference last week.

THE COURT: Okay. I will hear from counsel for the government, Mr. Roos.

MR. ROOS: Thank you, your Honor.

So the government agreed to the bail package that agreed to when the defendant was arrested but not without hesitation and not without thought that perhaps this defendant should be detained due to the substantial flight risk he poses.

Now, I will start with the circumstances of his arrest and I think it in some ways there is not a lot of dispute here. Mr. Blanche has spoken to folks who said he was coming back at some point. But what is clear is he was subpoenaed by Congress and indicated he was not going to comply on October 7th. On October 8th he booked a flight with less than 24 hours before he was going to board. On October 9th he was at the airport and arrested on the jet bridge as he was boarding a one-way

flight to Vienna. It's not clear if that was his final destination and it is not clear when he was going to come back.

Now, that's not the sole basis for the government's detention argument, but it certainly is a fear here, which is he had reason to leave and he did it on short notice. He happened to do it on a very significant Jewish holiday, which raises the question of why there was such a rush to leave the country, and he did it with a number of reasons why he has substantial ties to Europe.

Let me go through those. First of all, yes, he has been a United States citizen for some time. On the other hand, he was born Belarus. He lived a good part of his life in Ukraine. He has substantial business ties there. He operates a bar called Buddha Bar. He has a luxury brand called Tada that he is a partner in that has hotels and restaurants.

THE COURT: That is in Europe?

MR. ROOS: Yes, your Honor.

I can pass this up. This is the hotel brochure for Tada. Mr. Fruman is on the second page, and it describes him as the president and CEO of FD Import Corporation or Tada Luxury Group. Among others things -- like I said, your Honor, I have a copy for Mr. Blanche and I can pass one up to your Honor as well. This is also not in the Pretrial Services report because I guess the defendant didn't disclose it. But there is a hotel. There are restaurants. There is a beach

club, there is the Buddha Bar in Kiev. There are various retail stores that are associated with this group. So I think it is safe to say that the defendant is in a position where he can return to Ukraine where he is politically connected and can decide never to come back here and live a very nice life and his family could follow him. That is not necessarily a reason why the government is seeking to detain him, but it is a reason why by substantial conditions need to be in place in the United States to ensure that he doesn't flee.

Now, I think there are a few other points that just sort of the bolster the idea that the defendant poses a flight risk. Number one, as Mr. Blanche pointed out, the defendant has traveled internationally extensively on at least 15 times since January 2018, which was the period covered in the indictment. Many of those trips have sort of circuitous travel patterns, including flying to a city in Western Europe and ultimately coming back from a different one or from the Ukraine.

The defendant has utilized private travel. So, for instance, earlier this year the defendant took a private plane from Miami to a small Canadian city. Was outside the United States for a period of time and then came back via Spain. So again the defendant did return, but it suggests that, number one, the defendant has access to private aircraft; and second, that the defendant sometimes utilized different travel plans

that will take him through multiple different countries obscuring ultimately the final destination of his trip, which again is noteworthy in the context where he was taking a trip to Vienna. It is not clear that that was his final destination.

A few other points, your Honor. The defendant's business FD Import, which he discloses having income from in his Pretrial Services report. $21 million traveled through accounts in FD imports. At least $21 million through U.S. accounts FD imports in the last three years. The defendant reports significantly less than that amount and that may because of business expenses. Certainly a substantial business which is an import export business, which means there is a Europe facing side to all of this, and it is yet another financial resource that he has a connection to.

So I think you, your Honor, there is a number of different international components here whether it be the foreign travel, the fact that he was on the verge of leaving the United States as things were becoming political hot for him, his undisclosed substantial foreign business interests, the extent to which he is minimizing his international import/export business, the foreign business partners he has, the use of private travel, the use of circuitous international travel routes. Those all favor, in addition to the fact that there is considerable evidence proving his guilt on the charged

offenses and as we proffered previously in the ongoing investigation those were all considerations that would favor him fleeing the jurisdiction at some point.

So why is the particular condition here essential? Well, a few things, your Honor. Number one, without these conditions the defendant could go to the airport. He could get on a boat. It is very possible law enforcement would have no way of knowing. He turned in his U.S. passport. We don't know if he has any other passports. There is certainly a risk that he could fly. And these conditions are narrowly tailored. He can still take flights. The government has indicated to defense counsel there are particular reasons he needs to be able to leave his home -- religious service, some sort of childcare obligation. We're happy to hear those out and clear them with pretrial services. He obviously is permitted to go meet with his attorney.

