EXHIBIT C

# SERCARZ & RIOPELLE, LLP

CARNEGIE HALL TOWER
152 WEST 57TH STREET, 24TH FLOOR
NEW YORK, NEW YORK 10019
(212) 586-4900
FACSIMILE (212) 586-1234
www.sercarzandriopelle.com

ROLAND G. RIOPELLE
MAURICE H. SERCARZ*

―――――

JULIA L. GATTO
*ADMITTED IN NY & NJ

December 23, 2005

**_VIA FAX AND ECF_**

The Honorable Harold Baer
United States District Court
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

> **Re:     _United States v. Ishan Sharif Khwaja, 05 Cr. 830 (HB)_**

Dear Judge Baer:

In light of the statements recently made by our President, I would respectfully ask that the Court permit me to make one additional discovery application on behalf of my client, which was not included in the motions filed on December 16. The application is this: that the Court direct the Department of Justice to ascertain from all relevant agencies of the Executive Branch of our government whether any communication (whether oral or email) of my client, or any of the companies with which he was affiliated (i.e. National Electronics, Inc., Taban Company, Inc., Krona Trading, Inc. or Mailtronics, Inc.), was covertly intercepted and/or recorded as part of our national effort to combat terrorism. In connection with this application, I request that the Court also direct the Department of Justice to obtain an affidavit from each such government agency, averring that a search of the agency's records has been done, and that no such communications were intercepted and/or recorded (if that is the case). Of course, if any such communications were intercepted and/or recorded, I ask that they be produced to Mr. Khwaja promptly, and that the Court order such production.

In connection with this application I note that this case was investigated by the Joint Terrorism Taskforce, which I believe did surveillance on the business premises of National Electronics for a period of more than a year before the indictment in this case was returned. I also note that early on in this case AUSA Leung represented to me that no statements of my

The Honorable Harold Baer
December 23, 2005
Page 2

client were recorded, and I have no reason to doubt Mr. Leung's <u>bona fides</u> in making that
representation.  However, I note that there have been instances where the fact of surreptitious
interception and/or recording of statements has been withheld from the United States Attorney's
Office, <u>see</u> <u>United States v. Huss</u>, 482 F.2d 38 (2d Cir. 1973) and, therefore, I believe this
application is appropriate, given what seems to have been an ongoing campaign of interception
and recording of statements by the Executive Branch of government outside the direct
supervision of the Department of Justice.

Respectfully submitted,

S/

Roland G. Riopelle

Cc:     AUSA Wilson Leung, Esq.
         AUSA Lisa Korologos, Esq.

61K8KHWA

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          05 Cr. 830 (HB)

5    ISHAN SHARIF KHWAJA,

6                   Defendant.

7    ------------------------------x

8                                          January 20, 2006
                                           10:15 a.m.
9
     Before:
10
                        HON. HAROLD BAER, JR.
11
                                           District Judge
12
                              APPEARANCES
13
     MICHAEL J. GARCIA
14        United States Attorney for the
          Southern District of New York
15   WILSON LEUNG
          Assistant United States Attorney
16
     ROLAND RIOPELLE
17        Attorney for Defendant

18

19

20

21

22

23

24

25

1           (Case called)

2           THE DEPUTY CLERK:  Counsel for the government please

3   state your name for the record.

4           MR. LEUNG:  Wilson Leung for the government.

5           Good morning, your Honor.

6           THE DEPUTY CLERK:  Counsel for the defendant.

7           MR. RIOPELLE:  Roland Riopelle for the defendant.

8           Good morning, your Honor.

9           THE COURT:  Good morning.

10          This is Mr. Riopelle's motion so why don't you begin

11  and maybe we will interrupt you occasionally.

12          MR. RIOPELLE:  Judge, if you don't care where I begin,

13  I prefer to begin with the privilege issue.

14          THE COURT:  That's fine.

15          MR. RIOPELLE:  That is the thorniest and perhaps the

16  most interesting from a legal perspective.

17          We have moved, as your Honor knows, to begin by having

18  a hearing as to the manner and degree in which certain

19  privileged documents or the attorney-client privilege was

20  invaded and to determine what sort of prejudice derived from

21  that invasion, which we strongly suspect occurred.

22          I think, your Honor, the record is pretty clear at

23  this point that at least some privileged documents, and

24  specifically those documents prepared by Ms. Rana Rahimi, which

25  your Honor has previously ruled were privileged, were in fact

1    examined by Agent McWilliams, and I say that because the

2    government has now had two bites at the apple to deny that that

3    examination occurred.  First, in their response to our motion,

4    they submitted a declaration from Agent McWilliams, and that

5    declaration nowhere states that he did not examine those

6    documents, and second, the government submitted a surreply a

7    day or two ago, after in our reply we pointed out this

8    deficiency, and that surreply contains no denial of the fact

9    that Agent McWilliams did examine these documents which were

10   privileged not only, we would contend, as to National

11   Electronics but also for this individual client.

12           I know there is a standing issue that the government

13   has raised, but at least with respect to those documents, I

14   don't believe there can be any real standing.

