JCHTparA                       argument

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,              New York, N.Y.

4              v.                           19 Cr. 725 (JPO)

5    LEV PARNAS,

6              Defendant.

7    ------------------------------x

8                                          December 17, 2019
                                           12:30 p.m.
9

10   Before:

11                   HON. J. PAUL OETKEN

12                                         District Judge

13

14                   APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     BY:  REBEKAH A. DONALESKI
17        NICOLAS T. ROOS
          DOUGLAS S. ZOLKIND
18        Assistant United States Attorneys

19   LAW OFFICES OF JOSEPH A. BONDY
          Attorneys for Defendant
20   BY:  JOSEPH A. BONDY
          STEPHANIE SCHUMAN
21

22   ALSO PRESENT:  DENNIS KHILKEVICH, Pretrial Services Officer

23

24

25

JCHTparA                          argument

1          (Case called)

2          THE DEPUTY CLERK:  Starting with the government,

3    counsel please state your name for the record.

4          MS. DONALESKI:  Good afternoon, your Honor.  Rebekah

5    Donaleski, Nicholas Roos, and Doug Zolkind for the government.

6          THE COURT:  Good afternoon.

7          MR. BONDY:  Good afternoon, your Honor.  Joseph A.

8    Bondy on behalf of Lev Parnas.  I am joined today at counsel

9    table by attorney Stephanie Schuman.

10          THE COURT:  Good afternoon.

11          We are here for a bail review hearing.  The defendant

12   was released on a $1 million bond, secured by $200,000 in cash,

13   subject to conditions including the condition of home detention

14   with electronic monitoring.

15          These conditions were agreed upon by the defendant and

16   the government following Mr. Parnas' arrest.  On December 4th,

17   counsel for Mr. Parnas filed a letter requesting modification

18   of defendant's bail conditions as initially raised in the

19   December 2nd conference, seeking to be allowed to leave his

20   home between 8:00 and 5:00 each day, and the government

21   responded on December 11th raising a number of issues and at

22   that time moving for revocation of the defendant's bail.

23   Mr. Bondy submitted a letter in reply yesterday, December 16th.

24          So, I think I will start with the government, because

25   the government is moving for revocation of bail and I think I

JCHTparA                    argument

1    essentially need to decide that and the issues raised around

2    that before addressing whether there will be any loosening of

3    the home detection condition.

4            So, Ms. Donaleski?

5            MS. DONALESKI:  Thank you, your Honor.

6            Your Honor, our application is about risk of flight

7    and Mr. Parnas poses an extraordinary risk of flight.  Just to

8    set the stage before I proceed with my argument, your Honor,

9    Mr. Parnas posed an extreme risk of flight at the time of his

10   arrest and initial presentment in EDVA.  The government was

11   aware of many of the factors that I will go through in my

12   argument today and which we raise in our briefing -- his ties

13   abroad, his lack of connection to the United States, his access

14   to limitless funding.  Because of that, this was a close call

15   and the government negotiated the most restrictive and onerous

16   bail package possible.  We negotiated a bail package that we

17   believed would ensure Mr. Parnas' appearance because it would

18   bankrupt his family if he fled, and the reason that we reached

19   that agreement was we assumed that we were proceeding in good

20   faith and that defense counsel was accurately and truthfully

21   representing Mr. Parnas' assets in the fact that he didn't have

22   another pot of money hidden away that the government didn't

23   know about that he could use to ensure his flight.

24           Now we know that the representations that were made to

25   us and to pretrial were totally false.

JCHTparA                    argument

1          Given the extreme risk of flight that he posed at the

2     time of his arrest and presentment on October 10th, and knowing

3     now that he has misled Pretrial Services and lied to Pretrial

4     Services and the government about his assets and about the

5     Court's directions, that's extremely troubling and it shows

6     that he poses an unacceptable risk of flight and should be

7     detained.

8          Your Honor, I would like to proceed this afternoon by

9     first outlining briefly the risk of flight that he poses

10    because I believe under 3148, that is what the Court is

11    directed to consider, and then I will also speak to his lies

12    and misstatements to Pretrial and the government which forms

13    the basis of the revocation hearing.

14          So, first, I would like to address the risk of flight.

15    There are very few defendants that pose as much of a risk of

16    flight as Mr. Parnas does.  I would like to give five separate

17    reasons.

18          So, first he has reported and unreported connections

19    to the highest levels of government to the Ukraine.  He

20    traveled internationally on an almost monthly basis in this

21    year alone.  He has access to private jets, to extreme foreign

22    wealth that would enable him to flee the country.  He traveled

23    to Ukraine almost monthly in 2019.  And so, the idea that it is

24    dangerous there and that he would not be welcomed with open

25    arms when he arrived in Ukraine is just simply not credible.

JCHTparA                    argument

1         THE COURT:  Well, I assume maybe the idea of

2    dangerousness in Ukraine might be of recent vintage based on

3    statements made about possibly cooperating with the House

4    impeachment inquiry.  I am just guessing.  We will hear from

5    Mr. Bondy about that.

6         MS. DONALESKI:  Yes, your Honor; and I would like to

7    point out that that leads into a second point that I will make

8    in that there are people who, in Ukraine, abroad, that do not

9    want Mr. Parnas sitting here in New York so their interests and

10   Mr. Parnas' interests are aligned in ensuring that he does not

11   appear.  And I will also note that the only person who is

12   saying that there are threats in the Ukraine is Mr. Parnas and

13   we have seen no independent evidence of that.  We believe that

14   it is simply something he is saying to the Court in order to

15   stay out of jail today.

16        So, I mentioned the interests of foreigners who would

17   be benefited by Mr. Parnas not being present for Court.  He has

18   a foreign benefactor who will pay for his travel and who has

19   paid for his travel this year.  Much of his private travel in

20   the fall of 2019 was paid for by the same Ukrainian oligarch

21   that is fighting extradition to this country and for whom

22   Mr. Parnas is working.

23        THE COURT:  Is that Mr. Firtash?

24        MS. DONALESKI:  Yes, your Honor.

25        Second, Mr. Parnas has powerful incentives to plea.

JCHTparA                    argument

He faces a maximum of 30 years' imprisonment.  The government's

evidence is overwhelming and the Second Circuit has held that

that alone provides a significant impetus to flee.

Third, Parnas is charged with crimes involving fraud,

deception, and foreign influence on a grand scale.  The crimes

with which he is charged show that Parnas has no compunction

about lying to the government, lying to the public about the

true source of his funds when it suits him.

Fourth, GPS monitoring cannot mitigate the extreme

risk of flight that Parnas poses.  Simply put, defendants flee

all of the time.  We have cited a number of examples from the

last few years alone in this district.  Parnas could cut off

his bracelet and go to the airport and be gone before we could

do anything about it.  Simply because pretrial would receive a

notification that he had tampered with his bracelet does not

mean that pretrial or the government could stop him from

fleeing.  And, indeed, if pretrial received a notification that

Parnas had cut off his bracelet they would go to his house,

they wouldn't go to the airport or anywhere else that Parnas

actually was.

Fifth, Parnas' lies and misstatements to Pretrial

Services and the government, which have only recently come to

light, show how little respect Parnas has for the process and

the Court and any efforts to place restrictions on him so I

would like to turn to that now, your Honor.

JCHTparA                    argument

1          What we have seen over the last two months is a

2     pattern, a pattern of misleading the government, a pattern of

3     misleading the Court and Pretrial Services, of walking just up

4     to the line so that he has an excuse if he is caught and I

5     expect that's what we will hear a lot of today.  But what this

6     is is an effort to ensure that Parnas is released on the terms

7     that suit him and that he is only disclosing what he wants to

8     disclose in a way that benefits him.  He is self-interested and

9     he has shown that he will only act in his self-interest and not

10    according to the Court's directions.

11         So, first, Parnas misled his pretrial services

12    officer, Officer Samson in Florida, about the conditions of his

13    release.  I know your Honor has spoken with Officer Samson and

14    we have outlined in our papers what officer Samson's

15    understanding was.  I expect that Parnas' counsel will say

16    well, it was all just a misunderstanding.  What is troubling is

17    that this misunderstanding was so diametrically opposed to what

18    the Court had ordered at the conference, which was simply that

19    Parnas' counsel was to solicit the views of Pretrial Services,

20    and yet Pretrial Services in Florida was left with the clear

21    understanding that the Court had already ordered this

22    modification.

