K1UAAPARC                        Conference

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
   UNITED STATES OF AMERICA,
3
               v.                        19 CR 725 (JPO)
4
   LEV PARNAS, IGOR FRUMAN, DAVID
5  CORREIA and ANDREY KUKUSHKIN,
6               Defendants.
   ------------------------------x
7
                                         New York, N.Y.
8                                        January 30, 2020
                                         2:30 p.m.
9
   Before:
10
                      HON. J. PAUL OETKEN,
11
                                         DISTRICT Judge
12
                         APPEARANCES
13
   GEOFFREY S. BERMAN
14      United States Attorney for the
        Southern District of New York
15 NICOLAS LANDSMAN ROOS
   REBEKAH ALLEN DONALESKI
16 DOUGLAS SAMUEL ZOLKIND
        Assistant United States Attorney
17
   LAW OFFICES OF JOSEPH A. BONDY
18      Attorneys for Defendant Parnas
   JOSEPH A. BONDY
19 STEPHANIE SCHUMAN
20 CADWALADER WICKERSHAM & TAFT LLP
        Attorneys for Defendant Fruman
21 TODD BLANCHE
22 GOODWIN PROCTER, LLP
        Attorneys for Defendant Correia
23 ANNE E. RAILTON
24 GERALD LEFCOURT
   FAITH FRIEDMAN
25      Attorneys for Defendant Kukushkin

K1UAAPARC                        Conference

```
1        (Case called)

2             MR. ZOLKIND:  Good afternoon, your Honor.

3             Douglas Zolkind, Nicholas Roos and Rebecca Donaleski,

4    for the government.

5             MR. BONDY:  Joseph A. Bondy and Stephanie Schuman, on

6    behalf of Mr. Parnas.

7             MR. BLANCHE:  Todd Blanche, on behalf of Mr. Fruman.

8             MS. RAILTON:  Anne Railton, on behalf of David

9    Correia.

10            MR. LEFCOURT:  Gerald Lefcourt and Faith Friedman, on

11   behalf of Andrey Kukushkin.

12            THE COURT:  Good afternoon and welcome, everybody.

13            As you know I scheduled this conference solely to

14   address the issues raised in the connection with Mr. Parnas'

15   request for a third modification of the protective order and

16   the letters that I received about that.

17            I want to start just by confirming that each of the

18   lawyers here has checked with his or her client and that the

19   client has waived his presence.

20            MR. BONDY:  Yes, your Honor.  We've spoken with

21   Mr. Parnas and he waives his persona appearance.

22            MR. BLANCHE:  Yes, your Honor.

23            MS. RAILTON:  Yes, your Honor.

24            MR. LEFCOURT:  Yes, for Mr. Kukushkin.

25            THE COURT:  Thank you.
```

K1UAAPARC                    Conference

1          So I'll the set stage a little bit in terms of

2    background just to make sure we're all on the same page.  The

3    request for a third modification of the protective order was

4    filed by Mr. Parnas's counsel on January 17 and I received

5    several letters from the parties in response, all of which I've

6    placed on the docket.

7          To go into the background a little bit more, there is

8    a protective order in this case which was issued in November of

9    last year.  It was agreed to by all parties and it was signed

10   by me.  The protective order applies to materials that the

11   government designates as, quote, protected materials, end

12   quote.  If the government designates materials as protected

13   material then the materials cannot be disclosed publically

14   absent an exception or modification granted about the Court.

15         On December 309 Mr. Parnas's counsel filed a request

16   for permission to produce documents to the House Intelligence

17   Committee in Washington in response to a subpoena from that

18   committee.  This was docketed as a modification protective

19   order.  It consisted of certain documents and the extraction of

20   Mr. Parnas's iPhone 11.  The request represented the government

21   did not oppose this production to the committee and no

22   opposition was filed by any of other party.  I granted that

23   request on January 3rd of this year.

24         Then on January 11 Mr. Parnas's counsel filed a

25   request for a second modification of the protective order

1    seeking permission to produce materials from three other

2    devices of Mr. Parnas.  This was also in response to the House

3    subpoena.  Counsel for Mr. Parnas represented that there was no

4    opposition from the government and I granted that request on

5    January 13.

6          Finally, January 17, Mr. Parnas's counsel submitted a

7    request for a third modification of the protective order

8    seeking to disclose materials produced by Apple Inc. from

9    Mr. Parnas's iFile account in response to a government search

10   warrant.  Again, this was in response to the subpoena issued by

11   the House Intelligence Committee.  The government did not

12   consent to this request explaining its position in a letter

13   that was submitted on January 23rd.

14         Mr. Fruman also submitted a letter on January 22 which

15   objected to this third request on grounds of privilege and also

16   raised the issue of privilege with respect to the two earlier

17   requests asking that I order Mr. Parnas to seek to clawback any

18   privilege materials produced to the House Intelligence

19   Committee in response to the subpoena and I received additional

20   letters from the government and counsel for Mr. Kukushkin on

21   these issues.

22         So that's the background.  If I got anything wrong,

23   please any of you want to clarify or correct what I said.  I

24   want to start with a couple questions for the government.

25         Mr. Zolkind, would you speak for the government?

1          MR. ZOLKIND:  Yes, your Honor.

2          THE COURT:  So the first question I have is, were the

3    materials at issue in the first two requests in the

4    government's view covered by the protective order?

5          MR. ZOLKIND:  They were, yes.  They were covered by

6    the protective order and we did not oppose the defendant's

7    request to modify the protective order to turn those materials

8    over to the House because those were devices that had been in

9    the defendant's possession.

10         THE COURT:  So then why were they -- did the

11   government do some action that designated them as protected?

12         MR. ZOLKIND:  We did.  So we extracted the devices,

13   the extraction involves putting the content of the devices into

14   a report that the FBI prepares and it's turned over and

15   designated as protected because it could implicate privacy

16   interests, third parties' interests, government's ongoing

17   investigation and so we do designated it as protected.

18         But we had discussions with Mr. Bondy and had told him

19   that this was in connection with negotiating the protective

20   order.  We had told him that the government was not going to

21   object to him turning over materials to the House in response

22   to the House subpoena to the extent those had been materials in

23   his possession so it was anticipated that there would be

24   proposed mortifications to the protective order.

25         THE COURT:  So did the government return his actual

1    phone or did it provide to him some sort of extracted set of

2    materials on a disk or otherwise?

