UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        v.<br><br>DAVID CORREIA,<br><br>                         Defendant. | No. 19 Cr. 725 (JPO) |

# MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANT DAVID CORREIA'S PRIVILEGE MOTION

Filed:  April 3, 2020
        New York, NY

William J. Harrington, Esq.
Goodwin Procter, LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018

Jeff Marcus, Esq.
Marcus, Neiman, & Rashbaum LLP
One Biscayne Tower
2 South Biscayne Blvd, Suite 1750
Miami, Florida 33131
*Admitted Pro Hac Vice*

*Attorneys for Defendant David Correia*

This Motion raises serious concerns that go directly to the sanctity of the relationship between defendants and their attorneys. The Government intercepted a communication that the defendant sent to his lawyer for the purpose of obtaining legal advice. It scoured that communication – a sealed package – to determine what information Mr. Correia had sent to his attorney after a series of attorney-client discussions, described in an *ex parte* declaration submitted in support of this motion (hereinafter, "Marcus Dec."), and now seeks to use that information to prosecute and investigate Mr. Correia. He sent this communication for the purpose of seeking legal advice and did so with every expectation of confidentiality and privacy that undergirds the attorney-client privilege and a charged defendant's constitutional rights. Accordingly, the entirety of Mr. Correia's communication is protected from government intrusion by the attorney-client privilege.

Beyond infringing the attorney-client privilege, the Government's search here also violates the distinct protections of the attorney work-product privilege as Mr. Correia's selection of information to send to Mr. Marcus reflected his strategic instructions. The Government has improperly sought to justify its search by asking the Court to draw adverse inferences from the fact that Mr. Correia sent documents to his lawyer rather than bringing them to his arrest – in other words, that he exercised his Fifth Amendment right against self-incrimination and Sixth Amendment right to counsel.

These intrusions into hallowed legal privileges and protections cannot be left to stand, particularly given the Government's awesome power to obtain attorney-client communications. The Government can obtain warrants for a person's emails held with third party email providers. It can intercept a person's phone lines. It can place mail covers on a person's mailings to see the identity of a person's correspondents and then, as it did here, seek to seize and search them. A

rule that permitted the Government to use these powers to peer into attorney-client communications would drastically reduce the confidentiality currently afforded in the American legal system to criminal defendants communicating with their lawyers. This Court should not permit such a radical departure from American legal norms.

### A.  Relevant Background

In July 2019, FBI Special Agent Robert McGuire visited Mr. Correia's home in an attempt to interview him, but Mr. Correia was not present at the time of the agent's visit. See Marcus Dec., at ¶ 2. Mr. Correia subsequently retained Jeff Marcus and his law firm, Marcus, Neiman, Rashbaum & Pineiro LLP as defense counsel. *Id.* In August 2019, Mr. Marcus reached out and spoke to S.A. McGuire to learn about the investigation and offered to meet with him. *Id.*, at ¶ 3. Mr. Marcus also asked to be put in touch with any federal prosecutors investigating the matter. *Id.* S.A. McGuire only provided Mr. Marcus with very general information, explaining that his inquiry was at a "very early stage" and that he had some questions about a campaign contribution made by Global Energy Producers ("GEP"), and GEP partners Lev Parnas & Igor Fruman. *Id.* S.A. McGuire thereafter did not accept Mr. Marcus's offer to meet with him nor did he put Mr. Marcus in touch with any prosecutors. *Id.*

On Thursday, October 10, 2019, Mr. Marcus learned that Lev Parnas and Igor Fruman had been arrested and that the Government was in the process of searching certain physical locations in South Florida but not Mr. Correia's residence. *Id.*, at ¶ 5. Mr. Correia was outside of the country at the time and he and Mr. Marcus spoke by telephone throughout the day. *Id.*, at ¶ 6. Mr. Marcus also undertook steps to find out which prosecutors in the U.S. Department of Justice were handling the case. *Id.*, at ¶ 7. After learning that AUSAs in the SDNY were in charge of the prosecution, Mr. Marcus left a message for AUSA Rebekah Donaleski and subsequently spoke to AUSA

