**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

    -against-

DAVID CORREIA,

                    Defendant.

No. 19-CR-00725-003 (JPO)

## SENTENCING MEMORANDUM ON BEHALF OF DEFENDANT DAVID CORREIA

William J. Harrington, Esq.
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 813-8800
Facsimile: (212) 355-3333
wharrington@goodwinlaw.com

*Counsel for Defendant David Correia*

January 25, 2021

Defendant David Correia, by his counsel, pursuant to the Court's Individual Practices in Criminal Cases, respectfully submits the enclosed Sentencing Memorandum and appended letters in support of this Sentencing Memorandum ("Appended Letters"),[1] in connection with his sentencing scheduled for February 8, 2021 at 11:30 a.m.

## PRELIMINARY STATEMENT

On October 29, 2020, Mr. Correia pled guilty to two counts: making false statements to the Federal Election Commission ("FEC") in violation of 18 U.S.C. §§ 1001(a)(2) and 2 (Count Two) and conspiring to commit wire fraud in connection with a business known as "Fraud Guarantee" in violation of 18 U.S.C. § 1349 (Count Seven). Pursuant to a plea agreement, the parties stipulate that the applicable Guidelines range is 33 to 41 months' imprisonment.

At the outset, I wish to stress four factors that I hope weigh heavily in the Court's sentencing determination:

- Mr. Correia is unlike most criminal defendants who have pled guilty to fraud. He full heartedly believed in Fraud Guarantee's promise. He poured himself into these ventures and spent many unremunerated hours trying to make the businesses a reality. He personally received very little money – just $43,650 out of $2.3 million raised, and even that was over almost seven years. These qualities—his belief in the project's validity, his personal investment of time, and his failure to line his own pockets— distinguish him from the typical fraud co-defendant, and render the applicable guidelines a poor estimate of his culpability. They are also reflected in his letters of

---

[1] Pursuant to the Court's Individual Practices in Criminal Cases and the Southern District's ECF Privacy Policy, I have redacted certain materials in this Sentencing Memorandum and in the Appended Letters. *See infra* at 3, 12, 15-18; Appended Letters at 1, 4, 11, 12.  I respectfully request permission to redact additional materials in Mr. Correia's letter to Your Honor because they are highly personal, sensitive, and akin to the categories of material for which the Court's rules permit redaction.  *See* Appended Letters at 1-2.

support, which include a powerful, personal letter from one of the Fraud Guarantee investors submitted on Mr. Correia's behalf.

- Having said that, Mr. Correia quickly accepted responsibility. He pled guilty October 29, 2020, just weeks after being charged of the instant crimes, which were new additions to the superseding indictment filed on September 17, 2020.

- Mr. Correia has two small children, aged nine and six. His wife is and has been the primary breadwinner in the family for many years, and her schedule as a physician's assistant is demanding. Mr. Correia is thus the primary caretaker for his children. A period of incarceration will fracture his family and disrupt his children's lives.

- 

Given these factors, I respectfully submit that a noncustodial, non-Guidelines sentence can satisfy the sentencing goals of 18 U.S.C. § 3553(a). Such a sentence would reflect Mr. Correia's belief in the project and lack of personal benefit and his speedy guilty plea. It would allow him to continue his role as a key caregiver in his home so that his wife can earn money for the family. And it protects Mr. Correia from potentially catastrophic ██████████.

## I.   BACKGROUND

### A.   Mr. Correia's Humble But Difficult Upbringing

Mr. Correia has lived a difficult life by any standard. He spent his early life and childhood under the dark cloud of a physically and mentally abusive father. Mr. Correia's mother was on the

receiving end of his father's mental and emotional abuse (and on occasion, physical abuse), making for a very stressful marriage for her and childhood for the children. Mr. Correia and his siblings experienced similar emotionally abusive treatment, but his half-brother, who received the brunt of it via frequent physical abuse, was so mistreated by their father that he ran away from home at the age of fifteen. The fallout from his parents' divorce, prompted by his father's abuse and infidelities, required Mr. Correia to take on responsibilities far beyond his eleven years of age and forced him into the stressful role of providing emotional support for his mother and younger sister. Mr. Correia has prepared a letter for you that describes in more detail the facts of his life. *See* Appended Letters at 1-8. I respectfully submit that Mr. Correia's letter demonstrates that he is a person of good character, who, despite his difficult upbringing, has tried to find success in life and who has provided constant support to his family and friends.

