

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 1, 2021

<u>By ECF</u>

The Honorable J. Paul Oetken
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

     Re:    *United States v. David Correia,* **S1 19 Cr. 725 (JPO)**

Dear Judge Oetken:

     The Government respectfully submits this letter in advance of sentencing in the above-captioned case, which is currently scheduled for February 8, 2021, at 11:30 a.m. David Correia stands convicted of two offenses that stem from his successful efforts to lie to and defraud numerous investors out of millions of dollars over the course of a seven-year period, and to lie to the Federal Election Commission ("FEC") by submitting a materially false affidavit in response to an FEC inquiry. His brazen fraud and deceitful behavior caused significant financial harm to his victims, and his lies to the FEC frustrated the agency's important mission. For the reasons set forth below, the Government submits that a sentence within the stipulated United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range of 33 to 41 months' imprisonment is warranted in this case.

     **A. Offense Conduct**

     Correia pled guilty to two serious offenses. First, between 2012 and 2019, Correia and co-defendant Lev Parnas defrauded seven different victims out of more than $2.3 million dollars. Correia played a critical role in the scheme by convincing investors that Fraud Guarantee was a legitimate and functioning business, when Correia knew that it was not operational and that the vast majority of the money investors put into the company was spent on purposes having nothing to do with Fraud Guarantee. Second, after a complaint was filed with the FEC about straw donations made by Parnas and Igor Fruman, Correia submitted a materially false affidavit to the FEC and helped Parnas and Fruman modify their accounting records so that they were consistent with the their false affidavits.

Hon. J. Paul Oetken                                                                                              Page 2
February 1, 2021

                      1.   <u>The Fraud Guarantee Scheme</u>

       In late 2012, Correia and Parnas established Fraud Guarantee, and pitched it to potential investors as a company that would provide services to protect investors from fraud. (Presentence Investigation Report ("PSR"), dated January 20, 2021, at ¶ 27). Parnas and Correia marketed Fraud Guarantee as a company that would "help reduce the risk of fraud as well as mitigate the damage caused by fraudulent acts . . . by building products that protect investors in the private equity marketplace." They claimed that Fraud Guarantee would "provide[] . . . investors peace of mind through comprehensive intelligence, and insurance against losses due to fraudulent behavior, or defaults due to fraud." Their planned product, "InvestSafe," would be "an insurance product which will insure investors against investment fraud." Although the specifics morphed over time from 2013 to 2018, the general idea the defendants pitched was that if an investor invested in "Company XYZ" and purchased a Fraud Guarantee policy, then in the event that the investor lost the value of his investment due to a criminal fraud at Company XYZ (resulting in a criminal conviction), Fraud Guarantee would enable the investor to recoup his losses. (*Id.*).

       Beginning in late 2012, Correia and Parnas began raising money for Fraud Guarantee. (PSR ¶ 28). In their pitches to investors, they repeatedly made several false material statements: that funds would be used for Fraud Guarantee's purposes, that Correia and Parnas would not take a salary from investors' funds, and that Parnas had already invested millions in the company. (PSR ¶ 28-36). Specifically, in late 2012 and early 2013, Correia and Parnas induced three victims—Victim-1, Victim-2, and Victim-3—to invest in Fraud Guarantee through false and fraudulent representations. (PSR ¶ 28). Correia and Parnas told these victims that Fraud Guarantee was raising funds to develop insurance and anti-fraud products, and otherwise facilitate the company's development. (*Id.*). Correia and Parnas, who claimed to investors that they themselves had been victims of fraud, lulled investors into parting with their money by promising not to draw salaries and assuring investors that all funds would be used for appropriate business expenses of Fraud Guarantee. (*Id.*) Correia was responsible for sending these investors emails, management presentations, and business plans. Based on those representations, Victim-1, Victim-2, and Victim-3 invested a total of approximately $750,000 in Fraud Guarantee in 2013 and 2014. (PSR ¶ 29). Contrary to the promises made by Correia and Parnas, the majority of those funds were *not* spent on purposes having anything to do with Fraud Guarantee. (*Id.*). Over $230,000 was withdrawn in cash and used for personal expenses; $130,000 was used to pay rent for Parnas's house; $40,000 was transferred to accounts in the name of Parnas's wife; and tens of thousands of dollars were spent on personal expenditures, including more than $30,000 at luxury car leasing companies. (*Id.*).

       As Correia and Parnas burned through their victims' initial funds, they sought additional investments. Based on representations by Correia and Parnas that additional funds were needed for legitimate business expenses of Fraud Guarantee, Victim-1 and Victim-2 paid another $190,000 in 2014 to an account controlled by Parnas and his wife. (PSR ¶ 30). Over $100,000 of those investments were used to pay rent for Parnas's home; more than $29,000 was withdrawn in cash; $4,000 was transferred to an account in the name of Correia's wife;[1] $3,000 was transferred

---

[1] According to his wife, who was interviewed by the FBI, Correia's bank accounts had been closed due to the number of checks that he had bounced and he was barred from opening a

to Parnas's saving account; and thousands of dollars were spent on other personal expenditures. (*Id.*). Correia and Parnas also made additional misrepresentations to Victim-3 in 2014, telling him that additional funds were needed for legitimate business expenses of Fraud Guarantee. (*Id.*). Victim-3 paid another $15,000 to an account in the name of Fraud Guarantee, on which both Correia and Parnas were signatories. (*Id.*). From that investment, $8,000 was withdrawn in cash, $3,000 was transferred to an account in Correia's wife's name, and at least a few hundred dollars were spent on various personal expenses. (*Id.*).

