1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                              19 Cr. 725 (JPO)

5   DAVID CORREIA,

6                Defendant.
                                            Sentence
7   ------------------------------x

8                                           New York, N.Y.
                                            February 8, 2021
9                                           11:40 a.m.

10  Before:

11

12                     HON. J. PAUL OETKEN,

13                                          District Judge

                            APPEARANCES
14
    AUDREY STRAUSS
15       United States Attorney for the
         Southern District of New York
16  BY:  REBEKAH A. DONALESKI
         NICOLAS T. LANDSMAN-ROOS
17       Assistant United States Attorneys

18  GOODWIN PROCTER, LLP
         Attorneys for Defendant
19  BY:  WILLIAM JOSEPH HARRINGTON

20

21

22

23

24

25

 1          THE COURT:  This is Judge Oetken.  I believe we're

 2  ready to proceed.  I can see on the video Mr. Correia,

 3  Mr. Harrington, and Mr. Roos.  So I think we're ready to go.

 4          (Case called)

 5          THE DEPUTY CLERK:  Starting with the government,

 6  counsel, please state your name for the record.

 7          MR. LANDSMAN-ROOS:  Good morning, your Honor.

 8  Nicholas Roos for the United States.  I'm joined on the line,

 9  on the non video, by my colleagues, Rebekah Donaleski and Aline

10  Flodr.

11          THE COURT:  Good morning.

12          MR. HARRINGTON:  Good morning, your Honor.  Bill

13  Harrington representing Mr. Correia.  I note that Mr. Correia

14  is also on the videoconference.

15          THE COURT:  Good morning.

16          Mr. Correia, can you hear me?

17          THE DEFENDANT:  Yes, your Honor.  I can.

18          THE COURT:  Okay.  We're here for sentencing in this

19  case.  The defendant pleaded guilty on October 29, 2020, to two

20  counts of the superseding indictment, Count Two, which is

21  making false statements to the Federal Election Commission, and

22  Count Seven, conspiracy to commit wire fraud.

23          I want to start by recognizing the fact that we're

24  proceeding remotely by videoconference with an audio feed to

25  the public.  Proceeding remotely for a sentencing is authorized

1    by the CARES Act in light of the current pandemic and by the

2    chief judge's standing order of this district finding that

3    sentencing proceedings cannot be conducted in person without

4    jeopardizing public health and safety, as long as the defendant

5    consents.

6         Mr. Harrington, have you discussed the subject of

7    proceeding by videoconference with the defendant?

8         MR. HARRINGTON:  I have, your Honor.  And we consent

9    to doing it remotely.  Mr. Correia consents and requests that

10   it be done remotely.

11        THE COURT:  Mr. Correia, you've had a chance to talk

12   to your lawyer, and you agree to do this remotely by video?

13        THE DEFENDANT:  Yes, your Honor.

14        THE COURT:  I find the defendant has waived an

15   in-person proceeding and consents to proceeding remotely by

16   video.  I also find that this proceeding cannot be further

17   delayed without serious harm to the interests of justice.

18        The defendant pleaded guilty after being charged in

19   the superseding indictment.  And through counsel, he's

20   requested a prompt sentencing hearing.  Conducting sentence at

21   this time will provide certainty and will avoid unwarranted

22   delays in achieving final resolution of the case as to this

23   defendant.  And I find that further delay would not be in the

24   interests of justice.

25        In preparation for today's proceeding, I've reviewed

 1   the presentence report with an addendum and sentencing

 2   recommendation prepared by the probation department; the

 3   submission by defense counsel, written submission, dated

 4   January 25 with several letters, including a letter from

 5   Mr. Correia, from members of his family, as well as friends and

 6   business associates, all of which I have read; the written

 7   submission by the government dated February 1; and three victim

 8   impact letters, all of which I've read.

 9          Do I have everything I should have, as far as you all

10   know, Mr. Roos?

11          MR. LANDSMAN-ROOS:  Yes.  The only other thing, your

12   Honor, is there is a restitution order and an updated schedule

13 A that we sent yesterday, and I just want to be sure your Honor

14   has that as well.

15          THE COURT:  Yes.  I have that as well.  Thank you.

16          Do I have everything as far as you're concerned,

17   Mr. Harrington?

18          MR. HARRINGTON:  Yes, your Honor.

19          THE COURT:  Mr. Harrington, have you read the

20   presentence report and discussed it with your client?

21          MR. HARRINGTON:  I have.  We've discussed it.

22          THE COURT:  And, Mr. Correia, you've also read the

23   presentence report?

24          THE DEFENDANT:  Yes, your Honor.  I have.

25          THE COURT:  Any objections, Mr. Harrington?

1              MR. HARRINGTON:  No, your Honor.

2              THE COURT:  Mr. Roos, have you read the presentence

3    report?

4              MR. LANDSMAN-ROOS:  Yes, your Honor.  The government

5    has no objections.

6              THE COURT:  All right.  I adopt the facts in the

7    presentence report as my findings of fact, and I'll start with

8    the sentencing guidelines, as we always do in the federal

9    system.