So there is this compelling need for a way of tracking him and ensuring that he is in the same location and also there is a combination we're willing to make if there is a childcare issue. I will not on that question, your Honor, that when the defendant was arrested, his children was with a full-time nanny in Miami and he has extensive travel where he is willing to leave them. So there certainly is -- in this context, it seems that he has other support. As I said we are willing to work with him on the childcare issue, but it doesn't sound like that

is the motivating factor here for his request to remove these particular conditions. I will leave it at that unless your Honor has any particular questions, but I think all that together we view it as a compelling need to have some way of securing where he will be at a given time and being able to track it.

Let me make one more point actually about the intersection between GPS and home detention. So the GPS basically allows Pretrial Services to see where the defendant is relatively and they have set up restrictive zones. For instance, the state of Georgia could be a restricted zone outside of Florida. If he crosses over there, at least as I understand it, Pretrial Services gets an alert. Obviously law enforcement would have to respond and find him. That process is not perfect.

So the larger the geographical radius is where you set the restrictive area, meaning whether it the Southern District of Florida or the small area where he lives, the more the defendant has room to move in the event that he sets off an alert. So if travel were restricted to the Southern District of Florida and he has no GPS, then he can just go to the airport or he can go anywhere and we will not have anyway of knowing. If he still has the GPS but no home detention, then he can literally go to the airport and it is not until that point where there is an alert, but at that point maybe too late

where he can cross state lines or get on a boat. Again, it is not until he leaves the jurisdiction or the restricted area that Pretrial Services would get an alert.

So it is the government's view that law enforcement needs to be able to confine the defendant to a geographic area so that we have time to respond in the event that he begins to flee. Of course the geographic area we're proposing is not the MCC but the defendant's home. So he can still live his daily life. We can, as I said, carve out restrictions if he wants to go somewhere. That's a narrowly tailored way of securing against the government's proffered risk of flight while also allowing the defendant not to be detained.

THE COURT: One of the factors under the statue is the weight of the evidence against the person and the nature and circumstances of the offense.

Do you want to address anything about those?

MR. ROOS: Certainly, your Honor.

So I think defense counsel even stated it is a serious offense. There is substantial evidence. It is described to some extent in the indictment, but there are text messages and emails, among other evidence, implicating the defendant. Some of the international wire transfers that were used to fund the foreign contributions passed through accounts that were jointly held by the defendant. He was a leader. As the Pretrial Services' report even indicates, he is a leader in the global

energy producer's purported business, which is charged in the first count of the indictment. So there is substantial evidence against him and he is obviously facing jail time as a result of that.

I would also just note that there is obviously heightened attention and sensitivity to that, and I think history bears out sometimes in those circumstances in higher profile matters the attention becomes too much for a defendant and they decide they just want to leave. So I think to address that particular factor, your Honor, the weight of the evidence is substantial and weighs heavily in favor of some form of pretrial restriction as the government has proposed here.

THE COURT: Thank you.

MR. BLANCHE: Briefly, your Honor.

First of all, there is nothing in this statute or in the case law that suggests that because this case is purportedly close that a defendant is supposed to be subject to some of the greater conditions than otherwise is required to require his appearance in court.

In addition, the prosecutor made reference to the idea that Mr. Fruman was less than forthcoming with Pretrial. Pretrial doesn't say that. That is completely false. If there is something about Mr. Fruman that Pretrial has any questions about, he will show up within an hour and talk to him. They asked questions and he answered them. Those interviews are

very quick. They are usually right after you have been arrested. You don't have paperwork with you. If the Pretrial or Court wants more information about his businesses and his income, they can inquire; but there has been no allegation he hasn't provided it.

Third, the prosecutor made reference to a business that has had several million dollars go through it. It is an import/export business. The margins on that business, as anybody knows, are quite small. So it is not inconsistent with Mr. Fruman's income as reported to Pretrial and the fact that his business has had several million dollars go through it over the course of several years. That is not admissible of flight.