15           THE COURT:  You're talking about you can't believe

16   there can be any problem with your position vis-a-vis National

17   Electronics, and we are not going to talk about the individual

18   for the moment?  It's a question.

19           MR. RIOPELLE:  Right.  I was making the point, or

20   trying to make the point, with respect to these documents, the

21   ones prepared by Ms. Rahimi, they were prepared in her capacity

22   as a sort of Kovel-type accountant working for me.

23           THE COURT:  We went through this before.  Let's not do

24   it two or three times if we can help it.  Considering my

25   decision on the privilege issue, I know who she is.

61K8KHWA

1      MR. RIOPELLE:  Those documents, I think there is some

2  strong evidence to suggest, were used by the government in

3  connection with this --

4      THE COURT:  National Electronics documents, it's their

5  privilege that you're talking to me about this morning?

6      MR. RIOPELLE:  No.  With respect to these particular

7  documents, I am talking about my own client's individual work

8  product privilege.

9      THE COURT:  Can we go back to the National Electronics

10  privilege?

11      MR. RIOPELLE:  Sure.  There were a number of documents

12  seized by the government in the search warrant of National

13  Electronics that were privileged documents.  As the record

14  reflects, some of those documents were culled out by Agent

15  McWilliams as he examined all of the documents seized at

16  National Electronics and were delivered --

17      THE COURT:  This was at the time of the search?

18      MR. RIOPELLE:  Following the search, Agent McWilliams

19  examined the documents, despite apparently a directive from the

20  government not to do so.  There appears to have been a

21  misunderstanding, is the best gloss that can be put on it, as

22  to what happened.

23      THE COURT:  OK.  So with respect to those privileged,

24  for the sake of argument, documents, in addition, there were

25  documents belonging to your client individually, is that what

61K8KHWA

1    we are talking about?

2              MR. RIOPELLE:  That would be one way to put it, your

3    Honor.  There were documents prepared by an accountant working

4    for me on his behalf.

5              THE COURT:  OK.

6              MR. RIOPELLE:  That second category of documents, I

7    think there is strong evidence to suggest in the record at this

8    point that second category of documents was employed by the

9    government in connection with the preparation of the civil

10   forfeiture complaint that is a companion to this case, because

11   many of the transactions described in that complaint are the

12   very transactions described in Ms. Rahimi's work papers.

13             THE COURT:  How do we come to the conclusion, other

14   than the two documents I ruled, that these documents, either

15   for National Electronics or for your individual client, were in

16   fact privileged?

17             MR. RIOPELLE:  With respect to the documents that Ms.

18   Rahimi prepared, there was a Kovel agreement that was produced

19   to the Court and the Court made a ruling that those are in fact

20   privileged.

21             With respect to the other documents, roughly, a box

22   full, a detailed privilege log was produced to the government

23   and ultimately the government conceded that the documents were

24   in fact privileged.

25             THE COURT:  Those were about 100 documents?  There are

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

61K8KHWA

1    too many boxes for me.

2            MR. RIOPELLE:   100-odd documents, maybe 120.

3            THE COURT:   I think we are referring to the same box.

4            MR. RIOPELLE:   Then there were some documents where

5    privilege was initially asserted, and as we got more familiar

6    with the facts, we withdrew our privilege claim.

7            THE COURT:   OK.   Let's move along.

8            McWilliams, the special agent, went out there with a

9    search warrant, which in the first instance you believed was

10   too broad.   Why don't we talk a little bit about that part of

11   your motion and then move right into what it was that makes you

12   clear, other than what you have told me, that in fact they were

13   relied upon in connection with the government's investigation?

14           MR. RIOPELLE:   Well, the search warrant motion is

15   pretty straightforward, Judge.   We believe that the search

16   warrant was vague and way too broad, overly broad, improperly

17   so.

18           THE COURT:   Essentially it asks for the kinds of books

19   and records that at least in the old days, and I see no change

20   in the law, I would use regularly without a problem in terms of

21   anything but perhaps the length of time.   That's not an area

22   that the search warrant covered.   But in this instance, or

23   similarly a subpoena, you don't have that problem in this

24   instance.   So I am not clear what problems you have, except you

25   think they are too broad and I don't.   So I think you lose on

61K8KHWA

1    that aspect.  I think I have ruled that way once before so I

2    don't think it comes as a big surprise.