23         It is troubling for several reasons.  Number one, the

24    way that Parnas misled his officer was, had the effect of

25    making it more easy for Parnas to flee.  The officer understood

JCHTparA                        argument

1   that the Court had already ordered that Parnas could be out of

2   the house during the day.  Your Honor, it takes time to arrange

3   flight, especially it takes time when your travel documents

4   have been surrendered, when you need to ensure that your family

5   can flee with you.  We believe that Parnas was possibly setting

6   the stage for his flight.  He is trying to get out of the house

7   for several hours a day when pretrial didn't know where he was

8   to enable him to flee.  This strongly suggests that he

9   continues to pose an extreme risk of flight and that he has no

10  issue with lying to pretrial and misleading pretrial in order

11  to enable him to do that.

12        Second, he has a pattern of misleading Pretrial

13  Services and the government about his assets and there are four

14  significant omissions and lies regarding his income that I

15  would like to speak to now.

16        So, first, Parnas lied about his income from the law

17  firm.  So, Parnas, as we mentioned in our papers, submitted as

18  part of his bail conditions, an affidavit under penalty of

19  perjury to the government.  I can hand that up to your Honor if

20  you would like to see it.

21        THE COURT:  Yes, please.

22        What was the date of the affidavit?

23        MS. DONALESKI:  The date of the affidavit is October

24  29th.  It was submitted to the government on October 30th.

25        Your Honor, there are three significant omissions from

1    that affidavit.  Number one, Parnas doesn't disclose his

2    employment with the law firm -- at all.  Number two, Parnas

3    doesn't disclose the cash accounts held in the name of his

4    wife, which I will get to in a moment and which we believe to

5    be Parnas' assets, his purchase of a $4.5 million home which I

6    will also get to in a moment, and the loan or income of

7    $1 million that his wife received in September of 2019.

8           Now, when defense counsel submitted this affidavit to

9    the government on October 30th, defense counsel noted in a

10   cover e-mail that Parnas still needed access to certain

11   information in the government's possession.  Your Honor, this

12   is a ridiculous attempt to shield Mr. Parnas from criminal

13   liability for submitting a materially false statement for two

14   reasons.  First, the information that Mr. Parnas omitted was

15   not known to the government and was not in the government's

16   possession.  People, of course, know who they work for.

17   Mr. Parnas intentionally omitted the fact that he worked for

18   this law firm and we know that he did that because he had

19   previously told the Pretrial Services officer in Virginia on

20   October 17th that he worked for the law firm.  So, he

21   intentionally misrepresented and omitted that information from

22   the government's affidavit.

23          THE COURT:  But I mean a lot of this stuff -- and I

24   will get to the assets of his wife -- but, for example, it says

25   employment information.  Your employer, if it was a one-time

JCHTparA                    argument

1    contract employment for a few weeks three months ago, would you

2    put that down?  Or, would you interpret that as my current

3    employer?  I mean, there is a lot of interpretational issues

4    that I assume Mr. Bondy is going to get up and respond to.

5            MS. DONALESKI:  A couple responses to that, your

6    Honor.

7            First, at the time he submitted that affidavit he was

8    still receiving income from the law firm.  Second, what he has

9    said in the press is that he was working for the law firm to

10   represent Mr. Firtash.  There is no evidence that he wasn't

11   employed by the law firm and, in fact, he said the opposite --

12   that he was working for the law firm and being paid by the law

13   firm.  They are his employer.  He is receiving income from

14   them.  There is to reason why he would disclose that

15   information to pretrial but then completely omit it from the

16   sworn affidavit he submitted to the government.  That just

17   doesn't make sense.

18           I would like to also talk about the cash assets which

19   gets into his arguments about the fact that they're all in his

20   wife's name so they're not actually his assets.

21           So, that doesn't touch the argument that we are making

22   which is that he disclosed vastly different sums to Pretrial

23   Services and the government about his cash assets.  And the

24   questions from pretrial and the government in that affidavit

25   are simple.  What assets do you have?  They're aimed at trying

JCHTparA                    argument

1    to find out what money is available to you if you are going to

2    flee, what money is available to you if you are going to try

3    and satisfy a bond.  That's what the government is trying to

4    get at, that's what pretrial is trying to get at.  And

5    Mr. Parnas and his wife are married, they live together, she is

6    unemployed, she has no separate assets aside from Mr. Parnas.

7    It is not as if she has a trust fund.  The only money that she

8    has comes from Mr. Parnas.

9          Mr. Parnas' lawyer told the government on October 17th

10   in an e-mail that the total cash assets for the Parnas family

11   included the three accounts that we have noted in our letter.

12   Number one, a SunTrust account in Mrs. Parnas' name that had

13   approximately $450,000; number two, a student account which had

14   approximately $50; and number three, a checking account for a

15   business to which Mr. Parnas was a signatory that had about

16   $2,000.  He sent screenshots of each of these accounts and I

17   can hand up that e-mail to your Honor if you would like to see.

18          THE COURT:  Please.

19          MS. DONALESKI:  Your Honor, what that e-mail shows is

20   simply the sums in each of the accounts.  So, in an effort to

21   cause the government to reduce the amount of cash or property

22   that we were requiring him to post and that he had agreed to

23   post, his lawyer represented to the government that all the

24   money or property that they have is set in these three bank

25   accounts, it is about half a million dollars, less than half

JCHTparA                          argument

1    a million dollars.  Based on that representation and that

2    information, we consented to a modification of his bond to

3    allow him to post $200,000.  You will see in the e-mail that

4    his counsel said they need the remaining money to live off of

5    which is why we didn't require Mr. Parnas to post every cent he

6    owned.  So, the government consented to a modification of the

7    bond based on counsel's representation that they didn't have

8    any other funds and I can provide that e-mail to the Court.

9         So, on October 17th, defense counsel provided us with

10   the sums in the account and later that evening the government

11   responded and said that while we were still concerned about the

12   lack of assets, we would consent to a modification of the bond.

13        THE COURT:  In this e-mail correspondence from October

14   17th, was the detailed account information provided to the

15   government reflecting the $1 million loan from a foreign

16   source?

17        MS. DONALESKI:  It was not, your Honor, and I provided

18   the attachments to your Honor which simply show a snapshot.

19   They simply show the amount that was in the account.

20        THE COURT:  As of that date.

21        MS. DONALESKI:  As of, presumably, whenever

22   Mrs. Parnas printed off the snapshots.

23        So, the government had already consented based on that

24   information.  The following morning, on October 18th, defense

25   counsel provided to the government slightly more information

JCHTparA                    argument

1   which I understand Mr. Bondy has provided to the Court in

2   advance of today's hearing.  However, I would like to make a

3   couple points about that.

4            First, the information that defense counsel provided

5   did not provide any information about the source of the funds

6   either incoming or outgoing.

7            THE COURT:  But, on October 18th, Mr. Parnas' counsel

8   did provide the more detailed bank accounts reflecting the

9   $1 million wire transfer.

10           MS. DONALESKI:  He did, after the government had

11  already consented.  And, your Honor, when we saw those account

12  records, we couldn't see any other detail; we just saw fed wire

13  $200,000 in, $200,000 out.

14           THE COURT:  But you saw $1 million; $200,000 five

15  times over the course of a few days in September.

16           MS. DONALESKI:  More than a few days, but yes, that is

17  exactly right, your Honor, and what we did with that

18  information was we immediately subpoenaed that bank account

19  information.  We found it to be suspicious but we didn't think

20  that that, standing on its own, was enough to go back to the

21  Court and revoke our consent to the bail package so what we did

22  was investigate it for ourselves and then provide Mr. Parnas an

23  opportunity in the financial affidavit, which he submitted

24  about a week later, to explain that information, to explain

25  whether that money was income, what he was doing with the

JCHTparA                        argument

1    money.  And what he did was not disclose any of it.  He didn't

2    disclose the law firm income, he didn't disclose the fact that

3    he had bought a house, and he didn't disclose the $1 million

4    loan.

5            THE COURT:  Wouldn't it have then been apparent to the

6    government on the date of the affidavit, October 29th, that he

7    was not including his wife's financial information because he

8    didn't include the $1 million that you knew about?

9            MS. DONALESKI:  Your Honor, we didn't know the details

10   of the $1 million and I will get to that in a moment.  We saw

11   that the financial affidavit was facially incomplete and it

12   appeared to be materially false so we investigated it.

13           THE COURT:  Right, but on October 29th you saw the

14   discrepancy.