3          MR. ZOLKIND:  The latter.  We did not turnover the

4    physical device that remains in FBI custody.  We turned over to

5    Mr. Bondy an extraction, basically, a report that contains the

6    content that the FBI was able to extract from the device

7    through the course of cracking that device.

8          And I should say we've discussed the fact that

9    Mr. Bondy was presented with the opportunity to provide the

10   password for the device.  Obviously, he was under no

11   obligations to do so and declined to do so.  So it took the FBI

12   some time to crack that device.  My understanding is that even

13   as the FBI has now cracked the iPhone because it was done using

14   their technology and not with the password, that the report

15   that has been turned over is not necessarily the entire content

16   of that phone.  My understanding is that there could be

17   additional content on the phone that could be accessed with the

18   password that has not been able to be accessed without the

19   password.

20         But to answer the Court's question what it was turned

21   over was a report that contains the content that the FBI was

22   able to extract from the devices.

23         THE COURT:  Has the government returned any of the

24   devices themselves?

25         MR. ZOLKIND:  No, your Honor.  We are maintaining

1    custody of those devices.  They constitute evidence.  There's

2    always, as I alluded to, the possibility that additional

3    material may exist on those devices could be needed for

4    authentication purposes at trial.  So it is our standard

5    practice in a case like this not, certainly, to return the

6    device prior to trial and that's the practice we're adhering to

7    here.

8              THE COURT:  OK.  So I was a little confused because

9    based on the government's different approach to the third

10   request in which the government said, well, he can get on Apple

11   Support and get his own iCloud.  I thought the government was

12   going to say the first two were not even subject to the

13   protective order because that's material that Mr. Parnas had

14   before, he could have turned it over to the House Committee

15   before his arrest.  It wasn't really a Rule 16 discovery but

16   your position is that it was.

17             MR. ZOLKIND:  Our position is that it was, your Honor.

18   And I should say I'm not sure if this short circuits the issue

19   in any way but Mr. Bondy told us just a few moments ago that he

20   has since writing these letters, has since been able to

21   download his client's iCloud account from Apple the way that

22   the government had proposed that he do.  And so our

23   understanding is that he is now withdrawing his request to

24   turnover the iCloud account to Congress.  He'll correct me if

25   I'm misunderstanding but that is my understanding.  So I'm not

1    sure that this remains an issue as to whether or not the

2    government's objecting or not objecting.

3          THE COURT:  OK.  Well, before I get to that I want to

4    get the government's position on whether the materials that he

5    downloads from Apple are within the protective order.

6          MR. ZOLKIND:  No.  If he, separate and apart from the

7    criminal case pending here, goes onto his Apple account,

8    downloads materials that he can access on his own without some

9    process from the government, no, those wouldn't be subject tot

10   he protective order.

11         THE COURT:  OK.  Thank you.  That's helpful.

12         I guess it's probably most efficient for me to turn to

13   Mr. Bondy and ask whether there's a live dispute as between you

14   and the government.

15         MR. BONDY:  They beat me to it, your Honor.  I had

16   apprized all the parties earlier today and the Court that we

17   will withdraw our request for the subpoena and the warranted

18   materials from the cloud account.  And the reason being that

19   the younger people in my office have identified, indeed, we can

20   do this and we don't need to have the kind of data that the

21   government has indicated that they have some propriety ability

22   to obtain from Apple.

23         I know that in their letter they've indicated that

24   they would assist us if there are any records that we cannot

25   kind of reconstruct the deleted records.  But I think that that

K1UAAPARC                    Conference

1    would narrow the issue.  I think that it would also raises this

2    question, I'd say everything that we've really turned over,

3    limited exception so far, is stuff that could have been derived

4    from the cloud.  And the problem has been with Mr. Parnas we

5    did not want to do any damage, whatsoever, to the evidence that

6    the government possessed in the beginning stages of this case.

7    The last thing we wanted to do was have him do some kind of

8    process involving a two-step verification that would have had

9    them lose access to data that I understood that in the early

10   part they had yet to extract.

11          So for our purposes today and to narrow the issue, I

12   think we're really talking about Mr. Blanche's concerns about

13   attorney/client privilege.

14          THE COURT:  OK.  Understood.

15          MR. BONDY:  Thank you.

16          THE COURT:  Let me go back to the government for a

17   second.

18          Do you have any position on the dispute that I might

19   ask Mr. Blanche about privilege?

20          MR. ZOLKIND:  Your Honor, we are not taking a position

21   as to clawback requests or other requests that Mr. Parnas's

22   co-defendants have made.

23          I will just state so that the Court is clear, at the

24   time that we informed Mr. Bondy that we were not objecting to

25   him turning over the iPhone or other devices in response to the

K1UAAPARC                    Conference

1    House subpoena, we made very clear to him that what he had in

2    his possession he had received from the government were

3    materials that had not made their way out of the filter

4    process.  So in other words, had not been reviewed for

5    privilege that might well contain privilege materials.  So at

6    the time that we told him we weren't opposing the request, we

7    made sure he was aware of that.

8            THE COURT:  If the House Intelligence Committee let's

9    say had subpoenaed the United States Attorney's Office for the

10   Southern District of New York, just as it had subpoenaed

11   Mr. Fruman and Mr. Parnas in October, would the government have

12   A, complied, and B, filtered for privilege first?

13           MR. ZOLKIND:  I honestly do not know the process that

14   would have taken place.  What I can say is that there is an

15   office within the Department of Justice, the Office of

16   Legislative Affairs or OLA, which has control over all

17   communications and requests between the Congress of the United

18   States and the Department of Justice.  So that is a question

19   that to the extent that they would receive a requests or

20   subpoena from Congress, that office would at least in the first

21   instance determine how the department responds to that.  So

22   that hasn't happened here at least that I'm aware of and so I

23   don't know how that would have been handled.

24           THE COURT:  OK.  Thank you.

25           Mr. Blanche, given where we are, is there still a live

1    issue from your perspective?

2            MR. BLANCHE:  Yes, your Honor.  I still think the

3    privilege issue is live because I have no idea what has been

4    produced to the House as part of your Honor's prior two rulings

5    regarding the protective order.  I do know with confidence that

6    there are materials on the phone.  I don't know what -- but

7    there are materials on the phones that he asked permission to

8    produce that contain privileged information that belonged to

9    Mr. Fruman.  They also belonged to Mr. Parnas.  But I still

10   have exactly the same concerns that I had coming in here.  I

11   will deal with the fact that potentially Mr. Parnas is going to

12   produce materials off of his iCloud to the house that may

13   contain privileged information as it relates to Mr. Fruman

14   separately from Mr. Parnas.