Nicolas Roos. *Id.*, at ¶ 8. Mr. Marcus informed Mr. Roos that Mr. Correia was traveling overseas and that he wanted to self-surrender voluntarily. *Id.*, at ¶ 8. Mr. Roos agreed to a voluntary self-surrender in New York City and put Mr. Marcus in touch with Special Agent Zach Goodman of the FBI. *Id.*

Mr. Marcus had multiple rounds of communication with the AUSAs and also with Special Agent Goodman. *Id.*, at ¶ 9. With the upcoming Monday federal holiday, it was agreed that Mr. Correia would fly to New York on Tuesday morning. *Id.* Special Agent Goodman also agreed to make sure that Mr. Correia was able to fly all the way to New York without getting detained *en route*. *Id.* Mr. Marcus agreed to give S.A. Goodman Mr. Correia's itinerary so that S.A. Goodman could meet and arrest Mr. Correia upon arrival in the United States. *Id.* Mr. Correia purchased a ticket on a flight to New York that would arrive on Tuesday, October 15, 2019. *Id.*, at ¶ 10. On October 10, 2019, Mr. Marcus notified S.A. Goodman and the prosecutors about Mr. Correia's travel plans. *Id.*, at ¶ 11. The next day, Mr. Marcus sent Mr. Correia's itinerary to the FBI and the Government informed the Court of Mr. Correia's expected arrival. *Id.*

In anticipation of Mr. Correia's self-surrender, he and Mr. Marcus had multiple conversations beginning on October 10, 2019 that are described in the *ex parte* declaration of Mr. Marcus filed contemporaneously with this motion. *Id.* at 12. In those privileged discussions, Mr. Marcus provided legal advice and instructions to Mr. Correia. *Id.*, at ¶¶ 13-17. After receiving that legal advice, Mr. Correia sent Mr. Marcus the communication via DHL that is the subject of this motion, which included two notebooks, a hard drive, a computer and a smartphone. The purpose of the communication was for Mr. Correia to communicate information to Mr. Marcus for the purpose of soliciting his legal advice and to begin to prepare a defense to the criminal charges.

On October 14, 2019, Mr. Marcus boarded a flight in Miami for New York. *Id.* at 18. Before take-off, he received a call from Mr. Correia that Mr. Correia had left his passport at DHL and it was locked and after hours. *Id.* As a result, he was going to miss his flight and not arrive in time for Tuesday morning. Mr. Marcus immediately called S.A. Goodman to let him know that Mr. Correia would miss the flight because of his inability to get his passport. *Id.*, at ¶ 19. Mr. Marcus also emailed the prosecutors about the delay. *Id.* Mr. Correia flew to New York City the next day and self-surrendered to authorities without incident.

In the following days, Mr. Marcus's law firm never received the communication sent by Mr. Correia via DHL. *Id.*, at ¶ 20. Mr. Correia made repeated inquiries to DHL about its status but was told several times that it was "lost" in transit and DHL was taking steps to locate the sent package. *Id.* Finally, on October 29, 2019, DHL informed Mr. Correia that "[a]fter conducting extensive searches of our Service Centers, including warehouses, docks, vehicles and lost and found facilities, we have not been able to locate your shipment." *Id.* They also said they were ending their search.

After a December 2019 court conference, the defense team learned that the Government said it was in possession of the telephone that Mr. Correia had sent to his lawyers via DHL. *Id.*, at ¶ 21. The defense team also subsequently received a search warrant which indicated that the Government had intercepted and searched Mr. Correia's communication to Mr. Marcus. *Id.*, at ¶ 22. In a production letter dated January 10, 2020, the Government produced an agent's inventory of Mr. Correia's communication to Mr. Marcus which included two notebooks, a hard drive, a computer and a telephone. *See* USAO_00137757.

The defense team has reviewed copies of Mr. Correia's handwritten notebooks which the Government produced to us in January 2020. *See* Marcus Dec., ¶¶ 23-24. As described in the *ex*

4

*parte* Declaration, it is clear that the information communicated was sent to Mr. Marcus for the purpose of soliciting legal advice and at the instruction of Mr. Marcus.