### B.     Mr. Correia Finds Success, a Refuge, and a Future in Golf

After many years as a stay-at-home mom, Mr. Correia's mother returned to teaching elementary school, where she befriended the school's principal. When Mr. Correia was twelve years old, the principal took him golfing one day. Much to their surprise, Mr. Correia excelled at the sport from the start and developed a lifelong love for the game. The principal gifted Mr. Correia an old set of golf clubs to practice with, and Mr. Correia began to practice regularly. He could only afford to practice at the local public driving range and public par-three course to start, but he was hooked. Seeing Mr. Correia's passion for golf and realizing it was the best outlet for stress during his parents' difficult separation and subsequent divorce, Mr. Correia's mother made every attempt to support his newfound love for the game.

4

Mr. Correia credits golf as his mental and emotional savior during what was an incredibly stressful time in his early life. It sparked in him a drive and focus unlike anything he had ever experienced; all Mr. Correia wanted was to become the best golfer he could possibly become.

After becoming quite proficient, Mr. Correia was eventually invited to play on the ESPN Junior Tour, which consists of a series of national tournaments and gave Mr. Correia a good chance to get a college scholarship or play professionally. Mr. Correia honed his skills over the next several years, eventually attending college and playing golf there. He chose to leave school early and turn professional before finishing, with the next few years consisting of playing any professional tournaments for which he could qualify.

### C.     Mr. Correia Pauses His Golf Career to Answer a Friend's Call for Help

After several months honing his golf skills in hopes of qualifying for the PGA Tour, Mr. Correia chose to take a hiatus from golf to help his best friend during a trying time. Mr. Correia's friend's father found out that he had terminal cancer and could no longer manage the several Philadelphia-area restaurants he owned. Mr. Correia decided to put his golf career on hold to help his best friend manage the restaurants for a full year, all the while knowing that this pause in his game could preclude him from ever becoming a professional golfer. After his best friend's restaurants were running successfully, Mr. Correia then moved to Florida and spent three years attempting to get back his golf skills and improve his game to a professional level. But he was no longer progressing, and ultimately he made the difficult decision to leave the game of professional golf.

### D.     Mr. Correia Meets, and Eventually Works With, Lev Parnas

During the three years in his early twenties Mr. Correia spent in Florida attempting to revive his golf career, he worked in the golf operations department of a golf and country club in

Boca Raton, where Lev Parnas was a member and played golf daily. Mr. Parnas was learning how to play, and he and Mr. Correia established a rapport that developed into a friendship. Mr. Parnas would often invite Mr. Correia to play golf with him and his guests, and he even paid to sponsor Mr. Correia in a few professional tournaments.

Mr. Correia was enamored of Mr. Parnas's success. He owned a successful broker-dealer in Boca Raton, which employed more than 200 traders and, to Mr. Correia, impressively hummed with important activity. Mr. Parnas invited Mr. Correia to Miami Heat basketball games, where they sat in corporate seats behind the bench and where Mr. Parnas could control the ticker tape to welcome Mr. Correia to the game by name. Mr. Parnas also had a personal assistant, a beautiful home and family, numerous luxury cars, and the ability to play golf almost every day, all at the young age of just thirty years old. At that time, Mr. Correia was an impressionable young man, who was inspired by Mr. Parnas's business success and trusted in Mr. Parnas's business acumen.