In late 2015, Parnas and Correia were again desperate for money, and based on false and fraudulent representations, they induced another victim, Victim-4, to invest in Fraud Guarantee. (PSR ¶ 31). Correia and Parnas provided Victim-4 with a Fraud Guarantee business plan, that Correia had put together, which contained multiple false and misleading claims about the company, including suggestions that the funds raised up until that point had been used on legitimate business expenses, when in actuality, those funds had largely been used on cash withdrawals and personal expenses. (PSR ¶ 31). Correia and Parnas also told Victim-4 that the funds Victim-4 invested would similarly be used solely for legitimate business expenses of Fraud Guarantee. (*Id.*). Correia and Parnas committed that promise to writing, providing Victim-4 with a convertible loan agreement which represented that Victim-4's funds would be used ". . . to finance the development, promotion and initial operation of an investment protection business. . ." and would be ". . . fully reserved and committed. . ." for such purposes. (*Id.*). To seal the deal with Victim-4, Parnas and Correia told him that Parnas had personally invested millions of dollars in Fraud Guarantee, which was false. (*Id.*). Based on those representations, between December 2015 and mid-2016, Victim-4 invested a total of approximately $300,000 in Fraud Guarantee. (PSR ¶ 32). Victim-4 wired his funds to a bank account in Parnas's name—not in the name of Fraud Guarantee—because Parnas and Correia led Victim-4 to falsely believe that Parnas had already contributed approximately $300,000 to Fraud Guarantee on Victim-4's behalf, and that Victim-4 therefore needed to reimburse Parnas. (*Id.*). In actuality, Parnas had never contributed any funds to Fraud Guarantee on Victim-4's behalf, nor had Parnas contributed the $300,000 to Fraud Guarantee once Victim-4 transferred those funds to Parnas's personal account. (*Id.*). Rather, while a portion of the funds Victim-4 transferred to Parnas's account was used for Fraud Guarantee's business expenses, Parnas and Correia mainly used the funds for personal purposes. (*Id.*). In particular, during that period, more than $76,000 was withdrawn as cash from the account; approximately $14,000 was transferred to accounts in the name of Parnas, his wife, and his son. From those accounts, approximately $2,000 was then transferred to an account in the name of Correia's wife; approximately $5,500 was transferred directly to an account in Correia's wife's name; and thousands of dollars were spent on various personal expenditures, including more than $30,000 at luxury car leasing companies. (*Id.*).

The fraud scheme continued in 2016 when Correia and Parnas induced another victim, Victim-5, to invest in Fraud Guarantee through false and fraudulent representations. (PSR ¶ 33). Correia and Parnas told Victim-5 that Parnas had contributed a significant amount of money to the company. (*Id.*). Correia and Parnas also provided Victim-5 with Fraud Guarantee documents which indicated that Parnas's capital contribution was $570,000, and in another document that Parnas's capital contribution was $1,100,000 and Correia's capital contribution was $143,000.

---

bank in his own name. The funds transferred to her account, she confirmed, were Correia's contribution to his family's living expenses.

(*Id.*).  Those representations were false: Parnas and Correia had invested little, if any, money in Fraud Guarantee.  (*Id.*).  Correia also provided Victim-5 with a false and misleading business plan—the same one that had previously been furnished to Victim-4.  (*Id.*).  Based on those representations, Victim-5 invested approximately $250,000 in Fraud Guarantee, consisting of approximately $200,000 in payments to Parnas's personal account plus a vehicle valued at approximately $50,000 which Victim-5 transferred to Parnas.  (*Id.*).

In late 2016, Correia and Parnas induced Victim-6 to invest in Fraud Guarantee through false and fraudulent representations.  (PSR ¶ 34).  Correia and Parnas promised Victim-6 that they were not drawing salaries and that Victim-6's funds would be used for appropriate business expenses of Fraud Guarantee.  (*Id.*).  Parnas told Victim-6 that Parnas had invested millions of dollars of his own money in Fraud Guarantee, which was false.  Correia also advised Victim-6, via email, that there was significant investment from all parties in order to take ownership in Fraud Guarantee which equated to several millions of dollars invested.  (*Id.*).  Correia's statement was patently false: Fraud Guarantee had raised substantially less than several millions of dollars and, of those funds raised, they had largely been withdrawn as cash, transferred to personal accounts, and spent on personal expenditures.  (*Id.*).  Parnas and Correia also sent Victim-6 the false and misleading business plan that they had provided to Victim-4 and Victim-5.  (*Id.*).  Victim-6 invested approximately $300,000 in Fraud Guarantee through a payment to Parnas's personal bank account.  (PSR ¶ 35).  At the time they were soliciting money from Victim-6, it was clear that they intended to use the funds on personal expenses.  Shortly before Victim-6 wired the funds, Parnas texted Correia: "Waiting 🙏🙏🙏🙏," to which Correia responded, "[s]till nothing" and Parnas wrote, "[n]ope."  After Correia spoke to Victim-6 and relayed to Parnas that Victim-6 said he would be wiring funds soon, Correia said to Parnas: "Please do the $25!... really need every penny to pay people and bills."  Parnas replied, "♣ ♣."[2]  Once the wire arrived in Parnas's account, approximately $169,000 was transferred to a personal account belonging to Parnas and his wife; approximately $14,000 was withdrawn as cash; and thousands of dollars were spent on various personal expenses.  (*Id.*).  Additionally, out of the approximately $169,000 transferred to an account in the name of Parnas and his wife, approximately $50,000 was used to pay for a political contribution so that Parnas could attend a fundraising event hosted by Victim-6 and meet then-candidate Donald Trump.  As Correia had requested before the money arrived, Parnas also wired approximately $25,000 to an account in the name of Correia's wife so that Correia could pay personal expenses and use some of the money to attend the event.