10             Although the Court is not required to follow the

11   guidelines, I am required to consider the applicable guidelines

12   as a starting point and a benchmark in determining an

13   appropriate sentence.

14             In this case, the parties stipulated to the guideline

15   calculation, and the probation department agrees with the

16   parties' calculation.  And I also agree that that is the

17   correct sentencing guidelines calculation.

18             The offense level, after adjustments and grouping is

19   23.  And because the defendant accepted responsibility, there's

20   a 3-point reduction.  So the total offense level is 20 under

21   the sentencing guidelines.

22             He has no prior convictions.  Therefore, the criminal

23   history category is I.  Therefore, the guideline range is 33

24   months to 41 months' imprisonment.

25             Now I will give each of you an opportunity to speak,

1    and I'll start with defense counsel.  I'll note that I've read

2    all your submissions, which I appreciate and were very well

3    done.  So you don't need to repeat what's in there.  But

4    anything you'd like to say or highlight today, you're welcome

5    to do that.

6              And I'll start with Mr. Harrington.

7              MR. HARRINGTON:  Thank you, your Honor.

8              My comments are aimed at highlighting much of what was

9    said in our papers.  Our intention really was to present the

10   detail and the texture in my letter and Mr. Correia's letter

11   and the letters that came from others.

12             But I think there are two main factors that we want to

13   highlight for the Court.  One is that the sentence the Court

14   imposes reflect the seriousness of the offense and that similar

15   people get a similar sentence for similar conduct.

16             The 33-month recommendation is based on our kind of

17   crude assessment of what the fraud is here, what the crime is

18   here.  There are two characteristics we highlight in our letter

19   that fundamentally differentiate David from a person who is

20   typically within this range.

21             The first is that David himself received very little

22   personal gain, just over $43,000 over seven years.  I think

23   it's that fact that led probation to make the recommendation it

24   made, which is for a sentence well below the 33-month minimum.

25             The other thing that really distinguishes him is that

1    he has a very honestly held belief in the promise of Fraud

2    Guarantee, the business that he himself invested thousands of

3    hours of what he's talked to me about as sweat equity into the

4    business.

5            There are two letters from people he worked with,

6    brokers he worked with to try to make that business happen.

7    One of them describes how they came to be impressed with

8    David's worth ethic, his focus, his dedication.  I think that

9    that dedication that David had to the business is different

10   than what your Honor might see in some other sorts of frauds.

11           The second characteristic that I want to focus on, the

12   issue I want to focus on is the history and characteristics of

13   Mr. Correia, which is one of the 3553(a) factors.

14           The letter talks about his modest upbringing and the

15   modest opportunities he had growing up as a young adult.  And I

16   think it puts in context how it came to happen that he went

17   into business with Lev Parnas, how he ended up in these

18   projects, and how he ended up in the middle of these crimes

19   that he pled guilty to.

20           He's learned a great deal since his arrest.  The

21   process of going through this and thinking about these

22   materials opened his eyes as to who Mr. Parnas was and what it

23   meant to be in business with him.

24           It's caused him to refocus on his family and take care

25   of them.  He quickly pled guilty to the new charges that were

1    eventually filed against him.  He really pled guilty in a

2    matter of weeks.  And I think that reflects the change and the

3    learning that he's had since his arrest.  He's also suffered a

4    lot already as a result his arrest.

5           He really hoped that these businesses would become

6    something.  He spent years working on them.  And those

7    businesses really lie, if not in ruin, at little hope of really

8    making them happen.

9           So he is in a place now where he needs to reset his

10   professional life because of the arrest.  The press coverage

11   has been extensive and at times brutal for him.  Even when the

12   sentencing was coming up, he was put on the front page of a

13   local newspaper in his old hometown.

14          That attention itself is a form of deterrence and

15   punishment for someone.  That's not what the intention of it

16   is, but it has that effect.  He's committed to pay restitution

17   of over $2 million.

18          The government in their comments said a few court

19   conferences aren't really enough of a punishment.  But I think

20   when seen in the overall context of what he's been through,

21   he's gone through a lot more.

22          And that has meant a lot in terms of how David has

23   processed this event and how someone else looking at it

24   would -- I don't think any person would look at David and say,

25   this was worth it.  The $43,000 that he achieved here over

1   seven years was worth all of the negative harm that he's gone

2   through, the kind of resetting of his professional life, and

3   the $2 million restitution agreement that he has now.

4        I'm not saying that those consequences are unjust.

5   I'm just saying that they're real consequences and something

6   that the Court can consider in deciding how much more

7   punishment David needs to receive.

8        Also because his particular situation, incarceration

9   will be harmful.  He takes care of his children.  He's a

10  primary caregiver for them, particularly when his wife is

11  working.  She has a very difficult schedule as a medical

12  professional.

13       He has health issues that will make prison more

14  difficult for him that an average person being incarcerated.

15  I saw the form letter from the Bureau of Prisons about how they

16  have health services available for people, and I recognize

17  that.

18       The argument though is that it can't be suggested that

19  prison wouldn't be harder for him than it would be for others.

20  So to the extent the Court concludes that a term of

21  incarceration is necessary, I would ask that the Court consider

22  that it will be more difficult for him to be in prison than for

23  other people, and it should be reduced accordingly.