Judge, the rest of what the government said about why electronic monitoring was necessary was completely hypothetical. He may have another passport. Okay, he doesn't. There is no evidence that he does. His passport has been surrendered. He may decide that he wants to go to the airport and get on a flight. Well, he doesn't have a passport and they have offered no evidence that that is something that would happen. By the way, if he wanted to flee, he could simply tell his Pretrial Services Officer, I am going to visit Mr. Blanche in New York, and he goes to the airport with permission and hypothetical with this new passport he is able to flee. It is not fair to the defendant and in fact it is not fair to the process to not actually have evidence to support a position you

take about something that the defendant may or may not do.

I think your Honor's should ask for evidence. The evidence is the one-way ticket was not because he was not coming back. The evidence is he has lived in the United States for 25 years and a United States citizen for over 15. He has been in the same residence for over 15 years. He has his entire life in the United States. To be sure, he travels a lot and has businesses overseas, which is why there is a one million dollar bond fully secured with cosigners and other conditions as well.

In my view what we're asking for is not a great stretch. If the government's position is, Well, Judge, he might go to the airport and flee, one question would be what evidence do you have that he would do that. I submit to you that the evidence would be zip. Nothing. So I am almost fighting a battle punching in the dark here. There are all kind of hypotheticals we can come up with; but if you look at the facts, he has been completely compliant since he made bail. He has been in the United States for plenty long enough. He doesn't have family contacts overseas. His contacts are here. His kids are in school.

I do agree with the government he certainly has help at home. He travels a lot. He has help getting the kids to and from school. That is not what this is about. This is about whether the least restrictive conditions to reasonably

assure that he shows up here when directed, your Honor. For the reasons I just stated and the reasons that I stated earlier, in my view the conditions without the bracelet and home detention can more than reasonably assure your Honor.

THE COURT: Thank you for your arguments.

Having considered the circumstances and the factors in the statue which is Section 3142(g), I am going to deny the request for bail modification. I find that the current conditions, including home detention and GPS monitoring are reasonably necessary to assure the appearance of the defendant. I realize there is not a lot of evidence in these situations. It is early in the case and the Court is required to make a determination on what the least restrictive restrictions are to ensure the appearance of the defendant. But I am persuaded when considering the nature and circumstances of the offense, its seriousness, the weight of the evidence, and the other circumstancial factors that these conditions are reasonably necessary to assure the appearance and this includes the factors mentioned by the government -- a one-way ticket to Vienna -- it is impossible to know right now based on what I have whether there was a purpose to leave or not or if it was just a standard practice.

In addition to that you have the business and properties of the defendant overseas, including Kiev, political connections, overseas extensive foreign travel, and the

financial resources. Considering that in light of the nature and circumstances of the offense and the weight of the evidence, I am going to deny the request for modification of bail conditions.

Let's address the other matter you raised in your letter.

MR. BLANCHE: Thank you, your Honor.

So the other matter, as your Honor will recall, there are three cosigners for the bond. Two, Mr. Fruman's son and his brother were agreed upon and approved by the Court and there was a third cosigner to be named later. The third cosigner is Mr. Fruman's brother's wife. As is the practice in this district, cosigners go to the U.S. Attorney's Office to be interviewed prior to signing the bond, and in this case Mr. Fruman's brother who already signed and was approved in the Eastern District of Virginia had met with, I believe, the Pretrial Service Office in Virginia, which is how they do it in that district, and signed the bond in Virginia and met with a representative of the United States Attorney's Office and provided information.

I was not at the interview. I don't believe any of these prosecutors were at the interview either. My understanding is initially Mr. Fruman's brother didn't -- when talking about his business didn't mention every single business or he mentioned that he owns several coffee shops and that he

is not the sole owner, is a partial owner and they were rolled up into one LLC. And for reasons that I will let the government address, he provided two months or three months of bank statements and two years of tax returns, which is what he was told to bring with him prior to showing up. That information shows that he is financially stable. He has a significant amount of money. After hearing about other businesses, the government wanted bank accounts from his partial ownerships and all the other businesses. I don't think that is necessary. I think it is appropriate especially because he had already been approved and he has been approved by your Honor.

The next cosigner, and that is the individual's wife, has her own business. I believe she is an acupuncturist and has a business associated with that. Her personal bank statements were provided because she shares them with her husband and tax returns were also provided. I believe the government is also requiring bank statements from her business. As I put in my letter, I am not trying to be difficult and create issues that shouldn't exist, but I don't think it is appropriate or necessary for the government to do that, that deep of an interview. They have access to the cosigners. The cosigners are hard-working people in New York City who have shown to be financially honorable to what they did provide. My ask to the Court is if there is some more information needed

about the businesses that it be provided to Pretrial besides the government who I know does that in this district, but in this case it doesn't seem appropriate.