3            So let's move along to the evidentiary hearing

4    concerns because, as you suggest, that's a little more

5    exciting.

6            MR. RIOPELLE:  I agree.  On that one, the government's

7    rejoinder to our motion has been Mr. Khwaja doesn't specify the

8    prejudice done to him and doesn't sufficiently specify the

9    manner in which the privilege was invaded, to which our

10   response is, well, we can't do that.  That's what a hearing is

11   for.  I don't know as I stand here exactly what use was made of

12   these privileged documents.  I need to cross-examine the agent

13   about that.  I don't know if the forfeiture complaint in this

14   case or the indictment in this case derived in part from those

15   privileged documents.  The agent, and we will obviously ask the

16   Court to make a Rule 6 order that permits the agent to talk

17   about what was presented to the grand jury, the agent can tell

18   us if these documents were marked as grand jury exhibits and

19   the like.

20           THE COURT:  I gather in part of your papers you say

21   you know that they were seized and looked at by virtue of some

22   Post-its and handwriting.  Tell me a little bit more about

23   that.

24           MR. RIOPELLE:  That's right.  When we went to examine

25   the documents at the agent's offices, numerous documents and

1   numerous business records which are not privileged, but all

2   kinds of documents had clearly been examined by the agent

3   despite Mr. Leung's directive not to examine anything until the

4   privilege issue was resolved.  The clear evidence of that was a

5   series of Post-its which were put on all kinds of documents

6   indicating a review.  The typical Post-it would say something

7   like the numbers here have been tied out to the bank account

8   records of May 5 or something like that, and the Post-its

9   contained dates, all of which were after the date of the

10  execution of the search warrant.

11          Now, as I stand here today, Judge, without the

12  specific privileged documents at issue in hand, I can't tell

13  you how many Post-its were attached to which privileged

14  documents, but I can tell you that the Post-its indicated

15  clearly a review of the business records of the company and at

16  least some of the privileged materials, and, indeed, Agent

17  McWilliams acknowledges at least looking at documents, and with

18  respect to those he clearly recognized as privileged,

19  segregating them and delivering them to us in a manila envelope

20  when we arrived on the first day to review the documents.

21          So that's what the Post-its are about.  I do think

22  they would be relevant depending on which documents they are

23  attached to.  We would like to see those.  I think they do

24  appear to be in more than one handwriting.  There may be more

25  than one agent who looked at these documents.

1    THE COURT:  What makes you clear that these are agents

2  rather than your client and his employees?  Is there no

3  contention by the government to the contrary on that score?  We

4  don't need to talk about it if everybody agrees.

5    MR. RIOPELLE:  The Post-its are dated after the date

6  of the search warrant.

7    THE COURT:  So that means the government had the

8  records in their possession?

9    MR. RIOPELLE:  That's correct.

10    THE COURT:  What you're saying is we don't know what

11  they used these for.

12    What is the date of the indictment?

13    MR. RIOPELLE:  August 5.  The search warrant was in

14  May.

15    THE COURT:  We know that in fact the search warrant

16  was executed in the documents available, whatever that means,

17  prior to the indictment.

18    MR. RIOPELLE:  What really raises my suspicion level,

19  Judge, is the forfeiture complaint, which was filed at the same

20  time as the indictment in August, contains detailed

21  descriptions of the very transactions that were recorded by Ms.

22  Rahimi on those Kovel-type schedules, and that makes me

23  believe, or I think it gives me a fair argument, that there

24  clearly was an examination and perhaps use of these very

25  privileged documents.

61K8KHWA

1           I just offer that as some circumstantial evidence in

2     favor of the need for a hearing.

3           THE COURT:   OK.   Now, there are a couple of other

4     concerns that you have it seems to me.   First, let's run

5     through the more typical ones just so we can seesaw back and

6     forth amongst the goodies.

7           Let's go to the bill of particulars for a moment.

8           MR. RIOPELLE:   Your Honor, this is a very interesting

9     case and I think an appropriate one for the provision of the

10    very modest type of particulars that the defendant has

11    requested here.   The reason I say that is this.   There is going

12    to be a real battle at trial, I believe, as to whether there

13    was, for at least a very long period and indeed for all of the

14    relationship between my client and the two sellers of goods

15    here, whether there was really any real proscription against

16    the resale of the goods he bought back into the United States.

17          Among the particulars we have sought are, Where is it

18    that it is said either in writing or orally that you can't

19    resell in the United States?   We know from the complaint that

20    there came a point where there was a conversation allegedly

21    between my client and a very senior executive at Panasonic on

22    this issue, but for years prior to that my client was,

23    according to the allegations, reselling into the United States

24    without complaint by anyone, and indeed, after examining 30

25    boxes, as near as I can tell, there was never any writing

61K8KHWA

1    addressed to him by Panasonic or Fuji saying you can't resell
2    in the United States.