15           MS. DONALESKI:  That's correct, your Honor, but we

16   didn't have the bank records.  We didn't actually have any

17   information about where the money had come from or gone to, and

18   the reason that we should have investigated and did investigate

19   is there could have been some innocent explanation for that

20   money and why Mr. Parnas didn't include it.  That's not the

21   case, we have now learned, and our investigation coincided the

22   timing with Mr. Parnas' bail application.  We only recently

23   received the records from SunTrust and we only recently learned

24   that the true source of the $1 million was Firtash's lawyer.

25           THE COURT:  Firtash's lawyer.

JCHTparA                    argument

1        MS. DONALESKI:  Exactly.  The man for whom Parnas was

2   working sent $1 million -- the lawyer for the man for whom

3   Parnas was working sent $1 million to his wife in September of

4   2019.  So, the assertion that that money was just an arm's

5   length friend-to-friend transaction between Firtash's lawyer

6   and Parnas' wife is not credible.  Number one, it is an

7   unsecured, undocumented loan to a housewife with no assets.

8   That makes no sense, your Honor.  And second, there is press

9   reports that Parnas had bragged that he was the highest paid

10   translator.  I have the articles, I am happy to hand it up to

11   your Honor, but Mr. Parnas bragged that the money was his and

12   spent the money as if it were his.

13        So, if you look at how Parnas and Svetlana spent the

14   money, they bought a house.  Your Honor, on September 9 of 2019

15   Svetlana Parnas signed an agreement to purchase a house for

16   $4.5 million cash.  She put $200,000 down in September of 2019

17   using some of the money they received from Firtash's lawyer and

18   their closing date was scheduled to be October 4th.

19        THE COURT:  Now the information about the house was

20   also disclosed to Pretrial Services, wasn't it?

21        MS. DONALESKI:  No.

22        THE COURT:  I thought it was disclosed to the Virginia

23   Pretrial Services.

24        MS. DONALESKI:  That they had purchased a $4.5 million

25   house?

JCHTparA                          argument

1          THE COURT:  Or that they were purchasing a house.  Is

2    that not true?

3          MS. DONALESKI:  He disclosed that he is unsure if he

4    and his wife will be closing on the home in Boca Raton,

5    Florida.

6          THE COURT:  Right.  So, they disclosed that they were

7    buying a house.

8          MS. DONALESKI:  They disclosed that they were unsure

9    of whether they were buying a house but, again, that wasn't on

10   the financial affidavit that he submitted to the government.

11         THE COURT:  Okay.

12         MS. DONALESKI:  So he should have either disclosed on

13   that financial affidavit the $200,000 he had in escrow or the

14   fact that they were buying this $4.5 million house.  It also

15   bears the question of if Parnas and his wife believed that they

16   were going to be able to come up with $4.5 million cash in

17   October 2019, where the rest of that money was going to come

18   from and whether that money is still available to them but

19   unknown to the government.

20         THE COURT:  Do you know the status of the house

21   purchase?

22         MS. DONALESKI:  We learned last night that it was sold

23   to another party and the $200,000 remains in escrow.

24         I will also note, your Honor, that Parnas regularly

25   papered-over money that he received into his account as loans.

1    In the government's experience in this case and in

2    investigating other cases involving Russian and Eastern

3    European money, it is common for money to be transferred into

4    the United States but papered over as a loan for two reasons.

5    Number one, loan income is not taxable; and second, it evades

6    scrutiny from banks because if it is a loan it appears to be

7    more legitimate and we know that Parnas, in the past, based on

8    our investigation, has received funds from overseas that appear

9    to be papered over as loans that he never repaid and he spent

10   as if they were his own personal income.

11            THE COURT:  Okay.  But just to be clear on the house,

12   the Pretrial Services officer in Virginia where he was arrested

13   wrote on October 15th the defendant advised that he and his

14   wife had signed a contract for a home in Boca Raton two to

15   three weeks ago and closing is scheduled for October 31st.

16   However, he does not recall the address of the property or the

17   price.

18            MS. DONALESKI:  Your Honor, yes; this was not known to

19   the government.  His counsel represented to the government that

20   they had no other property and that's why they couldn't post

21   $1 million, and then on his financial affidavit on October

22   29th, which was before the closing date, he didn't disclose any

23   of this.

24            Given the materiality of these misrepresentations in

25   what was already a close case, Parnas knew that any additional

JCHTparA                     argument

1    funds that the government learned of, any access to foreign

2    funding such as the loan from Firtash's lawyer to his wife,

3    their purchase of the $4.5 million home, these are things that

4    would have been material to the government in determining

5    whether Parnas was even bailable.  And the fact that he

6    specifically omitted these things from his financial affidavit

7    is troubling and indicates that it was intentional.

8            THE COURT:  But what on the financial affidavit would

9    technically call for disclosure of a future closing on a home

10   or of $200,000 in escrow toward a home?  That's not your asset

11   anymore is it?

12           MS. DONALESKI:  Your Honor, I think that -- I don't

13   know that that's the case.  He has $200,000.  It is asking for

14   any assets or any accounts.  He has $200,000 sitting in an

15   escrow account and he signed a contract to purchase a home.  He

16   also didn't disclose his income from the law firm and he didn't

17   disclose the loan and it specifically asked for any obligations

18   that he had.

19           THE COURT:  Have you learned anything else about the

20   loan that you are in a position to share?

21           MS. DONALESKI:  Sorry, one moment?

22           (Counsel conferring)

23           MS. DONALESKI:  A couple points that I have made and I

24   think it will just drive home about the loan.

25           So, first, the idea that it was a loan to his wife is

JCHTparA                    argument

1   not credible given who made the loan, when it was made, and the

2   context in which it was made; the statements that Parnas made

3   about the money and what he did with the money after he

4   received it; the fact that they are continuing to represent it

5   as, oh, it is a loan to Svetlana, I think is troubling.

6         Second, he didn't disclose the loan to the extent it

7   was income, which is how they treated it.  He should have

8   disclosed it to pretrial and the government.  To the extent it

9   was a loan, he was obligated to disclose that and he didn't.

10  And I think what is interesting about that money in particular

11  is it shows the access to foreign funding that he has and

12  particularly funding associated with his foreign benefactor.

13  So, I think the fact that even now, in connection with this

14  bail application Mr. Parnas didn't disclose the true source of

15  the funds, I think, shows a pattern.  It shows that he is

16  continuing to at step, after step, after step, trying to only

17  disclose enough not to get himself into further trouble but

18  give him an excuse about why he shouldn't be held responsible

19  for his actions and his misstatements.

20        That is the main point that we want to make, your

21  Honor, is Parnas posed an extreme risk of flight from day one

22  and continues to pose that risk of flight and his actions in

23  the last two months, this pattern of misleading the Court,

24  pattern of misleading pretrial, pattern of misleading the

25  government, it shows that the Court should have no faith in

JCHTparA                         argument

1    Mr. Parnas.  It shows that Mr. Parnas is acting only in his own

2    interest, is not amenable to supervision, and it shows that

3    there are no conditions that would assure his appearance and

4    his compliance with the Court's directives.

5            So, unless your Honor has any other questions, I am

6    happy to answer them.

7            THE COURT:  Okay.  Thank you.

8            I will hear from Mr. Bondy.

9            MR. BONDY:  Thank you very much, your Honor.

10           I start out by noting that Mr. Parnas won a green card

11   lottery for his family from the Soviet Union when he was 4

12   years old and he came here with his family and he went to

13   school in Brooklyn, we went to PS 303 in Brooklyn.  Talk about

14   ties, deeper ties to the community from 5th to 9th grade.  He

15   then attended Lincoln high school in Brooklyn, your Honor.  He

16   has no family in Ukraine.  His mother is here, his sister is

17   here, he is happily married, he has five children that are

18   still either in the home -- his oldest son is in law school.

19   They are 1-year-old, 6 years old, 12 years old, 17, 20 -- the

20   law student -- and he has a 26-year-old full grown daughter as

21   well.  All of his ties are to the United States of America and

22   he is a proud citizen of the United States of America, and he

23   has been for many, many years.

24           I started this process on the 2nd of December by

25   asking you if you would consider granting Mr. Parnas a couple

1   hours out of the house so that he could walk with his family,

2   exercise a little bit, perhaps have a meal with his wife, and

3   have some semblance of normalcy while fighting this case in the

4   Southern District of New York.  I made that request and the

5   Court properly invited me to seek the position of the Pretrial

6   Services office.  I contacted, on the 4th of December -- let me

7   back up.