15           I am not sure that your Honor has anything for your

16   Honor with respect to those materials --

17           THE COURT:  So you recognize that the iCloud matters

18   that he downloads himself are not within the protective order.

19           MR. BLANCHE:  I agree with that.

20           THE COURT:  But there's a technical difference but not

21   really a practical difference between -- everything from

22   Requests One and Two were materials he had before.  He could

23   have turned them over before the arrests in this case.  And if

24   you had that remedy, if your client had that remedy, it would

25   be in Washington presumably with the motion to quash the

K1UAAPARC                     Conference

1    subpoena or to treat confidential jointly held privileged

2    materials to the House Intelligence Committee or in the

3    District Court of D.C.  But how is it different?  How are the

4    first two tranches different from the iCloud account?

5              MR. BLANCHE:  Mr. Bondy and Mr. Parnas would not, they

6    didn't have that information from the first two productions

7    except for from discovery in this case.  I don't disagree with

8    your Honor that had they made the production prior to the

9    arrests, sure, they could have done that or if the government

10   ultimately returns the phone at the conclusion of this case

11   they could turn them over and then they wouldn't be subject to

12   the protective order.  But the materials were -- and I do

13   believe that, your Honor, given that when I think about it, if

14   Mr. Bondy would have said in his initial request to your Honor

15   that he is going to produce materials that contain privileged

16   information that belonged to, among other people, Mr. Fruman,

17   I'm assuming your Honor would have questions.  I would have

18   certainly objected.  It would have raised a lot of issues that

19   were not raised by his letter which indicated, that would imply

20   the material would be reviewed before being produced and there

21   would possibly be a subset produced.

22             THE COURT:  We haven't decided.

23             MR. BLANCHE:  Hadn't decided, correct, exactly.

24             So the fact that your Honor did give permission to

25   produce an entire phone, among other things, that contained

1    privileged materials, I do think your Honor has the power to

2    direct Mr. Bondy to attempt to clawback any privileged

3    materials that belonged to Mr. Fruman.

4         The side issue here is that -- well, maybe not the

5    side issue but another issue here is the idea that the House

6    does not respect attorney/client privilege or does not allow

7    parties responding to subpoenas to do a privilege log and only

8    produce non-privileged materials is absurd.  There's lots of

9    examples.  Even in the investigation of, the impeachment

10   investigation where the House allowed people, individuals

11   responding to subpoenas to not produce privilege materials,

12   indeed, the original request to Mr. Parnas had a carve out

13   within it -- it's an attachment to Mr. Bondy's letter -- that

14   allowed Mr. Parnas to not produce privileged materials and to

15   create a privilege log.

16        So the idea that there would have been no remedy for

17   Mr. Fruman because the House doesn't recognize the

18   attorney/client privilege is just not true.  The House had an

19   agreement with Mr. Bondy with respect to the certain privilege

20   materials as it is.

21        I do think that your Honor does have the authority to

22   say those materials were produced pursuant to the protective

23   order and -- in this case and that Mr. Bondy should attempt to

24   clawback privilege materials.  There are privilege materials

25   that are highly relevant to this case that I believe have been

1    produced.

2             THE COURT:  Give me an example.

3             MR. BLANCHE:  There was a prior investigation by the

4    FEC -- conduct and charged indictment, Fruman and Mr. Parnas

5    hired counsel, as did Mr. Gray and there are communications.

6             THE COURT:  Was that Mr. Dowd or was --

7             MR. BLANCHE:  No.  Totally separate law firm.  The

8    relationships referenced in Mr. Bondy letter, I don't know if

9    there's a single privileged document addressing that.  But

10   there is definitely privileged documents --

11            THE COURT:  Do you agree that that's privileged?

12            MR. ZOLKIND:  I certainly agree, your Honor, that

13   there could be, well, certainly, could be communications

14   between Mr. Parnas, Mr. Fruman and/or Mr. Correia and the

15   lawyer that they were consulting in connection with the FEC

16   investigations.  So, yes.  Obviously, to the extent that those

17   materials exist, we haven't seen them.  But my understanding

18   from the filter team is that it's certainly possible those

19   materials would exist.

20            THE COURT:  Would an exception apply?

21            MR. ZOLKIND:  That's something -- whether a particular

22   document came within a crime fraud exception would be something

23   we'd have to analyze.  Certainly, we're not taking the position

24   right now that there's a crime fraud exception that applies.

25   Not to say that that couldn't arise at some point but we're not

K1UAAPARC                    Conference

1      taking that position today.

2                  THE COURT:  If someone had seen it it would be that

3      filter team, not the three assistant U.S. attorneys sitting

4      here.

5                  MR. ZOLKIND:  Correct.  Our filter team is reviewing

6      all of this material for privileged documents and removing them

7      before they make their way --

8                  THE COURT:  Got you.  Sorry to interrupt.

9                  Do you want to add something?

10                 MR. LEFCOURT:  Yes, your Honor.  With respect to Count

11     Four of the indictment, conspiracy to have licenses which is

12     the only count Mr. Kukushkin is charged in, there was a

13     business being formed to obtain licenses for the legal

14     distribution of marijuana and they consulted counsel.  And all

15     of the defendants were part of those discussions.  So there is

16     privileged material definitely with respect to the transaction

17     concerning Count Four.

18                 THE COURT:  OK.  So those are some examples.

19                 MR. BLANCHE:  My point is that, the point of the

20     letters and my objection was not to raise some hypothetical law

21     school question.  It's that I have multiple documents that are

22     highly privileged that belong to three of the defendants and in

23     some cases four of the defendants that are not -- some of them

24     are about not necessarily directed to the conduct charged in

25     the indictment but still communications among counsel including

K1UAAPARC                    Conference

1    Mr. Fruman and Mr. Parnas.  Mr. Parnas and Mr. Bondy may have

2    made a decision to waive that for whatever reason or motivation

3    they have.  But the point is it certainly didn't ask Mr. Fruman

4    or me whether we waived it.  He most certainly did not.  I

5    believe Mr. Correia does not waive it and certainly

6    Mr. Kukushkin doesn't waive.

7             So putting aside the crime fraud, that's a decision to

8    be made much later.  But before your Honor is a simple request

9    whether Mr. Bondy should be instructed to try and get back

10   those privileged materials.