The Government also produced an inventory of the items that Mr. Correia had on him when he was arrested. *See* USAO_137739, 137741. That inventory makes plain that Mr. Correia kept certain papers and documents which he then traveled with to his self-surrender.

### B. Mr. Correia's Communication to His Criminal Defense Counsel Is Protected By The Attorney-Client Privilege

#### 1. Applicable Law

"The attorney–client privilege is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) "Its purpose is to encourage full and frank communication between attorneys and their clients." *Upjohn Co.*, at 389; *see also Fisher*, at 403. "The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." *Upjohn Co.*, at 389.

The privilege protects "[c]onfidential disclosures by a client to an attorney made in order to obtain legal assistance." *Fisher v. United States*, 425 U.S. 391, 403 (1976). Accordingly, "[t]he privilege attaches: (1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) [to] the communications relating to that purpose, (4) made in confidence (5) by the client." *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1036 (2d Cir. 1984).

The privilege protects a client's "giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn Co.*, at 390. This is because "[t]he first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an

eye to the legally relevant." *Id.* at 390-91. "A lawyer should be fully informed of all the facts of the matter he is handling ... It is for the lawyer in the exercise of his independent professional judgment to separate the relevant and important from the irrelevant and unimportant." *Id.* at 391(quoting the *ABA Code of Professional Responsibility*, Ethical Consideration 4–1).

The privilege "'attaches not to the information but to the communication of the information.'" *In the Matter of Grand Jury Subpoenas Dated Oct. 22, 1991, & Nov. 1, 1991*, 959 F.2d 1158, 1165 (2d Cir. 1992) (quoting *United States v. Cunningham,* 672 F.2d 1064, 1073 n.8 (2d Cir. 1982)); *see also Upjohn Co.*, at 396 ("[T]he protection of the privilege extends only to *communications* and not to facts."). Thus, a client may not "be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney." *Id.* (quoting *Philadelphia v. Westinghouse Electric Corp.*, 205 F.Supp. 830, 831).

Accordingly, a client's communication of documents to his attorney is a privileged communication. *See United States v. Hankins*, 631 F.2d 360, 365 (1980). "As to … preexisting documents … the client may make communications about the document by words or by acts, such as sending the document to the lawyer for perusal or handing to him and calling attention to its terms. These communications, and the knowledge of the terms and appearance of the documents which the lawyer gains thereby are privileged." *Id.* at 365 (quoting McCormick, Evidence s 89 (2d Ed. 1972, p. 184); *see also United States v. Davis*, 636 F.2d 1028, 1040 (5th Cir. 1981) (same). Indeed, a client's act of producing documents is itself a "testimonial communication because it might entail implicit statements" *United States v. Hubbell*, 530 U.S. 27, 36 n.19 (2000), including that "the papers existed, were in his possession or control, and were authentic." *Id.* at 36 (2000).

6

2.	Discussion

The attorney-client privilege attached to Mr. Correia's communication to his criminal defense counsel via DHL, as demonstrated by a straightforward application of the privilege analysis to the communication.  Having learned that he was wanted in a criminal case, Mr. Correia sought (1) legal advice from (2) Mr. Marcus, a legal advisor and experienced criminal lawyer who had already interacted with the Government on Mr. Correia's behalf.  As set forth in Mr. Marcus's declaration, (3) the purpose of the communication was to seek Mr. Marcus's advice on the case.  And the communication was sent to Mr. Marcus (4) in a sealed package through a confidential medium (5) by the client, Mr. Correia.  *See In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, at 1036 (setting forth five factors for determining when the privilege attaches).

The Government's application for a search warrant invented a new requirement for privileged attorney-client communications – namely that it is limited to "items that were *created* for the purpose of legal advice, " USAO 69424 (emphasis added).  It appears that the filter team has applied this standard to its review of the communication, only setting aside as privileged those materials that would have been protected under any circumstance, such as "any letter, memorandum, or other communication from Correia to counsel indicating why the materials were being sent to counsel." (Document 95-1, p 2)  Based on its incorrect application of a "*created* for the purpose of legal advice" standard, the Government afforded no import at all to the fact that Mr. Correia had been communicating with his defense counsel.