Leaving behind his professional golfing aspirations, Mr. Correia moved back to Philadelphia to work again in the restaurant business and lost touch with Mr. Parnas. After several years in the industry, Mr. Correia wanted a career change and sold his restaurants. His wife, whom he had met in Philadelphia, suggested that they move to Florida. Upon Mr. Correia's return to Boca Raton, he and Mr. Parnas reconnected, and Mr. Parnas offered him a much-needed job with a friend who had cofounded a medical staffing company. Mr. Correia accepted the offer, and began working in the investor relations department of that company. In what would become a pattern over the years—only evident now to Mr. Correia after the benefit of hindsight and retrospective reflection in light of his arrest—Mr. Parnas also proposed an opportunity for Mr. Correia to invest in the company. Mr. Correia and his wife invested most of their savings at that point, $20,000, but the company sold the valuable portion of the business, rendering the investment worthless and

prompting financial and some marital struggles. Mr. Correia was not upset with Mr. Parnas at the time because Mr. Parnas had represented that he had invested over $200,000 of his own money in the stock and was also quite disappointed that the investment had failed. Only years later did Mr. Correia begin to suspect that Mr. Parnas never actually invested the $200,000.

Mr. Parnas also founded a company called Parnas Holdings, Inc. ("Parnas Holdings"), and invited his "right-hand" Mr. Correia to help him run it. Mr. Correia was responsible for most of the day-to-day operations of Parnas Holdings, but Mr. Parnas reserved for himself control over decision-making, negotiations, and company finances. Several of Mr. Parnas's business deals in connection with Parnas Holdings did not pan out (*e.g.*, a movie project deal resulted in several lawsuits because the movie never got made). Mr. Parnas was always asking Mr. Correia to extend himself personally and financially, by not taking a regular salary while the company was still growing and even requesting that Mrs. Correia co-sign for a corporate American Express card, the bill for which was run up $80,000 and never paid back. This severely affected the Correias' credit for several years. Mr. Correia estimates that Mr. Parnas was responsible for 90% of those charges, which included personal expenditures such as a lavish Christmas vacation to the Ritz Carlton in Mexico and a cruise in the Caribbean. Mr. Correia's and Mr. Parnas's business affiliate, Dale Wood, had apparently promised Mr. Parnas that he would compensate him for services rendered by paying expenses on the card. But the balance was never paid. Not fully blaming Mr. Parnas for his role in asking Mr. Correia and his wife to sign for the credit card, an ever-trusting Mr. Correia remained loyal to him.

Prior to the issues with the credit card, Mr. Correia had been introduced to one of Mr. Wood's employees, who worked at Mr. Wood's real estate fund company. Mr. Correia had wanted to invest in the real estate market, and he decided to purchase a portion of a hotel that Mr. Wood's

fund controlled. Mr. Correia, along with some friends and family, personally invested $100,000 in connection with the hotel transaction. In a transaction unrelated to Mr. Correia's hotel investment, Mr. Parnas lent Mr. Wood capital. But as they learned the hard way, Mr. Wood was a fraudster, who had fabricated the documentation that set forth the status of the real estate holdings and his funds' interests in those holdings and defrauded approximately 1,872 German nationals. *See generally* Information, *United States v. Wood*, No. 0:18-cr-60202-WPD (S.D. Fla. July 18, 2018), ECF. No. 1; Factual Proffer, *United States v. Wood*, No. 0:18-cr-60202-WPD (S.D. Fla. July 25, 2018), ECF. No. 8; Judgment in a Criminal Case, *United States v. Wood*, No. 0:18-cr-60202-WPD (S.D. Fla. Apr. 30, 2019), ECF. No. 49 (sentencing Mr. Wood to 151 months and ordering $7,130,410 in restitution). Because of related civil and criminal proceedings, Mr. Correia and Mr. Parnas knew that they would be at the back of the line to collect either judgments or restitution from Mr. Wood to recoup their respective lost investments and loans. They realized that damaged investors can have very little recourse in similar situations, prompting the idea for a business that could guarantee one's investment if the investment was lost due to fraud—Fraud Guarantee.