In 2018, Parnas and Correia met Victim-7 and induced him to invest in Fraud Guarantee through false and fraudulent representations.  (PSR ¶ 36).  Parnas and Correia falsely told Victim-7 that Fraud Guarantee had raised millions of dollars from investors.  (*Id.*)  Victim-7 pressed Parnas and Correia for assurances about how his investment would be used.  On September 18, 2018, Correia and Victim-7 spoke by telephone, and Victim-7 questioned Correia about the potential investment.  Victim-7 was, in particular, interested in the involvement of a high-profile attorney ("Attorney-1") whom Victim-7 greatly admired.  Victim-7 recorded the conversation without

---

[2] The text messages referenced herein have been produced to Correia in discovery and will be provided to the Court upon request.

Correia's knowledge and the transcript of the call, which is attached as Exhibit A, reflects the following:[3]

- Victim-7 asked about the valuation of the company, inquiring whether they expected it to go from a $20 million valuation to "a $50 million valuation on the high end, right?" Correia responded, "No, not the high end. It'll probably go [to] a $50 million valuation with [Attorney-1] being signed on." Victim-7 said, "No, shit. Really?" and Correia said, "oh, absolutely."

- Victim-7 asked Correia "[h]ow much money do you have from people that are committed to this . . . venture? How much money do you have that has been . . . pledged . . . at this point to come in?" Correia said that he "do[esn't] keep a ledger of that" but said the amount is "[t]ens of millions of dollars" if he adds up everyone who has said they will invest when the company is ready. Correia added, "If I reached out to the people that . . . have been along for the ride in terms of waiting for us to raise money, and I said to them, . . . we want to go forward. I bet you if we wanted to raise ten million we wouldn't have a problem raising ten million at this valuation . . . without any effort."

- Victim-7 asked Correia "how much money do you have scheduled to raise at the moment?" Correia said that "[r]ight now, we're just doing a smaller amount for a couple of million dollars to be able to get . . . to the next phase." He continued, "Right now I've got the existing shareholders that are going to put in money . . . we're bringing in about $1 million from them right now, and then Lev will probably throw in 250." These statements were false. None of Fraud Guarantee's "existing shareholders" were in discussions to contribute any funds, much less $1 million. Nor was Parnas himself planning to contribute $250,000. (*Id.*).

- Victim-7 asked why—if the company was raising approximately $1 million, of which he was contributing $250,000—he was receiving only 1% of the equity rather than 25%. Correia responded that "we put millions of dollars into the company." Victim-7 asked, "So are you telling me, just so we're clear, are you telling me that you've got millions of dollars of your actual money in this thing?" Correia replied, "Of course. Not my money, but . . . some of my money. Lev has money in it. We have other. . . original shareholders, of course." Victim-7 asked again, "How much money . . . has been invested in this company so far overall?" Correia replied, "I just said millions, man. I don't misspeak. Four or $5 million probably." These statements were false. Fraud Guarantee had raised far less than the "millions" claimed by Correia, and certainly had not raised the four to five million dollars Correia claimed. (PSR ¶ 36). Parnas and Correia had not contributed millions of their own money. (*Id.*).

- Correia said that Fraud Guarantee was more than a mere "idea." He said that Attorney-1 was "signing on" "to the fact that we have built underwriting and scoring systems and algorithms that have blown their minds that insurance companies have decided to, for

---

[3] The transcript, which was produced in unredacted form in discovery, has been partially redacted due to victim and third party privacy interests. The Government will provide an unredacted copy to the Court upon request.

the first time in history of the United States—actually globally, ever decided to engage in covering fraud in the investment world." This statement was false. The business was nowhere near the stage represented by Correia. By this point, they were still in discussions with insurance carriers, and none had "decided to" enter into a deal with them.

- Victim-7 said that if "[Attorney-1] wasn't part of this thing, I probably wouldn't do it. . . . If you're telling me that [Attorney-1] is definitely on board with this thing and he's not going to back out . . . I'm good. So I'm getting your assurance that [Attorney-1] is definitely in with this thing without a problem?" Correia replied, "Absolutely, 100 percent." He then told Victim-7 that he could send his $250,000 payment directly to Attorney-1's consulting business, on behalf of Fraud Guarantee.