24       Of course, we've asked for a non-incarceratory

25  sentence, given the specifics of David's situation.  But

1   regardless, if the Court disagrees with that and ultimately

2   does think that jail time is appropriate, it will be harder for

3   him just because of the dietary issues and other issues that

4   will aggravate his health problem.

5          I think the fundamental question the Court faces is is

6   whether David is someone who requires a significant punishment,

7   a long term of incarceration, or whether he's really a good

8   person who did wrong.

9          This is a serious offense.  There's no question about

10  it.  How much more punishment does he really need.  I think the

11  letters that were submitted both by David and the other people

12  in David's life really say a lot about him.

13         It's very striking that two of the victims of the

14  offense submitted letters that talked very positively about

15  David.  The people that kind of knew him well had a very

16  positive response to him.  Even others who knew about his crime

17  talk about his good character and their trust in him.

18         One of the letters said that the crimes that David

19  pled guilty to are not an accurate reflection of who David

20  Correia is as a human being, but rather the fact that he made

21  mistakes in judgments, and they're serious mistakes.  There is

22  no question about that.

23         I hope that our submission to the Court demonstrated

24  the truth of what that one letter-writer said about who David

25  is as a human being, who he wants to be, who he's trying to be

1   because I think it says a lot about the needs and the sorts of

2   punishment that the Court might consider imposing.

3          So those are the elements of our submission that I

4   wanted to highlight for the Court, and I don't have any further

5   comments now.

6          THE COURT:  Thank you, Mr. Harrington.

7          Mr. Roos, again, I've read the government's

8   submission, as well as the victim letters.  I'm obviously

9   familiar with the case.  But anything you'd like to highlight

10  today.

11         MR. LANDSMAN-ROOS:  Thank you, your Honor.

12         So the scale of the fraud, the amount of money

13  involved, the duration of the scheme; the fact that defendant

14  received some of the victims' funds, even if it was

15  comparatively less; and the fact that the victims suffer to

16  this day, financially and emotionally, requires the imposition

17  of a significant sentence and one that is within the guidelines

18  range.

19         Your Honor, as you just acknowledged, has our

20  submission.  And that submission outlines the reasons why, in

21  our view, a guideline sentence is necessary, specifically the

22  nature and the seriousness of the offense and the need for

23  deterrence, as well as the culpability of this individual

24  defendant.

25         Two points I want to draw out from the submission.

1   One is how Correia profited.  It may not have been on the scale

2   of his codefendants, at least financially.  But he did receive

3   money.

4          The evidence indicates that that was, at the time the

5   money was being solicited, a goal.  And the evidence also

6   suggests that it was essential to his livelihood.

7          I also just want to make a note that the guidelines

8   recognize and look to loss amount, not the gain amount.  And

9   that's because there are many frauds in fact where perpetrators

10  don't profit personally.

11          They may profit sort of indirectly, for instance, by

12  receiving a salary from a company that they're perpetrating a

13  fraud through.  But that is not a core part necessarily of the

14  fraud.  It's certainly an important point.  I don't think the

15  fact that Correia got less money does not diminish the overall

16  scope of the fraud, which is serious.

17          Our sentencing submission also outlines the nature of

18  the scheme and the extensiveness of it and the role that

19  Correia played in it.  And while I don't want to go over our

20  sentencing submission since your Honor has already read it, I

21  do want to highlight a few things from the victim impact

22  statements that came in after we filed our submission.

23          And I think these statements paint a picture of the

24  damage that David Correia has done through his fraud.  From the

25  statements, there are a few conclusions that I think can be

1    drawn about Correia's culpability and the need for just

2    punishment in this case.  So I'll go through those.

3          First, the statements describe Correia's extensive

4    role in the fraud.  Victim 7 in particular notes that it was

5    Correia's job to convince him that the business was legitimate,

6    and he used the language "on the level."  And we see that in

7    the transcript of the conversation between Correia and Victim

8    7.  Correia was effectively the closer.  He was essential.

9          And I emphasize this point because I want to be clear.

10   He wasn't some sidekick.  He wasn't an assistant to Parnas.  He

11   was an equal player in the criminal scheme, and that demands a

12   substantial sentence.

13         They may have had different roles and profited

14   differently, but that doesn't diminish the essential role that

15   Correia played in a fraud scheme that resulted in significant

16   losses.

17         Second, the statements describe how Correia benefited

18   from the scheme.  Again, I think there is no dispute that he

19   comparatively received less money.  But I think the victim

20   impact statements bear out that while Correia was defrauding

21   victims, he was telling them he was enjoying a luxurious life

22   that was filled with travel and nice hotels.

23         The impact statement from Victim 6 makes a point of

24   saying how Correia bragged about his lavish lifestyle.  So I

25   think that bears noting in considering exactly how this

1  defendant profited or enjoyed the fruits of his criminal

2  scheme.

3          Third is that the statements describe the enormous

4  effect the fraud had on the victims, both mentally and

5  financially.  Both Victim 6 and Victim 7 are self-made

6  individuals who support their families financially.  They saw

7  this as a nest egg based on assurances from the defendants.