THE COURT: You know it is the normal practice at least in this district for these sorts of questions to be asked by the U.S. Attorney and then if there is a dispute as to whether someone is a financially responsible person for purposes of the bond conditions, then I might resolve a dispute. I am not sure that there is a ripe dispute yet. I don't know that I would in the first instance step in to do the interview myself.

MR. BLANCHE: I am not suggesting that you do, your Honor. I was a paralegal in that office for four years. I have done 500 cosigner interviews. I know exactly the questions they ask. I am not objecting to any of the questions. I am not objecting to the information they requested be provided prior to the interview, which is they want proof you have money. Bring the bank statements and two years of tax returns. They did that. They answered questions and the government I believe now wants backup information about their businesses. I am not objecting to the questions. I am not objecting to their questions about moral suasion and influence on the defendant, the background, whether they have been arrested, all the questions that are always asked. I don't believe there needs to be further documents provided

about the businesses they have or that they have a partial interest in order to qualify them as cosigners on a fully secured million dollar bond.

THE COURT: Mr. Roos.

MR. ROOS: Yes, your Honor.

As a little background. Right before Mr. Fruman was to be released in Virginia, we flagged for his prior counsel's counsel in Virginia the fact that we had some concerns about Steve Fruman, the defendant's brother, because it appeared he could be involved in some of the conduct that is charged in the indictment. So we said, You need to have another cosigner and our preference is since you have already selected two family members that the new cosigner is not another family member. So his prior counsel said, Well, we really want to get him out today. So we said, Okay, we will allow Steve Furman for now but there needs to be someone else because we have this concern. So that was the premise under which we were operating and I think also there was no dispute that it is SDNY standard practice to typically have a paralegal specialist in our office interview the cosigners and ask for various documentation.

So fast forward. Your Honor sets the bail conditions. We learn that the cosigners are the defendant's son, his brother, and his brother's wife, which feels a little cute in light of the conversation we had previously about maybe not being a family member. In any event, we proceed forward with

the interviews that the paralegals are conducting. The paralegal specialist who conducts the interview of Steve Fruman asks him one of our very standard questions, which are can you tell us where you have bank accounts and the types of your business. Mr. Steve Fruman identifies a personal checking account and says that he has a particular coffee business.

The paralegal who is aware of aspects of the case asked if those were the only accounts and Steve Fruman said yes, which is false. And then later in the interview the paralegal following up knowing this was an issue asked if there are any other businesses or significant assets that Steve Fruman had that he had not reported previously. And Steve Fruman again said no. So twice we got a false statement from him that -- that seemed as though he was trying to conceal some type of business that we're aware of. What is particularly notable about the business that he was not disclosing to the folks in our office is that, number one, it is a substantial source of income but number two, it is the business that may be connected to the scheme charged in the indictment. So it certainly seemed like an effort to conceal to the extent to which he might be implicated and which would make him an inappropriate cosigner in this case. That was our concern.

The AUSAs, who were not part of the interview, spoke with the paralegal. The paralegal then recommenced the interview. Mr. Steve Fruman had spoken to his attorney and

then acknowledged some business, but again distant himself from this particular business in question by saying he doesn't work there anymore. Your Honor, frankly just from our review of the financial records, we don't think that is right. In any event, the larger issue here is not that Steve Fruman is an inappropriate financially responsible person or from the stand point he doesn't have assets but that he has demonstrated he is not an appropriate cosigner based on his answers to the government in an interview.

THE COURT: Okay. So let me just say, Mr. Blanch, I don't think it is appropriate for the government to be seeking discovery from a cosigners. However, it is entirely appropriate for the government to be asking questions to ensure that a cosigner is not involved in some way in the charged conduct.

MR. BLANCHE: I couldn't agree more, your Honor. The question that a false answer was supposedly given to about this LLC that may be connected, it's not a functioning LLC. It is not ongoing. It is something in the past. At last that is my understanding. So the question is do you have any other businesses and he answers no, that is not a false statement. He doesn't have ongoing kind of income, which is the purpose of that question -- what is your ongoing income.