3            I think, in fact, what was going on here, to lay all
4    the cards on the table, was there were distributors of
5    Panasonic goods working for Panasonic or for Fuji who had a
6    certain territory that their goods were supposed to be resold
7    in, but who were on commission and couldn't care less where the
8    goods went once the goods went out their door, and indeed knew
9    darn well, given the nature of the goods sold and for a host of
10   other factors, that these goods would be resold in the U.S.,
11   and the guy selling the goods purportedly in Puerto Rico
12   couldn't care less where they went once they went out his front
13   door and he earned that commission.

14           Now, I believe his knowledge, which I think we will be
15   able to prove at trial if we get there, that he knew these
16   particular goods were going back to the United States, I think
17   that's going to be amply demonstrated by the proof at trial,
18   and that knowledge then, I believe, will be attributable to
19   Panasonic, and if that's so, there can be no fraud.  That will
20   be the defense.

21           THE COURT:  In other words, the distributor knew that
22   your client was doing what he is accused of doing illegally?
23           MR. RIOPELLE:  That's correct.
24           THE COURT:  If you know all that, not that I think
25   you're entitled to it anyway, but why would you need it?

1        MR. RIOPELLE:  I want to know if there was, prior to

2   this conversation very late in the relationship, if there was

3   at any time in the years before any written or oral

4   proscription known to the government to my client, and these

5   are not described in the indictment so I don't know if there

6   was or there wasn't.  I suspect there was not.

7        I have looked at 30 boxes of documents.  I don't see

8   any written one, but I want to know did Panasonic ever say to

9   my client in 2001, near the beginning of their relationship,

10  did Panasonic say explicitly you may not resell these goods in

11  the United States?  Is there some written or oral command that

12  I will be hit with at trial on that?  I don't think there is,

13  but I want to confirm that.

14       That's an example of the type of particular I am

15  looking for.  Indeed, I am signaling what the defense really is

16  here.  I don't think there was that kind of command, and if

17  there was not, that's something I intend to try to make hay of.

18       THE COURT:  Anything else you want in your bill?

19       MR. RIOPELLE:  I confess, Judge, that my memory is not

20  perfect.  I don't recall exactly what else we asked for.

21       THE COURT:  You must have a copy of your papers.

22       MR. RIOPELLE:  I have it right here.  We asked for the

23  precise nature of the misrepresentations the government alleges

24  by Mr. Khwaja, to whom the misrepresentation was made, when and

25  in what format, and essentially the same type of information

61K8KHWA

1   with respect to any proscription on his resale of the goods in

2   the United States.

3        THE COURT:  You understand that the law is relatively

4   clear here that as long as the indictment apprises you, as I

5   recall it again from long ago, of the charges so that you could

6   prepare a defense, which you have now actually recited to me,

7   you don't have an entitlement to a bill of particulars.

8        MR. RIOPELLE:  I know that the law is very bad for me

9   on the point of the bill of particulars, and I know the

10  strategic risk in actually coming to court prepared on this

11  issue and knowing something about your case.  Perhaps I would

12  have done better to show up and just play dumb, your Honor, but

13  I have too much ego for that.

14       There are cases like *Bortnovsky* and *Nachamie* and

15  *Davidoff*, which say in these enormous document cases where

16  there are thousands of documents and boxes of records and all

17  of that, to enable the defendant to adequately prepare his

18  case, some modest particulars are appropriate, and those are

19  the cases on which we rely, and I do think it is good law.  I

20  think it is frankly good practice.  I have to say, having been

21  a U.S. attorney, I cited the same strings of cases that

22  Mr. Leung cites today with exactly the same types of arguments.

23       THE COURT:  And usually how did you come out?

24       MR. RIOPELLE:  I won a hell of a lot more than I lost,

25  again, to be painfully honest, but the truth is cases like

61K8KHWA

1   this, where there is really no allegation of violence or

2   anything like that, the greater factual openness there is on

3   both sides, I think the greater the chances for a resolution

4   that's appropriate.

5          THE COURT:  I don't want to interfere with you and Mr.

6   Leung working out some kind of resolution, but I am not clear

7   that my role as lawgiver gives me any more leeway because of

8   your good intentions.

9          In any event, I will listen to Mr. Leung.  Maybe he is

10  willing to provide you with some of this information.

11         Let's go back to the more romantic aspect.

12         MR. RIOPELLE:  There is one last issue.

13         THE COURT:  On the bill of particulars?

14         MR. RIOPELLE:  No, one last issue in our motions.

15         THE COURT:  I have another issue on your motion.

16         You play it the way you want to play it.  I won't

17  forget.