8           When we left, your Honor, in the presence of

9   Mr. MacMahon and I, we had Mr. Parnas call Officer Samson to

10  apprise him of the fact that we would be calling to seek his

11  position on whether he would oppose or not oppose, at that

12  point, the meager two hours out of the house every day that we

13  had asked for.  And Mr. Parnas did that and he informed his

14  Pretrial Services officer that he was done with court, he would

15  be returning home, and his lawyers would be speaking with him

16  about the possibility of him getting out of the house a couple

17  hours.  It was nothing deceptive or misleading about that

18  communication with Mr. Samson whatsoever.

19          I note that along the way, up until the time that we

20  got to December 2nd, Mr. Parnas has at all times come to his

21  court proceedings.  He has visited with counsel in New York

22  repeatedly.  He has not violated a single term of his pretrial

23  supervision which he takes very seriously.

24          During the course of that multi-month period or

25  three-month period at this point, he has traveled to and from

JCHTparA                    argument

1    New York through a variety of international airports.  He has

2    traveled back to Florida through a variety of international

3    airports.  He has been, at all times, near the same cluster of

4    boats and airplanes and airports that the government knew of

5    when this bail was issued.  Not once has he ever tried to flee.

6    That's not what he wants to do.  He is very interested and he

7    has been very vocal about standing up and speaking out and

8    telling the truth.

9            The government notes in their first footnote in their

10   pleading from December 11th that, as the Court is aware, at the

11   time he was leaving the country he received a Congressional

12   document and had refused to cooperate with the subpoena.  We

13   changed that entire course.  Mr. Parnas very much wanted to

14   cooperate with that subpoena and we apprised the House

15   Intelligence Committee by letter, my letter dated October 30th

16   and delivered to them on November 2nd, that we were withdrawing

17   his prior counsel's objection to the subpoena and intended

18   fully to comply.

19           As the Court knows, there has been a little problem in

20   compliance because the documents that constitute item 11 in the

21   House Intelligence committee's rider are all of the documents

22   seized from him by federal law enforcement.  And so, we have

23   had to try to gather things that we can that in his possession

24   and custody and control and turn them over to Congressional

25   investigators.  Some of that's been photographic, some of it

JCHTparA                          argument

1     has been video, some of it has been e-mail, some of it has been

2     fruits of his trips to Ukraine which were almost always either

3     with Mr. Giuliani or on behalf of the law firm of Victoria

4     Toensing and Joseph diGenova.

5              In any event, the change in circumstances since the

6     time of his arrest and bail, it has been his vocal willingness

7     to stand up and to tell the truth and to do everything that he

8     can to get that material to the House and at this point to

9     Congress.  Indeed, we have even asked the government to just

10    turn over his devices.  We have no objection, with everything

11    they have seized, going to get Congress.  And the reason it is

12    so important to us -- it makes perfect sense to the lawyers in

13    the room, maybe not so much to others -- before Mr. Parnas

14    could be properly evaluated as a witness in that proceeding it

15    was important that we got documents to the committee.  Our

16    inability to do that has, on some level, thwarted and hampered

17    our ability to have him properly evaluated as a witness.

18    Nonetheless, if he was trying to go anywhere it would be to

19    Washington, D.C., to speak to Congress.

20              THE COURT:  So have you produced some documents?  Or

21    not?

22              MR. BONDY:  Yes, we have, your Honor.  We have

23    produced the things that we can that are in our possession,

24    custody, and control.

25              THE COURT:  So, the government said at the December 2

JCHTparA                    argument

1    hearing that one of the problems with the delay is that they're

2    password protected.

3          MR. BONDY:  Yes.  Yes.  I mean, the problem with that

4    is it is unique but we have the government here and then we

5    have this Congressional inquiry.  And we can assure you that

6    our interest in speaking truth is not just limited to Congress.

7    But, I don't control the ability for somebody to be called as a

8    witness and I don't control the ability for people to want to

9    hear from Mr. Parnas.  I do, though, have to deal with the

10   interest of his Fifth Amendment concerns here; the ability to

11   get information to a Congressional body that may be able to

12   actually immunize him in a way that would be beneficial to him

13   and I am trying very hard to navigate those two agencies, if

14   you will.

15         THE COURT:  Understood.  Why don't you get to the good

16   stuff --

17         MR. BONDY:  Yes.  You got it.

18         THE COURT:    -- which is how you explain these

19   discrepancies as discussed by the government.

20         MR. BONDY:  Well, I had sent to the Court some

21   documents that I thought were probably better that we looked at

22   a little bit internally and they constitute, we will start with

23   the SunTrust banking records.

24         The government sent Mr. MacMahon an e-mail on the 17th

25   of October.  They have tendered that e-mail to the Court in

JCHTparA                    argument

which they state that they've run this proposal up our chain

and are still concerned about the lack of assets to secure

bond.  We would be willing to consent to the following

modification -- this is Ms. Donaleski's words -- provide two

months of bank records for Svetlana Parnas' account at SunTrust

account prior to release.  She identifies screen shots that

Mr. MacMahon sent to her apparently later that day, but does

concede the fact that these SunTrust records were tendered to

her colleagues in Virginia and presumably the Court had access,

and pretrial as well, the following day before there was any

kind of determination as to a combination of factors or a bail

package that might reasonably secure Mr. Parnas' appearance.

Into the SunTrust account it is seen that there are

transactions.  There are five $200,000 transactions that go

into that account in September.  No one was trying to hide that

from the government in any respect.  No one from the government

apparently asked.  If they had asked, they would have been told

that it was never hidden.  And the point is this:  Income or a

loan or whatever it was, these were monies that went into that

account that the government wanted to see before they agreed to

release, that they then had access to and look at, and then

they agreed upon his release.

THE COURT:  So there are five $200,000 incoming wires?

MR. BONDY:  Yes.

THE COURT:  There is no information about the wires

1   other than the date; September 3rd was two of them; September

2   10th was one of them; September 13th was one of them; and

3   September 23rd is one of them but there is no information on

4   the source, it is just a wire transfer.

5        MR. BONDY:  There is not but the government certainly

6   could have asked and taken it into account at the time that

7   they were agreeing upon the bail package and if they had asked

8   it would have been told.  It was right in front of them that

9   information.  Every one of these transactions was in front of

10  them.  The escrow deposit that was made on a home was two

11  $100,000 debits from the account that same month.  Mr. Parnas

12  did identify the fact that there was a home that the family was

13  purchasing.  Mr. Parnas, as the signator on the contract of the

14  home, the monies are currently in escrow and will not be

15  released absent some kind of a Court order or amicable

16  settlement because they were viewed to be a hard money deposit

17  and the Parnas' defaulted on their ability to close on that

18  property.  He is not trying to buy a $4.5 million home, he is

19  not trying to continue that transaction, it has been abandoned

20  and the state of the money is currently unreleasable.  It could

21  be released.  I don't know that they would get a quantum of it

22  back.  My understanding, with real estate deals that go awry

23  with a hard money deposit, is the seller usually keeps, if not

24  all the money, then virtually all the money.  But, certainly

25  that was in the bank records, that was disclosed to the

JCHTparA                    argument

 1    government, it was told to the Pretrial Services office.  There

 2    was no attempt to deceive whatsoever.  There was no attempt to

 3    minimize his assets whatsoever.

 4              During the course of ferreting out the information on

 5    this loan so that I could be prepared to stand up and respond

 6    to it today, your Honor, I learned that, indeed, there was a

 7    loan and there is an e-mail chain that is pretty clear about

 8    this from this gentleman to Ms. Parnas.  And it seems to be it

 9    is a loosely-papered loan, that's for sure, and it seems to be

10    one that is entered into with relatively favorable terms and

11    not much documentation, but I don't pretend to understand how

12    the very wealthy decide things and do things.  What we do have

13    here is a record of conversations between this attorney, a

14    Swiss national -- not a Ukrainian person, not a Russian person.

15              THE COURT:  Can you say who it is?

16              MR. BONDY:  Yes, Ralph Oswald Isenegger.  And, indeed

17    he writes to Ms. Parnas on the 3rd of September that it was

18    really nice to see her and she has a beautiful family and he

19    will provide her a loan for maximum of five years.  He didn't

20    need a collateral guaranty but it was a five-year period at 5

21    percent annually meaning $50,000 year in interest.  She thanked

22    and acknowledged and the tranches of the loans then followed.

23              When I tried to dial down on this and get additional

24    information and I communicated with Mr. Isenegger, the next

25    thing that he did was write a letter to Ms. Parnas essentially

JCHTparA                    argument

1    pulling the loan because all of the bad press her husband has

2    received and asking if she was in position to now return the

3    loan.  And so, as to that source of financing that the

4    government points to, it is dried up, it's gone, it's blown

5    away.