11            THE COURT:  Is that a reasonable remedy?  Is there

12   really -- if I ordered him to go back to the House Intelligence

13   Committee and get back the materials, what do you expect is

14   actually going to happen?

15            MR. BLANCHE:  This happens in litigation all the time.

16   It happens at the house all the time.  There is litigation that

17   you can find in Washington D.C. where there's been materials

18   produced and inadvertently produced or produced later.  You

19   learn there's privilege and you say listen, based on 789 were

20   privileged, can you return them?  I don't know what the house

21   will do.  But I assume I don't think it's farfetched that when

22   Mr. Bondy says to them, listen, the following Bates numbers

23   I've produced to you contain privileged information, will you

24   lease return them?  I don't doubt the House is going to go to

25   court or say no, no.  We really want to keep them.  I believe

1    Mr. Bondy's communications about doing a clawback of some the

2    of materials, I don't think they said no.

3              THE COURT:  Well, he gave a lot of stuff.  We're

4    talking extraction of a lot of devices, tons of stuff.  I don't

5    know.  It's certainly not reasonable to expect the House to go

6    through it with their staffing.  I don't know that Mr. Bondy

7    needs to go through it and give them a bunch of Bates numbers

8    and pages because there is no calling up Bates numbers on these

9    documents.

10             But in any event, there are two issues from the

11   clients perspective which is one is, has he inadvertently

12   waived privilege?  And I don't think anyone here could be

13   regarded as having waived privilege even though you could have

14   raised this when his first letters came in and he didn't until

15   the third request.  I don't think the other defendants have

16   waived privilege.  But in terms having it out there, I don't

17   know that anything is going to happen to it that's going to

18   affect your client or other defendants given where we are.

19             MR. BLANCHE:  Just going back to the waiver issue a

20   moment, I do think that it's important that we're doing the

21   exercise that we're doing here today in expressing the fact

22   that we did not waive and we don't agree to it.  So I agree

23   with your Honor that we haven't waived.

24             And the reason why we didn't, why Mr. Fruman did not

25   file an objection to the first two requests is twofold.  One is

K1UAAPARC                    Conference

1    operating under the assumption that counsel did not provide

2    privileged material to the House or privilege that did not

3    belong to him.  I found out from the government shortly before

4    the third requests to maybe right after the third requests that

5    their taint team had in fact identified potentially privileged

6    material they hadn't seen them.  The filter team hadn't seen

7    them.

8             I immediately wrote a letter to your Honor and

9    communicated with Mr. Bondy where counsel for Mr. Correia

10   asking whether it was true that he had not done any kind of

11   review.  We were told he not done a review and we were told

12   that he didn't intend to do a review.  So I don't think

13   Mr. Fruman should be faulted for not jumping up and down the

14   first two times.  I'm not going to operate under the assumption

15   that folks are going to just violate the attorney/client

16   privilege.  I wouldn't expect that to happen.  So I learned

17   that that may be happening, Mr. Fruman did immediately exercise

18   his rights as I believed did the other defendants.

19            So I don't share your Honor's view in trying to

20   attempt to clawback some of the other materials is fruitless.

21   I don't think the House -- it does matter in the long run.  The

22   House has released to the public certain materials produced by

23   Mr. Parnas.  So there may come a day when everything is

24   released.  Who knows?  And so if certain privileged materials

25   have been clawed back it matters because they'll never been be

K1UAAPARC                    Conference

1    in the public and we will be able to maintain -- the cat will

2    be out of the bag and we can't put it back.  I do think it

3    matters.

4                THE COURT:  OK.  I'd like to give Mr. Bondy an

5    opportunity to respond.

6                MR. BONDY:  Thank you very much, your Honor.

7            A few things.  As the Court noted, we made this

8    request for the iPhone 11 the 30th of December.  There was no

9    communication from Mr. Blanche, whatsoever, about what we

10   intended to handover.  Our letter indicated that to the extent

11   we take out a subset of material that we would apprize the

12   parties of that fact, we did not.  There are other privileges

13   that are at issue, whether they are spousal materials we

14   materials that were seized from Parnas' home.  The filter team

15   identified certain materials like what Mr. Parnas was eating

16   for breakfast, when they were feeding the baby and we decided

17   not to exercise the privilege over those materials to invoke

18   any kind of privilege.

19           But we at all times have tried to behave appropriately

20   in this case and get very voluminous materials to the House

21   Intelligence Committee on a very, very short deadline so that

22   they could be utilized meaningfully in the impeachment inquiry.

23   When I first raised the issue of attorney/client privilege with

24   Dan Goldman from the House Intelligence Committee, he correctly

25   retorted, We don't recognize the common law judicially free in

1   privileged attorney/client privilege.

2          THE COURT:  Why is subpoena according to Mr. Blanche

3   has some acknowledgment of privilege treatment material?

4          MR. BONDY:  The devil is in the details.  That's the

5   September 30 letter request when this was being requested and

6   Mr. Fruman, of course, decided not to honor the request at that

7   time Mr. Parnas being represented by the same lawyer that was

8   representing Mr. Fruman, John Dowd and of course, we've shown

9   the Court a communication that Mr. Dowd and Mr. Seculow and

10  Jane Raskin and Rudy Giuliani.  But Mr. Dowd in his famous

11  comic sense letter took the position that there would be no

12  compliance with that letter request.

13         If Mr. Blanche -- and I would invite the Court's

14  attention to the subpoena -- that was then tendered as Exhibit

15  C, the subpoena doesn't have any such carve out or privilege

16  log, whatsoever.  And having done the research, what I find is

17  this.  It is a judicially created privilege.  It may be in

18  Upjohn and supreme court time honored and I accept that

19  privilege in a judicial proceeding.

20         I look at, for example, Mr. Blanche wants to cite the

21  Rules of Evidence.  He cites Rule 1101(C) but as I was reading

22  Rule 1101 of the Federal Rules of Evidence the applicability of

23  the rules don't apply to congressional inquiry which is deemed

24  to be a non-adversarial or at least less adversarial

25  proceeding.  We've examined that the Rules of Evidence don't

K1UAAPARC                    Conference

apply in this court to like a sentencing proceeding or

obtaining a warrant.  But in any event, as I was reading the

applicability of these rule and I would include as privilege,

they don't apply to a congressional inquiry.