The resulting search violated the attorney-client privilege.  The reason why Mr. Correia sent the documents to counsel, and the basis for his selection of those materials, is set forth in Mr. Marcus's *ex parte* declaration.  It unequivocally demonstrates that the purpose of the communication was to assist with counsel's preparation of Mr. Correia's legal defense in this case.

7

Such a communication – "the giving of information to the lawyer" – is privileged, *Upjohn Co.*, at 390, even where the information communicated would not be privileged had the Government obtained it in some other fashion.

*United States v. Hankins* illustrated this point. The *Hankins* Court reversed a contempt finding against a defense lawyer who refused to reveal what documents his client had communicated to him – exactly the details that the Government here improperly obtained by its search of Mr. Correia's communication to his counsel. In *Hankins*, the Government reasoned that because the documents themselves could be subpoenaed without a valid privilege objection, the questions asked of the lawyer as to precisely "which of the [client's] books and records … he had seen and when he had seen them could not be the subject of a privileged communication between lawyer and client." *Id.*, at 364-65. The Court held that the Government's logic "does not follow:" the fact that the information itself is not privileged does not mean that *the communication* containing the information also lacks protection. *Id.* at 365. Because the client's "communications about the document by words or by acts … are privileged," the Court agreed with defense counsel that the Government was prohibited from asking about the client's communication of documents, including which of the books and records the client had shown the lawyer and when he had shown them. *Id.*

Here, the Government has made a similar error, invoking the principle that the privilege "attaches not to the information but to the communication of the information." *Matter of Grand Jury Subpoena Dated Oct. 22, 1991*, 959 F.2d 1158, 1165 (2d Cir. 1992). But its logic similarly "does not follow" because it is *the communication* itself that the Government searched. None of the cases the Government cited approves the Government's search of or inquiry into a *communication* from the client to the attorney made for the purpose of legal advice. *See* Document

8

95-1; *In re Grand Jury Subpoenas Dated Mar. 19, 2002 and Aug. 2, 2002*, 318 F.3d 379, 383 (2d Cir. 2003) (analyzing the distinct doctrine of how the work product privilege applies to preexisting documents, rather than the applicability of the attorney-client privilege to an attorney-client communication containing documents); *Duttle v. Bandler & Kass*, 127 F,R,D, 46, 52 (S.D.N.Y. 1989) (holding that communications containing preexisting documents were not privileged where the communications were not "made for purposes of obtaining legal advice" or were subject to the crime-fraud exception). Nor is it important that the Government found no memo by Mr. Correia memorializing why or how he selected the materials he included in the DHL package: a client's act of producing documents is itself a "testimonial communication because it might entail implicit statements," *United States v. Hubbell*, 530 U.S. 27, 36 n.19 (2000), including that "the papers existed, were in his possession or control, and were authentic." *Id.* at 36 (2000). The government's intrusion into the legal communication, which included handwritten notes of the Defendant, also allowed the government to peer into the mind of the defendant in terms, for example, of what he believed most relevant to the case.

A client's provision of documents to his counsel serves a fundamental role in building his defense. The right is grounded in the Sixth Amendment and the attorney-client privilege because of "the presumed inability of a defendant to make informed choices about the preparation and conduct of his defense" on his own and without the input of counsel. United States v. Levy, 577 F.2d 200, 209 (3d Cir. 1978). Although the Sixth Amendment right to counsel is distinguishable from the attorney-client privilege, the two concepts overlap in many ways. The right to counsel would be meaningless without the protection of free and open communication between client and counsel which is why such communications are protected much like "the inviolable character of the confessional." Id. (citing Powell v. Alabama, 287 U.S. 45, 61 (1932)).

The Government's argument – that it can seize privileged communications, scrape them of information, and pass that information on to prosecuting attorneys – degrades the ability of criminal defendants to confer in confidence with their counsel. The attorney-client "relationship would be seriously weakened if the client had the fear that the lawyer could disclose to an opposing party the identity of the client's records that he had used to build up his case." *Hankins* at 365. The Court should hold that Mr. Correia's communication to Mr. Marcus is protected by the attorney-client privilege.