Fraud's Guarantee's business model morphed several times over the years as they learned more about the insurance industry and their target clientele. They eventually considered two subscription-based services: (1) a monitoring and protection product that would monitor the investments of their clients and alert them as to any concerns of fraud on existing investments, and (2) a due diligence and underwriting product for investors who were contemplating new investments. Mr. Correia and Mr. Parnas envisioned that Fraud Guarantee, in collaboration with one or more insurance carriers, would either accept or decline investment opportunities based upon the anticipated risk-level for fraud associated with the opportunities. The investments that satisfied Fraud Guarantee's risk analysis would be eligible for a "guarantee" backed by a large insurance

carrier or reinsurer. Should a potential investor decide to purchase this guarantee, the investor would be covered for any investment loss stemming from losses due to criminal fraud. Mr. Correia was especially excited about this aspect of this business, as it would have been an industry-changing product; losses due to fraud have not traditionally been covered by insurance companies, and Mr. Correia wanted Fraud Guarantee to be the first.

In terms of the work that went into designing these business models and products, Mr. Correia estimates that he did 80 to 90% of the work. Mr. Correia did almost all of the product design and planning and spent years working with numerous domestic and international insurance companies, predominantly with Lloyd's of London and several of its syndicates. Despite Mr. Correia's hard work and after several years, Fraud Guarantee could not secure an insurance company to fully sign onto the risk, which was almost always explained as the product having no previous track record, being the first of its kind.

Mr. Parnas controlled Fraud Guarantee's accounts, control which he abused by withdrawing hundreds of thousands of dollars for cash, rent on his personal residence, transfers into his and his wife's bank accounts, and personal expenditures, including spending tens of thousands of dollars at luxury car leasing companies. *See* Presentence Report, *United States v. Correia*, No. 1:19-cr-00725-JPO (S.D.N.Y. Jan. 20, 2021), ECF No. 168 ¶¶ 29, 30, 32, 35 (detailing Mr. Parnas's extravagant withdrawals and expenditures). Mr. Correia, on the other hand, received very little money – just $43,650 out of the $2,322,500 total that was raised. And Mr. Correia received this money over a seven-year period during which he was not paid salary in connection with his efforts in building Fraud Guarantee and developing its products.

Although the company was unable to launch a product by the time of Mr. Correia's indictment and arrest, Mr. Correia wholeheartedly believed, and still believes, in the company's promise.

### E.      Mr. Correia's Indispensable Role in His Family's Lives

Mr. Correia's wife and children are the loves of his life. Having grown up in a volatile, abusive household, Mr. Correia strived to create the exact opposite for his children. Mr. Correia and his wife have forged a loving and stable household, and Mr. Correia's ability to be involved in his children's lives as a devoted and present father gives him purpose.

Mr. Correia's wife works as a physician assistant at a hospital near their home and has an alternating one-week-off and one-week-on schedule. As Mrs. Correia notes in her letter in support of this memorandum (*see* Appended Letters at 9-10), during the weeks that she works, Mr. Correia fully immerses himself in caretaking for their children. Mr. Correia gets his children ready for school in the mornings; makes lunches; does school drop-off and pick-up; ensures that their homework is done; reviews any in-class work, agendas, or tests that have been brought home and/or that require a parent's signature; makes and eats dinner with them while Mrs. Correia is still at work; ensures that the children take their evening baths and showers; and before they go to bed, Mr. Correia and his children will either play a board game or watch a family movie together. During nice weather days, Mr. Correia will often take his children to the green spaces in their neighborhood to play basketball, use the jungle gym, throw a frisbee, kick a soccer ball, or have a picnic or dinner at the picnic tables.

Mr. Correia teaches his children important lessons, like the values of hard work and spending quality time with family, the importance of kindness, the comforts of faith, and that the greatest gift a person can give the world is to leave it better than how they found it. Mr. Correia

worries about missing out on opportunities for even more teachable moments, and that his children could spend formative years without the regular guidance of their father. Mr. Correia fears the long-term damage this may cause to his children and to their relationship with him.