To seal the deal with Victim-7, Correia texted Parnas the next day that "all is good" with Victim-7 and the "only contingency he had was that he was asking that Attorney-1 jump on the phone with him to welcome him aboard so he knows he's really a part of it. He trusts, but he's just a little trigger shy having lost money on another deal recently. Let me know if you can facilitate that." Parnas responded, "Tell him when everything is sighed and wire hits he will call him." Correia sent Victim-7 a voicemail that Attorney-1 had left for Correia. In the voicemail, Attorney-1 noted certain of the steps he would take to assist Fraud Guarantee in exchange for a $500,000 payment. Victim-7 responded to Correia, "Just please confirm here that [Attorney-1] is a partner on this and be in it for the long haul with all of us." Correia wrote, "He is absolutely on board and part of the company. He, via[] [his consulting firm] will be with us and help with compliance and regulatory issues, advertising and marketing, and several other deliverables. He has also agreed that we can use his likeness to be the 'face of the company' (should we choose) for commercials, advertisements, etc. He personally will also engage in sales/business development . . . . Simply put, we will have full access to his entire team. Extremely broad list of things he has agreed to do. The relationship is very strong and we are doing business with him in other capacities as well." Victim-7 replied, "Ok. I'm in. Money will be there within the next 2 hours." Victim-7 then wired $250,000 to Attorney-1's firm. Approximately two weeks later, Parnas asked Victim-7 to wire an additional $250,000 to Attorney-1's firm, which Victim-7 did.

In sum, over the course of the scheme, Correia and Parnas conspired to defraud at least seven victims out of a total of approximately $2,322,500 through the commission of wire fraud. (PSR ¶ 37). Despite the length of the scheme and the amount of money invested by victims, Fraud Guarantee never became operational. (PSR ¶ 27). At his guilty plea proceeding, Correia admitted that he gave "incorrect information" to potential investors in Fraud Guarantee and "knew this was wrong at the time that it was done." (Plea Tr., Oct. 29, 2020, at 18).

### 2.   Correia's False Statements to the FEC

In March 2018, Parnas and Fruman began attending political fundraising events related to the 2018 midterm elections. (PSR ¶ 21). To attend those events, Parnas and Fruman made, or promised to make, substantial contributions to candidates, joint fundraising committees, and independent expenditure committees with the purpose of enhancing their influence in political circles and gaining access to politicians. (*Id.*). Parnas, Fruman, and Correia believed that by attending these events, they could advance their personal financial interests and promote an energy import-export business, Global Energy Producers ("GEP"), which they were in the process of

Hon. J. Paul Oetken                                                                                      Page 7
February 1, 2021

launching.  (*Id.*).  At that time, GEP did not have any income or assets, including a bank account.
(*Id.*).  According to records from the IRS, GEP never filed any return, and according to U.S.
Department of Energy records, GEP never had a permit to engage in shipping of oil or natural gas.

        In April 2018, Parnas received an invitation to a fundraising dinner later that month with
President Trump.  Parnas was told that he would need to pledge to contribute $1,000,000 to the
America First Action super PAC to attend the event.  Parnas, Fruman, and Correia agreed that by
attending the event, Parnas and Fruman could promote their business interests, including but not
limited to GEP.  But since GEP had no money, the defendants had to obtain funding from other
sources.  Parnas texted Correia on April 25, 2018, "Bro when you wake up please look at every
hard money lender you know and how quick can we turn it around."  The next morning, Correia
emailed a mortgage broker the next morning about getting a private loan on one of Fruman's
properties, and told him they needed the money to take advantage of a potential energy business
deal.  Fruman ultimately agreed to a one-year $3 million private loan with a 9 percent interest rate.
On May 17, 2018, the proceeds of the loan were transferred to a bank account controlled by Parnas
in the name of an LLC (with very little money in the account), and from there $325,000 was wired
to American First Action PAC.  (PSR ¶ 22).  The memo on the wire indicated it was from "Global
Energy Producers" and days later, a personal assistant who worked for Parnas, Fruman, and
Correia completed a contribution form, at Parnas's direction, which stated the contribution came
from "Global Energy Producers."  The contribution form required Parnas to affirm that "[t]his
contribution is made from the funds of the above-listed donor, will not be reimbursed by another,
and if this contribution is made via credit card, it is being made with a card for which the donor
has a legal obligation to pay and will not be made on the card of another."

        In July 2018, multiple press stories ran about the $325,000 contribution from GEP, raising
questions about its source and validity.  On July 25, 2018, the Campaign Legal Center filed a
complaint with the FEC about the contribution, arguing that it was an illegal straw donation.
Correia took the lead on responding to the press and FEC allegations.  Correia contacted an
accountant about recording the $325,000 contribution as coming from GEP and told the accountant
to "update the GEP balance sheet to properly reflect the fact that the $325,000 donation is in-fact
booked properly and will memorialize[] that GEP is the entity that made the donation (albeit via
[Parnas's LLC])."  Correia also told the accountant that they would "follow-up with [Parnas's]
LLC's info so the numbers will properly jive" and it was their "intent all along, just need to show
it on the financials."  Correia further asked the accountant for "any insight as to any specific
language that should be included with the loan documents that would memorialize the transaction."