8          And their statements, while those detail how the fraud

9  has cost them financially -- it's injured their families.  It's

10  exposed them to press attention, and it's caused great

11  emotional trauma.

12          And that emotional scarring those statements indicate

13  continues to this day.  So I think that can't be overlooked in

14  terms of this is not a victimless scheme.  There are real

15  victims who took the time to write statements, who have been

16  followed the case and who feel significantly injured by the

17  conduct of the defendant.

18          Finally, I want to say something about this fraud in

19  particular and why I think it's so pernicious.  So Correia

20  solicited money for a business called Fraud Guarantee.  There's

21  of course an irony or a pun involved in the fact that that's

22  the name of the business at issue here.

23          But what I think is important and what's emphasized by

24  a statement that Victim 6 wrote is that victim wrote:  "I

25  invested my hard-earned money for the purpose of assisting

1    others, other investors to combat fraud."

2            So the business itself was about emphasizing the

3    devastating effect that fraud can have on people.  Correia and

4    Parnas in fact told their own stories of how they had been

5    victimized by fraud.

6            One of the victim impact statements in fact

7    acknowledges how Correia said he was so damaged by fraud.  And

8    while they were saying those things, acknowledging explicitly

9    the damage that can come from fraud, they were stealing money.

10           Correia was stealing money, and I think he was

11   defrauding the very people that he was telling this is how bad

12   fraud can be.  Calling the business Fraud Guarantee, taking

13   peoples' money to help stop fraud and then stealing it,

14   effectively guaranteeing fraud, was just so brazen, and it

15   demands a significant sentence.

16           So for those reasons and for the reasons in our

17   submission, our view is that a guideline sentence is

18   appropriate.  The only other thing I want to say, unless

19   your Honor has any questions, is that there is obviously on a

20   question of health and family circumstances the issue of the

21   pandemic.

22           I think, as we've noted previously, I don't think that

23   should be a consideration.  And the government certainly, as we

24   have done in other cases, is willing to entertain a delayed

25   surrender until vaccination can happen or conditions have

1   improved.

2         And as your Honor knows, the BOP also has vaccination

3   underway.  So I think that ultimately doesn't need to be a

4   weighty consideration in this context.

5         THE COURT:  Just one or two questions for the

6   government, Mr. Roos.

7         First of all, I wonder if you would speak a little bit

8   more to the relative culpability of Mr. Correia as compared to

9   codefendants, I guess in particular, Mr. Parnas.

10         It's a little difficult to do that in a situation

11   where Mr. Parnas hasn't pled and is, as of now, planning to go

12   to trial.  So I wondered if you could tell me anything about

13   the state of the record.

14         What does it mean that Mr. Correia received only

15   $43,000, which is I think 2 percent of the amount that was

16   defrauded from the victims or less, where at the same time so

17   much more of the money coming in seems to have been used by

18   Mr. Parnas for luxury items and things like that?

19         Does that make Mr. Correia more like an employee as

20   opposed to a partner in practice?

21         And the second aspect of it, if you can speak to, is:

22   What can you tell me about the record of what he was doing?

23         Some of the letters indicate -- well, some of the

24   defendant's submission points indicate he really believed in

25   this business and that he was actually working day to day to

1  kind of make it come to fruition, talking to insurance brokers,

2  etc.

3      what can you say about those two aspects and how they

4  go to relative culpability?

5      MR. LANDSMAN-ROOS:  Certainly, your Honor.  Your Honor

6  correctly notes that obviously Mr. Correia's codefendant hasn't

7  pled guilty.  But I'll just assume for purposes of the record

8  what's in our submission and what's in the indictment against

9  codefendant and sort of assess relative culpability

10  accordingly.

11      So number one, there is no question that the

12  defendants played different roles.  Mr. Parnas might be

13  described as like a big-ideas guy here, certainly as an

14  animating vision, gives direction, helps to find the victims,

15  tell them a story.

16      I think the record also points that an equally

17  important part of the scheme was the closing.  Mr. Correia was

18  effectively the closer in this scheme.  We have a transcript of

19  that.  We have victim impact statements that show that.

20      And I think the facts set forth in the PSR also

21  corroborate that, which are, when it came time to getting the

22  money, whether it was assembling an investor deck, putting

23  together an agreement, getting people to wire funds, ultimately

24  selling them, it was Mr. Correia.

25      So in terms of the core elements of a wire fraud --

1   who was making the misrepresentations, who is ultimately

2   selling the victims on parting with their money -- I would say

3   they are equal players in that.  They may play different roles,

4   but both roles are equally important in terms of effecting a

5   scheme to defraud investors.

6           On the money, no dispute.  Just from tracing the

7   funds, we see that money typically first arrives in an account

8   that goes to Mr. Parnas.  And then oftentimes, some of those

9   funds are directed to Mr. Correia.

10          There is of course in some ways an answer or a

11  knowable question of all of those cash withdrawals -- where did

12  they go.  Who got the money.  There's a question of, you know,

13  as indicated in Victim 6's submission, whether or not some of

14  the travel was being financed by Parnas or Mr. Correia.  But I

15  think there can be no dispute that Mr. Parnas profited

16  personally at a greater extent than Mr. Correia.