Again, I wasn't there so I don't know exactly the questions asked or exactly how the question was answered; but

my understanding also, and the government can correct me if I am wrong, when the government representative came back down and asked questions what about this, he didn't lie and say, Oh, yeah, I also have a small interest in a building in Manhattan. So he was not trying to be forthcoming or lie. He talked about his main business, which is partial ownerships in a bunch of coffee shops. When the representative came back down, he was forthcoming. He wasn't trying to keep anything from the government.

Again, this happens regularly with cosigners. They are not part of the criminal process. They come in to be interviewed. I agree with you asking him are you part of this indictment, that's a perfectly fair question.

THE COURT: I don't think they should be asking that, but they can ask subsidiary questions that might shed light on that.

MR. BLANCHE: Sure.

THE COURT: That includes give me information about these other accounts and entities.

MR. BLANCHE: The government can correct me if I am wrong but when they asked him about that, he didn't say it initially. There was something where they came back down and asked him more questions and he was forthcoming thereafter. Again, I don't think that that process allows the government to necessarily say, Okay, since you didn't tell us when we first

asked you, give us hard copies of all the bank statements.

THE COURT: I am not sure exactly what the ask is here.

MR. BLANCHE: I want them to be approved, Judge. I think they met with the government. They provided significant information about their assets. They answered all the questions. They gave two months of bank statements as requested prior to the interview. I think they should be able to sign today -- it is due today. I would ask for one extra day if they cannot come until Monday, but they be approved to sign the bond.

THE COURT: Mr. Roos.

MR. ROOS: I think on this, your Honor, so the defendant's brother did say when the interview recommenced, Oh, yeah, I am part of that, too, but I don't really work with that business anymore. Now, notably on the Pretrial Services report, the business in question is listed as the defendant's source of monthly income. Right under it says the defendant's brother affirmed it as much. So it seems as though the brother does have some awareness. So at this stage the government wasn't even trying to say Steve Fruman cannot be a cosigner because he didn't disclose these particular things. We just said, In light of the fact that you didn't disclose it initially and we have these concerns we're trying to evaluate and then you say, I am no longer part of that, we just want to

see the financial records for these things so we can verify whether or not what you are saying is true. I think that is a pretty reasonable step in terms of evaluating a cosigners where these issues have come about is just to ask for more information.

By the way, if the defendant's brother doesn't want advance information, the defendant certainly can advance another financially responsible person as a cosigner. We will consider someone else instead of Steve Fruman if some of these issues stand in the way if he doesn't want to inculpate himself or for privacy reasons doesn't want to disclose financial documents.

THE COURT: What about the argument of Mr. Blanche that irrespective of that he has already established the sufficiently financially -- has enough financial wherewithal to be a financially responsible cosigners?

MR. ROOS: Right. He definitely has demonstrated that he while he doesn't have enough money to satisfy the entirety of the bond, he would fall within the way SDNY typically treats people as financially responsible persons or not.

The issue really is what certainly seemed like acts of deception but perhaps could have been a misunderstanding and the government's request is really let's just run this down a little bit more to see whether or not he was deliberately lying or just forgot about this business that he perhaps recently

disentangled himself from.

THE COURT: So what exactly is the government seeking?

MR. ROOS: The paralegals asked for financial records, which would be the same bank records which he produced for his other businesses for the businesses that he disclosed at the very end of the interview.

THE COURT: Which is two or more than two?

MR. ROOS: The one we're talking about extensively we would be looking for something that either shows what he is gaining from it or would show the fact that he is no longer involved in it. And then he named I believe three other LLCs and it is not clear whether or no t those generate any income. So that is a secondary point, but that is something we would be interested in as well.

MR. BLANCHE: Judge, this is unprecedented. I say that having dealt with the world of cosigners since 1999. They have shown two years of tax returns, significant assets that more than qualify them under the SDNY's threshold to be a financially responsible person. To ask for now further information about LLCs that the cosigner may have a small interest in, even though they have already separately told the government about it so they told the government about it, but also shown assets that are more than sufficient by the government's own admission.

It is now becoming a discovery process. So the

cosigners has a choice to make: Either don't support your brother or go and try to find all these bank statements and give the government all this information that goes above and beyond what is already proven as required under the statute that you're financially responsible.