18         MR. RIOPELLE:  I am sure you won't.

19         The last motion we have was sort of sprung from the

20  recent statements from our executive branch about wiretapping

21  without judicial authority, and we believe, based on the way

22  the investigation proceeded in this case, and the fact that the

23  investigation was conducted apparently by the Joint Terrorism

24  Task Force, although this case --

25         THE COURT:  The investigation that resulted in this

61K8KHWA

1    indictment?

2              MR. RIOPELLE:  Yes, sir.

3              THE COURT:  I thought they were there for a while and

4    then they left.

5              You tell the story.  I hope you understand your case

6    better than I do.

7              MR. RIOPELLE:  My client is an Afghani American

8    citizen, and he has a large family which is, as near as I can

9    tell, sort of the equivalent of an Irish clan.  They all are in

10   this business of electronics distribution together and the

11   entire family after 9/11 was pretty intensively investigated,

12   and Agent McWilliams is a member of the Joint Terrorism Task

13   Force, as I understand it, and I am confident that they were

14   looking to see if there was some evidence of some involvement

15   in terrorism, and I am equally confident that they found none

16   of that.

17             But given that fact and the kind of, I won't call it

18   statements, I would call it rhetoric that has come out of the

19   executive branch, I have to say I must believe that my client's

20   telephone calls have probably been tapped during the last few

21   years, and indeed, based on my conversations with my client, I

22   think that if they were intercepted, there would be what

23   amounts to Brady material on there because I think that many of

24   those phone calls would demonstrate or tend to demonstrate that

25   the people he dealt with at Fuji and Panasonic were in fact

61K8KHWA

1  well aware of the fact that he was transshipping the goods back

2  into the United States despite obtaining them on the Caribbean

3  price list.

4        THE COURT:  You want to know if in fact he was under

5  this umbrella of surveillance that nobody knew about?

6        MR. RIOPELLE:  That's exactly correct.  Again, I make

7  absolutely no criticism of Mr. Leung with respect to this.  He

8  has handled himself completely professionally at all points,

9  but I must say it seems to me entirely possible that the

10  executive branch has been photographing my client regularly on

11  surveillance, unknown to Mr. Leung, tapping his phone unknown

12  to Mr. Leung.  Indeed, I am informed by my client that he met

13  with representatives of Panasonic on United States soil to

14  discuss his business on at least one occasion and possibly

15  more.  If there are photographs out there of my client meeting

16  with the people who claim they had no idea he was doing

17  business in the United States, if they are sitting around a bar

18  talking in a Marriott somewhere in Montana or something, well,

19  gosh, I would like to get those photographs and argue that I

20  can put them into the jury and say, Look, they are meeting to

21  talk about business on American soil.  Where did they think he

22  was doing business, ladies and gentlemen?

23        These are the types of things that I think may well

24  have gone on unbeknownst to Mr. Leung and the United States

25  Attorney's Office and anybody else, except maybe the NSA and

61K8KHWA

1    the CIA and whatever other acronym does that kind of thing, but
2    we want access to it.

3         THE COURT:  There has to be some relationship, it
4    seems to me -- I guess you're trying to give it to me --
5    between this particular lawsuit and the kinds of surveillance
6    that you're postulating.

7         MR. RIOPELLE:  I would think that -- and again, I sort
8    of will beam myself back to my days as a law enforcement
9    officer -- I would think that if they were concerned that my
10   client was somehow selling electronics to the wrong people or
11   dealing with bad people, they would want to know what
12   electronics he was ordering, what his relationship with his
13   suppliers were and what might be going out the door to
14   terrorists, and it wouldn't surprise me at all if they were
15   listening to his conversations with Panasonic and Fuji.  And if
16   he talks to a distributor from Panasonic who says, I will sell
17   you 300 video cameras that cost $3,000 each, which, by the way,
18   is the type of business my client was doing, and these were
19   sold on the Caribbean price list, I don't mean to belittle the
20   folks in the Caribbean, but there are just not that many people
21   who can afford that kind of fancy equipment down there, and it
22   would be our argument to the jury that, look, when this person
23   from Panasonic was selling $3,000 worth of video cameras to my
24   client, they had to understand, because they understand the
25   business, that this was going to go to a market where it might

61K8KHWA

1    be afforded, namely, the United States.  That's where people

2    can afford to spend that money.

3              THE COURT:  Are you saying McWilliams was a member of

4    this joint terrorist task force?

5              MR. RIOPELLE:  Yes.  Indeed, I think it may be right

6    in the criminal complaint, Judge, which is attached to our

7    papers.