6           To the extent they want to argue that Dmitry Firtash

7    is some kind of a benefactor all from the Ukraine, I note that

8    over the past couple of months with Mr. Parnas taking the

9    position that he has taken, it is one contrary to the interests

10   not only of Mr. Firtash but also people representing him and a

11   number of people around him.  I believe he has burned that

12   bridge to the extent that there ever was a bridge in terms of

13   getting any money.

14          THE COURT:  When you say it is dried up, there is a

15   request to return it or they haven't returned it?  Or are you

16   saying they have?

17          MS. DONALESKI:  Well, it was yesterday evening when I

18   got this request and the thing is I then submitted to the Court

19   a more recent set of SunTrust bank records, we have the

20   November statements, and that demonstrates that the Parnas'

21   financial position has diminished dramatically September.  They

22   have I think $94,000 as of the end of November.

23          So, I have not yet spoken to the family about what

24   they want to do with the loan.  It is not part of my mandate

25   for today.

JCHTparA                    argument

1          THE COURT:  But isn't that suspicious that they got a

2     $1 million loan and now it is down to $94,000?  I know you are

3     an expensive lawyer but you are not that expensive.

4          MR. BONDY:  But his bail was $200,000.  It has to be

5     posted by Ms. Parnas, and was, out that account.  There was

6     escrow payment for a home for $200,000, right?  There was a

7     variety of other payments for back payments that were due and

8     owed, and now there is $100,000 remaining.  So, when you start

9     to break down the numbers you have payment for the security of

10    the defendant in a significant federal matter.  You have some

11    legal fees which are really not the corpus of that.  You have

12    payments for the real estate property and you have every

13    transaction that is laid out in his bank accounts that was

14    available to the government and has always been available to

15    the government.  It is only now when we, in response to the

16    government's motion for remand, ask for additional

17    documentation of a loan that we have this notification that the

18    loan will now be pulled and there is a request for return of

19    funds.

20          But, if anything, those monies that the claims are

21    available to flee are just not there.  It is not true.  It is

22    not true.  And, everything in this banking record was known to

23    the government.

24          I note that there is an October 23rd Pretrial Services

25    report from the Southern District of New York that was prepared

JCHTparA                     argument

1   before we saw your Honor and in that document there is

2   reference to an income of about

3   four-thousand-one-hundred-some-odd dollars a month which

4   represents funds from a law firm, plus about $2,500 from this

5   company Global Energy Producers which is this energy company

6   that he and Mr. Fruman were hopeful to start.  That figure

7   represents $50,000, the four-thousand-one-hundred-some-odd a

8   month that Mr. Parnas was still due from the law firm at that

9   time.  There was a payment he was yet to receive.  It was

10  income that he expected to receive that he disclosed and then

11  it got broken up by pretrial into some kind of monthly

12  allowance but it was a $50,000 payment.

13          When we filed our financial document with

14  Ms. Donaleski I was very clear because the government had

15  seized all of his materials.  His co-defendant, Mr. Correia,

16  did a lot of his secretarial work he can't speak to outside of

17  the presence of counsel and he was not in a position to put

18  together many of the things were requested by the government.

19          Furthermore, and I will say that I had written to

20  Ms. Donaleski in my e-mail which was dated October 30th early

21  in the morning -- this case has kept us up, I think -- at 1:26

22  a.m. indicated:  *Please see Mr. Parnas' financial statement and*

23  *attachments below.  He requires additional information that is*

24  *in the government's possession and from his accountant to*

25  *complete the statement accurately on questions that include his*

JCHTparA                    argument

*business, self-employment income, judgments, and matters*

*pending.  Please do not hesitate to contact either Ed or I with*

*any questions.*

That was on the 30th early in the morning.  I am not

sure and the government may not know, however, I can hand up a

letter from Mr. and Mrs. Parnas' accounting firm dated October

30th in which the firm fires the Parnases.

So, since that time Mr. Parnas has undertaken to

engage a new accountant and is intent upon gathering correct

information not only for these purposes but for purposes of his

tax liabilities and for attempt to go resolve those issues

also.

I can understand how, given the nature of this case

and Mr. Parnas being in the public eye and the accounting firm

would not want to have him as a client anymore, but there was

nothing that Mr. Parnas filed in that financial statement that

was false.  To the extent that things were incomplete we

explained why they were incomplete.  We would be more than

happy to supplement and complete that record to the extent that

we can.

THE COURT:  Well, let's start with specifics.

MR. BONDY:  Yes.

THE COURT:  Law firm employment.  Where it says

employment information, it is blank.

MR. BONDY:  Right.  That's correct.  Because part of

JCHTparA                        argument

the proceeds that Mr. Parnas received from the law firm do not

represent income.  Part of that was to be shared with

Mr. Correia; another part, that represents things that would be

deducted and those were things that I, in terms of putting down

a number and saying that's income, under penalties of perjury,

did not seek to be accurate or true.  It seemed that if I could

not answer something accurately under penalty of perjury that

we needed to explain to the government that we couldn't make an

accurate calculation and the reasons why.  But, that's not

Mr. Parnas trying to defraud anybody.  That's not Mr. Parnas

trying to lie.  And, it is not him trying to mislead.

            THE COURT:  But he was employed by this law firm, no?

            MR. BONDY:  He had a four-month contract, that's

correct.  He was paid $50,000 for four months.  At the

beginning of this case there was another payment that -- maybe

even two -- but, there were payments that were yet to be made.

Of the money that had been paid, not all of that money would

have been viewed as income, per se.  And my only point is if

you are signing this financial statement and you are misstating

something, it is a lot worse, I believe, than telling the

government why you can't answer something and indicating that

that is indeed the case.

            So, we have most of the monies that have been received

that the government is complaining of, things that were known

to them at the time of the original bail setting.

JCHTparA                        argument

1    Furthermore --

2              THE COURT:  Let me ask another thing about the

3    affidavit.

4              I don't quite understand that answer.  There is an

5    employment information section that's blank and you just told

6    me he got $200,000 over four months.  I don't know why you

7    wouldn't put that on the form.

8              MR. BONDY:  I understand that.  I understand.

9              THE COURT:  What about the wife, which is that this

10   $1 million came to his wife's account under circumstances

11   which, let's be honest, suggest that it is his $1 million.  Why

12   didn't he disclose it?

13             MR. BONDY:  Well, an inference or a suggestion is not

14   necessarily accurate and he didn't disclose it because it

15   doesn't ask him to disclose anything pertaining to his spouse.

16             I have what -- and I didn't really dial down on this

17   until I had to, but I had what appears to be a clear and

18   unequivocal chain of communication between the lender and

19   Mr. Parnas indicating that, indeed, this was a loan that was

20   being given to her.  Even when I tried to acquire additional

21   information, what I got back was a letter he wrote to

22   Mrs. Parnas indicating, quite strenuously, that what I did know

23   was not your husband's travails but that I gave you a loan

24   under certain terms.

25             So, again, these are records that the government asked

JCHTparA                    argument

for, the government had them, the government could review them,
and there is really, if you look at it I think as you pointed
out earlier, there is no independent place to put those facts
about your wife's assets.  It is just not asked.  In fact, I
think that when pretrial interviews you and you start saying
what about my wife's assets, they're more focused on your
assets, more focused on your income.  But, there was never
intent to deceive on part of Mr. Parnas.

          THE COURT:  He didn't recall the amount of the house
that he had just bought or the address?

          MR. BONDY:  Well, I wasn't with him, that was
Mr. MacMahon.  I don't know.  But, I do know this.  There was a
contract for a home, it has never been closed upon, it was
between Ms. Parnas and a seller and it is somewhere in Boca
Raton, I believe.  Right?  But I don't know how granular or
detailed people's memory or knowledge is about addresses.  I
just don't.  But, again, that's not evidence of an intention to
deceive somebody.

          And remember, particularly when you are telling this
all to pretrial, you are telling this all to the government,
they can easily ask the follow up question, *Well, provide us*
*information about the house.  What more about these incoming*
*wires?  What's going on here?*  Right?

          If they're concerned about all of these things in the
beginning which are international travel, what access to

1    deep-pocketed foreign individuals, or money that's coming into

2    an account, I mean these are all things that no matter what

3    they say today were taken into account during the time that the

4    original bail had been set.  They're all taken into account.

5    There is maybe a couple items that they cite.  One is this

6    document stuff and the other is principally my communications

7    with the Pretrial Services officer in Florida to support a

8    claim that there are changed circumstances and I just don't

9    think that there are.