          So what we tried to do is get all of this evidence

quickly to the House so that Mr. Parnas would be viewed as in

compliance with his subpoena or we could try to undue the

damage that had been created by his prior lawyer refusing to

comply with the requests for documents.  In the original

requests Mr. Parnas was supposed to give over documents and

also testimony.  By the time that we indicated that we would be

complying with the subpoena and I had Mr. Blanche in my office

on November 5th when we told them that he would be complying

with the subpoena that of course at that point all of our paths

diverged because Mr. Fruman remains in noncompliance and has

continued to decide he doesn't want to provide any materials,

even those subpoenas erred from them.

          But at that moment in time he had no longer had any

commonality of interests and it would be pretty safe, not a big

inferential leap to know that when we're producing materials

pursuant to these modifications that were requesting of the

Court and that the government is agreeing to or at least this

time they proposed it but it's no longer right, that there

would be materials on, for example, the iPhone 11 that would

involve Mr. Fruman.

K1UAAPARC                    Conference

1          In fact, Mr. Blanche received probably the analog of

2     his client's materials that would have many of the things if

3     not almost all of the things that we're discussing on

4     Mr. Fruman's phone.

5          THE COURT:  Well, he suggested you lulled him into

6     inaction by suggesting in your letter that you'd be

7     reviewing --

8          MR. BONDY:  Well, I didn't lull him into inaction and

9     that's not what I said in the letter.  I said we would identify

10    to the extent that we had taken anything out, we would identify

11    that.

12         The government did in their letters indicate to us

13    that we would be potentially waiving privilege with respect to

14    the things we turned over.  As the Court's probably well aware,

15    we approached this case a little differently than people often

16    approach cases and we've waived our own privilege with respect

17    to a lot of materials.  The singular piece of privilege we

18    retained is the communications and the attorney work upon

19    evidence that was generated by either Ed McMahon and

20    Mr. Parnas, my predecessor counsel or I, subsequent to the date

21    of Mr. Parnas's arrest.  Everything else we've given over.  We

22    are not asserting any kind of privilege.  But I think that the

23    remedy is simple.  I've asked the government if they would

24    agree to this and told me they're thinking about is to just

25    maintain the filter team in place, to have everybody agree that

1    none of those materials are going to be used in this judicial

2    form with privileged attached and for us to be able to go on

3    from there.

4              THE COURT:  You can understand though, imagine you

5    were treating the case as an ordinary case where you are going

6    to assert all the privileges and your client had a business

7    relationship with another client and they had a joint

8    privilege.  Wouldn't you be upset if the other client was

9    turning stuff over to a congressional committee without you

10   concern for your client's privilege?

11             MR. BONDY:  I would be upset.  I would also be upset

12   if I had decided or our client had decided to be in contempt of

13   his subpoena and the other party wanted to abide his subpoena.

14   But I would understand if we had a diversion path at that point

15   which would involve all of our efforts to produce materials

16   pursuant to the subpoena so that they're not in contempt of

17   Congress.  And the notion that Mr. Parnas will have to either

18   oppose production of these materials and risk being in contempt

19   or somehow go through the -- so we can identify items that are

20   not even recognized as privileged by the congressional body.

21   We didn't do that.  And I apologize if I offended Mr. Blanche

22   certainly, but I don't think we did anything inappropriate.

23             THE COURT:  Is there some sort of clawback of the

24   request of your contact of the House Committee in the nature of

25   just don't publish anything, don't make anything public without

1   checking with me for --

2            MR. BONDY:  Yes good question.  I spoke to the

3   committee.  They're a little busy but we communicated by e-mail

4   day before yesterday I think it was.  And they have no issue, I

5   believe, with the clawback of a Samsung telephone that was

6   produced to us under the protective order and the modifications

7   allowed us to give it over to IPSE that really didn't belong to

8   Mr. Parnas we found.  It belonged to Mr. Fruman's minor child.

9   And somehow it was misdescribed as being ours.  I note in the

10  public record, the things that have been put into evidence at

11  the proceeding do not involve privilege material as to

12  Mr. Fruman.  And in fact IPSE has been very, very narrow in

13  terms of the production of materials into the record from what

14  we produced that's maybe a thousand of the percent.

15           The greater discussion that it will have, I am going

16  to have it is whether we can enter into some agreement that

17  those things will not be produced or disseminated or put into

18  the public record somehow.  But I don't think that a clawback

19  is that realistic quite frankly in  the form of there are no

20  Bates numbers.  That file is 50 gigabytes maybe, that iCloud 11

21  file is voluminous.  But I will do my best to preserve and

22  protect Mr. Fruman's documents from reaching public view

23           THE COURT:  OK.  I think the law is a little bit murky

24  in this area.  I've seen authorities from House legal sources

25  that congressional committees do take the view sometimes that

K1UAAPARC                          Conference

1   were kind of above privilege common law privilege.  I don't

2   think it's something that's been tested in courts.  I think

3   that is a situation where there's a subpoena from a

4   congressional committee and then a protective order and I don't

5   know that there's clear law, one trumping the other, certainly,

6   not in this type of context.  I recognize your point that

7   impeachment is a particularly significant action and there

8   might be time issues that required production from your

9   perspective particular time.

10          So I think it's kind of a difficult issue.  I thought

11  I was going to have an easy way out by saying the government's

12  returning our phones but it's not subject to the protective

13  order.  Turns out they did designate it as protected material

14  and the therefore, technically, it is.  So I think it's tricky.

15          Mr. Blanche.

16          MR. BLANCHE:  Briefly, I agree with your Honor.  It's

17  quite unsettled.  And the reason in my experience is the House

18  and the Senate never require attorney/client privileged

19  information to be produced.  There's a few cases out there but

20  not cases where the House has said Dan Goldman didn't say to

21  Mr. Bondy, no, no, I want your privilege stuff.  To the

22  contrary.  He immediately reached an agreement with Mr. Bondy

23  about privileged materials.

24          So the idea that the house the house would not have

25  honored a request to produce a privilege log or did not produce

1    privilege materials is wrong and absurd.  Indeed, Mr. Bondy got

2    an exception to not produce privileged material as related to

3    his relationship with Mr. Parnas.  So that's not fair for that

4    position to go any where.