    **C.**    **The Court Should Strike Portions Of The Government's Submissions That Urged The Court To Make An Adverse Inference Against Mr. Correia For Exercising His Constitutionally Protected Rights**

The Government has repeatedly asked the Court to draw a negative inference from the fact that Mr. Correia's consulted his criminal defense counsel and decided not to incriminate himself when he flew to the United States to surrender himself to the FBI. Both acts are constitutionally protected by the Sixth Amendment and the Fifth Amendment respectively. The Government's request that the Court draw an adverse inference is unlawful and should be stricken from their applications.

The Government asserted that Mr. Correia "apparently" sent his counsel materials "to avoid having them in his possession (and thus seized) when he was arrested" in its application for an expedited briefing schedule. Document 95, p 1. In its search warrant affidavit, it speculated that that the items "appear to have been sent by mail so that they would not be on Correia's person when he arrived in the United States to be arrested." USAO_00069424. Later, the Government adds "[i]t appears that Correia knew he would be arrested by the FBI upon landing in the United States and took efforts to mail his electronic devices separately from his person. Taken together,

10

these facts suggest that Correia did not want the contents of the Subject Premises to be seized by the FBI because they contain evidence of the Subject Offenses." USAO_00069485.

To the contrary, taken together, these facts demonstrate that Mr. Correia sought to rely on his Sixth and Fifth Amendment rights to consult with counsel and against self-incrimination. Mr. Correia had a valid Fifth Amendment right not to incriminate himself at his arrest. The Fifth Amendment encompasses the privilege not to produce documents where the act of production would inculpate someone. *United States v. Hubbell*, 530 US 27, 44-45 (2000). The Government has identified no obligation a surrendering defendant has to arrive at the FBI with his evidence on his person. By exercising his right not to incriminate himself at his arrest, Mr. Correia would have done nothing wrong, and it is inappropriate and unlawful for the Government to support its search warrant and its current motion by suggesting the Court draw an inference against Mr. Correia based on an "apparent" exercise of his Fifth Amendment right. *See Doyle v. Ohio*, 426 U.S. 610, 618 (1976) (finding that under the Fifth Amendment "silence … may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous…. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence" to be used to generate an adverse inference or inculpatory admission). It undermines and violates those constitutionally-protected rights where, as here, the Government asks the Court to draw negative inferences from their exercise. The Court should strike those requests from the Government's submissions. The Government is forbidden from urging a negative inference as a result of a criminal defendant's exercise of his Fifth Amendment privilege. *Griffin v. California*, 380 U.S. 609, 615 (1965). A defendant's Fifth Amendment protections apply "at any criminal proceeding" and not just at a criminal trial. *Weaver v. Brenner*, 40 F.3d 527, 535 (2d Cir. 1994). Yet both in seeking to establish probable cause to

11

believe that the package to be searched was not a protected communication and again now in its current effort to expedite this motion, the Government has done precisely that: asked the Court to speculate that because Mr. Correia did not arrive at his arrest carrying incriminating documents, no valid basis exists for his asserted privilege.

Similarly, Mr. Correia was a charged defendant and represented by counsel at the time of these events. His Sixth Amendment right to counsel had fully attached. *See, e.g.*, *Brewer v. Williams*, 430 U.S. 387 (1977) (a defendant's Sixth Amendment rights attach "at or after the time that judicial proceedings have been initiated against him, whether by formal charge, preliminary hearing, indictment, information, or arraignment"). The Government may not argue that it is suspicious that a criminal defendant has lawyered up or consulted with counsel to cast aspersion on him or obtain an adverse inference from a judicial body to justify a search warrant. *Griffin*, 380 U.S. at 615; *Doyle*, 426 U.S. at 618. The Government's asserted logic here would permit a probable cause finding for every instance of a defendant's communications with his counsel, a breathtaking misuse of a constitutional protection that is intended to encourage "full and frank communication" between criminal defendants and their lawyers. *Upjohn Co.*, at 389.