When Mr. Correia learned he was charged with a crime, his thoughts immediately rushed to his family, who were at the family home when the FBI came for him with an arrest warrant. The FBI made a scene in the Correias' quiet neighborhood, showing up with almost two dozen officers in the evening after Mr. Correia's children were asleep. His wife was sick with the flu, and his sleeping children (his then-eight-year-old daughter and then-five-year-old son) were abruptly awakened by the loud noise of the agents banging on the door and turning on their sirens. The children did not understand what was happening, but were fearful, and Mr. Correia's daughter held her little brother as he cried uncontrollably, scared that the agents were going to take their mother away. The trauma for Mr. Correia's children extended well beyond that night. His son mentioned it constantly to anyone who would listen—every teacher, neighbor, and friend—over the weeks that followed. Mr. Correia's children would both jump every time they heard a knock at the door or any type of loud sound outside. They also discussed the traumatic incident during sessions with their school counselor for the next couple of months.

Mr. Correia and his wife have worked hard to protect their children from such fear and to instill stability and structure in their household. Mr. Correia and his wife experienced marital difficulties a couple of years ago, leading to a physical separation for a year during which they maintained separate households. Though their marriage seemed unsalvageable at the onset of the separation, Mr. Correia's wife unexpectedly but unequivocally sought reconciliation one day, expressing that she wanted them to rebuild their marriage. Mr. Correia has described that day as one of the greatest days of his life. The joy, friendship, and happiness with which Mr. Correia and

his wife approach their lives post-separation have enabled them to fully prioritize their marriage and children.

**F.      Mr. Correia's** 

Mr.  Correia  has  a

. Mr. Correia also

. Mr. Correia

. Mr. Correia's

. According to

Mr. Correia's

## II.      THE INSTANT OFFENSE

On October 29, 2020, Mr. Correia pled guilty to Count Two, in connection with an affidavit he submitted to the FEC upon its investigation of certain political contributions that contained material misstatements as to the source of the contributions, and to Count Seven, for conspiring to commit wire fraud through an agreement to defraud victims by inducing their investments in Fraud Guarantee based on materially false and misleading representations.

Pursuant to the parties' plea agreement, Mr. Correia's stipulated Guidelines range is 33 to 41 months' imprisonment, which Mr. Correia does not contest. It is worth noting that the range is mostly driven by the total loss amount of $2,322,500 million, even though Mr. Correia only received $43,650.

The base offense level for Count Two is 14, pursuant to Section 2J1.2(a). The base offense level for Count Seven is 7, pursuant to Section 2B1.1(a)(1). The offense level for Count Seven is increased by 16 because the loss exceed $1.5 million, pursuant to Section 2B1.1(b)(1)(I); thus, the offense level as to Count Seven is 23. Pursuant to Section 3D1.2, Counts Two and Seven do not group together, but pursuant to Section 3D1.4(c), Count Two is disregarded because the offense level as to Count Two (14) is 9 levels less serious than the offense level as to Count Seven (23). Because Mr. Correia has demonstrated acceptance of responsibility for his actions, the level is reduced by two points pursuant to Section 3El.l(a). Further, the Government stipulated that assuming Mr. Correia's acceptance of responsibility, it will move at sentencing for an additional one-level reduction, pursuant to Section 3E1.1(b), because Mr. Correia gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. These reductions result in a total offense level of 20.

Mr. Correia has zero Criminal History Points, and accordingly is in Criminal History Category I. Based on these calculations, Mr. Correia is subject to a Guidelines range of 33 to 41 months' imprisonment.

## III.   A NONCUSTODIAL, NON-GUIDELINES SENTENCE IS APPROPRIATE IN THIS CASE

"The [sentencing] statute, as modified by *Booker*, contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to

accomplish the goals of sentencing . . . ." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007)

(citing 18 U.S.C. § 3553(a)). To guide courts in applying this principle, Section 3553(a) sets forth

a list of factors to consider, including:

> (i)  the nature and circumstances of the offense;
> (ii)  the history and characteristics of the defendant;
> (iii)  the need for the sentence imposed to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant; and
> (iv)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

18 U.S.C. § 3553(a)(1), (2), (6). Sentencing proceedings commence with the Guidelines range as

the "starting point and the initial benchmark." *United States v. Johnson*, 567 F.3d 40, 51 (2d Cir.

2009) (internal quotation marks omitted) (citing *Gall v. United States*, 552 U.S. 38, 49 (2007)).