        On October 11, 2018, GEP, Fruman, Parnas, and Correia filed a response with the FEC to
the Campaign Legal Center's complaint.  Attached to the response were sworn affidavits by
Parnas, Fruman, and Correia.  According to the Fruman, Parnas, and Correia affidavits, GEP "is a
real business enterprise funded with substantial bona fide capital investments," "its major purpose
is energy trading, not political activity," and the America First Action contribution "was made
with GEP funds for GEP purposes."  Those statements were false.  (PSR ¶¶ 24-25).  The funds
used to make the America First Action PAC contribution came from Fruman's private real estate
lending transaction, and GEP had no business activity or revenues when it made the contribution.
(*Id.*).  At his guilty plea, Correia admitted that his FEC affidavit contained information "that [was]
not correct" and he "knew that this was wrong at the time [he] did it."  (Plea Tr. at 17).

### B.  Procedural History and the Stipulated Guidelines Range

On October 9, 2019, Correia and his three co-defendants were charged in an indictment with campaign finance offenses.  (Dkt. 1).  Correia was arrested on October 16, 2019.  (PSR p. 2). On September 17, 2020, a Grand Jury returned a superseding indictment charging: (i) Parnas and Fruman with conspiring to defraud the United States by obstructing the lawful functions of the FEC and knowingly make straw donations in excess of $25,000, in violation of 18 U.S.C. § 371; 52 U.S.C. § 30122 and 30109(d)(1)(A) and (D) (Count One); (ii) Parnas, Fruman, and Correia with making materially false statements to the FEC, in violation of 18 U.S.C. § 1001(a)(2) and (2) (Count Two); (iii) Parnas, Fruman, and Correia with making materially false statements to the FEC with the intent to impede, obstruct, and influence the administration of a matter within the jurisdiction of the FEC, in violation of 18 U.S.C. § 1519 and 2 (Count Three); (iv) Parnas, Fruman, Correia, and Andrey Kukushkin with conspiring to defraud the United States by obstructing the lawful functions of the FEC and knowingly make foreign straw donations in excess of $25,000, in violation of 18 U.S.C. § 371; 52 U.S.C. § 30121, 30122 and 30109(d)(1)(A) and (D) (Count Four); (v) Parnas, Fruman, and Correia with soliciting contributions from a foreign national, in violation of 52 U.S.C. § 30121 and 30109(d)(1)(A) (Count Five); (vi) Parnas, Fruman, and Kukushkin with aiding and abetting the making of contributions by a foreign national, in violation of 52 U.S.C. § 30121 and 30109(d)(1)(A) (Count Six); and (vii) Parnas and Correia with conspiring to commit wire fraud in connection with defrauding seven investors in their business "Fraud Guarantee," in violation of 18 U.S.C. § 1349 (Count Seven).  (PSR ¶¶ 1-8).

On October 29, 2020, Correia pled guilty to Counts Two and Seven pursuant to a plea agreement.  (*Id.* ¶ 10).  As part of that agreement, the parties agreed that the Guidelines range was 33 to 41 months' imprisonment (the "Stipulated Guidelines Range").  (*Id.*).  Correia also agreed to (i) forfeit to the Government $43,650, which represented the proceeds of the offense traceable to Correia; and (ii) pay restitution in the amount of $2,322,500 to the seven victims listed in the plea agreement.  (*Id.*).

### C.  Presentence Investigation Report

On January 20, 2021, the Probation Department issued the final PSR.  (Dkt. 168).  In the PSR, the Probation Department agreed with the parties' Guidelines calculation, and determined that the total offense level was 20; that Correia was assigned to Criminal History Category I; and that as a result the applicable Guidelines range, consistent with the Stipulated Guidelines Range, was 33 to 41 months' imprisonment.  (PSR ¶¶ 44-65, p. 35).  Citing the seriousness of the offense, and specifically the "severity of the wire fraud scheme" that "resulted in significant losses totaling more than $2.3 million to several victims," the Probation Department recommends "a custodial sentence."  (*Id.* at 37).  However, because Correia's personal gain "amounted to only a fraction of the total losses of the conspiracy," and since he is a first-time offender, the Probation Department

recommends a term of imprisonment of 366 days.  (*Id.*).  In addition, the Probation Department recommends forfeiture in the amount of $43,650, and restitution in the amount of $2,322,500.

### D. Discussion

The Government submits that a sentence within the Stipulated Guidelines Range of 33 to 41 months' imprisonment is appropriate in order to reflect the serious nature of the defendant's conduct, afford adequate deterrence, and promote respect for the law.