17          What I will say, at the same time, that doesn't mean

18  that the funds received by Mr. Correia weren't absolutely

19  essential to his livelihood.  There is a part in our sentencing

20  submission discussing an instance in which Mr. Correia was

21  relatively broke and was pleading with Mr. Parnas for a portion

22  of the funds so that he could pay living expenses.

23          And so certainly that does not paint a picture of a

24  defendant who is traveling the world on profits from victims.

25  But I think there is still a financial motive there, and that's

1     something important to consider.

2              Finally, on your question about this working sweat

3     equity in the company, I think there is no dispute between the

4     parties that Mr. Correia put a bunch of time into Fraud

5     Guarantee.  It hasn't manifested anything.

6              But I think what's significant -- and I point to sort

7     of a vignette in our submission -- is an instance when the

8     money came in from Victim 6.  And we quote a text message in

9     there where there is an exchange where Mr. Correia and

10    Mr. Parnas are eagerly awaiting Victim 6's money.  And upon the

11    money coming in, Mr. Correia says, like, can I have $25,000?

12             That is particularly telling because it indicates that

13    this was not about, well, let's invest the money and things

14    sort of went awry.  The scheme was at the moment the wire hits,

15    let's take a bunch of that money and use it for stuff that's

16    totally unrelated to the business.

17             And I think that's a telling instance because it

18    indicates that regardless of hopes and dreams about what this

19    business would be, when the dollars arrived, they had very

20    different intentions.

21             THE COURT:  When he was arrested -- actually, he was

22    in the Middle East when the codefendants were arrested.

23             Does the record reflect if he was in the Middle East

24    pursuing business for Fraud Guarantee or something else?

25             MR. LANDSMAN-ROOS:  You know, your Honor, I'm not sure

1    there's a clear indication in the record.  I guess all I would

2    say on this is I think it's maybe acknowledged from some other

3    materials that the defendant had multiple things he was working

4    on at various times.

5           Another one was Global Energy Producers as represented

6    in the indictment.  But I don't think there's an indication in

7    the record of what he was doing in the Middle East at the time.

8           THE COURT:  And you mentioned Victim 6.  The last

9    victim was Victim 7 who I believe has written a letter and gave

10   two wires of $250,000 each to Attorney 1.

11          Does the record reflect whether that was in fact for

12   Fraud Guarantee business as opposed to something else?

13          MR. LANDSMAN-ROOS:  You know, your Honor, I think

14   bottom line is the record is not fully probably developed on

15   that question.  I think ultimately in some ways, it will be

16   immaterial for a few reasons.

17          Number one is, as the PSR outlines, there were a

18   number of misrepresentations about the business itself,

19   separate and apart from how that money would be used.

20          And second, I think your Honor reading it can see

21   there was maybe -- there were representations made about what

22   would come from that, from those wires, that may not have

23   ultimately happened.

24          THE COURT:  Okay.  Thank you.

25          MR. LANDSMAN-ROOS:  Just one more point, your Honor.

The sentencing submission I think acknowledges that Correia

told Victim 7 that Attorney 1 would help out on a number of

things. So there is at least that in the record to sort of

guide your Honor on the question of was it more than one

potential.

THE COURT: Okay. And then finally just one other

question, which is about the other count, the false statement

to the FEC.

The shell company was Global Energy Producers, which

was I believe in the end, according to how you've described the

evidence, was designed to cover up the fact that it was

actually a loan taken out from a codefendant backed up by a

mortgage or something like that. It wasn't a foreign donation

or something like that.

So am I correct that it wasn't in fact at the end of

the day covering up something that would have been an illegal

donation?

MR. LANDSMAN-ROOS: No. I don't agree with that, your

Honor, because it's not a foreign violation, but it would still

be a violation of 52 U.S. Code, Section 30122, which is the

straw donor prohibition, making a contribution in the name of

another person.

So here, the evidence is clear that it was a

codefendant taking out a personal loan, passing that money that

was indisputably his money and not related to a business,

1    through an LLC controlled by a codefendant and then reporting

2    it to a PAC as coming from Global Energy Producers and saying

3    this is a contribution from that entity.  So effectively here,

4    the straw is the company.

5            So just to be clear, Mr. Correia didn't plead guilty

6    to any of those substantive counts or the conspiracy as charged

7    in Count One of the indictment.  This would just be the after

8    effect reporting to the PAC.

9            THE COURT:  All right.  Thank you.

10           I'm going to ask Mr. Correia if he would like to

11   speak.

12           Before I do, Mr. Harrington, is there anything that

13   you want to add?

14           MR. HARRINGTON:  If I may, your Honor, very briefly.

15   I think that Mr. Roos is correct that gain matters as well, not

16   just loss -- rather gain is not the only factor.  Loss also

17   matters.  Mr. Correia has agreed to restitution in the full

18   amount.  But I think the nature of the loss matters too.