THE COURT: Well, it may be unusual, but maybe the reason it is unusual is because the government has to suss out whether there is an appropriate cosigner. If someone is connected to the charged conduct, they are probably not appropriate cosigner and they are trying to figure that out.

MR. BLANCHE: I don't think the government is saying that. They are not saying is he connected to the charged conduct.

THE COURT: I thought they were.

MR. ROOS: I was saying we're trying to evaluate that in part and the business that he declined to disclose and appeared lied about in the first instance would potentially connect him to the charged conduct.

MR. BLANCHE: Or put another way, a fishing expedition. He is the brother of the defendant. He has moral suasion. They have done some business together. We're trying to find out through the cosigner due process. By he way, already approved an EDA and already signed the bond in EDA with the government's blessing. We're now going to interview him. He proves he is financially responsible. But wait, we want to

do a little more work, a little more digging to see if he may be connected. That doesn't seem, for lack of a better word, fair. He is left with an impossible choice -- support his brother like he did in Virginia or indulge the government in their digging to see whether he may or may not connected.

THE COURT: If the purpose is not to do a fishing expedition but rather to determine if this is an appropriate cosigners and/or whether lied when talking to the the U.S. Attorney's Office, if that happens to result in discovery, I don't think that makes it improper. What is proper is to determine whether he is an appropriate cosigners. He can decline to give the information and the defendant can find someone else.

MR. BLANCHE: I just think he already answered their questions. He didn't answer them the way they wanted, but he was forthcoming. He didn't, I guess, answer all the questions right away; but he was forthcoming when ultimately asked about other interests he had in any other thing. It is not normal if someone says that I own four cars for the government to say bring me the loan payments. That is not the way the government does it.

I understand the government's point whether he has moral suasion, which will go to whether he is involved, is an appropriate avenue for them to explore, which I believe they did already by asking the questions. All I am asking here is

for your Honor to find what they have done enough. The government hasn't said that he wasn't forthcoming by the end of the interview. It is just about whether he now has to go back and get, I guess, bank records, which I am not sure whether he is a signatory on some of the accounts. He only has a small ownership in them I believe. He is an appropriate cosigner. He is the defendant's brother.

By the way, the defendant's brother's wife who has her own business, which I don't know whether they have any issues with her, but I guess that is another question for them to answer.

THE COURT: Are you seeking information from the wife's business as well?

MR. ROOS: On the wife she refused to turn over any bank records and I think as is clear some level of bank records or tax record is common for all cosigners. As in the case with Steve Fruman, we initially asked for tax records and bank records. He just didn't give us a full picture. In the case of his wife, she declined to give any information.

MR. BLANCHE: May I have one moment?

THE COURT: Yes.

(Pause)

MR. ROOS: Sorry. In support of her business.

THE COURT: On the business?

MR. ROOS: Yes.

THE COURT: So the question for me now is do I deem Mr. Steve Fruman as a financially responsible person, or do I let the government continue requesting this additional information?

MR. ROOS: Well, your Honor, I think posed that way, the government would say it opposes Steve Fruman as a cosigner because it appears he could be involved in the relevant conduct and because it appeared he initially lied to the paralegal who was interviewing him. That's not a final conclusion. So our hope is that more information will be provided so that we could further evaluate that. So I think the government's request is that we just put this off for a little bit and request additional information. If the defense counsel really wants the Court to rule on this right now, then I think the Court has to decide basically yes or no on the cosigner.

THE COURT: Well, I am not in a position to decide on whether this is an appropriate and financially responsible cosigner. I am also not going to grant the request at this time to deem him an appropriate cosigner without additional information. So I am denying the request to preclude the government from asking the questions given the representations that are before me.

I think you should confer with each other and talk about how this plays out going forward and if there is a ripe request for me to deem someone a financially responsible person

at a later point. I am not in a position to do that at this point.

So that is the ruling. I am denying the bail modification request and the additional relief sought in the letter.

Is there anything else for now?

MR. BLANCHE: Yes, Judge.

the cosigners were supposed to sign today. I would request, I don't know, another week. I don't think it will take that long, but if we can have until next Friday to deal with what we just discussed.

THE COURT: Is that okay with the government?

MR. ROOS: We have no objection to that.

THE COURT: Another week is fine. Next Friday.

MR. BLANCHE: Thank you.

THE COURT: Thank you everybody.

We're adjourned.

o0o