8              THE COURT:  I will take your word for it.  The concern

9    that I have is why can't this information be elicited by you

10   from the people at Panasonic that your client tells you he

11   negotiated with?

12             MR. RIOPELLE:  That's a very good question, but I

13   think as a practical matter what will happen, I think that the

14   distributors from Panasonic, who the home office at Panasonic

15   would be furious to find were selling goods knowing they would

16   be transshipped to the United States, are likely to take the

17   witness stand and sound a little bit like the French inspector

18   in the old movie Casablanca and say that they were shocked to

19   find that goods were transshipped into the United States.

20   That's the testimony we are going to hear, I think, on direct

21   examination, as their winnings were handed to them each month

22   in the form of a commission.

23             What I want, if I could get it, are the

24   contemporaneous recordings that would show quite the opposite.

25             THE COURT:  If there are any.

1          MR. RIOPELLE:  And I want those photographs if they

2    are out there.

3          THE COURT:  In color if they are there.

4          MR. RIOPELLE:  If they are.

5          THE COURT:  Is that the totality of your motions so we

6    can get some pearls from the government?

7          MR. RIOPELLE:  I believe those are the highlights,

8    Judge, and if you have further questions after you hear from

9    Mr. Leung, let me know.

10          THE COURT:  Very well.

11          All right.  Mr. Leung, let's not tax you with respect

12    to the bill because I really don't think it's appropriate.  But

13    all the other motions seem to have a little more meat on the

14    bones so take them in whatever order you choose.

15          MR. LEUNG:  It seems like the major bone of contention

16    here is the privilege issue and the issue concerning whether a

17    hearing would be appropriate.

18          The government has stated to the Court in its

19    submissions it believes that a hearing would not be appropriate

20    and here is why.

21          There are three categories of documents, your Honor,

22    that are putatively privileged.  The first and the largest

23    volume is a box of documents which the government did not

24    concede was privileged but did not really care about, so

25    therefore we returned to Mr. Riopelle.  The second category

1   consists of the few documents that were submitted to your Honor

2   for in-camera review about which there was dispute.  And the

3   third category were documents that belonged to National

4   Electronics, etc.

5          We submit that the National Electronics documents are

6   not in issue because these are documents that are protected by

7   a corporate privilege and it's not available to Mr. Khwaja as

8   an individual defendant to assert the privilege over those

9   documents.

10          In addition, your Honor, the several documents that

11   were in dispute that were submitted to you for in-camera

12   review, there is some dispute as to whether those documents

13   were reviewed.  Mr. Riopelle indicated that his belief that

14   privileged documents were reviewed is based on the fact that

15   there were Post-it notes on several of the documents that he

16   identified as privileged.  However, I am not aware of whether

17   the documents in dispute that were submitted to your Honor had

18   those Post-it notes.  I haven't seen them.  We turned them over

19   to you when you ordered an in-camera review.

20          THE COURT:  For the sake of argument, let's assume

21   that they indicated that the bureau had looked at them.

22          MR. LEUNG:  Even if we assume that the attorney-client

23   privilege was violated in this case, it seems clear that there

24   are two remedies.  One, either dismissal of the indictment,

25   which is a drastic remedy that's disfavored, or two,

1    suppression of the evidence.  We turned over all putatively

2    putatively privileged documents back to Mr. Riopelle.  Your

3    Honor has possession of the few remaining items.  We have no

4    intention of using any of these putatively privileged documents

5    at all.

6            THE COURT:  The problem is whether they were used to

7    help make the case.

8            MR. LEUNG:  That issue can be easily resolved, your

9    Honor, because we had a complaint that was filed prior to the

10   execution of the search warrants.

11           THE COURT:  When?

12           MR. LEUNG:  Dated May 9, 2005.  That was the day

13   before the execution of the search warrants and its allegations

14   are substantially identical to the allegations in the

15   indictment.

16           Mr. Riopelle alludes to a forfeiture case.  However,

17   that case is not before this Court.  That case is before Judge

18   Stein.  If there are issues concerning privilege arising from

19   the forfeiture allegation, that should be addressed before

20   Judge Stein by the appropriate parties.  I believe it's the

21   corporate entities who are the parties in that civil matter.

22           Right now, for purposes of this criminal case, the

23   remedies are dismissal of the indictment or suppression of the

24   evidence.  Suppression would be the favored remedy.  However,

25   that's somewhat moot because, as I noted earlier, we already

61K8KHWA

1   turned over the documents and we don't intend to use them.

2        THE COURT:  Isn't the concept whether they in some

3   fashion tweaked your head so as to really be utilized, if not

4   specifically, in the lawsuit if they were privileged?