10           For example, I will start with just going through the

11   things in the government's pleadings here at page 3 of the

12   memo.  Parnas' diverging statements to pretrial and the

13   government regarding his assets.  Again, this is an example.

14   The Judge in the Eastern District of Virginia, prosecution in

15   the Eastern District of Virginia, were aware of these items.

16   The government had asked that these things be presented as a

17   precondition to Mr. Parnas' release.  If they know and complain

18   that they didn't read the things that they asked for and

19   obtained as precondition to release, I just don't think that

20   that's fair to now impute to him some kind of bad conduct

21   because they didn't ask a follow-up question.

22           Then, we do have evidence in the Southern District of

23   New York just before our first appearance of him talking to

24   Pretrial Services about the monies that he was due at that

25   time, accurately, from the law firm, that he computed this

JCHTparA                    argument

1     future income, this what do you intend to receive in the future

2     stuff.  A couple days later we informed the government I can't

3     complete this because there is certain information that we need

4     and we cite to banking records, the need to speak to an

5     accountant, things that are related to his self-employment.

6     There was no attempt whatsoever to deceive.

7                And, along the way we have the government -- I should

8     say the Pretrial Services office in this district not seeking

9     remand of any sort and, indeed, identifying Mr. Parnas as

10    having been compliant with every term of his release.

11    Everything.  He has not been late home.  He has not tried to go

12    somewhere else.  There is no evidence of him trying to engage

13    in criminal activity while out on pretrial supervision as the

14    defendants in some of the these cases that the government would

15    cite to you was doing.

16                And, the bottom line there is clearly a combination of

17    conditions that will reasonably assure Mr. Parnas' appearance

18    in Court.  They have been in place.  He has been flying to

19    court.  He has been traveling back and forth to see his

20    lawyers.  He has been defending his case.  He has been taking

21    positions with respect to the Congressional subpoena.  And then

22    you look to the facts of this case and the government's claim

23    about his considerable ties abroad.  Well, they knew that, his

24    considerable ties abroad at the time of the setting of the

25    original bail.  They knew about his seemingly limitless access

1   to foreign funds, this benefactor relationship with Mr. Firtash

2   at the time of the original bail.  They knew about these

3   alleged powerful incentives to flee at the time of the original

4   bail.  They knew that they were investigating other criminal

5   charges at the time of the setting of the original bail.

6          All of these things were put into the calculus and

7   then they decided to enter into an amended downward bond

8   quantity with Mr. MacMahon and it was, indeed, as he couched.

9   There was no deception about this so that Ms. Parnas and her

10  three small children will have some means to live while

11  Mr. Parnas is enduring dealing with this federal prosecution.

12          THE COURT:  I thought I understood that the agreement

13  to go down to $200,000 was perhaps a day before they actually

14  got the bank records showing the $1 million loan.

15          Is that right?

16          MR. BONDY:  Well, yes.  Here.  Again, Ms. Donaleski,

17  on the 17th, requested of Mr. MacMahon that he provide two

18  months of bank records.  And this is prior to release.  So,

19  they asked for the two months of bank records prior to release.

20  The following day, as we have been told by the government in

21  Court, those records were produced.  That, again, they show the

22  records; they're produced.  Mr. MacMahon, in his e-mail back to

23  Ms. Donaleski, indicates that here are the bank statements I am

24  told constitute the current cash accounts possessed by the

25  Parnases.  Remember, he also submits a couple bank account

JCHTparA                   argument

1   records from a Chase account or something that is not

2   Ms. Parnas'.  Mr. MacMahon identified that day that there was

3   also approximately $30,000 in cash that had been seized as part

4   of the search of the residence.  This is partially Ms. Parnas'

5   mother who is living in the residence, an older woman; a little

6   bit of it was also Ms. Parnas.  That money has been sequestered

7   and now returned.  And Mr. MacMahon proposes that the Parnases

8   place $200,000 in cash, in immediately available funds with the

9   clerk in Virginia, as part of a revised bond package.

10          THE COURT:  And that's Ms. Donaleski's e-mail.

11          MR. BONDY:  This is Mr. MacMahon back to Ms. Donaleski

12  after she -- yes, on the 17th of October.

13          THE COURT:  Right.  So, they didn't get the record

14  showing the $1 million loan until the 18th so she had already

15  agreed to the $200,000.

16          MR. BONDY:  Yes, but the 18th is when he is released

17  in court.  That is a precondition.  I mean, it is not that hard

18  if they get the record and there is something they don't like

19  about it to say wait a second, Judge, we have some other kind

20  of questions here.  It is routine.  It is very simple.

21          But, importantly, Mr. MacMahon indicated that he

22  offers the $200,000, as Mr. Parnas is raising three young

23  children in Florida and the family will need cash to live on as

24  well as pay their travel and legal expenses occasioned by this

25  case.  And so, he asks, if we can reach an agreement we can

JCHTparA                    argument

1    present an agreed order to Judge Nachmanoff and get Mr. Parnas

2    to Pretrial Services to arrange the monitoring to get to New

3    York next Wednesday for the arraignment and he hopes that is

4    acceptable.

5          This is there has been nothing but disclosure here,

6    your Honor.  There was disclosure that there was going to be at

7    least a couple hundred thousand dollars set aside for the

8    purpose of the family attempting to live while Mr. Parnas was

9    not in a position to be working and, for that matter, even

10   leaving his home.  So, again, all of these are things that are

11   known to the government at the time.

12         Again, they cite on page 6, they talk about this

13   nearly limitless means and this Ukrainian oligarch, but I

14   believe it is pretty clear right now as we stand here in

15   December that Mr. Parnas has absolutely no continuing

16   relationship with Mr. Firtash.  Mr. Firtash has no interest in

17   having a relationship with Mr. Parnas.  Mr. Parnas has

18   completely burned those bridges by stating his willingness to

19   comply with his subpoena and, indeed, attempting to do so.

20         The law firm that he was working for was a law firm

21   that was employed by Mr. Firtash and those lawyers, too, have

22   absolutely no incentive to assist Mr. Parnas, ever engage him

23   for any purposes again, or even speak to him, for that matter.

24   And, he has done that at great risk to himself and certainly at

25   great risk to having any of these continuing relationships and,

JCHTparA                    argument

1    I submit, he did the right thing.

2          Again, these powerful incentives to flee.  Mr. Parnas

3    knew he was under investigation for additional crimes, as did

4    the government, as did the Court, everybody did at the time of

5    his original arraignment when he was pulled off a flight with

6    his one-way ticket and, in part, at least because he failed to

7    comply with the Congressional subpoena he is now complying

8    with.  If anything, he has a powerful incentive now to stay and

9    not to flee and, frankly, I don't think he ever had a powerful

10   incentive to flee and that's why these conditions were arrived

11   at, because he was deemed to not be a serious risk of flight.

12         I would like to take a moment to talk about his

13   misleading Pretrial Services thing simply because it's

14   upsetting to me.

15         I, very explicitly, spoke with Officer Samson and I

16   told him that I was in court on the 2nd and I asked for

17   Mr. Parnas' ability to go out for a couple hours a day.  I told

18   him the government opposes this.  I asked him his position.  We

19   had a lengthy discussion in which he told me that Mr. Parnas

20   was compliant with every term of his release; that pretrial, of

21   course, works for the Court and not either party, and that he

22   was comfortable with a day time curfew from 8:00 a.m. to 5:00

23   p.m.  And this is not so that he can be thrown out of his home

24   every day for that period of time, but rather so that he would

25   have the discretion to leave his home, if he wanted to, during

JCHTparA                        argument

that time frame, so that he could do things, the same types of

things I had asked before, your Honor -- just to be able to get

out an exercise and have some sun and be with his family.

I am the one driving these requests but once I heard

Officer Samson's position, which included the statement to me

that when Mr. Parnas is stopped at a traffic light or taking a

turn, he knows where he is.  And Mr. Samson is saying to me

that when he is driving down the highway, they even know how

fast he is going because that was the nature of the GPS device

that Mr. Parnas is wearing that pings every 30 seconds.  Those

are his words to me, his examples to me about the leash that

Mr. Parnas is on.  And, it goes further.  When he gets up and

goes to the bathroom, one can say Pretrial knows when he is

moving.  Every movement of his is tracked.  If the bracelet was

tampered with in any respects it would immediately go off.

I don't know what Pretrial would try to do but

Mr. Samson told me specifically that had it been tampered with,

if it was tampered with, it would immediately go off and he

would know that immediately.  I don't know whether it is on an

app, I don't know if it is 24/7 in his phone, I don't know, but

that was what he said to me.