5           Secondly, both letters requesting exemptions to the

6    first two did not indicate that Mr. Bondy would share anything

7    with the parties.  He said that he would report to the Court

8    and the government the subset that was produced.  So this theme

9    or this idea that somehow Mr. Fruman just sat idly by watching

10   as his privileged rights went out the window is just absolutely

11   false.  I certainly operate under the assumption that Mr. Bondy

12   was not going to produce certain materials that belonged to my

13   client.  The day that I learned he may have, the next morning I

14   wrote a letter to your Honor.  So I don't think there's been

15   any issue with waiver or me standing by while Mr. Bondy did

16   this.

17          I will tell that you, I am confident that a

18   communication with Mr. Goldman at the time that would have said

19   there's privilege material that belongs to other people beyond

20   my client, I don't want to have to produce those or I want

21   those.  I want to have the opportunity to claw those back.  I

22   would be shocked if the answer wouldn't have been absolutely.

23          Finally, Mr. Fruman is not in contempt of Congress.

24   He was indicted and he has Fifth Amendment rights.  It is

25   Congress, the House has no expectation.  It had no expectation

1    that he would comply with the subpoena after he was indicted.

2    I don't know how, what communications Mr. Parnas has had with

3    the House through counsel but there's no been no overtures to

4    me or to my client that he is in any kind of contempt of

5    congress.  He was indicted and there's been expectation that he

6    would supply documents or appear to testify given the case in

7    this court.

8            So the clawback issue, I don't know what to say.  The

9    answer seems to be it seems like it's going to be a lot of

10   work, the clawback materials that were privileged.  Yes, it

11   probably is a lot of work.  You can do searches.  There's a law

12   firm that his client knows about that you can do a search of

13   anything with that law firm's name on it.  I did the searches.

14   It took, it helped but I did the searches and there were, it

15   doesn't take a super long time to identify the materials we're

16   talking about

17           THE COURT:  I am still skeptical about the -- idea of

18   a claw back because you didn't ask for anything at the time of

19   the first two tranches and you could have.  You could have, to

20   me or the House Committee.  And B, the House really doesn't

21   take the position.  There's no privilege, especially with

22   respect to the impeachment.  I don't know that was it wrong to

23   turn everything over.  I think it's unfortunate for your client

24   but why isn't there any remedy that you have for you to go to

25   the House Committee?

K1UAAPARC                     Conference

1           MR. BLANCHE:  They didn't take that position.  They

2       agree as it relates to Mr. Bondy.  So that's not accurate.  I

3       haven't tried to go to the House.  I didn't make the

4       production.  That's certainly something I could try to do.  I

5       don't know what was produced.  I haven't been given a copy of

6       what was produced.  That's the other issue that if the Court is

7       suggesting that Mr. Fruman should do something to right the

8       wrongs done by Mr. Parnas, OK.  But then I need to get a copy

9       of the materials that were produced.  I can draft a privilege

10      log.  I can do the work, identify all the documents that all

11      the defendants at this table have to a joint privilege, try to

12      claw them back from the House.  It seems extremely unfair

13      that's the remedy proposed by Court.  But if that's what we

14      have to do to protect information, I don't believe that any of

15      the other co-defendants would take a different view than I do

16      about this material.  But it would seem like an unfair remedy

17      for Mr. Fruman to have to spend the time and expense

18      identifying privileged documents produced by Mr. Parnas in

19      order to attempt to claw them back from the House.

20          THE COURT:  Well, the documents are sitting in the

21      House.  A tiny percent has been made public and they take the

22      position that -- if I say that it wasn't a waiver I think it's

23      very unlikely -- waiver on the behalf of the other clients.  I

24      think that prevents you from being prejudiced unless something

25      else happens.  I don't know.

K1UAAPARC                    Conference

1          MR. ZOLKIND:  Your Honor, just in terms of the effect

2     of the disclosure of some of these documents to the public,

3     although, they're being deemed not to be a waiver, certainly,

4     the government is not going to, I can't imagine that we would

5     use a document that our filter team determines to be privileged

6     even though that document was disclosed to the House.  But that

7     doesn't entirely answer the question of what happens if a

8     potential witness who we may not have even identified yet today

9     reads that document in the media.  So we can certainly take

10    reasonable steps to avoid using material that could have been

11    privilege that were turned over to the House but I just want to

12    flag the fact that there would still be the possibility of some

13    derivative exposure to those documents.

14          THE COURT:  What do you think is a reasonable solution

15    here?

16          MR. ZOLKIND:  Again, the government's not taking a

17    position on the clawback question but I do think Mr. Blanche

18    raises a reasonable host, even though the documents are not

19    Bates stamped.  So as I understand it it would be difficult to

20    say documents one, two, three, four, five.  But to the extent

21    that there's particular lawyers that were involved in these

22    communications it might not be a terribly big lift to either

23    identify those lawyers to the House and say communications

24    involve those lawyers are very likely to be privileged or for

25    Mr. Parnas or Mr. Fruman or one of the other defendants to

1    review the materials and identify the specific communications

2    involving those lawyers.

3           We'll say, again, we haven't seen, we sitting at this

4    table haven't seen potentially privileged communications but

5    from how they're being described and from our understanding,

6    what we heard from our filter team, it doesn't sound like they

7    would fall within the subject matter that would be particularly

8    interesting to the House.  They might well be a relevance to

9    this case but from what we understand about what the House is

10   looking at, it's not obvious that they would be material that

11   the House would be concerned about.

12          THE COURT:  Right.  That's why I assume they are never

13   going to see the light of day.

14          MR. ZOLKIND:  Right.  And to the extent that they

15   exist at the House but are never released to the public, the

16   derivative taint issue that I was describing, I think is not a

17   real concern.  The concern would be just with respect to the

18   materials that get released to the public that potential

19   witnesses could view.

20          THE COURT:  Why is the government raising this now

21   when you had no trouble with the first requests saying, sure,

22   no problem, even though you thought it was Rule 16 discovery

23   you designated it as protected, you promptly said fine, turn it

24   all over?

25          MR. ZOLKIND:  Our objection here is based on the fact

K1UAAPARC                    Conference

1    that the materials that Mr. Bondy was proposing to turnover

2    came from Apple.

3         THE COURT:  I'm not talking about that.  I'm talking

4    about why you're now saying where we think there's all these

5    third-party attorney/client privilege concern you didn't raise

6    that before.