The Government's suggested adverse inferences are also not probative of the issue presented by the instant motion: whether Mr. Correia sent the materials to Mr. Marcus for the purpose of seeking legal advice. A defendant's effort to avoid having the Government seize his defensive materials is entirely consistent with the desire to have one's own defense lawyer inspect and review those materials, as a government seizure would delay defense counsel's review by many months. Indeed, the Government's seizure of Mr. Correia's communication to his counsel accomplished that outcome here, depriving his counsel of Mr. Correia's communication for months.

For these reasons, the Court should strike the Government's unlawful requests that it take an adverse inference against Mr. Correia in its search warrant affidavit and in its letter dated March 11, 2020 seeking expedited briefing of this motion.

### D. Mr. Correia's Communication to His Criminal Defense Counsel Is Also Protected by the Work Product Privilege

While the attorney-client privilege protection is dispositive of the issue raised by this motion, there is a wholly independent ground for declaring the communication protected: the Government's review here is also prohibited by the attorney work product privilege, a doctrine "distinct from" the attorney-client privilege. *In re Grand Jury Subpoenas Dated Mar. 19, 2002 and Aug. 2, 2002*, 318 F.3d 379, 383 (2d Cir. 2003). That privilege applies to "documents and tangible things" that are "prepared by or at the behest of counsel in anticipation of litigation or for trial." *Id.*

Mr. Correia's mailing to Mr. Marcus reflected a collection of materials undertaken at the direction of counsel based on counsel's mental impressions of the subject areas and evidentiary categories relevant to the criminal case pending against Mr. Correia. *See ex parte* Marcus Declaration, at ¶ 14 (noting counsel's instructions and advice), 23-24 (describing documents that Mr. Correia mailed to counsel), and 25 (describing documents that Mr. Correia brought with him to the United States rather than mailing to counsel).

The Government's seizure of the mailing to Mr. Marcus is an attempt to capitalize on Mr. Marcus's defense planning. Searching that correspondence invades counsel's mental impressions. The Government may not do this:

> "While it would probably be more convenient for the Government to secure the results of petitioner's internal investigation by simply subpoenaing the questionnaires and notes taken by petitioner's attorneys, such considerations of convenience do not overcome the policies served by the attorney–client

13

> privilege. As Justice Jackson noted in his concurring opinion in *Hickman v. Taylor*, 329 U.S., at 516, 67 S.Ct., at 396: 'Discovery was hardly intended to enable a learned profession to perform its functions ... on wits borrowed from the adversary.'"

*Upjohn, Co.*, 449 U.S. at 396 (1981).  Accordingly, the attorney work product privilege prohibits the Government from reviewing Mr. Correia's mailing to Mr. Marcus.

### E. Conclusion

The Government has seized a communication between a defendant and his counsel that fits squarely within the four walls of the attorney-client privilege: it was a confidential communication of information made by a client to his attorney for the purpose of seeking legal advice. The Government's seizure also violates the attorney work product, because the information Mr. Correia elected to send to his counsel was based on his counsel's instructions about what would be relevant to Mr. Correia's defense.  Further, the Government improperly supported its unwarranted intrusion into these privileges by seeking adverse inferences from Mr. Correia's exercise of his Fifth Amendment right against self-incrimination and his Sixth Amendment right to counsel.  Mr. Correia respectfully requests that the Court grant Mr. Correia's motion in full, declaring that his communication with counsel was protected by both the attorney-client and the attorney work product privileges and striking the portions of the Government's submissions that seek improper adverse inferences.

Dated: April 3, 2020
      New York, NY

Respectfully submitted,

By: /s/ William J. Harrington
    William J. Harrington, Esq.
    Goodwin Procter, LLP
    The New York Times Building
    620 Eighth Avenue

New York, New York 10018
wharrington@goodwinlaw.com
Telephone:  (212) 813-8800
Facsimile:  (212) 355-3333

Jeff Marcus, Esq.
One Biscayne Tower
2 South Biscayne Blvd,
Suite 1750
Miami, Florida 33131
jmarcus@mnrlawfirm.com
Telephone : (305) 400-4260
*Admitted Pro Hac Vice*

*Attorneys for Defendant David Correia*

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 3, 2020, I caused a true and correct copy of the foregoing to be served by electronic means, via the Court's CM/ECF system, on all counsel registered to receive electronic notices.

/s/ William J. Harrington
William J. Harrington