"The court must then consider all the § 3553(a) factors and then undertake an individualized

assessment based on the facts presented. If a non-Guidelines sentence is indicated, the court must

. . . ensure that the justification is sufficiently compelling to support the degree of the variance."

*Id.* (internal quotation marks and citation omitted) (citing *Gall*, 552 U.S. at 49-50)).

 Based on these standards, a noncustodial, non-Guidelines sentence is appropriate given Mr.

Correia's history and characteristics as well as the nature and circumstances of his offense.

 First, the Guidelines range, as calculated, weighs heavily the loss amount involved in the

fraud. It does not factor in that Mr. Correia himself received $43,650 over almost seven years at a

time when he devoted significant personal efforts to the business that were otherwise

unremunerated. Nor does it account for the fact that Mr. Correia himself deeply believed in the

promise of the investment. Indeed, even one of the victims who invested in Fraud Guarantee,

Hubert Weisslinger, similarly believed in the company, its mission, and Mr. Correia's hard work.

As Mr. Weisslinger states in his letter in support of this memorandum:

> As an investor in Fraud Guarantee [H]oldings, LLC, I believe David worked extraordinarily hard to make the company a success. David always returned everyone [sic] of my phone calls and and [sic] was always there to answer any questions that I may have had. I always respected the fact that David was very transparent and would often directly share with me the status of certain projects, both good or bad news. He was open and honest with me as to where the company stood in terms of launching a product which I believe the company would have done, under different circumstances. Among those involved in the company, it was clear he was responsible for almost all of the work and didn't have much help.

Appended Letters at 13. In addition to Mr. Weisslinger's letter of support, Christian Davies and Lowery Robinson, with whom Mr. Correia discussed Fraud Guarantee and each of whom has specialty insurance experience, have also written letters of support. Appended Letters at 18, 19. Both Mr. Davies and Mr. Robinson acknowledge the significant work Mr. Correia did for many years in hopes of making Fraud Guarantee a reality.

Second, a noncustodial, non-Guidelines sentence would avoid grave collateral consequences to Mr. Correia, his wife, and their children, consequences that are unduly harsh given Mr. Correia's personal history and offense. A sentence of incarceration would drastically change Mr. Correia's life and the lives of his family. Mr. Correia serves as his children's primary care giver during weeks when his wife, a physician's assistant, works grueling seven-day shifts. He is also trying to find a way to earn money for his family. He will be unable to support his wife and young children while incarcerated. Further, while in-person visitation has been reinstated at certain Bureau of Prisons' ("BOP") facilities, the BOP policy otherwise suspends in-person visitation and could preclude Mr. Correia from seeing his family for the foreseeable future. *See* Federal Bureau of Prisons, *BOP Modified Operations*, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited Jan. 25, 2021).

Third, Mr. Correia's sentence should account for his ███████████████

██████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████

Mr. Correia ████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████



Mr. Correia is



Finally, this record gives the Court a clear idea of who Mr. Correia is—a person of character, despite facing considerable adversity in his abusive childhood home; a devoted husband

and father; a hard worker willing to put in long hours; and, ultimately, a man who misplaced his trust in his experienced business partner. Notwithstanding Mr. Correia's instant offenses, he has led a law-abiding life and has demonstrated a deep commitment to his family and his faith.

## IV.    CONCLUSION

Mr. Correia now comes before Your Honor with little personal gain as a result of the crimes pled to in this case and nothing to show for his years of hard work in connection with what he believed were promising businesses. He has quickly accepted responsibility. In light of his personal characteristics, especially the critical support he provides his wife and young children, I respectfully request that the Court exercise its discretion to impose a noncustodial, non-Guidelines sentence.

Dated:  January 25, 2021
         New York, New York

Respectfully submitted,

By: */s/ William J. Harrington, Esq.*
     William J. Harrington, Esq.
     GOODWIN PROCTER LLP
     The New York Times Building
     620 Eighth Avenue
     New York, New York 10018
     Telephone: (212) 813-8800
     Facsimile: (212) 355-3333
     wharrington@goodwinlaw.com