#### 1.  The Nature and Circumstances of the Offense

*First*, a sentence within the Stipulated Guidelines Range would appropriately reflect the serious nature of the defendant's conduct and promote respect for the law.  *See* 18 U.S.C. §§ 3553(a)(1), (2)(A).  Over the course of a seven year period, Correia defrauded seven different investors out of more than $2 million.  He did so not once, not twice, but over and over again.  He lied to each of these investors on a variety of material topics; prepared and disseminated demonstrably and materially false investment materials; and knew that the vast majority of the funds he and Parnas raised were not going to be used, as promised, to grow Fraud Guarantee's business, but instead to other, improper purposes, including to cover their own personal expenses. The recording of the call between Correia and Victim-7 is emblematic of the pivotal role Correia played in defrauding investors.  Correia lent credibility to the venture: he knew the details and could "talk the talk" and appeared knowledgeable and confident, even though much of what he was saying was false or misleading.  Correia knew as much, of course, and yet he made these false claims anyways.  Moreover, Correia knew how to gain the trust of his victims (for instance, by taking advantage of Victim-7's admiration for Attorney-1) when all the while Correia was lying to them about the money invested in Fraud Guarantee; how operational the business was; and how their funds would be spent.

What makes this fraud so shameless, and the conduct so serious, is the fact that a significant portion of the victims' funds were used to pay for the personal expenses of Correia, Parnas, and their families.  The vast majority of the investors' funds were not used to develop the business, or pay for employees' salaries: Correia and Parnas simply stole the money.  Correia clearly knew where their victims' money was going.  In addition to his intimate involvement in Fraud Guarantee's day-to-day activities, Correia was a signatory to the Fraud Guarantee accounts— despite his claim that Parnas controlled them—and thus knew precisely how little of the victims' funds were going to legitimate business expenses. (Def. Ltr. 9).  Correia places the blame for his own actions on Parnas, citing the amount of money that went to Parnas (Def. Ltr. 8-9).  While Parnas and his family received a far greater share of the profits of the scheme, the amount of money received by Correia was significant to his overall financial picture and essential to covering his living expenses.  Indeed, text messages between Parnas and Correia reflect the fact that Correia was routinely broke, and consistently seeking ways to cover basic living expenses.  When victims' funds came in and a comparatively small amount was transferred to Correia, he was overjoyed to be able to cover his living costs and existing debts.  For example, as the text exchange between Correia and Parnas about Victim-6's funds makes clear, Correia was eagerly awaiting the arrival of money from Victim-6 not because of the impact on Fraud Guarantee, but because he wanted Parnas to wire $25,000 to him for living expenses.  In short, Correia's role should not be assessed solely by the total amount of money he received since he was instrumental in carrying out the fraud.  As detailed extensively above, Correia was pivotal to convincing investors that the

Hon. J. Paul Oetken                                                                                          Page 10
February 1, 2021

operation was seemingly legitimate, he handled many of the direct (and fraudulent) communications with donors and potential donors, he created the materially false investment materials and circulated them to the victims, and he continued to dupe investors for years knowing that their investments would instead be used for improper, personal expenses. Correia's lies and deceit had serious consequences for his victims, each of whom lost hundreds of thousands of dollars. The seriousness of this conduct weighs strongly in favor of a Guidelines sentence.

The fact that Correia may well have hoped that Fraud Guarantee would someday be successful, earning his clients—and himself—money, is belied by his own misappropriation of victims' funds and hardly excuses giving victims obviously and patently false information to cause them to invest. Correia contends that he truly believed in Fraud Guarantee and claims that such a belief makes him "unlike most criminal defendants who have pled guilty to fraud." (Def. Ltr. 2). The argument, however attractive on the surface, is belied by the brazenness of the defendant's conduct. The defendant—knowing full well that Fraud Guarantee did not have a marketable product, did not have "millions" in investments, and knowing that he and Parnas had not personally invested substantial sums of their own money—nonetheless duped victim after victim into making substantial investments under false pretenses. His hope that the business may one day succeed—which hardly differentiates him from any other fraudster—does not in any way mitigate or excuse his egregious conduct.

Moreover, Correia's conduct was not the result of a single, isolated lapse in judgement. Rather, for more than seven years, Correia worked hand-in-hand with Parnas to identify, deceive, and defraud their victims. Correia befriended his victims and used his charm and ability to engender trust to bilk them of their money. Correia took advantage of his victims' trust to solicit funds by purposefully and intentionally telling lies about things that he *knew* to be false. He did that because he knew that if he told the victims the truth—that Fraud Guarantee was not a real, operating business and that the victims' money was going not to business expenses, but to pay for personal expenses—they would have never invested.

That Correia perpetrated this wire fraud in connection with a business called Fraud Guarantee is more than an unfortunate irony. In preparing to launch the business, Correia did research about fraud laws and consulted a former prosecutor about fraud offenses. When he sold victims on an investment in the company, he claimed that he and Parnas had once been defrauded. He told his victims that the financial impact of that fraud hurt him terribly and drove him to launch a business to prevent that type of damage to other people. And while he was doing that—while he was telling them how terrible it can be to be a victim of fraud—he was stealing their money. Some of Correia's victims have apparently forgiven him—although the fact that they appear more concerned for Corriea's reputation and well-being suggests that Correia has not come clean with his victims and instead has continued to shade the truth to make himself look less culpable. Nonetheless, each of his victims have lost hundreds of thousands of dollars that Correia has made no effort to date to pay back. The brazenness of the scheme demands a sentence that reflects the real-world consequences of his actions and its serious nature.