19           And Victim 7 illustrates something.  Victim 7 was told

20   by Mr. Correia that the $500,000 was being raised so that

21   Attorney 1, who is a high-profile attorney and who had done

22   work in similar states in the past, could assist Fraud

23   Guarantee in pushing the project forward.

24           And he wrote a long letter to investors about that and

25   his excitement of having Attorney 1 involved in the project.

1    I'm not aware of any evidence from the government that suggests

2    that Attorney 1 was doing something else for the money, other

3    than to assist Fraud Guarantee.  That was the purpose of it.

4    And every penny of the $500,000 went to Attorney 1.

5    Mr. Correia didn't take any of that money.

6           The thing Mr. Correia did that was wrong in that call

7    is when he was asked what the amount of money was that had been

8    raised by the company, he initially said he didn't know at that

9    time.  And when he was asked again, he said, probably $4

10   million or $5 million.  And it wasn't $4 million or $5 million.

11   It was only $1.7 million.

12          It may be that this victim was really interested in

13   the involvement of Attorney 1.  But Mr. Correia shouldn't have

14   said it was $4 million or $5 million when it wasn't $4 million

15   or $5 million.  That was something that the victim asked about,

16   and that was important to the victim.

17          THE COURT:  To say that it was $1.7 million is

18   arguably misleading because as the money was coming in, it was

19   simply being used for personal expenses in many cases.  Right?

20          MR. HARRINGTON:  Some of the earlier victims gave

21   money, and it was used for personal expenses when those

22   victims, as the government reports, were told that that

23   wouldn't be the case.

24          So we're not disputing the wrongness of it.  Victim 7

25   illustrates something.  There really was an effort to build the

1    business here.  All of the $500,000 from victim 7 was used in

2    the way that Victim 7 was told it was going to be used.  But

3    that's still part of the loss figure, and it's still increasing

4    his guideline range.

5         In terms of the money that came out, Mr. Parnas the

6    record shows received hundreds of thousands in funds used to

7    pay rent and other items.  It was far more than Mr. Correia and

8    did allow for a lifestyle that was the sort of lifestyle that

9    Mr. Correia hasn't lived.

10        So I do think there is a significant difference

11   between the two.  So those are the only comments I would ask to

12   add.  Thank you.

13        THE COURT:  Thank you.

14        I've heard from counsel.  Mr. Correia, I'm going to

15   give you a chance to speak.  However, you're not required to

16   speak, and you did write a letter which I appreciate and which

17   I've read.  But if there's anything you'd like to say today,

18   you may do so.

19        THE DEFENDANT:  Thank you, your Honor.

20        I have prepared something short.  I just want you to

21   know that I sincerely have learned quite a bit in the last 16

22   months about who I am as a person, why I believe I did the

23   things I did, and the poor decisions that I made.

24        I let down many people who trusted me, including the

25   people who invested in my projects.  In the past year since

 1  being arrested, I have tried to make sense of this literally

 2  every day.

 3          I have thought about how I can change my life, which I

 4  have begun, to be a better father, a more loving husband, and

 5  so much more.  Overall, I am fully committed to being the

 6  person who achieves what I have always wanted to be, which is a

 7  good person.  I put my thoughts about these into the letter

 8  that you referenced that I wrote, and it was very difficult to

 9  do at times.

10          Today I really want to add one important thing.  I

11  feel true remorse for my previous actions.  These actions do

12  not reflect what I want in life, and I will never repeat them

13  again.  Thank you.

14          THE COURT:  Thank you, Mr. Correia.

15          Is there any reason sentence may not be imposed at

16  this time?

17          Mr. Roos?

18          MR. LANDSMAN-ROOS:  No, your Honor.

19          THE COURT:  Mr. Harrington?

20          MR. HARRINGTON:  No, your Honor.

21          THE COURT:  In preparing to sentence the defendant,

22  I've considered the presentence report; probation's

23  recommendation; and the written and oral statements of defense

24  counsel, the defendant, and the government; as well as all the

25  letters submitted on behalf of the defendant and the letters

 1 │ submitted by certain victims in this case.

 2 │       And I've considered all the factors in the statute

 3 │ that governs my decision, Section 3553(a) of Title 18.  That

 4 │ includes the sentencing guidelines of course and policy

 5 │ statements but also the nature and circumstances of the

 6 │ offense; the defendant's history and characteristics; and the

 7 │ purposes of sentencing -- the need to provide just punishment,

 8 │ the need to reflect the seriousness of the offense and to

 9 │ promote respect for the law, to promote adequate deterrence and

10 │ protect the public, and to provide any needed or appropriate

11 │ training and treatment to the defendant.

12 │       I'm also required to consider the need to provide

13 │ restitution and the need to avoid unwarranted sentencing

14 │ disparities among similar defendants in similar situations.  In

15 │ the end, I'm required to impose a sentence that is sufficient

16 │ but not greater than necessary to comply with the purposes in

17 │ the statute.

18 │       The defendant committed two separate crimes, both of

19 │ which were serious crimes.  First, he defrauded victims out of

20 │ more than $2 million essentially selling them on the idea of

21 │ turning over their money to invest in his Fraud Guarantee

22 │ business by making misrepresentations and lying to them about

23 │ how much money had been raised and about what the money was

24 │ being used for.