5        MR. LEUNG:  The charge is solidified on May 9, 2005.

6   The charges have not changed since then.  Between the complaint

7   and the indictment the charges remain the same, the allegations

8   remain the same.

9        The issue then becomes what evidence becomes available

10  to the government to prove its case?  We submit, your Honor,

11  that suppression would be the appropriate remedy in this case

12  if there had been a violation of the attorney-client privilege.

13  Suppression, however, is moot because we don't intend to use

14  this stuff, and we turned the stuff back over to Mr. Riopelle.

15       The other issue, your Honor, is we believe that there

16  is absolutely no reason to have a hearing concerning this

17  issue.  It would be a waste of the Court's time.  Mr. Riopelle

18  indicated that he wanted a hearing to determine whether the

19  privilege was violated and to determine what prejudice

20  resulted.  That is somewhat speculative because the only

21  documents at issue were, of course, the Rana Rahimi documents

22  that were presented to you.  Since your Honor has ruled they

23  are privileged, we don't intend to use them.  So Mr. Riopelle

24  gets the appropriate remedy that we feel he is entitled to

25  under the circumstances.

1    THE COURT:  I gather you're saying that even if they
2    were utilized, they were too little and too late to affect your
3    charge because that charge had already been formulated.

4    MR. LEUNG:  That charge had already been formulated on
5    May 9th of 2005, your Honor.  The issue is whether then the
6    government should be denied its use as evidence, and of course
7    we don't contest that.  We don't intend to use it.  I will
8    state now that we don't intend to use any privileged documents.

9    We would also note that a case that Mr. Riopelle cites
10   in his brief on page 11, *U.S. v. Aulicino*, 44 F.3d 1102, which
11   is a Second Circuit case, addresses this issue in passing.  It
12   noted that the defense attorney's, quote, statement that he had
13   no way of knowing the extent of any prejudice defendants might
14   have suffered, supported only by speculation that they may well
15   have been severely privileged, was insufficient to require a
16   hearing.  That's exactly what Mr. Riopelle has presented to
17   your Honor.  He has acknowledged that he doesn't know what
18   prejudice resulted, even assuming there was a violation of the
19   attorney-client privilege.

20   Under these circumstances and given the fact that he
21   has already got what remedy would be appropriate, even if he
22   prevailed on the violation claim, would obviate the need for a
23   hearing.  To have a hearing, your Honor, would simply be a
24   waste of time under these circumstances.

25   THE COURT:  What about -- you're welcome to finish.

1          MR. LEUNG:  That's it.

2          THE COURT:  Tell me about his other concern about this

3     great big brother in the sky concept.

4          MR. LEUNG:  Your Honor, we have complied with our

5     Brady obligations, to the extent that we have the evidence that

6     we have available, and we produced them to Mr. Riopelle.  We

7     have made inquiries concerning Mr. Riopelle's latest requests

8     for executive branch intercepts that were made without

9     warrants, and we will take appropriate action after being

10    advised by Washington.

11         THE COURT:  You have to go a little slower for me, Mr.

12    Leung.  What exactly have you done and what exactly do you

13    think limits your obligation to do more?

14         MR. LEUNG:  We have made inquiries with the Department

15    of Justice in Washington, D.C. who is handling all such

16    requests.

17         THE COURT:  All these requests, like it's a big flood

18    of interest in this kind of surveillance?  Have they designated

19    a special place in the DOJ for these inquiries so that we know

20    they actually have an idea of what they are doing when they get

21    your request?

22         That may be unfair.  I don't mean to say this in the

23    pejorative, but I am not quite clear.  Mr. Riopelle said,

24    Listen, we don't know what is happening with this possible

25    unconstitutional search up there in the sky.  And you say, OK,

61K8KHWA

1    there is a special office at DOJ where these inquiries are

2    sent, and I am going to send one on your behalf.  Is that

3    right?

4              MR. LEUNG:  Your Honor, we have contacted the

5    Department of Justice in Washington, D.C. with Mr. Riopelle's

6    inquiry and that's all that I am authorized to report, your

7    Honor.

8              THE COURT:  We have a trial date here come April, on

9    the 3rd as I recall.  The only thing that interested me about

10   it is if it was this national terrorism task force and

11   Mr. McWilliams was a part of that, and if whatever is happening

12   in this, we will make it quasi legal search is going to have

13   some exculpatory material, the fact that you're telling me how

14   it is you did all you can do and you say all you can say really

15   doesn't advance my role at all.  You have to do better or

16   somebody has to do better in order for me to be sure that the

17   defendant's rights are protected.  If you don't have any idea,

18   I will be glad to work something out on my own.

19             MR. LEUNG:  I understand your Honor's concerns, and I

20   am addressing it through the procedures we have been instructed

21   to follow.