I told him that we would be willing to limit travel

away from slips, boat slips, and docks, and airports because it

was Ms. Donaleski's concern that she raised to you on December

2nd when she was concerned about him being able to slip onto a

1    boat or get onto a plane.  And I happily said we are more

2    than -- we are contented to not go near any of those

3    transportation hubs.

4              THE COURT:  I think it was Mr. Zolkind, not

5    Ms. Donaleski.

6              MR. BONDY:  Okay.  It was the government and whomever

7    from the government was arguing, that was the argument that was

8    being made, and in an attempt to address that with Officer

9    Samson we gave that up.

10             I then incorporated what he said to me in the letter

11   that I wrote to the Court including the italicized phrase, *the*

12   *government opposes this application in all respects.*

13             Within an hour of my ECF filing I sent a copy of what

14   I had filed to Officer Samson so that he could see what I wrote

15   and so that he had it.  Next thing I know on this issue is I am

16   flying to a professional conference in Las Vegas and I get

17   these calls from the government, and when I respond they ask me

18   if I have told this Officer Samson:  *It is all okay, the*

19   *parties have agreed to this, don't worry, we are going to work*

20   *it out.*  Which is ridiculous.

21             They want to talk about me making a ridiculous

22   argument?  I am terribly sorry, that's ridiculous.

23             I sent him the correspondence showing what I had

24   filed.  When I spoke to him on the 11th he told me it was a

25   misunderstanding.  We had a discussion back and forth.  I

JCHTparA                    argument

1    reminded him of the e-mail I had sent him a week earlier.  I

2    believe he opened it then.  But when I sent it, he responded

3    and said got it by e-mail.  "Got it."

4          So, there was not any attempt, whatsoever, to mislead

5    Officer Samson.

6          THE COURT:  Look.  I'm not going to rely on that but I

7    will say for the record that I did speak with the Pretrial

8    Services Officer Mr. Samson on the 13th of December, just to

9    get his recollection, and his recollection was, as the

10   government has said, that you gave him the impression that the

11   Court -- I -- had ordered the parties to try to reach an

12   agreement as opposed to my having ordered the parties to simply

13   get pretrial service's position.  The reason I am not relying

14   on that is he doesn't blame anything on your client,

15   Mr. Parnas.  He thought that you were spinning it in a

16   particular way but none of this was on the record, this was a

17   game of telephone.  So, maybe you put an aspirational spin on

18   what I was contemplating in terms of that but, in fact, I did

19   not say anything about likely granting your request.  He was

20   left with that impression, maybe it was his mistake.  It

21   doesn't matter.

22         You do need to be careful when relaying what the Court

23   has said but I can't pinpoint where the breakdown was so I am

24   not going to put a lot of emphasis on that.

25         MR. BONDY:  I understand all of that and I can assure

JCHTparA                          argument

1    the Court, as an Officer of the Court, that I was careful, and

2    I was not so aspirational.  I might have been closer to wet

3    towel but I was just trying to get that answer.

4           Needless to say, it was nothing in those

5    communications between Mr. Parnas and Mr. Samson that would

6    amplify or constitute some kind of a new circumstance to allow

7    the government to go back into this bail hearing and retrench

8    the old.  It does not make him a risk of flight, it just

9    doesn't.

10           THE COURT:  Okay.

11           I am going to take a brief break but I would like to

12   see if the government would like to reply to anything you said.

13           Were you done?  Or no?

14           MR. BONDY:  I wasn't done but if you would like me to

15   stop I could stop.  I had a couple more points that I thought

16   might be important.

17           THE COURT:  You can go through them briefly.

18           MR. BONDY:  Okay.

19           Just in terms of distinguishing these cases here, at

20   page 7 they are citing *U.S. v. Bartok*, affirming revocation of

21   bail based upon a magnitude of omissions in an affidavit that

22   was probably willful and I don't think we have that magnitude

23   of omissions here.

24           In terms of nature and circumstances, again, these are

25   things all known to the government, your Honor.  This is a

JCHTparA                        argument

straightforward fraud case, there is no mandatory minimum,

there are guidelines in this case that would be calculated far

below the 30 years.  Mr. Parnas' conduct in his attempts to

provide truthful information and to be one of those people,

unlike certain people, even in government, who want to comply

with their subpoena, is something that I think would go a long

way towards trying to make a mitigating argument at his

sentencing -- if there is to be a sentencing -- if there is

ever a conviction.  But, he has very powerful incentives to

stay here, face these charges and, if he loses, to make every

argument available to him in mitigation of his sentence whether

it is under 5K2.0 of the Sentencing Guidelines or 18 U.S. Code

3553(a), the binding sentencing statute that requires a Judge

to impose a sentence sufficient but no greater than necessary.

        The government goes on to cite a litany of cases about

people who have cut off their bracelets and run off to

different countries.  I do not know whether these defendants

had the same ties to the United States that Mr. Parnas does

coming here on a lottery, on a green card lottery; staying here

and being a proud American citizen and having six children in

the U.S.; having his wife in the United States as well.  I

don't know if people who are cutting the bracelet and fleeing

to the Dominican Republic have those types of ties to this

jurisdiction but Mr. Parnas certainly does.

        Also, at *U.S. v Porter*, the government cites a Judge

JCHTparA                          argument

1    Sifton Eastern District case from 2017 supporting the defendant

2    being detained in supervised release context after he has been

3    convicted and is not presumed innocent -- as Mr. Parnas is --

4    because of his failure to abide by conditions of release that

5    include defying any orders with which he does not agree.  These

6    cases are inapposite.  This is not Mr. Parnas, your Honor.

7          And then, finally, they cite *Berkun*, again.  They

8    close with *Berkun* where a defendant's concealment of millions

9    of dollars in assets and his commission of a crime while on

10   bail warrant his being detained.  And, again, I think that

11   these cases are easily distinguishable from the circumstance at

12   bar.

13         And so, at the end, I renew my request because I think

14   it is fair that the Court grant Mr. Parnas some limited ability

15   to be outside of his home during the pendency of his case.  I

16   know that we have seen Mr. Fruman on page 6 of the newspapers

17   at a baseball game with his children and wife during

18   Thanksgiving.  The risk of flight, right?  But, I would ask

19   that he be allowed to have some humane opportunity simply to be

20   outside.  He is not a risk of flight, he is certainly not a

21   serious risk of flight.  Nothing the government has said here

22   today has changed that calculus.

23         If the Court has any questions, I would be happy to

24   answer them.

25         THE COURT:  I think you have.  Thank you.

1          MR. BONDY:  Thank you, your Honor.

2          THE COURT:  Did you want to add anything?

3          MS. DONALESKI:  Yes, your Honor.  I just want to

4     correct a couple of misstatements of the record that I think

5     are pretty important.

6          So, there is no question that Parnas materially misled

7     the government both on October 17th, October 18th, and October

8     30th, about his finances.  There is no question that he didn't

9     disclose his income from the law firm.  As your Honor pointed

10    out, he knew that he had earned that income.  It is not as if

11    the form asked for whether his accountant uses it as income,

12    the question is what did you earn.  He just told the Court that

13    he earned $50,000 a month for four months.  He didn't disclose

14    that, that's a material omission.

15         Second, under Florida law, whether or not an account

16    or a house is held in his wife's name, it's his asset.  The

17    form calls for Mr. Parnas to disclose real property, to

18    disclose bank accounts.  There is no question that he did not

19    disclose to the government the fact that he had entered into a

20    contract or his wife had entered into a contract to purchase

21    real property.

22         There is no question that he didn't disclose to the

23    government the fact that they owed Firtash's lawyer a million

24    dollars.  The suggestion that the government was aware of this

25    incoming money and therefore has waived any opportunity to

JCHTparA                          argument

challenge it is just ludicrous.  The government investigated
it, was told one thing by Parnas' counsel which turned out to
be false.  And, the government has now brought it to the
Court's attention.

          So, given all of this, there is no reason for the
Court to trust anything that Mr. Parnas is saying about his
assets now.

          THE COURT:  What are you referring to when you just
said, *was told one thing by counsel that turned out to be*
*false.*

          MS. DONALESKI:  The government was told by defense
counsel that the screenshots represented the Parnas' entire
cash assets and they had no other real property or cash to
post.  That was not accurate.  And then, when they submitted
the financial affidavit, it materially omitted his income from
the law firm, the loan from Firtash's lawyer, and the real
property that they had purchased.

          THE COURT:  They didn't own it yet.