7         MR. ZOLKIND:  We did.  As I said, at the time that we

8    told Mr. Bondy that we were not objecting to him turning this

9    material over to the House, we did tell him that this material

10   that you have in your possession now is stuff that has not yet

11   gone through the privilege review and so we did flag that for

12   him.  Then once we saw that it had all been turned over

13   wholesale to the House without a privilege review, without

14   anything being talked and out and we saw the materials being

15   released to the public, we made sure when the most recent

16   requests came, made sure to flag it to the other defense

17   counsel so that to the extent that they weren't already aware

18   of that, they knew that this was the situation.

19        THE COURT:  So you think that Mr. Blanche has a good

20   point at the end of the day about with respect to the clawback

21   argument?

22        MR. ZOLKIND:  Yeah.  I think it doesn't strike me as,

23   again, I haven't, I don't know the exact process they'll have

24   to go through to identify the materials but doing privilege

25   reviews, identifying specific lawyers, specific law firms, I

K1UAAPARC                    Conference

1  wouldn't think that that would be a huge task either for one of

2  defendants or for the House to do to identify communications

3  that involved one of those lawyers at a minimum.

4          THE COURT:  OK.  Thank you.

5          Mr. Bondy, did you want to say something?

6          MR. BONDY:  Yes, just a couple things.

7          Our agreement was entered into with the House when we

8  traveled to Washington to deliver these files that day.  And it

9  only governs, it doesn't protect Mr. Parnas in any respect

10 except as to those communications that he had between either

11 Edward McMahon or I from the date of his arrest which was

12 October 9, I believe, forward.

13         THE COURT:  But that belies the argument that

14 Mr. Bowman and the House don't care about privilege or above

15 privilege.

16         MR. BONDY:  It was all I felt I could fairly get quite

17 frankly, I felt that given the fact that they had a subpoena

18 that they had served on Mr. Parnas dated October 10, I believe

19 Mr. Fruman got the same subpoena, the same legal command on

20 October 10 that he has not in been compliant with, that was

21 what we believed we could fairly extract.

22         I have asked the House.  But as I said, they are a

23 little bit busy.  I don't know how easy it would be for them to

24 return these materials.  I note that there has been very

25 scrupulous, very narrow production as to Mr. Parnas.  I think

1    that the easy remedy is one and I'd asked the government

2    yesterday and they said they're thinking about it.  I think the

3    easy remedy is for the Court to just order or otherwise have an

4    agreement that any materials that have been produced to a

5    congressional body pursuant to Parnas, the clear terms of his

6    subpoena are not going to be utilized in this form and indeed,

7    that these defendants have not waived privilege here with

8    respect to my production in the impeachment.

9            THE COURT:  That seems fine but it seems like you are

10    not responding to Mr. Zolkind's point about the derivative

11    effect with jurors or whatever where they might see something

12    and it was privileged and belongs to Mr. Fruman say.

13            MR. BONDY:  I think I can circle back to the Court.  I

14    don't think it's unreasonable for me to ask if in light of --

15    and they're aware of the fact that we're having a hearing

16    today.  They're aware of the issues at stake here -- to ask if

17    there's a way for us to somehow protect those materials

18    unscrupulously so from any other kind of public disclosures.

19    Of course everyone is worried whether it's here or in

20    Washington about the potentiality or a leak of some materials.

21    I stand that.  But there is possibly a way for it to be

22    sequestered in the house where they retain custody over those

23    exhibits and I am happy to ask.

24            THE COURT:  Let me just ask whether Mr. Lefcourt or

25    Ms. Friedman or Ms. Railton wants to add anything to what's

1    been discussed.

2              MR. LEFCOURT:  No, your Honor.

3              MS. RAILTON:  We appreciate your Honor's position that

4    the defendant is not -- we did not intend to waive privilege

5    and we're happy with it, whatever is done to protect

6    Mr. Fruman's privilege we've done protect that --

7              THE COURT:  Thank you.

8              Mr. Blanche, let me just be clear that with respect to

9    the iCloud, the things that Mr. Parnas downloaded himself,

10   you're not asking for any remedy from me with respect to that?

11             MR. BLANCHE:  I would like to but I don't think I have

12   the ability.  I think there's other remedies I will have with

13   ethics and whatnot because I don't think Mr. Bondy is permitted

14   under his rules of attorney to produce privileged materials

15   that belong to somebody else.  But it's not something that I am

16   asking your Honor to try to remedy today.

17             THE COURT:  OK.

18             MR. BONDY:  I have read the rules Mr. Blanche has

19   cited and I think that I haven't revealed knowingly a

20   communication to the disadvantage of my client or the advantage

21   of a lawyer or a third person.  I do believe the

22   attorney/client privilege does not -- and as the Court has

23   noted -- apply in this congressional inquiry.  That is what the

24   case is saying.  That's what the law is.

25             I also note as I looked at the rule, it cites a couple

K1UAAPARC                    Conference

1   of additional rules and this is not about a duty to afford a

2   client or a duty to a prospective client.

3           In terms of secondary rule about conflicts of

4   interest, and up until I got my letter from Mr. Blanche on the

5   27th of January, I thought he was really just representing the

6   interests of Mr. Fruman's court.  But I note the footnote and

7   it's at page three of this letter, Footnote Five, where he

8   feels for some reason a need to identify Dimitry Freetash and

9   the potentialities of some materials that Mr. Parnas has turned

10  over somehow had breached his attorney/client privilege.

11          I also note and Mr. Blanche and Mr. Giuliani

12  apparently have some kind of a joint defense as reported in The

13  New York Times and have had that for a couple of months.  And

14  if we connect the dots, I have asked the Attorney General to

15  recuse himself and a lot of that has to do with bona fide

16  perceptions based on the public documents of the existence of

17  at least the appearance of impropriety of a conflict of

18  interest.  So I will abide by whatever order the Court issues.

19          I certainly can ask for there to be the return of a

20  sequestration of those documents.  I don't believe I've

21  breached any rule of ethics.  And furthermore, I note that

22  Mr. Blanche cited CPLR 4503(A) in connection with something

23  I've done wrong.  And as I read that rule it pertains to

24  administrative actions, trial and hearings, proceedings,

25  conducted on be behalf of any state, municipal or local

1    government agency or legislature or committee or body thereof.

2            Again, I think that these citations are inapposite.

3    The legal citations I have cases have never been cited out of

4    the D.C. circuit, I believe.  In any event would seem to

5    support my premise.  So I leave it to the Court, your Honor.