It also bears noting that the Guidelines here are driven not by the intended loss, but on the actual loss caused to Correia's and Parnas's victims. The loss amount does not overstate the harm, and to the contrary, directly reflects the harm that Correia's lies and deceit caused on his victims. None of the victims have gotten a penny of their money back, and given that Correia has remained unemployed for the year and a half following his arrest, it appears unlikely that Correia will ever

Hon. J. Paul Oetken                                                                                     Page 11
February 1, 2021

be able to make his victims whole.  And it also bears noting that the reason this fraud came to an
end was not because Correia had a change of heart, but as a result of his and Parnas's arrest and
the Government's investigation.

With respect to Correia's conviction on Count Two, his conduct is also serious and also
merits a Guidelines sentence.  Correia went to significant efforts to lie to and deceive an important
regulatory agency tasked with enforcing the campaign finance laws to ensure transparent elections,
the FEC, about the source of a substantial political contribution.  He did so in direct response to
learning that the source of that donation was likely to be subject to inquiry and potential scrutiny.
Correia was not a minor participant in the scheme: he took the lead with respect to public relations;
he submitted his own false affidavit; and he asked an accountant to alter GEP's financial records
to substantiate the lie that Correia, Parnas, and Fruman told about the source of the funds for the
GEP contribution.  In particular, he knew that lie to be false because he was personally involved
in obtaining the source of funds for the GEP contribution.  Correia has proffered no explanation
for his deceit, and the fact that he so willingly engaged in a different type of fraudulent conduct
while also engaging in a long-term wire fraud underscores the seriousness of his criminal conduct
and his lack of respect for the law.

### 2.  The Need to Afford Adequate Deterrence

*Second*, the need to afford adequate deterrence weighs in favor of a sentence within the
Stipulated Guidelines Range.  *See* 18 U.S.C. §§ 3553(a)(1), (2)(B).

Specific deterrence is necessary here.  Correia has spent much of his adult working life
engaged in the fraud scheme to which he has now pled guilty.  He has remained unemployed since
his arrest, and appears to have no imminent plans to make money to pay back his victims or support
himself legitimately.  Correia has not spent a single day in prison, and has appeared before Your
Honor only once since his arrest, yet he asks for a non-incarceratory sentence: it is difficult to
imagine how several video conference calls with the Court could provide adequate deterrence
given the seriousness and scope of Correia's conduct.  Moreover, Correia's sentencing submission
strongly suggests that Correia continues to downplay the seriousness of his conduct and continues
to have trouble accepting his role in the scheme.  While the Government does not dispute that
Correia has met the requirements of U.S.S.G. § 3E1.1, Correia's attempts to shift blame of Parnas
for his own conduct along with his repeated claims that he truly believed in a business he knew
full well was a far cry from the multi-million dollar operation he touted to investors—strongly
suggests that something more than a non-custodial sentence is needed to impart on this defendant
the magnitude of his crimes and to ensure he does not engage in further criminal conduct. .  (*See*
Def. Ltr. at 2).

Correia's lack of empathy for his victims also counsels in favor of the need for specific
deterrence.  It is notable that in his eight-page letter to the Court, Correia does not mention his
victims—and the millions of dollars they lost as a result of his conduct—a single time.  While
Correia devotes paragraphs to the harm that his family experienced after law enforcement agents
visited his home in an effort to find and arrest Correia (Def. Ltr. 11), and complains about the
difficulty he experienced seeing his face "plastered" on CNN (Correia Ltr. 6), he evinces none of
the same concern for the families of his victims, each of whom lost hundreds of thousands of
dollars because of Correia's criminal conduct.  Similarly, Correia expresses no regret and offers
no excuse for his decision to submit a false affidavit and attempt to deceive the FEC and by

Hon. J. Paul Oetken                                                                                               Page 12
February 1, 2021

extension the American public.  His self-regard at the expense of his victims and the public is troubling.  (*See* Correia Ltr.).  In sum, Correia's justifications for his criminal conduct and lack of consideration for his victims strongly suggest that Correia may recidivate and is in need of specific deterrence.

General deterrence is also of particular importance in this case.  It is important that those who might choose to engage in brazen fraud of the sort that occurred here, particularly a fraud that resulted in the loss of millions of dollars, be sent a clear message that such conduct will not be tolerated and will result in stiff punishment.  *See, e.g.*, *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks omitted)).

Imposing a non-custodial sentence in this case—a significant downward departure from the applicable Guidelines range—suggests that these kinds of white collar crimes are not as important, or at least not as deserving of punishment, as other crimes.  Imposing a term of incarceration, by contrast, is critical to the goal of affording adequate general deterrence to future crime of this nature.  *See United States v. Livesay*, 587 F.3d 1274, 1279 (11th Cir. 2009) ("[I]t is difficult to imagine a would-be white-collar criminal being deterred from stealing millions of dollars from his company by the threat of a purely probationary sentence.").  Finally, with respect to the conduct charged in Count Two, Correia's efforts to deceive the FEC and by extension the American public do not merit a mere slap on the wrist.  Correia went to significant efforts to submit a demonstrably false affidavit and falsify business records in service of those lies.  A Guidelines sentence adequately serves to deter both Correia and others who may be considering lying to and deceiving the FEC in connection with its important mission.