25 │       These were important misrepresentations.  The victims

1    would not have invested hundreds of millions of dollars of

2    their money had they known that the vast majority of their

3    investment was being used to pay for personal expenses,

4    including luxury items, and not legitimate expenses of an

5    actual, operating business.

6          I'm persuaded that the defendant knew the significance

7    and impact of his misstatements to investors.  Of course the

8    irony of the business' name, Fraud Guarantee, is hard to

9    ignore.

10         The idea of the business was to insure investors

11   against the risk of criminal fraud, which is exactly what the

12   defendant engaged in while raising money from investors in this

13   very business.

14         The crime was serious also because it had real victims

15   who actually lost over $2 million among them.  And although the

16   defendant personally benefited from only a small fraction of

17   that amount, he was directly involved in the communications

18   with the investors that misled them.

19         Two of the three victim letters submitted in this case

20   speak to what they experienced as a result of this fraud.  As

21   one of them said:  "These men conspired to steal money from me.

22   They caused me so much pain and grief emotionally, financially,

23   and every way possible by defrauding me."

24         This crime is also serious because it was not just a

25   momentary lapse of judgment.  It took place over the course of

1    seven years and involved repeated lies and falsehoods.

2         Defense counsel has argued that the defendant actually

3    believed in this business idea and genuinely thought that it

4    could be successful at some point.  And I think there's

5    probably some truth to that.

6         But that does not justify lying about how much his

7    company had raised or how the investors' money would be used.

8    It is common for fraudsters to try to justify their behavior on

9    the theory that they thought it would all work out in the end.

10   At the end of the day, that does not justify committing fraud.

11        The other crime in this case is making false

12   statements to the FEC, and it really is an independent crime

13   from the wire fraud.  That separate crime did not involve any

14   direct financial victims in the same way, but it is

15   nevertheless serious in a different way, in a way that is

16   nonetheless pernicious.

17        It's serious because it undermines the federal

18   governments ability to enforce the campaign finance laws to

19   ensure that donations are lawful and to ensure transparent

20   elections.

21        I'm also required to consider the history and

22   characteristics of the defendant.  Mr. Correia is a 45-year-old

23   man.  He has no prior convictions.  He had a challenging

24   childhood, but he became a talented golfer.

25        He has a wife and two children who certainly love him

1    and care about him.  And the letters do speak to the positive

2    aspects of his character and the positive effect he's had on

3    others in his life.

4          I should note that two of the seven victims in this

5    case, as Mr. Harrington noted, have actually written in support

6    of Mr. Correia asking me to impose a lenient sentence, and that

7    is something you don't see every day in a fraud case.  And that

8    suggests that there are certainly positive aspects of him as a

9    person.

10         These particular victims appear to believe that

11   Mr. Correia really did believe in and worked toward what he

12   hoped would be a genuine business at some point.  But, again,

13   that does not excuse the misstatements and lies that he made to

14   defraud the victims out of over $2 million.

15         In the end, the purposes of just punishment, respect

16   for the law, and deterrence call for a significant punishment

17   to reflect the seriousness of these crimes.

18         Indeed, unlike many cases, this is actually a case, in

19   my view, where a guideline sentence, 33 months at the low end,

20   is not an unreasonable sentence.  There are many cases I think

21   where the guidelines overstate culpability.  This is not

22   necessarily one of those when you add both of the offenses

23   together.

24         However, I am persuaded that a variance, as

25   recommended by the probation department below the guidelines is

1    warranted principally for two reasons:

2            First, as Mr. Harrington has emphasized, Mr. Correia

3    personally appears to have received a relatively small portion

4    of the proceeds of this fraud compared to his codefendant.  And

5    I believe that that fact has some relationship, albeit not a

6    perfect one, to lesser culpability overall on a fraud

7    conviction.

8            And second, Mr. Correia does have medical conditions

9    that will make a term of imprisonment more difficult than it

10   would be for a healthy person, particularly in light of the

11   risks of COVID-19.

12           That having been said, I am confident that the BOP is

13   equipped to handle his medical conditions, and the way to

14   address the risk from COVID-19 is to defer his surrender date.

15           So I am certainly opened to deferring his surrender

16   date to a time perhaps in May, if that is appropriate.  And

17   I'll entertain a motion to extend that date depending on where

18   BOP is with vaccinations.

19           As of now, my understanding is that BOP has a target

20   date of May for full vaccinations of anyone who will be

21   vaccinated, staff and inmates in the system, and that all new

22   inmates will be vaccinated prior to entry into the system.  But

23   if that changes, I'm certainly open to deferring the surrender

24   date.

25           Balancing these considerations and the need to impose

1  a sentence that is sufficient but not greater than necessary to

2  comply with the purposes in the statute, I have decided that an

3  appropriate sentence is 12 months and one day imprisonment on

4  both counts current as recommended by the probation department.

5          The reason why I add one day to the 12 months, as you

6  probably know, is that adding time above one year allows for

7  good-time credit.  So if you have no infractions, it will be

8  closer to a little over ten months in prison.  But the sentence

9  is 12 months and one day followed by three years of supervised

10  release.