22             THE COURT:  Maybe we can put it this way, Mr. Leung.

23   Are there other cases in this office where that concern has

24   been raised and those concerns have been forwarded to this post

25   office box?

61K8KHWA

1        MR. LEUNG:  I am not sure if there are other cases in

2  this office in which the same issues have been addressed.  I

3  read in the papers that defense attorneys have been making such

4  requests, generally speaking.

5        THE COURT:  What are you suggesting we do?  You don't

6  think you have an obligation to ferret out what may or may not

7  exist and what may, if they exist, be or not be exculpatory?

8        MR. LEUNG:  Your Honor, we certainly have Brady

9  obligations and we take our Brady obligations seriously.  We

10  are operating under established instructions to determine how

11  to comply with these Brady obligations.

12        THE COURT:  I think we ought to give you another few

13  weeks to make that determination, but come the 9th of February,

14  which gives you three weeks, you have to help me.  Because I

15  can't really try a case where in fact there may be Brady

16  material out there that we have actually pinpointed, and we

17  can't find it, understand it, touch it, feel it, smell it or

18  anything like that.

19        MR. LEUNG:  I understand, your Honor.

20        THE COURT:  How about 10:00?  If that's convenient for

21  both of you, let's come together at 10 to hear a current status

22  report on what it is that can be furnished in the way of an

23  understanding or information about whether there was some kind

24  of surveillance of the defendant or the kinds of negotiations

25  or conversations which Mr. Riopelle thinks are vital.  I am not

1   clear they are vital, I am not clear he can't get them another

2   way, but I think, as you suggest, Mr. Leung, the Brady

3   obligation is yours, not his.

4         As far as the balance of these concerns, I have denied

5   once the allegations about the breadth of the search warrant,

6   and I will deny them again.  With respect to the bill of

7   particulars, I am also denying that.

8         With respect to this privilege problem that Mr. Leung

9   has been able to address, I will give that some more thought,

10   and with respect to the information about which we have just

11   been speaking, I will wait until the 9th, but come the 9th, or

12   prior thereto, keep in mind, Mr. Riopelle, that I have no

13   problem, if you convince me that indeed this is information

14   you're entitled to and you can't get it through this procedure,

15   there are other remedies.  Since the remedies are helpful to

16   you, my hope is that come the 9th you will tell me what they

17   are and why they are appropriate.  If you don't understand

18   that, I will be glad to spell it out.

19         MR. RIOPELLE:  I am not sure I do.

20         THE COURT:  What I think Mr. Leung is saying is that

21   there really are only two sanctions, if that's the proper word.

22   One is suppression and the other is dismissal.  I don't have

23   any problem on either score, or, in the alternative, in order

24   to be sure that defendant gets whatever he deserves, you ought

25   to make sure I understand exactly what you believe is

61K8KHWA

1    appropriate.

2              MR. RIOPELLE:   I understand that, your Honor.   If I

3    could just say one other thing.

4              THE COURT:   You have got to speak up.

5              MR. RIOPELLE:   Long ago I was a Wilson Leung on the

6    front line handling cases, and it seems to me what is happening

7    here is the executive branch is just refusing to cooperate with

8    the judicial process, and I hope there is some way we can

9    encourage it to do so.   I think Mr. Leung has been entirely

10   professional and fair and he is getting orders as to how to

11   handle these things, and, frankly, it's a little disturbing to

12   me, and it's no criticism of Mr. Leung at all, but I think I am

13   confronted with a situation where there may well be proof of my

14   client's innocence out there in the hands of the executive

15   branch, and we will all be told it doesn't exist and my client

16   will have to find out about it some day in the future

17   potentially sitting in a jail cell having been wrongly

18   convicted, and that I find deeply disturbing.   There is nothing

19   Mr. Leung can do about it other than make the inquiries he has

20   made, and I thank him for that, but it is deeply troubling to

21   me what I see in the press and the way in which this issue is

22   being handled.

23             I don't have anything else to say.   I just needed to

24   get that off my chest.

25             THE COURT:   I think we are both concerned.   What

61K8KHWA

1    happens as a consequence of that concern can only happen if you

2    tell me more about it, both of you, and we have a road map that

3    we can follow.  I think my position has now been spread on the

4    record clearly, and we will see you again at 10:00 on February

5    9th for a status report, hopefully backed up by additional

6    inquiries and perhaps even additional directions that the

7    government can take to try and clarify this problem, and I

8    presume, by the same token, Mr. Riopelle, you will tell me what

9    and why I should do something if we are able to go any further.

10             All right?

11             MR. RIOPELLE:   Thank you, Judge.

12             MR. LEUNG:   Thank you, your Honor.

13             (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25