          MS. DONALESKI:  Your Honor, it doesn't specify that.
It asks for real property so they should have either disclosed
the property that they had purchased or were about to purchase
or the $200,000 that they had in escrow.

          THE COURT:  And where would they have disclosed the
loan?  Is there something for obligations?

          MS. DONALESKI:  Yes.

JCHTparA                    argument

1          THE COURT:  That's assuming that he had a duty to

2     disclose a loan in the name of his wife.

3          MS. DONALESKI:  Which, your Honor, for the reasons we

4     have argued, was in fact income to him, but yes.  That's under

5     assets and liabilities.

6          And, your Honor, I think even now the government isn't

7     clear on Mr. Parnas' finances and the statements to the Court

8     that he has made today about how he only has $90,000, your

9     Honor, Mr. Parnas is unemployed and we have learned from his

10    pretrial officer that he has hired armed security to take his

11    children to school, to accompany him to court, to guard his

12    house.  Who is paying for that?  We still have serious

13    questions about where Mr. Parnas is getting this money and

14    whether or not this amount of bond is sufficient to deter him

15    from fleeing and we submit that it is not.  Mr. Parnas' lies to

16    the government show that he is not being fully forthcoming.

17         And I just want to address Bondy's suggest suggestion

18    that because the government didn't call him on that, call him

19    on the false statements at the time, that it means that we

20    signed off on it or have waived any opportunity to challenge

21    it.  He is obligated to be truthful.  He is obligated to be

22    truthful with pretrial, to be truthful when he is submitting a

23    sworn affidavit.  It is Mr. Parnas' obligation to comply with

24    pretrial, to be honest with pretrial and he hasn't done that,

25    your Honor.  It is not the government's obligation to

JCHTparA                    argument

1   cross-examine him at every instance.  It is his obligation to

2   be truthful and his lack of truthfulness, his lack of candor,

3   shows that he is not taking this seriously and he is unlikely

4   to comply with the terms of release in the future.  And just

5   because he thinks it is in his interest to come to court today

6   doesn't mean that he is not going to reach the opposite

7   decision if and when there is a superseding indictment or if

8   and when he is convicted.

9               THE COURT:  Thank you.

10              MR. BONDY:  Your Honor, I forgot to note with respect

11   to the threats, there is a gentleman whose name is Igor

12   Kolomoisky, and he is parentally what one might call an

13   oligarch, from Ukraine.

14              Mr. Giuliani, several months back, treated about

15   Mr. Kolomoisky having threaten Mr. Fruman and Mr. Parnas, from

16   Ukraine.  And there is media reportage about Mr. Kolomoisky

17   saying that Mr. Parnas was going to see his wife day or

18   something like that.

19              Mr. Parnas had actually gone so far as to file a

20   criminal complaint, a case against Mr. Kolomoisky in Ukraine

21   and has not returned -- because he can't return anyway now --

22   to try to further that issue.  But, there is palpable recorded

23   evidence of there being threats from this person whom, as I

24   understand it, controls a number of people and has a reputation

25   for some form of violence in the Ukraine, number one.

1          And then, number two, Mr. Parnas pointed out to me

2     that he was released on the 21st, not the 18th, just to kind of

3     get the continuance straight.

4          My final point is I don't know about Florida law but I

5     don't know if Mr. Parnas was aware of that either and I haven't

6     seen that statute.  So, for all the reasons that we stated, I

7     ask that you allow him to remain on bail and give him a little

8     time out.

9          THE COURT:  What is the timing of the complaint he

10    filed in Ukraine, if you know?  Was it a few years ago or last

11    few months?

12         MR. BONDY:  May of 2019, your Honor.  Recently.  And

13    then there is a Tweet from Mayor Giuliani sometime around that

14    period as well and the Tweet is something to the effect of Igor

15    Kolomoisky, exiled in Israel comes back to Ukraine and the

16    first thing he does is threaten two American citizens --

17    referring to Mr. Parnas and co-defendant Fruman.

18         THE COURT:  Thanks.  I'm going to take a five-minute

19    recess.

20         (recess)

21         THE COURT:  I have considered the parties' submissions

22    and arguments here today.  The question before me really is

23    whether there is a set of conditions that will assure the

24    presence of the defendant in light of all the circumstances or

25    whether the risk of flight is so great that even the

JCHTparA                         argument

restrictive conditions that have been imposed in the case are

not adequate to guard against risk of flight.  It is relevant

that the government did agree to the $1 million bond that was

secured by $200,000 in cash in October and that provides

somewhat of a baseline.  It is not as if the government waives

any argument, technically, for anything other than what has

changed since that time.  However, given that the government

agreed to it at that time there is a sense in which fairness

and justice support the idea that I should be focused on what's

different now versus the situation that existed at time the

government agreed to the bail conditions which are as

restrictive as they exist.

        The government points to several factors and they are

concerning.  They are focused in terms of what's different than

October, they're focused on the financial situation and alleged

misstatements by Mr. Parnas about his financial condition.  I'm

not going to focus on the issues of connections overseas, the

frequency of flights, the fact that he had a benefactor in

Mr. Firtash, etc., because those were all issues that were

present earlier and continue to be present.  But, with respect

to the alleged misstatements, when you focus on them, I find

that they're not obvious misstatements.  There is explanations

that don't necessarily excuse the answers that were given or

the information that was given by Mr. Parnas, but there is no

clear, direct misstatement, for example, with respect to law

JCHTparA                    argument

1    firm employment.  The fact that he wouldn't put down under

2    employment that you have an employer for a four-month stint

3    doesn't necessarily mean there is a misstatement in a situation

4    where you have disclosed separately that there is money coming

5    from this law firm.  Admittedly, the description of the money

6    is somewhat confused but that happens over time; this is based

7    on the information the defendant had at the time without access

8    to paper records or electronic records.

9            With respect to the financial status and assets of his

10   wife, again, there is nothing that clearly indicates that he

11   had a duty to disclose his wife's assets.  There is certainly

12   lots of suspicious information here about the fact that this

13   was, as a practical matter and in reality, Mr. Parnas' money as

14   opposed to his wife's, even though there was allegedly a loan

15   to the wife but I don't know that that's a clear and

16   intentional misstatement such that bail should be revoked at

17   this point.

18           In addition, the fact is that the government, on

19   October 17th, required two months of bank statements from the

20   defendant's wife, clearly tipped off to the idea that this

21   might be happening, and when it got the information the next

22   day, $1 million in wire transfers was disclosed to the

23   government; five separate $200,000 wiretap payments, the

24   government totally reasonably says we are going to look into

25   that we are going to investigate that.  But, the delta between

JCHTparA                          argument

1    having a $1 million wire coming in and knowing that it was from

2    a foreign source, I don't know that that makes the difference

3    between the conditions that have been set and detention.

4            Similarly, with respect to the house, that was

5    disclosed to the Pretrial Services officer; not the amount of

6    the payment but fact that the defendant was in the process of

7    purchasing a house.

8            So, with respect to all of these things, there was

9    information provided.  It might have violated the spirit of

10   what was requested and the spirit of what should have been

11   provided in terms of showing the defendant's real financial

12   picture, but I don't know that it rises to the level,

13   especially with respect to what is different now, as opposed to

14   October, to intentional misstatements warranting the revocation

15   of bail.  And I say all of this against the backdrop of the

16   idea that bail is for the purpose, at least here, of assuring

17   the defendant's appearance.  He hasn't been convicted, he is

18   presumed innocent, as we all know.  This is not a case under

19   these statutes where there is a presumption that he will flee

20   or presumption that he is a danger to the community.  He is

21   somebody who has young children, he has complied with all of

22   the conditions including reporting frequently to his Pretrial

23   Services officer in Florida.

24           Considering all of these factors -- and I'm not

25   denigrating any of the arguments made by the government, I

JCHTparA                        argument

1    think it is a reasonable application that the government has

2    made, but -- I do think that the strict conditions that exist

3    are appropriate.

4            I am also going to deny defendant's request for

5    modification.  For all the reasons I have described there is a

6    serious risk of flight but do I find that the conditions that

7    have been imposed are sufficient to assure the future

8    appearance of the defendant in the case, particularly in light

9    of the fact that he has met all of those requirements to this

10   point.

11           So, requests on both sides for modification of bail or

12   detention are denied.

13           Anything further?

14           MS. DONALESKI:  Not from the government.  Thank you,

15   your Honor.

16           MR. BONDY:  No, your Honor.  Thank you.

17           THE COURT:  Thank you.  We are adjourned.

18                           o0o

19

20

21

22

23

24

25