6    I'll do what ever it is the Court wants.

7            Thank you.

8            THE COURT:  Do you want to raise anything?  You don't

9    have to.  That is not something that's pending before me as I

10   understand it.

11           MR. ZOLKIND:  That's not a subject I was going to

12   address.  I stood up because Mr. Bondy referenced that the

13   Court could just enter an order saying that there's no waiver

14   with respect to the materials turned over to the House and I

15   just want to make sure, I don't think an order like that is

16   necessary.  But if the Court were inclined to enter an order

17   like that, I think it should be clear that if the Court is not

18   saying it's not a waiver as to Mr. Parnas because I think

19   clearly, Mr. Bondy has already said, that his client is waiving

20   any materials turned over.

21           THE COURT:  Understood.  Fair point.  I'm not going to

22   issue an order today on that.  But I think it was fair to

23   indicate to counsel for the three defendants other than

24   Mr. Parnas that from what I've seen, I think it's extremely

25   unlikely that there's been a waiver.  I don't think there was

1   an intended waiver, certainly.  So I'm not going to officially

2   make an order on that right now.  So if other facts come to

3   light, who knows?  Certainly, very, very, unlikely from what I

4   know to find that there's been a waiver.

5           I think this is all sort of a gray area because I

6   think there was a subpoena and Mr. Bondy was complying for

7   Mr. Parnas to the subpoena.  But I also think that

8   Mr. Blanche's letter raises legitimate concerns.  I think it's

9   a principle on which it's based that jointly held privilege

10  cannot legally be waived by one of the holders of privilege,

11  unilaterally.  It's certainly correct.  But I think it's a

12  difficult situation because there was subpoena.

13          So what I'm going to order for now is that, Mr. Bondy,

14  I'll take you up on your suggestion that you make an effort.  I

15  am not going to require that you get a clawback from the House

16  Committee at this time.  I'm going to leave open the possible

17  further remedies along those lines.  But I think for now I am

18  going to direct you to communicate with the House Committee to

19  take whatever steps including providing them, after conferring

20  with the other parties, any names of attorneys that they should

21  be aware of, making sure that they do not publicly disclose

22  those without further communication with the parties and the

23  Court for now.  I am not going to require destruction or return

24  but I think for now the important thing to avoid concerns that

25  have been raised is public disclosure or something that might

K1UAAPARC                    Conference

1  be a privilege held by the other defendants

2         MR. BONDY:  Yes, your Honor, we'll do that.  And just

3  to be clear, the cloud that we now are accessing is outside the

4  scope of protected order and not governed by this discussion.

5         THE COURT:  I think that is right and I think

6  Mr. Blanche acknowledges that and I think that if parties,

7  other defendants have a remedy there, it would probably be in

8  Washington.  I have no idea whether they do or not but if they

9  do, it'll probably be, that's outside the protective order and

10  therefore outside my purview I think.

11        MR. BONDY:  Thank you very much, your Honor.

12        THE COURT:  Is there anything else anybody, obviously,

13  we're coming back on Monday afternoon to talk about scheduling

14  a general discovered in the case and the other issues that are

15  pending but anything else you want to talk about today?

16        MR. LEFCOURT:  Yes, your Honor.  When I spoke to

17  Mr. Kukushkin about waiving his appearance for today and

18  telling him about your order with respect to Monday, he was

19  very concerned about having to travel all across the country

20  for what perhaps is an hour more or less of a conference.  He

21  would very much like to waive his appearance and save the

22  expense of doing that.  He understands that it very well may be

23  the case that a motion schedule, the trial date will be

24  discussed on Monday and he is fine with that and he would be

25  really pleased with the Court not to make him come all the way

1   from San Francisco and have that expense to be here for less

2   than an hour probably.

3          THE COURT:  Well, my main concern was setting those

4   dates and I think to the extent someone has strong feelings

5   when he suggest dates and talk about dates and what you to be

6   in a position to speak to that on Monday.

7          MR. LEFCOURT:  Some of us on the defense side have

8   discussed and we are going to try to arrange what we think is a

9   reasonable schedule, present to the government, see if they

10  agree, but Mr. Kukushkin's presence is not necessary for that.

11         THE COURT:  OK.  Let me hear from the other clients.

12         MR. BLANCHE:  Your Honor, Mr. Fruman might have to

13  come all because of your Honor's order.  He would very much

14  rather not come.  Everything that was just said to you is true

15  of my client as well, as far as discussions about next steps

16  with respect to motions and timeframe and trial dates and the

17  like.  If he were here, I'm not sure as these things go I don't

18  anticipate being, it wouldn't make much of a difference, your

19  Honor.  I know his views and thoughts on scheduling and the

20  process and we are going to talk today and tomorrow and so I'll

21  be able to communicate with him the same thing.  So certainly,

22  if can he avoid the trip to New York, I would join in the

23  request as well.

24         THE COURT:  How about the other two?

25         MS. RAILTON:  I think Mr. Correia is planning to

K1UAAPARC                    Conference

1    attend.  I am not sure if he will come if there's no directive

2    but as of today he is planning to attend.

3              MR. BONDY:  We couldn't keep him away, your Honor.

4              THE COURT:  How about the government?

5              MR. ZOLKIND:  We take no position on whether the

6    defendants should be here.

7              THE COURT:  OK.  I'm going to take back the

8    requirement given what you've said about assuring me that you

9    will be a position to set the schedule I'd like to set and you

10   will be fully informed about your client's views on those

11   scheduling issues and will get back to your clients about any

12   scheduling issues we talk about, I'll make it optional.

13             MR. BLANCHE:  Thank you, your Honor.

14             MR. BONDY:  Thank you.

15             MR. LEFCOURT:  Thank you.

16             THE COURT:  Anything else?

17             MR. ZOLKIND:  Not from the government.

18             MR. LEFCOURT:  Thank you.

19             THE COURT:  All right.  Thank you, folks.  We'll see

20   you Monday.

21             We are adjourned.

22             MR. LEFCOURT:  Your Honor, I have one more thing.

23             THE COURT:  Yes.

24             MR. LEFCOURT:  I don't know what your Honor is

25   thinking about with respect to my application on the 3504 or

K1UAAPARC                        Conference

1    whether you wish to discuss that in any way on Monday or --

2              THE COURT:  I'll likely to rule on it on Monday.

3              MR. LEFCOURT:  So we don't need to prepare for

4    argument?

5              THE COURT:  No.  OK.  Thank you very much.

6              (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25