Accordingly, a sentence within the Stipulated Guidelines Range would adequately balance the relevant considerations under Section 3553(a) and achieve the statute's stated objectives.

> 3.  <u>The Defendant's Remaining Arguments Do Not Warrant a Non-Incarceratory Sentence</u>

Correia's remaining arguments in support of a substantially below Guidelines, non-incarceratory sentence are unpersuasive.

*First*, Correia points to his difficult childhood in support of his request for a non-incarceratory sentence.  However, it bears noting that Correia was not a man who was desperate or had no prospects.  He had some college education and experience working in the restaurant industry, and was a talented golfer in his youth.  While he had a difficult childhood, as is unfortunately true for many defendants, by the time he reached adulthood he had a loving wife and family and owned a home, and was in that respect much more fortunate than many defendants that come before this Court for sentencing.  Correia's decision in the face of those circumstances to lie and cheat his investors—whether the motivation was more money, more success, or something else—is particularly troubling.  *See United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) ("Criminals who have the education and training that enables people to make a decent living

without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.").

*Second*, Correia's conduct since his arrest also weighs in favor of a Guidelines sentence. Correia has taken no steps to repay his victims, and his sentencing submission evinces no concern for those victims or the millions of dollars they lost. Correia has remained unemployed since October 2019, and although he incorporated a business in 2020, it is not functional and Correia appears to have made no effort to obtain any other employment. (PSR ¶ 93). Correia also does not appear to have taken any steps to come clean with, or apologize to, his victims, maintaining even in his instant submission that he genuinely believed in a company he knew had no viable product and was instead a vehicle for a brazen fraud scheme.

*Third*, Correia cites to his familial responsibilities to justify a significantly below-Guidelines sentence. (Def. Ltr. 10-12, 15). The Government is sympathetic to the strains a custodial sentence will place on Correia's family, and that is certainly a consideration to take into account in sentencing Correia. But as the Second Circuit has observed, "[d]isruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration," but not a basis for a variance. *United States v. Johnson*, 964 F.2d 124, 128 (2d Cir. 1992). Moreover, because Correia is not a sole caregiver nor an actual source of financial support for his children, the substantial variance sought by the defendant is not warranted here. *Cf. United States v. Smith*, 331 F.3d 292, 294 (2d Cir. 2003) (finding that a downward departure based on family circumstances was not justified where the defendant "was not the sole caregiver or financial supporter of his son" and noting that "[i]t is not unusual…for a convicted defendant's incarceration to cause some hardship in the family.").

*Fourth*, Correia argues that certain health issues justify a non-incarceratory sentence. (Def. Ltr. 12, 15-18). However, Correia fails to point to any health conditions that the Bureau of Prisons cannot address. While the Government does not question that Correia suffers from these issues, none of these conditions, even when considered together, are so severe that they warrant a non-Guidelines sentence, and certainly not a sentence of probation or home confinement. As Probation has correctly noted, the Bureau of Prisons operates several medical facilities that can readily accommodate the defendant's health issues. (PSR at 37). The Bureau of Prisons has similarly affirmed that they can care for Correia's health issues and accommodate his diet. (*See* Ex. B. (Letter from Bureau of Prisons, unredacted version to be filed under seal due to personal medical information)).

*Finally*, Correia devotes a substantial portion of his sentencing memorandum to arguing that he should not be sentenced to a term of imprisonment because of the impact of COVID-19 on the Bureau of Prisons' inmate population. (Def. Ltr. 17-18). As an initial matter, the Government notes that it was Correia (not the Government) who sought to move forward with sentencing at this time. Indeed, the Government suggested to the defendant that adjourning sentencing might be appropriate so as to allow for the possibility that if a term of incarceration was imposed, the risks posed by COVID-19 might have abated. More important, to the extent the defendant is concerned about the risks posed by COVID-19, the Government would have no objection to an extended surrender date until such time as a vaccine is more widely available (particularly within the prison population, where vaccination is currently underway). The current pandemic should not require the Court to wholly abandon the Guidelines and the goals of sentencing articulated in § 3553.

Hon. J. Paul Oetken                                                                        Page 14
February 1, 2021

       **E.**     **Conclusion**

       For the reasons set forth above, the Government respectfully submits that a sentence within the Stipulated Guidelines Range of 33 to 41 months' imprisonment would be appropriate in this case and would be sufficient but not greater than necessary to promote the legitimate ends of sentencing. In addition, the Government submits that the Court should order forfeiture in the amount of $43,650, and restitution in the amount of $2,322,500. The Court previously signed a preliminary consent order of forfeiture (Dkt. 138), and the Government will submit a proposed restitution order under separate cover within 90 days.

                                                Respectfully submitted,

                                                AUDREY STRAUSS
                                                United States Attorney for the
                                                Southern District of New York

By:                */s/*
                                                  Rebekah Donaleski
                                                  Aline R. Flodr
                                                  Nicolas Roos
                                                Assistant United States Attorneys
                                                Tel.: (212) 637-2423

cc:     William Harrington, Esq. (via ECF)