11          I'd like to ask defense counsel if you have any legal

12  objection or any legal reason that that may not be imposed.

13          MR. HARRINGTON:  I don't, your Honor.

14          THE COURT:  And the government?

15          MR. LANDSMAN-ROOS:  No, your Honor.

16          THE COURT:  Okay.  Mr. Correia, it's the judgment of

17  this Court that you are committed to the custody of the

18  Bureau of Prisons for 12 months and one day on both counts

19  concurrent.

20          Following release, you'll be placed on supervised

21  release for three years with the following conditions:

22          You will not commit another federal, state, or local

23  crime.

24          You will not possess or use any illegal controlled

25  substance.

 1          I'm waiving the mandatory drug testing conditions

 2  because I find that you pose a low risk of substance abuse.

 3          You will cooperate in the collection of DNA as

 4  directed by probation.

 5          The standard conditions are imposed with the following

 6  special conditions:

 7          You will provide probation with access to any

 8  requested financial information.

 9          You will not incur any new credit charges or open

10  additional lines of credit without the approval of probation,

11  unless you're in compliance with the payment schedule.

12          You will report to the nearest probation office within

13  72 hours of release, and you will be supervised by the district

14  of your residence.

15          You must pay restitution to the victims in the amount

16  of $2,322,500.  Again, $2,322,500.  Restitution will be paid in

17  monthly installments of at least 15 percent of any gross

18  monthly income beginning 30 days after release.  And I'm

19  signing the government's proposed restitution order to that

20  effect.

21          The schedule of victims as updated over the weekend

22  will be attached to the restitution order but will be under

23  seal because I find the victims' privacy outweighs the interest

24  of public revelation of the victims' identities.

25          You are subject to an order of forfeiture in the

1    amount of $43,650 as the Court has previously ordered.

2          I am not imposing a fine in light of the restitution

3    obligation because I find you're unable to pay a fine.

4    However, there's a mandatory special assessment of $200, which

5    is imposed.

6          Now, I would suggest a surrender date in May.

7          May 17?

8          MR. HARRINGTON:  Your Honor, I've spoken to

9    Mr. Correia about the COVID risk and the like.  And I think

10   that he is nonetheless inclined to try to start his sentence as

11   soon as he can, if he can get designated.

12         So I would ask the Court for a 45-day delay because I

13   think that's enough time for the Bureau of Prisons to designate

14   something.

15         THE COURT:  That's fine.

16         MR. HARRINGTON:  We noted in our papers as well that

17   there is some uncertainty about the importance of COVID for his

18   condition, but prison is hard for his condition irrespective of

19   COVID.  So in terms of his health, it probably is not a big

20   difference.

21         But I would just ask the Court to be able to write in

22   the event that he decides that based on how things are looking

23   with COVID, he would like to put it off until May and request

24   an adjournment at that time.

25         THE COURT:  Sure.  I'll set the surrender date for 45

1    days out.  March 22, March 22, 2021.  The defendant will

2    surrender on March 22, 2021, before 2:00 p.m. to the facility

3    designated by the Bureau of Prisons.

4           If there's been no designation before that time, you

5    can contact me.  You can surrender to the marshals here at the

6    courthouse, or we can talk about a deferment of the surrender

7    date.

8           MR. HARRINGTON:  Thank you, your Honor.

9           Your Honor, may I also request that the Court suggest

10   to the BOP that he be designated to FCI Jesup.  It's a facility

11   north of Jacksonville, Florida, where his family can drive to

12   visit him once family visits are permitted again and has other

13   offerings that just make it a more suitable facility for

14   Mr. Correia.

15          THE COURT:  Does the government have any objection to

16   that recommendation?

17          MR. LANDSMAN-ROOS:  No, your Honor.

18          THE COURT:  All right.  I'll make that recommendation.

19   The Bureau of Prisons ultimately decides where inmates are

20   designated, but I will make the recommendation that the

21   defendant be designated to FCI Jesup for those reasons.

22          Mr. Correia, you do have the right to appeal from your

23   conviction and sentence, except to the extent that you have

24   waived that right as part of your guilty plea and plea

25   agreement.

1           And if you cannot pay the costs of an appeal, you may

2     apply for leave to appeal without costs.  Any appeal must be

3     filed within 14 days of the filing of the judgment.

4           And I'm directing that a complete copy of the

5     presentence report be provided to the BOP and Sentencing

6     Commission, and the clerk will prepare the judgment.

7           Is there anything further from Mr. Harrington?

8           MR. HARRINGTON:  No, your Honor.

9           THE COURT:  From Mr. Roos?

10          MR. LANDSMAN-ROOS:  Yes, your Honor.  There are open

11    counts which the government would move to dismiss.

12          THE COURT:  Okay.  All open counts are hereby

13    dismissed as to the defendant.  This matter is adjourned.

14    Thank you, everyone.

15          MR. HARRINGTON:  Thank you, your Honor.

16          MR. LANDSMAN-ROOS:  Thank you, your Honor.

17          (Adjourned)

18

19

20

21

22

23

24

25