UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

                                    :

UNITED STATES OF AMERICA

                                    :

        - v. -

                                    :    S3 19 Cr. 725 (JPO)

LEV PARNAS and
ANDREY KUKUSHKIN,                     :

                    Defendants.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

# THE GOVERNMENT'S
# <u>MOTIONS IN LIMINE</u>

                                           AUDREY STRAUSS
                                           United States Attorney
                                           Southern District of New York

Aline R. Flodr
Nicolas Roos
Hagan Scotten
Assistant United States Attorneys
      *- Of Counsel -*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................................................1

I.   The Statements of the Defendants' Co-conspirators in the Foreign Donor Scheme Are Admissible ...........2

    A.   Applicable Law ...........................................................................................2

    B.   Discussion ...........................................................................................5

II.  The Statements of Parnas's Employee Are Admissible Against Him, and Are Not Offered for Their Truth Against Kukushkin ...........10

III. Cross-Examination of FBI Witnesses Should Be Limited to the Scope of Their Direct Testimony and Matters Affecting Their Credibility ...........12

    A.   Applicable Law ...........................................................................................13

    B.   Discussion ...........................................................................................14

IV.  The Presence of Lawyers During Some of the Charged Conduct Does Not Suggest that the Defendants Intended to Act Lawfully ...........16

V.   Evidence of Acts that Occurred After the Completion of the Charged Conduct Does Not Bear on the Defendant's Intent ...........17

VI.  Arguments and Evidence Sounding in Nullification Should Be Excluded ...........19

    A.   Applicable Law ...........................................................................................19

    B.   Discussion ...........................................................................................20

VII. Irrelevant, Confusing, and Unfairly Prejudicial Subjects of Cross-Examination Should be Excluded ...........21

    A.   Applicable Law ...........................................................................................22

    B.   Discussion ...........................................................................................23

VIII. Parnas's Proffer Agreement is Enforceable Against Him ...........30

    A.   Applicable Law ...........................................................................................31

    B.   Discussion ...........................................................................................32

IX.  Parnas's Diversion of Some of the Donation Funds Is Intertwined with the Charged Conduct ...........35

    A.   Applicable Law ...........................................................................................35

    B.   Discussion ...........................................................................................36

X.   This Court Should Rule on the Defendants' Ability to Impeach Each Other's Credibility Before Trial ...........38

CONCLUSION ...........................................................................................40

## PRELIMINARY STATEMENT

The Government respectfully submits these motions *in limine* in advance of the trial of defendants Lev Parnas and Andrey Kukushkin.  At trial, the Government expects to prove three counts arising from the efforts of Parnas, Kukushkin, and their co-conspirators to donate money belonging to a Russian businessman to candidates in the 2018 election cycle (the "Foreign Donor Scheme"):  Count One charges both defendants with conspiring to (a) contribute a foreign national's money in federal and state elections, (b) make such contributions in the names of others; and (c) defraud the Federal Election Commission (the "FEC").  Count Two charges Parnas with soliciting over $25,000 in contributions from a foreign national.  Count Three charges both defendants with aiding and abetting the making of over $25,000 in direct and indirect contributions by a foreign national.

The Government will further prove three counts arising from Parnas's role in making contributions to candidates and campaign committees in names other than the name of the person who was the true source of the funds (the "Straw Donor Scheme"), and Parnas's lies to the FEC to cover up that crime:  Count Four charges Parnas with conspiring to (a) make contributions in the names of persons other than the true source of the funds, and (b) defraud the FEC.  Count Five charges Parnas with making false statements to the FEC to cover up some of those straw donations.  Count Six charges Parnas with falsifying an affidavit to the FEC concerning the same straw donations.  The following motions seek to admit evidence that is probative of those charges, and exclude evidence that is irrelevant, confusing, or otherwise inadmissible, consistent with the Federal Rules of Evidence.

I.      **The Statements of the Defendants' Co-conspirators in the Foreign Donor Scheme Are Admissible**

At trial, the Government intends to offer out-of-court statements made by Parnas, Kukushkin, Igor Fruman, David Correia, and Andrey Muraviev as statements of co-conspirators in the Foreign Donor Scheme, made during and in furtherance of that conspiracy, under Federal Rule of Evidence 801(d)(2)(E).[1]  This Court is already familiar with Parnas, Kukushkin, Fruman, and Correia.  Muraviev is the wealthy Russian businessman who funded the donations, and is described as Foreign National-1 in the indictment.[2]  Because each of those five individuals participated in a conspiracy to donate Muraviev's money to U.S. political candidates, the statements they made to carry out that conspiracy are admissible for their truth against Parnas and Kukushkin in proving the counts arising from the Foreign Donor Scheme.

A.  **Applicable Law**

Federal Rule of Evidence Rule 801(d)(2)(E) provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party's co-conspirator during and in furtherance of the conspiracy."  To admit a statement under this rule, a court must find by a preponderance of the evidence that a conspiracy including the defendant and the declarant existed and that the statement was made during the course and in furtherance of

---

[1]      The statements of Parnas and Kukushkin are offered against each other under Rule 801(d)(2)(E), but against the declarant himself as the statement of a party opponent under Rule 801(d)(2)(A).  *See generally United States v. Yousef*, 327 F.3d 56, 153 (2d Cir. 2003) (although a defendant may not offer his prior out-of-court statements in his defense, the Government can offer those statements against the defendant).  The Government does not understand the defendants to contest the uncontroversial proposition that their own statements may be admitted against them, but the defendants have informed the Government that they object to the application of Rule 801(d)(2)(E).

[2]      The Government has previously redacted Muraviev's name in public filings (*see, e.g.*, Dkt. 163 at 6-8), but no longer does so here given that a trial at which Muraviev's name will frequently be invoked is now imminent.

that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999). The Court does not, however, need to determine that criminal conspiracy involving the defendants existed prior to hearing the evidence at trial: The Second Circuit has made clear that "statements proffered as co-conspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of the necessary evidence" establishing that a conspiracy involving the defendant existed. *United States v. Tracy*, 12 F.3d 1186, 1199 (2d Cir. 1993) (citing *United States v. Geaney*, 417 F.2d 116, 1120 (2d Cir. 1969)). When determining whether the predicate conspiracy has been established, a court is not bound by the Federal Rules of Evidence, *see* Fed. R. Evid. 104(a), and the "may consider the hearsay statement itself" as evidence of "the existence of a conspiracy." *United States v. Padilla*, 203 F.3d 156, 161 (2d Cir. 2000) (citing *Bourjaily*, 483 U.S. at 181).

To be in furtherance of a conspiracy, the statement must in some way have been designed to promote or facilitate achievement of a goal of the conspiracy. Under this standard, a co-conspirator statement is admissible if it "reasonably [can] be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988). Thus, statements are in furtherance of the conspiracy if they, among other things: (1) provide an update about the status or progress of the conspiracy, *see United States v. Desena*, 260 F.3d 150, 158 (2d Cir. 2001); (2) "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity," *Maldonado-Rivera*, 922 F.2d at 958; (3) "seek to induce a co-conspirator's assistance," *Desena*, 260 F.3d at 158 (internal quotations omitted); (4) "provide reassurance," *id.*; (5) "serve to foster trust and cohesiveness," *id.*; *United States v.*

*Simmons*, 923 F.2d 934, 945 (2d Cir. 1991); or (6) "facilitate and protect" the conspiratorial activities, *United States v. Diaz*, 176 F.3d 52, 87 (2d Cir. 1999).

A co-conspirator's narrative description of a past event will still be a statement in furtherance of the conspiracy if the narration serves "some current purpose in the conspiracy." *United States v. Thai*, 29 F.3d 795, 813 (2d Cir. 1994); *see also Dresna*, 260 F.3d at 159; *Maldonado-Rivera*, 922 F.2d at 958; *United States v. Flaharty*, 295 F.3d 182, 199-200 (2d Cir. 2002). Indeed, "[s]tatements that describe past events are in furtherance of the conspiracy if they are made . . . simply to keep coconspirators abreast of current developments and problems facing the group." *United States v. Jefferson*, 215 F.3d 820, 824 (8th Cir. 2000) (internal quotation marks omitted). For example, in *United States v. Lozano-Reyes*, 101 F.3d 686, 1996 WL 313934, at *2 (2d Cir. 1996), the Second Circuit affirmed admission of co-conspirator statements relating to past events because the statements served a current purpose in the conspiracy, namely, "to engender trust, to increase [the witness's] familiarity with the conspiracy's modus operandi, and to outline future conspiratorial actions and the anticipated profits."

Although the declarant and the defendant must be members of the conspiracy under Rule 801(d)(2)(E), the person to whom the statement was made need not be. A defendant's co-conspirator can advance the conspiracy by, for example, making statements to innocent parties that nonetheless advance the conspiracy's goals. *See United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994) (statements "communicating with a person who is not a member of the conspiracy in a way that is designed to help the coconspirators to achieve the conspiracy's goals" further the conspiracy and are admissible under Rule 801(d)(2)(E)).

**B.  Discussion**

The Government expects the evidence to prove that Parnas, Kukushkin, Fruman, Correia, and Muraviev agreed to use Muraviev's money to fund donations to political candidates in the 2018 U.S. elections, thereby conspiring to violate the federal law against donations by foreign nationals.  (*See* Dkt. 163, at 6-8).  This Court should therefore conditionally admit statements that furthered such a conspiracy during trial, then fully admit those statements at the close of the Government's case, assuming the Court finds the conspiracy proven by a preponderance of the evidence.  *See Tracy*, 12 F.3d at 1200.

The bulk of the co-conspirator statements at issue were made in electronic communications, such as emails, text messages, and chats using WhatsApp.  The Government has marked records of these statements as exhibits and disclosed them to the defense.  In general, the statements concern such matters as transferring money from Muraviev to the control of Parnas, Fruman, and Correia (*see, e.g.*, GX 33, 39, 42, 58, 82); donating Muraviev's money to U.S. political candidates (*see, e.g.*, GX 33, 40, 42, 43, 53, 56, 58, 82); the legalized cannabis businesses the group planned to operate and the political benefits those businesses would derive from the donations (*see, e.g.*, GX 33, 38, 39, 43, 50, 53, 56, 59, 75, 77, 78, 81, 86); and the need to conceal the criminal aspects of these actions (*see, e.g.*, GX 58, 82, 83, 136, 137), among other matters.[3]

Those statements are far too numerous to discuss comprehensively here, but an example may be helpful to the Court in ruling on the conditional admissibility of similar statements as the Government offers them at trial.   GX 14 is an exchange of WhatsApp messages between Kukushkin and Fruman.  These messages show the two sides of the agreement coming together:

---

[3]      The Government will provide the Court current copies of its exhibits and the 18 U.S.C. § 3500 material for its witnesses on September 28, 2021—the same date the defendants' response to these motions are due—so that the Court may refer to them in analyzing the motions.

The American political operation of Parnas, Fruman, and Correia with the Russian business operation of Muraviev, Kukushkin, and Muraviev's other lieutenants.  On June 2, 2018, Kukushkin wrote to Fruman, "we will resolve it with you and Andrey will support $."  Fruman replied, "Great !!!"  Other evidence—such as the testimony of witnesses familiar with Kukushkin and Muraviev, and subsequent messages involving Muraviev himself—will show that the "Andrey" who "will support $" is Andrey Muraviev.  Twelve days later, Kukushkin wrote Fruman, "Hi, everything is moving . . . How are you?"  Fruman replied, "Great!!!, We are working Washington!!!"  These statements furthered the conspiracy because they provide an update about the progress of the conspiracy, *Desena*, 260 F.3d at 158, and "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity," *Maldonado-Rivera*, 922 F.2d at 958, among other purposes.  That is, Kukushkin established that Muraviev's money would support the group venture and told Fruman that matters on his side were "moving," to which Fruman provided a similar status update, explaining that his side was engaged in the contemplated political efforts ("working Washington").  Thus, assuming the Government proves the existence of the criminal conspiracy between Kukushkin, Fruman, and Parnas, GX 14's statements are admissible for their truth against both trial defendants.

It should further be noted that much of the relevant content in these electronic messages need not satisfy a hearsay exception such as Rule 801(d)(2)(E), because it does not constitute hearsay.  To choose an example from later in the conspiracy's evolution, by early October 2018 Muraviev's side had wired approximately $500,000 to Parnas's side, and the conspiracy had formed a corporation called Strategic Investment Group, or "SIG," to carry out the cannabis business that would benefit from the political favor generated by the illegal campaign contributions.  Parnas, Fruman, and Correia composed a document called the "SIG Contribution

list." (GX 61-A-5).[4]   The SIG Contribution List is a chart showing contributions to various political candidates, with donations classified as either "Paid" or "Committed." (*Id.*). Fruman then sent that list to Muraviev and Kukushkin, and requested that the Russian side of the operation transfer another $500,000 to the American side, as the group's agreement had originally contemplated.

The creation, transmission, and effect of the SIG Contribution List appears in a series of electronic messages. In emails and WhatsApp chats on October 9, 2018, Correia circulated an initial draft of the list, and received input on its content from Parnas and Fruman. (GX 54, 144-46). Later that same day, Fruman forwarded the list separately to Muraviev and Kukushkin. (GX 58). Kukushkin told Fruman to send the list to "the group" (*id.*), referring to a running group chat between Parnas, Fruman, Kukushkin, and Muraviev. Fruman did so. (GX 61). The next day, the one-on-one chat between Fruman and Kukushkin shows that Fruman and Kukushkin discussed how to transfer more of Muraviev's money. Among other things, Kukushkin stated that he spoke with Muraviev's CFO, Alexander Mikhalev, a/k/a "Sanya," who is "waiting on approval from Andrey [Muraviev] regarding transfer."[5] Fruman stated that he spoke with Muraviev, and that rather than transferring the money to SIG, "it is better to use the old scheme to avoid problems

---

[4]     The SIG Contribution List appears as a sub-exhibit in several different Government exhibits, because it was exchanged among the co-conspirators in several different electronic messages. In numbering its sub-exhibits, the Government has generally used an "A" to indicate that the sub-exhibit is part of a larger exhibit. Where that larger exhibit is a series of chats or text exchanges, the Government has added another number to reflect which specific chat or text the sub-exhibit was attached to. For example, GX 61-A-5 is a copy of the SIG Contribution List attached to the fifth chat in GX 61, a WhatsApp chat between Parnas, Kukushkin, Muraviev, and Fruman. But the SIG Contribution List can also be found at GX 58-A-70, a WhatsApp exchange between only Kukushkin and Fruman, because Fruman sent the list directly to Kukushkin before sending it to the larger group.

[5]     A preponderance of the evidence shows that Mikhalev should also be considered a co-conspirator, although the Government is not presently aware of any of his statements that it would offer for its truth.

later." (GX 58). The "old scheme" refers to the method used to transfer the first $500,000, where Mikhalev made arrangements with Fruman's brother, Steven Fruman, to transfer Muraviev's money to a New York corporation operated by the Frumans. This will be shown in several ways, including that shortly after Fruman relayed Muraviev's guidance to use "the old scheme," Mikhalev reached out to Steven Fruman through the same WhatsApp chain used during the first transfer, stating "I need to send you the second tranche" and proceeding to arrange another $500,000 transfer. (GX 48).

The evidence described in the preceding paragraph includes several co-conspirator statements, such as Kukushkin's statement that he was waiting on Muraviev to approve the transfer, and Fruman's statement that he had spoken with Muraviev in determining which corporation should receive the funds. Those statements plainly furthered the conspiracy, as they directly sought to accomplish its core illegal objective: the donation of a foreign national's money to U.S. political campaigns. But many of the other words exchanged along the way are not statements. For example, in drafting the SIG Contribution List, Parnas and Fruman directed Correia to include particular candidates or political action committees ("PACs"), sometimes with specific donation amounts. (*E.g.*, GX 54 at 5 (Parnas: "America first [a PAC] 250 Pete sessions [a congressman] 100"); *id.* (Fruman: "In ny we have to mention Andrew Cuomo")). These directions are imperatives, not statements, and thus cannot be hearsay. *See* Fed. R. Evid. 801(c) (defining hearsay, in part, as "a statement"); *United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999) ("Statements offered as evidence of commands . . . rather than for the truth of the matter asserted therein, are not hearsay.").

Other declarations that might be considered statements are nonetheless not offered for their truth, and thus need not satisfy Rule 801(d)(2)(E). For example, although the SIG Contribution

List plainly advanced the conspiracy, its significance is not in the truth of the donations it described as paid or committed, but rather as evidence of the mutual agreement to use Muraviev's money for political donations. *See, e.g.*, *United States v. Quinones*, 511 F.3d 289, 312 (2d Cir. 2007) (approving admission of statement not for truth but to show state of mind); *Smith v. Duncan*, 411 F.3d 340, 346 n.4 (2d Cir. 2005) (same).[6]   The same is true for the exchange between Steven Fruman and Mikhalev about the transfers of Muraviev's money.  The truth of any of their particular statements is irrelevant—for example, it does not matter whether Mikhalev actually had a "need" to send "the second tranche."  What matters is that these two individuals discussed repeating the same method of transferring $500,000 from Muraviev to Parnas's side of the conspiracy immediately after Kukushkin received the guidance to use "the old scheme" for further funding the objectives outlined in the SIG Contribution List, thus helping show the meaning of "the old scheme." *See United States v. Pedroza*, 750 F.2d 187, 200 (2d Cir. 1987) ("When statements by an out-of-court declarant are admitted as background, they are properly so admitted not as proof of the truth of the matters asserted but rather to show the circumstances surrounding the events, providing explanation for such matters as the understanding or intent with which certain acts were performed.").[7]

---

[6]     Although the SIG Contribution List generally tracks Parnas's political activity, it significantly exaggerates his expenditures, presumably in an effort to convince Muraviev that his money had been, and would be, well spent.  For example, the list includes $125,000 "Paid" to then-New York Governor Andrew Cuomo, but the Government is aware no evidence that Parnas, Fruman, Correia, or anyone acting at their behest actually made this payment.

[7]     Rule 801(d)(2)(E) would also support the admission of statements Fruman or Correia made during and in furtherance of the Straw Donor Scheme against Parnas.  The Government has not, however, yet identified any such statements it intends to offer.

## II.   The Statements of Parnas's Employee Are Admissible Against Him, and Are Not Offered for Their Truth Against Kukushkin

Deanna Van Rensburg, who is expected to testify during the Government's case, served as Parnas's personal assistant from approximately April 2018 until his arrest.  In that capacity, Van Rensburg executed many of the campaign contributions at issue in this case, filling out contribution forms and providing credit card numbers at Parnas's direction.  Van Rensburg also coordinated other logistics for Parnas and those doing business with him, such as travel, meetings, and even a family celebration.  While doing so, Van Rensburg made relevant statements in emails, texts, and chats that the Government will offer against Parnas under Federal Rule of Evidence 801(d)(2)(D).

That rule provides that a statement "made by the party's agent or employee on a matter within the scope of that relationship and while it existed" is not hearsay when offered against that party.  Fed. R. Evid. 801(d)(2)(D).  For the statements to fall within the scope of that relationship, they need only "relate[] to a matter within the scope of the agency."  *Pappas v. Middle Earth Condominium Ass'n*, 963 F.2d 534, 537 (2d Cir. 1992).  "The authority granted in the agency relationship need not include authority to make damaging statements, but simply the authority to take action about which the statements relate."  *Id.* at 537.  Thus, the Circuit has explained that a nurse's statement to a patient about purging files in a doctor's office was admissible against the doctor both because helping to maintain files was within the scope of the nurse's work and because discussing such matters with patients was within scope of her work, even if "file purging" was not. *United States v. Lauersen*, 348 F.3d 329, 340 (2d Cir. 2003).

Because Van Rensburg worked for Parnas and was authorized to work on the matters at issue, her statements are admissible against him.  Thus, for example, on June 22, 2018 Van Rensburg texted a staffer for Congressman Pete Sessions, "Lev and Igor want to do a donation now and then get the rest of the donations to you by the 30th."  (GX 20).  This statement led to a

$2,700 donation funded by Fruman but made in Parnas's name—which it had to be, given that Fruman would reach his legal donation limit by separately donating $2,700 to Sessions in Fruman's own name.  Because Van Rensburg made the statement while employed by Parnas to handle matters including campaign contributions, it is admissible against Parnas for its truth under Rule 801(d)(2)(D).

The Government will also offer different emails and messages sent by Van Rensburg that are relevant to the Foreign Donor Scheme.  Because Van Rensburg was not Kukushkin's employee or co-conspirator, those messages are not admissible for their truth against him—and the Government will not offer them for that purpose.

For example, on October 1, 2018, Van Rensburg chatted with Parnas and Kukushkin about whether she should pay for Kukushkin's travel using some of the $500,000 Muraviev had already provided—as Kukushkin believed—or whether Kukushkin would pay from other funds—as Parnas insisted.  (*See* GX 55 to 57).  Nothing Van Rensburg stated during those conversations is offered for its truth; it is not, for example, independently significant that Van Rensburg did "not have authorization to give C[redit]C[ard] info" to Kukushkin.  Rather, these statements (as well as Van Rensburg's questions, requests, apologies, and other non-hearsay in the same chats) provide background for other WhatsApp conversations in which Kukushkin and fellow co-conspirators— while arguing about this travel expense question—make statements that help prove the conspiracy. For example, in his arguments with Van Rensburg, Kukushkin stated to her that he "funded Global Energy for all our planned endeavors."  (GX 56 at 1).  That statement is particularly probative in that it directly follows an exchange between Correia and Kukushkin—also on the subject of the latter's travel expenses—in which Correia stated that the first $500,000 investment was solely for "charitable/political donations," and Kukushkin responded not by disagreeing, but merely insisting

11

that "10% of the existing donation funds" be set aside for travel and other "business necessities."
(GX 52, at 2).

For the foregoing reasons, Van Rensburg's prior statements on matters concerning the Straw Donor Scheme are admissible against Parnas for the truth of the matters those statements assert, and will be offered to prove Counts Four through Six, in which Parnas alone is charged. Van Rensburg's statements concerning matters related to the Foreign Donor Scheme are not offered for their truth against Kukushkin, and thus will not be used for that purpose in proving Counts One through Three. To the extent Kukushkin identifies any statement of Van Rensburg's that might be considered by the jury for an improper purpose, the Government consents to a limiting instruction.

### III.   Cross-Examination of FBI Witnesses Should Be Limited to the Scope of Their Direct Testimony and Matters Affecting Their Credibility

The Government expects to call three witnesses employed by the FBI: Supervisory Special Agent Ellen Thomas, Special Agent Jacob Balog, and forensic accountant Kimberly Espinoza. Agent Thomas led the team that executed the search warrant at Parnas's residence. She will testify primarily about the type and nature of the building she searched, the execution of the search, and relevant documents found there. Agent Balog recently joined the New York FBI team assigned to this case. He will testify concerning summary charts—such as timelines—prepared from other exhibits in this case, and draw the jury's attention to portions of those underlying exhibits. Ms. Espinoza is in the process of creating summary charts focused on the flow of funds at issue in this case. She will testify about those charts, and may also draw the jury's attention to other exhibits relevant to the same subject matter. In order to ensure efficient presentation of the evidence, the

Government respectfully requests that the cross-examination of these witnesses be limited to the scope of their direct testimony, and matters affecting their credibility.[8]

## A. Applicable Law

Rule 611(b) of the Federal Rules of Evidence limits the scope of cross-examination "to the subject matter of the direct examination and matters affecting the credibility of the witness." Fed. R. Evid. 611(b); *see Baker v. Goldman Sachs & Co.*, 669 F.3d 105, 110 (2d Cir. 2012). Thus, defendants may not conduct cross examination that exceeds the scope of the direct examination solely because the witness is an agent involved in investigating the defendant. *See, e.g.*, *United States v. Koskerides*, 877 F.2d 1129, 1136 (2d Cir. 1989) (affirming district court's limitation of cross-examination of case agents to scope of direct testimony); *United States v. McLaughlin*, 957 F.2d 12, 18 (1st Cir. 1992) (affirming limitation of cross-examination of government agents to scope of direct because "a party has no right, unless the court in the exercise of its discretion allows, to cross-examine a witness beyond the subject matter of his direct examination and beyond matters affecting credibility."); *United States v. Ellis*, 156 F.3d 493 (3d Cir. 1998) (affirming district court's ruling that where agent's testimony was limited to authenticity of tape recordings which defendant did not challenge, agent could not be examined on other topics because his credibility was not at issue); *United States v. Adeniyi*, 2004 WL 1077963, at *3 (S.D.N.Y. May 12, 2004) ("The Court is also unpersuaded by Defendant's apparent contention that [the case agent's] acknowledgment during direct examination that he had participated in an investigation of Defendant, coupled with [the case agent's] testimony regarding certain specific aspects of that

---

[8] The Government (or the defense) may of course object to cross-examination of any witness that exceeds Rule 611. But the Government believes wide-ranging cross-examination is particularly likely where the witness is a member of the investigating agency, and thus respectfully requests an advance ruling specifically as to these FBI witnesses.

investigation, combined to give defense counsel carte blanche to inquire into any subject related to the investigation of Defendant.").

This Court "is accorded broad discretion in controlling the scope and extent of cross-examination." *United States v. Rivera*, 971 F.2d 876, 886 (2d Cir. 1992). "In the exercise of discretion, a district court should consider the need to 'ascertain[ the] truth,' 'avoid needless consumption of time,' and 'protect witnesses from harassment or undue embarrassment.'" *United States v. Whitten*, 610 F.3d 168, 182-83 (2d Cir. 2010) (quoting Fed. R. Evid. 611(a)).

**B. Discussion**

A Government agent who takes the witness stand can present a tempting target for cross-examination on subjects beyond the witness's direct testimony, whether to attack the overall quality of the investigation, or to introduce facts which the defense wishes to explore, on the theory that as a Government investigator, the witness "should" know them. Those are not proper topics for cross-examination: An inquiry into the nature of the investigation will typically be an irrelevant distraction, because the jury must decide only whether the evidence proves guilt beyond a reasonable doubt, not judge the manner in which the evidence was gathered. *See e.g.*, *United States v. Malpeso*, 115 F.3d 155, 162-63 (2d Cir. 1997); *United States v. Reese*, 933 F. Supp. 2d 579, 583-84 (S.D.N.Y. 2013) ("a defendant 'may not argue before the jury issues relating to the overall propriety of the Government's investigation in this case.'" (quoting *United States v. Demosthene*, 334 F. Supp. 2d 378, 380 (S.D.N.Y. 2004)). And to the extent the defense has facts it wishes to prove or evidence it wishes to offer, the appropriate time to do that is in a defense case, not through cross-examination. *See, e.g.*, *United States v. Stadtmauer*, 620 F.3d 238, 272 (3d Cir. 2010) (affirming district court's refusal to allow defendant's introduction of evidence during cross

14

of Government witness because the materials were "not really specifically impeachment material, but more akin to case-in-chief type evidence." (internal quotation marks omitted)).

To be sure, the Court has discretion to allow the defendants to question government witnesses about matters outside the scope of their direct testimony and unrelated to credibility, by asking non-leading questions "as if on direct examination." Fed. R. Evid. 611(b).  But the Court should generally decline to do so, to "avoid wasting time."  *Id.* 611(a).  If a defendant wishes to offer evidence, or otherwise pursue matters about which the witness did not testify, he should do so through a witness who is familiar with and prepared to testify on that subject, which both complies with Rule 611 and will offer a faster, clearer, and less laborious presentation to the jury. *See, e.g.*, *United States v. Londonio*, 17 Cr. 89 (CS), Dkt. 857 (requesting that scope of cross be limited to scope of direct for purposes of efficiency, and that exploration of other matters be conducted during defense case); Tr. 592 (granting request) (S.D.N.Y. 2019).[9]

To choose one example, Agent Balog will testify about summary charts showing a timeline of events significant to the Government's case, and read from certain exhibits relevant to that timeline.  *See United States v. Ho*, 984 F.3d 191, 209-10 (2d Cir. 2020) (approving such testimony); *United States v. Skelos*, No. 15 Cr. 317, Tr. 2252-57, 2262 (S.D.N.Y. 2015) (same). The defendants may well believe that other events, not depicted in Balog's charts or mentioned in his testimony, support their view of the case.  But especially because Balog is not a percipient witness, and rather testifying only about charts and documents identified by the prosecution team,

---

[9]     When courts do exercise their discretion to deviate from Rule 611(b), it is often to avoid the need for recalling a witness during the defense case.  But the witnesses at issue here are Government agents testifying as part of their job, who can be recalled without any inconvenience. Thus, to the extent the defense claims any of the FBI witnesses is particularly able to present defense evidence unrelated to the witness's direct testimony, that can readily be done during the defense case.

asking him about other documents or events plainly lies outside the scope of his testimony, and has no bearing on his credibility as a summary witness testifying only that the events which do appear in the charts accurately reflect the cited exhibits.  *See United States v. Calk*, 19 Cr. 366 (LGS), Tr. 338 (S.D.N.Y. June 29, 2019) (so holding with respect to similar summary witness); *Whitten*, 610 F.3d at 183 (district courts have broad discretion to manage the timing of evidence).[10]

## IV.    **The Presence of Lawyers During Some of the Charged Conduct Does Not Suggest that the Defendants Intended to Act Lawfully**

The defendants consulted with attorneys at various times during the conduct at issue in this case, but not about the crimes alleged to have occurred here.  For example, the defendants consulted with a Nevada lawyer about obtaining licenses to operate cannabis businesses in that state.  Parnas also consulted with attorneys in responding to the FEC complaint, which led to Parnas signing the affidavit that is the subject of Counts Five and Six.  The Government may call the Nevada cannabis lawyer to testify about the legal hurdles that the defendants faced in obtaining state licenses, which helps establish their motive in making large donations to Nevada politicians who the defendants believed could assist in this process.  The Government may also call the law firm associate who notarized Parnas's FEC response, to show that Parnas signed the affidavit containing the false statements at issue, and that he did so in Manhattan, thereby establishing venue.

Both defendants have confirmed that they will not attempt to present an advice-of-counsel defense, or otherwise argue that their conduct was lawful because they relied on the advice of attorneys.  Because neither defendant is offering an advice-of-counsel defense, the presence of

---

[10]    The defense certainly remains free to ask Agent Balog whether the evidence presented in his charts and testimony was chosen by the prosecutors, a common point of cross-examination for any summary witness.

lawyers during parts of the charged conduct has no bearing on the defendants' guilt or innocence. The Government therefore moves to exclude any argument or implication that the involvement of attorneys in some of the events discussed at trial indicates that the defendants believed they were acting legally with respect to the charged crimes, or otherwise rebuts the evidence concerning the defendants' *mens rea*.  Evidence concerning a defendant's reliance on counsel is properly excluded where that evidence would not support an advice-of-counsel defense.  *See, e.g.*, *United States v. Sardana*, 101 F. App'x 851, 854-55 (2d Cir. 2016); *Farias v. Instructional Systems, Inc.*, 259 F.3d 91, 100-101 (2d Cir. 2001).  For example, in *S.E.C. v. Tourre*, the court precluded the defendant from highlighting the fact that a lawyer participated in certain communications and transactions once it was clear that the defendant could not show a valid advice-of-counsel defense.  As the court explained:

> A lay jury could easily believe that the fact that a lawyer is present at a meeting means that he or she must have implicitly or explicitly "blessed" the legality of all aspects of a transaction. Likewise, the fact that lawyers saw and commented on disclosure language could be understood as "blessing" the sufficiency of that disclosure. This misunderstanding would give the defendant all of the essential benefits of an advice of counsel defense without having to bear the burden of proving any of the elements of the defense.

950 F. Supp. 2d 666, 683-84 (S.D.N.Y. 2013); *see also S.E.C. v. Lek Securities Corp.*, 2019 WL 5703944, at *4 (S.D.N.Y. Nov. 5, 2019) ("References to counsel's communications are not relevant in the absence of an advice-of-counsel defense and should be excluded as well pursuant to Rule 403.").

## V.    Evidence of Acts that Occurred After the Completion of the Charged Conduct Does Not Bear on the Defendant's Intent

The Government understands that both defendants intend to offer evidence of acts that occurred after the time of the charged crimes.  Parnas has indicated that he may seek to establish certain 2019 activity involving Global Energy Producers ("GEP"), the corporate name Parnas used

for a $325,000 straw donation in 2018.  The Government understands that Parnas views this evidence as suggesting that Parnas believed GEP was a "real" company—as he told the FEC in his 2018 affidavit—as opposed to the empty shell it was at the time of the affidavit.  Kukushkin has indicated that he wishes to offer evidence that in 2019 and beyond, including after Kukushkin was indicted and Muraviev was identified as "Foreign National-1" in that indictment, Muraviev sought repayment of the money he gave to Parnas and his co-conspirators.  Although the Government does not understand the precise relevance of this evidence, it appears to relate to an argument that Muraviev's money was given to Parnas's side of the conspiracy as a legitimate business investment, and not for a willfully illegal purpose.

This evidence should be excluded as irrelevant and confusing.  Because all the actions necessary to complete the charged offenses occurred in 2018, if the Government proves those facts, nothing that happened in 2019 could undo the defendants' crimes.  That includes the *mens rea* element: Facts post-dating the charged conduct cannot bear on the defendants' intent, because the intent that matters is the intent the defendants had when carrying out the criminal acts.  *See, e.g.*, *Holloway v. United States*, 526 U.S. 1, 12, (1999) (statute's intent requirement is satisfied at moment defendant commits charged crime); *Lewis v. City of Albany Police Dep't*, 332 F. App'x. 641, 643 (2d Cir. 2009) ("Allegations concerning after-the-fact events are immaterial to . . . state of mind." (citation omitted)).

With respect to GEP's 2019 activity, the Government is aware of no evidence that Parnas knew that activity would occur when he signed his affidavit in October 2018.  That future activity thus cannot have affected his state of mind (or any other element of Counts Five and Six), and is therefore irrelevant.  Similarly, that Muraviev would seek repayment of the money he advanced for the illicit campaign contributions can be relevant only to the extent Kukushkin knew that

Muraviev would do so when Kukushkin engaged in the charged conduct.  The Government therefore does not object to evidence from 2018 showing that the transfers of money to the American side of the conspiracy were documented as loans.  Any post hoc attempts to seek repayment of that money, should, however, be excluded.

## VI.   Arguments and Evidence Sounding in Nullification Should Be Excluded

The Government understands that Parnas may wish to offer evidence of aspects of his personal life—such as his injury in a childhood car accident, the early death of his father, and that he has several children—which would tend to elicit jurors' sympathy.  This evidence should be excluded as irrelevant, confusing, and unfairly prejudicial.[11]

### A.  Applicable Law

Federal Rule of Evidence 402 provides:  "Irrelevant evidence is not admissible."  Thus any evidence that does not bear on the defendants' guilt or innocence of the charges in the indictment should be excluded as irrelevant.  Rule 403 further states that the Court may "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Thus any evidence that is likely to distract the jury from the issue of guilt or innocence should be excluded under Rule 403.  *See United States v. Rosado*, 728 F.2d 89, 93 (2d Cir. 1984) (criticizing admission of evidence about the propriety of a prosecution "for turning the trial away from a determination of whether the elements of the offense

---

[11]    The defendants have agreed to avoid other distracting topics, specifically (1) any contention that the conduct at issue would more appropriately be addressed through civil regulation or enforcement, (2) that the jury should consider Parnas's political activity in Ukraine, and his subsequent attempts to offer testimony about that activity during the presidential impeachment proceedings, and (3) that the Government or its witnesses harbor bias against him due to that political activity (although Parnas reserves the right to argue to the Court—not the jury—that he has been vindictively prosecuted).

charged had been proved beyond a reasonable doubt into a wide-ranging inquiry into matters far

beyond the scope of legitimate issues in a criminal trial").

        Evidence and argument that makes the defendant appear sympathetic for reasons unrelated

to the charges at issue should also be excluded as inviting the jury to acquit a defendant even where

the evidence proves his guilt beyond a reasonable doubt.  That is because any attempt to seek

nullification is plainly improper.  *See United States v. Thomas*, 116 F.3d 606, 615 (2d Cir. 1997)

(Jury nullification is "by no means a right or something that a judge should encourage or permit if

it is within his authority to prevent."); *id.* at 614 ("We categorically reject the idea that, in a society

committed to the rule of law, jury nullification is desirable or that courts may permit it to occur

when it is within their authority to prevent."); *see also Sparf & Hanson v. United States*, 156 U.S.

51, 102 (1895) ("Public and private safety alike would be in peril if the principle be established

that juries in criminal cases may, of right, disregard the law as expounded to them by the court,

and become a law unto themselves."); *United States v. Washington*, 705 F.2d 489, 494 (D.C. Cir.

1983) (per curiam) ("A jury has no more '*right*' to find a 'guilty' defendant 'not guilty' than it has

to find a 'not guilty' defendant 'guilty,' and the fact that the former cannot be corrected by a court,

while the latter can be, does not create a right out of the power to misapply the law.  Such verdicts

are lawless, a denial of due process and constitute an exercise of erroneously seized power."

(emphasis in original)).

**B.  Discussion**

        The Government is unaware of any relevant reason for the jury to consider Parnas's family

history, personal health, or similar facts.[12]  Because those facts have nothing to with his guilt or

---

[12]      Parnas has indicated he wishes to offer proof of the following facts:  "Lev Parnas came to
the United States from Odessa, Ukraine—then-Soviet Russia—with his family, in late 1976 or
1977, as part of a Soviet Jewish refugee program; Lev Parnas suffered severe injury from an
automobile accident in 1978, and he was hospitalized for several months; Lev Parnas's father died

innocence, he should be precluded from mentioning such subjects in his opening statement, during the presentation of evidence, or in closing statements, absent a ruling that a specific fact is relevant and more probative than unfairly prejudicial. *See, e.g.*, *United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming preclusion of evidence that defendant had son with cerebral palsy whom defendant had devoted his life to care for); *United States v. Battaglia*, 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether Defendant committed the crimes charged"); *United States v. Harris*, 491 F.3d 440, 447 (D.C. Cir. 2007) (affirming preclusion of evidence designed "mainly to cast [the defendant] in the sympathetic light of a dedicated family man").

The defendants should similarly be precluded from offering evidence or argument concerning the punishment or consequences they face if convicted. Because the jury can have no role in sentencing these defendants, it "should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" *Shannon v. United States*, 512 U.S. 573, 579 (1994) (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975)). For good reason: argument concerning punishment "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Id.*

## VII.   Irrelevant, Confusing, and Unfairly Prejudicial Subjects of Cross-Examination Should be Excluded

The Government moves to limit cross-examination of two witnesses whom it expects to call, Adam Laxalt and Felix Vulis, on subjects that would be irrelevant, confusing, and unfairly prejudicial.

---

in April 1983; Lev Parnas was naturalized as a United States Citizen in Brooklyn, New York, on December 16, 1986; Lev Parnas left Lincoln High School in Brooklyn, and received a NYS GED in approximately 1988."

### A.  Applicable Law

Any cross-examination must satisfy Rule 403—that is, any subject may be inquired into on cross-examination only if its probative value is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.  *See* Fed. R. Evid. 403; *United States v. Sasso*, 59 F.3d 341, 347-48 (2d Cir. 1995).  Inquiry is unfairly prejudicial if it would invite the jury to decide an issue material to the outcome of the case for reasons that have nothing to do with the factual issues properly before the jury.  *See United States v. Harvey*, 991 F.2d 981, 996 (2d Cir. 1993).

The Federal Rules of Evidence further limit the circumstances under which evidence of specific acts of a witness may be offered.  Rule 608(b) provides that "[e]xcept for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness."  The Court "may, on cross-examination, allow [those prior acts] to be inquired into," but only if such acts "are probative of the character for truthfulness or untruthfulness of . . . the witness."  Fed. R. Evid. 608(b)(1).  Before cross-examining a witness on specific instances of prior conduct pursuant to Rule 608, the questioner must have a good-faith basis to believe that the conduct occurred and that it implicated the witness's credibility.  *Hynes v. Coughlin*, 79 F.3d 285, 294 (2d Cir. 1996).  "Although counsel may explore certain areas of inquiry in a criminal trial without full knowledge of the answer to anticipated questions, he must, when confronted with a demand for an offer of proof, provide some good faith basis for questioning that alleges adverse facts."  *United States v. Katsougrakis*, 715 F.2d 769, 779 (2d Cir. 1983).

Furthermore, Rule 611 provides that the Court should "protect witnesses from harassment or undue embarrassment."  Fed. R. Evid. 611(a).  It is well settled that "[t]he scope and extent of

22

cross-examination lies within the discretion of the trial judge." *United States v. Scarpa*, 913 F.2d

993, 1018 (2d Cir. 1990) (internal quotation marks omitted).  As the Supreme Court has explained:

> [T]rial judges retain wide latitude insofar as the Confrontation Clause is
> concerned to impose reasonable limits on such cross-examination [of a
> prosecution witness] based on concerns about, among other things,
> harassment, prejudice, confusion of the issues, the witness' safety, or
> interrogation that is repetitive or only marginally relevant. And as we
> observed earlier this Term, the Confrontation Clause guarantees an
> *opportunity* for effective cross-examination, not cross-examination that
> is effective in whatever way, and to whatever extent, the defense might
> wish.

*Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (internal quotation marks omitted).  "As long

as a defendant's right to confront the witnesses against him is not violated, limitations on cross-

examination are not grounds for reversal," *United States v. Roldan-Zapata*, 916 F.2d 795, 806 (2d

Cir. 1990), and "[t]he decision of the trial court to restrict cross-examination will not be reversed

on appeal unless its broad discretion has been abused," *United States v. Maldonado-Rivera*, 922

F.2d 934, 956 (2d Cir. 1990).  "A trial judge does not abuse his discretion by curtailing cross-

examination as long as the jury has 'sufficient information to make a discriminating appraisal of

the particular witness's possible motives for testifying falsely in favor of the government.'"

*Scarpa*, 913 F.2d at 1018 (quoting *United States v. Singh*, 628 F.2d 758, 763 (2d Cir. 1980)).

**B. Discussion**

    1.    Adam Laxalt

    In 2018, Adam Laxalt was Nevada's Attorney General.  That year, he unsuccessfully ran

for Governor.  He is expected to testify that during his campaign he met Parnas, Fruman, and

Kukushkin (although he knows only Parnas by name) at various campaign events, that Parnas

promised to support Laxalt's campaign, and that Parnas's promises eventually resulted in a

$10,000 donation in Fruman's name.  Laxalt will further testify that he believed Fruman to be the

true source of the donation, and that had Laxalt believed otherwise, he would have rejected the donation.[13]  When Laxalt later came to suspect that Fruman was not the true donor, he caused a check for the amount of the donation to be sent to the U.S. Treasury, in order to avoid continued possession of the illegal donation without returning it to a potential wrongdoer.

Parnas has informed the Government that he may wish to cross-examine Laxalt on political positions that Laxalt has publicly adopted, in order to suggest that Laxalt could not honestly believe those positions and thus is not credible.  Such questioning would confuse the issues, distract the jury, and be unnecessarily inflammatory.  Laxalt was the Nevada manager for then-President Trump's 2020 re-election campaign, and is currently seeking the 2022 Republican nomination for one of Nevada's seats in the U.S. Senate.  Given the fraught nature of modern politics, it can reasonably be expected that some jurors will strongly disagree with Laxalt's political positions, and come to doubt his testimony for reasons entirely unrelated to its truth.  Debating the "honesty" of a particular political belief is not, however, the province of a criminal trial, and inviting that debate would plainly distract from the jury's focus on the conduct at issue in this case.[14]

---

[13]     A witness may answer hypothetical questions asking what the witness would have done had they known a fact that was not known to the witness at the time, but which other evidence shows to be true. *See United States v. Cuti*, 720 F.3d 453, 457-61 (2d Cir. 2013).  Here, the fact that Laxalt would have returned Muraviev's money, had he known it to be Muraviev's money, helps prove both that the defendants concealed the true source of the funds, and that they did so based on the widespread knowledge that straw donations and donations from foreign nationals are unlawful.  That is, there is no point in making a political donation that the recipient will reject as illegal, and thus the defendants tried to make their donations appear otherwise.

[14]     The Government also expects to call a second former Nevada political candidate, Wesley Duncan, as a witness.  Duncan's testimony is expected to be similar in nature to Laxalt's.  Duncan has a lower public profile than Laxalt—he has sought and held less prominent positions, and is not presently a candidate for any office.  The defendants may thus have less interest in cross-examining Duncan on political subjects.  The Government nonetheless respectfully requests that the Court impose the same limitation on cross-examining Duncan about any of his political positions.

Parnas has also suggested that he may wish to cross-examine Laxalt on media allegations, first circulated in 2018, that when Laxalt applied to the Nevada state bar, he failed to disclose a juvenile arrest for assaulting a police officer (or some similar charge). Laxalt has acknowledged the underlying encounter with law enforcement, but denied any dishonesty in the application. The Government does not object to inquiry on this subject: Although it has no information concerning the veracity of the media reports, the mere existence of those reports likely creates a good-faith basis to inquire. That said, Parnas must accept whatever answer Laxalt gives, because "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." Fed. R. Evid. 608(b). Further, should Parnas's counsel attempt to imply the truth of the allegation of dishonesty absent some evidence, unknown to the Government, that the allegation is true, the Government respectfully requests the Court provide the familiar instruction that a lawyer's questions are not evidence. *See United States v. Eberhardt*, 793 F. App'x 8, 12 (2d Cir. 2019).

The Government has also disclosed to the defendants a 2017 FBI report concerning a 2016 recording of a meeting in which Laxalt was later accused of using his position as Nevada's Attorney General to benefit a political donor. This matter and the recording became public in 2018, and Laxalt testified about it before the Nevada state legislature, stating that his actions were entirely proper. This incident does not appear to have led to any criminal investigation, and the FBI concluded that recording did not contain evidence of a crime. Any continuing debate about the recording therefore appears to be more a matter of politics than legal or factual dispute. *See generally* https://www.rgj.com/story/news/politics/2017/05/18/laxalt-faces/329361001/. The Government therefore believes this would not be an appropriate topic of cross-examination, both

because its political aspects significantly outweigh its probative value under Rule 403, and because any relationship between this incident and Laxalt's credibility is at best tangential under Rule 608.



27

2.      Felix Vulis

Felix Vulis is an American businessman who was born in the then-Soviet Union.  Vulis is personally acquainted with Parnas, Kukushkin, Fruman, and Muraviev, and explored pursuing legalized cannabis ventures with them.  For a time, Vulis participated in the long-running WhatsApp chat with the other four discussed above.  (*See supra* a 6-8).  The defendants and their co-conspirators made numerous incriminating statements during that chat, starting while Vulis was a member, but increasing in importance after they removed him from the chat.  (*See, e.g.*, GX 38, 51, 59, 61).  Vulis is expected to testify about the relationships among certain co-conspirators— for example, that Muraviev is a wealthy Russian businessman and that Kukushkin worked for him—and to outline the background and goals of the joint venture that became the Foreign Donor Scheme.



████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████   ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[18]     The Government is still attempting to determine whether to seek use immunity for Vulis's testimony.  Such immunity might be necessary either because Vulis's participation in the conspiracy's early discussions brought him close enough to the charges at issue in this case to reasonably fear legal exposure, or because the cannabis business Vulis has pursued violates federal statutes even if legal under the laws of the relevant states.  If the Court grants Vulis such immunity, the Government does not object to cross-examination on that subject, but such cross-examination should not falsely imply that Vulis sought immunity for anything other than those reasons.

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

## VIII.   <u>Parnas's Proffer Agreement is Enforceable Against Him</u>

On March 5, 2020, Parnas and his counsel met with members of this Office and the FBI, to proffer Parnas's potential testimony about the charges at issue here and other matters.   In advance of the proffer, the Government provided a written proffer agreement to Parnas's counsel, setting forth the terms under which statements Parnas made during the proffer could and could not be used against him.   (*See* Ex. A).[19]   At the meeting, Parnas indicated that he had reviewed the agreement with his counsel and understood it.   The Government then again reviewed the key provisions of the agreement, and Parnas again indicated his understanding.   As relevant here, the Proffer Agreement provides that the Government may use Parnas's proffer statements "to rebut any evidence or arguments by or on behalf of" Parnas at "all phases of trial."   (Ex. A, at 1).   Parnas, his attorney, an attorney for the Government, and a special agent with the FBI signed the agreement.   During a lengthy proffer, Parnas made several statements that tend to prove the charges at issue here, or facts underlying those charges.   An FBI agent took detailed notes of the proffer,

---

[19]    This exhibit consists of Parnas's proffer agreement and the FBI report of his proffer.   The Government has filed this material under seal as portions of it relate to ongoing investigations.

and later produced a formal report memorializing it (the "302").  Those notes, and the 302, have been provided to Kukushkin and Parnas.

Thus, should Parnas, through his counsel, make arguments or offer evidence that would be rebutted by statements Parnas made during the proffer, the Government may call one or more FBI agents to offer contradictory statements Parnas made during the proffers.  Parnas's counsel has informed the Government that he intends to avoid any course of action that would allow that response, but because the parties often disagree on what arguments, questions, or positions would do so, the Government has here set forth its position, so that any disagreement can be litigated in advance of trial.[20]

## A.  Applicable Law

Although statements made during plea negotiations are inadmissible, Fed. R. Evid. 410; Fed. R. Crim. P. 11(e)(6), the Supreme Court has held that a defendant may waive the right to prevent the use of such statements as long as the waiver is knowing and voluntary.  *United States v. Mezzanatto*, 513 U.S. 196 (1995).  In *Mezzanatto*, the Court held that the protections in those rules are waivable for purposes of impeachment or rebuttal since "[a] criminal defendant may knowingly and voluntarily waive many of the most fundamental protections afforded by the Constitution."  *Id.* at 201.

The Second Circuit has specifically held that proffer agreements containing provisions identical to those contained in the agreement executed by Parnas are enforceable.  *United States v. Lyle*, 919 F.3d 716, 732 (2d Cir. 2019); *United States* v. *Rosemond*, 841 F.3d 95, 107 (2d Cir. 2016); *United States* v. *Velez*, 354 F.3d 190 (2d Cir. 2004) ("[W]here a proffer agreement is entered

---

[20]     The Proffer Agreement also permits the Government to use any of Parnas's proffer statements during cross examination, should Parnas choose to testify.  The Government believes it is in agreement with Parnas on this point.

into knowingly and voluntarily, a provision in which defendant waives his exclusionary privilege under Federal Rule of Evidence 410 by permitting the Government to introduce defendant's proffer statements to rebut contrary evidence or arguments presented by the defense, whether or not defendant testifies, is enforceable."); *see also United States* v. *Gomez*, 210 F. Supp. 2d 465 (S.D.N.Y. 2002) (Chin, J.) (explaining various legal and policy reasons why proffer agreements virtually identical to the Proffer Agreement are enforceable).

In examining whether a defendant's proffer statements may be introduced at trial for rebuttal purposes, courts look to whether "there has been any evidence offered or elicited, or factual assertion made, by or on behalf of the defendant that would trigger the Rule 410 waiver," and if so, "whether the proffer statement fairly rebut[s] the fact asserted or evidence offered or elicited." *Rosemond*, 841 F.3d at 107 (internal quotation marks omitted) (citing *United States* v. *Barrow*, 400 F.3d 109, 117-21 (2d Cir. 2005)).   Under the terms of the Proffer Agreement, therefore, defense counsel is free to present a defense and to argue, for example, that the Government has failed to prove its case beyond a reasonable doubt (or failed to present "credible" evidence). *Id.* at 109-10 (summarizing factual assertions sufficient, and insufficient, to trigger a proffer agreement's waiver provision).   Counsel cannot do so, however, in a manner that directly or indirectly contradicts facts elicited during the proffer without triggering the waiver provision of the agreement. *Id.*

### B. Discussion

As the Proffer Agreement and the above law make clear, Parnas may not present evidence or make arguments that are contrary to his own statements in the proffer session without permitting the jury to assess those assertions in light of his contradictory proffer statements.   Among the statements that appear most likely to be relevant with respect to the Foreign Donor Scheme, Parnas

admitted that the purpose of the money Parnas, Fruman, and Correia obtained from Muraviev was to make campaign contributions to U.S. political candidates.  With respect to the Straw Donor Scheme, Parnas admitted that Fruman, rather than Parnas, paid for the donations made to the campaign of Congressman Pete Sessions in Parnas's name, and that Parnas did not reimburse Fruman for those payments.  Allowing Parnas to suggest otherwise, when he had in fact admitted those facts as true, would deceive the jury and subvert the truth-seeking purpose of trial.  *See Gomez*, 210 F. Supp. 2d at 472.

Accordingly, the Government will seek to introduce Parnas's proffer statements if his counsel takes a position inconsistent with those statements—whether in opening statement, through cross-examination, during summation, or otherwise.  The Government respectfully requests that, in the event that any of those waiver-triggering circumstances occurs, the Court enforce the express terms of the Proffer Agreement and permit the Government to use Parnas's proffer statements.  Further, to the extent that Parnas's counsel takes a position contrary to Parnas's proffer statements during summation, the Government will request that evidence be reopened to permit the Government to offer evidence of Parnas's proffer statements, in accordance with the terms of the Proffer Agreement.

Offering Parnas's proffer statements to rebut specific claims he may make at trial will not infringe Kukushkin's rights.  Parnas discussed Kukushkin during his proffer, and if read in its entirety the report of Parnas's proffer plainly inculpates Kukushkin.  But the individual admissions that might be relevant to rebutting improper argument by Parnas—such as that Muraviev's money was sought and used for donations—did not mention Kukushkin.  Moreover, because the Government would offer Parnas's statements through a testifying agent (rather than, for example,

a recording), the relevant admission can easily be elicited without mentioning Parnas's statements about Kukushkin.

The ability to avoid directly implicating Kukushkin when offering Parnas's proffer statements matters because *Bruton* v. *United States*, 391 U.S. 123 (1968), holds that the Confrontation Clause precludes the admission of a non-testifying defendant's confession that also implicates his co-defendant.   Subsequent case law, however, made clear that, where the Government seeks to offer statements from a non-testifying defendant that specifically inculpate a co-defendant, the statements can be redacted in a way that eliminates the use of the co-defendant's name and, in conjunction with appropriate limiting instructions, alleviates the concerns raised by *Bruton*.   *See United States* v. *Jass*, 569 F.3d 47, 61 (2d Cir. 2009) (upholding district court's admission of a co-defendant's post-arrest confession where district court instructed the jury not to use the confession in any way against the defendant, and the confession was redacted in a way that permitted the jury to follow the limiting jury instruction).   "So long as the confession standing alone is not incriminating, even if the confession taken together with other evidence implicates the defendant, the confession may be admitted." *United States* v. *Wimbley*, 18 F. App'x 24, 27-28 (2d Cir. 2001).

A defendant's statements may be offered even when his redacted statements interlock with other evidence to implicate his co-defendant.   *See United States* v. *Martinez-Montilla*, 135 F. Supp. 2d 422, 424 (S.D.N.Y. 2001) (explaining that "the *Bruton* rule is not violated even where the interlocking of the redacted statements with other evidence at trial could conclusively lead to the identification of the individual referred to through neutral pronouns as the codefendant" (citing *Williams*, 936 F.2d at 700; *United States* v. *Smith*, 198 F.3d 377, 385 (2d Cir. 1999)).   Thus, even though Parnas's admission that Muraviev funded political donations would tend to inculpate

Kukushkin when combined with other evidence showing Kukushkin's involvement in transferring Muraviev's money to Parnas, the jury can be safely instructed not to consider Parnas's statements against Kukushkin, because the statements introduced at trial will not themselves expressly mention or implicitly inculpate Kukushkin.  *See, e.g.*, *United States v. Rubio*, 709 F.2d 146, 155 (2d Cir. 1983) (cautionary instructions will avoid a *Bruton* issue "unless the admitted evidence is clearly inculpatory as to the complaining co-defendant and is vitally important to the government's case."); *United States v. Wilkinson*, 754 F.2d 1427, 1435 (2d Cir. 1985) (admission of a co-defendant's statement that corroborates the Government's other evidence does not violate *Bruton* unless "the statement, standing alone, would clearly inculpate [the complaining defendant] without introduction of further independent evidence").

## IX.     Parnas's Diversion of Some of the Donation Funds Is Intertwined with the Charged Conduct

Although Parnas, Kukushkin, and others agreed to use Muraviev's money to fund their joint cannabis business—primarily by donating to U.S. politicians they believed would help the business—they did not in fact use all the money for that purpose.  Among other things, Parnas and Fruman used a portion of the money to cover expenses for luxurious hotel accommodations and airfare, and other personal expenses.  Because this fact is inextricably connected to the charged conduct, it should be admitted at trial.

### A.  Applicable Law

Direct evidence is "not confined to that which directly establishes an element of the crime." *United States v. Gonzalez*, 110 F.3d 941, 942 (2d Cir. 1997).  As the Second Circuit has explained, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *Id.*; *accord United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991).  The Second Circuit has

repeatedly held that actions and statements are admissible as direct evidence of the crimes charged, and are "not considered other crimes evidence under" Federal Rule of Evidence 404(b), if (a) they "arose out of the same transaction or series of transactions as the charged offense," (b) they are "inextricably intertwined with the evidence regarding the charged offense," or (c) they are "necessary to complete the story of the crime on trial." *United States* v. *Carboni*, 204 F.3d 39, 44 (2d Cir. 2000); *see also United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007); *United States v. Baez*, 349 F.3d 90, 93-94 (2d Cir. 2003). In those circumstances, the uncharged crimes evidence is "appropriately treated as part of the very act charged, or, at least, proof of that act." *Quinones*, 511 F.3d at 309 (internal citations and quotations marks omitted).

## B. Discussion

At trial, the Government will offer bank documents, messages, summary charts prepared by FBI forensic accountant Kimberly Espinoza, and other evidence, showing how Kukushkin and others transferred one million dollars from foreign bank accounts controlled by Muraviev to Parnas, Fruman, and Correia, and how that money was spent. That evidence will show that some of the money was spent on the agreed-upon political donations, either to fund donations that had not been made prior to the transfer, or to reimburse Fruman and others for donations they had previously made consistent with the conspiracy's plan. But the evidence will also show that Parnas and others diverted some of the money to expenses that although arguably consistent with the conspiracy's objectives, were not political contributions (such as travel to political events), and other expenses that appear entirely unrelated to the group's agreement, such as plainly personal costs incurred by Parnas and Fruman.

Although Parnas's (and Fruman's) diversion of some of Muraviev's money away from the joint criminal objective is a dishonest act—Parnas arguably defrauded Muraviev to the extent he

36

used Muraviev's funds for purposes that benefitted only Parnas—it remains admissible at trial. Espinoza will need to show as complete an accounting of the funds as possible to prove the charged crimes, because an analysis that showed the destination of only some of Muraviev's funds would inevitably, and reasonably, strike the jury as incomplete.   Thus, Parnas's diversion of funds is admissible because it "arose out of the same transaction or series of transactions as the charged offense," is "inextricably intertwined with the evidence regarding the charged offense," and is "necessary to complete the story of the crime on trial."  *Carboni*, 204 F.3d at 44.

The Government also understands that Kukushkin may wish to argue that Parnas's partial diversion shows that he and Parnas did not in fact conspire with each other.  Logically, that is a non-sequitur.   It is entirely possible both for Parnas and Kukushkin to have agreed to use Muraviev's money to make illegal campaign contributions, and for Parnas to have skimmed some of that money for himself:

> As suggested by the age-old maxim "no honor among thieves," coconspirators may reach some basic agreements among themselves but also engage in self-interested lying to each other on other points. It is commonplace, for example, for coconspirators to agree in principle to equally share proceeds of their illegal acts and yet, in practice, to try to cheat each other out of parts of the proceeds; but they are still guilty of having conspired to commit the illegal acts.

*United States v. Gohari*, 227 F. Supp. 3d 313, 316 (S.D.N.Y. 2017).  Nonetheless, whether that occurred here may be a factual question best left to the jury, and so the Government does not dispute Kukushkin's right to offer this evidence or argue that it rebuts the charged conspiracy. Moreover, because the Government will be offering Parnas's out-of-court statements under Rule 801(d)(2)(E), Kukushkin is entitled to impeach those statements under Rule 806.  (*See infra* at 38-39).  Showing that Parnas did not in fact spend all Muraviev's money in the manner his statements claim would likely constitute a proper form of impeachment under Rule 806.  Thus, for multiple

reasons, evidence that not all Muraviev's funds were spent to further the conspiracy is admissible, even if that even might reflect badly on Parnas.

## X.   This Court Should Rule on the Defendants' Ability to Impeach Each Other's Credibility Before Trial

Because the Government will be offering the out-of-court statements of each defendant against the other, each defendant has a right to impeach the other's credibility.  *See* Fed. R. Evid. 806 ("When a hearsay statement—or a statement described in Rule 801(d)(2)(C), (D), or (E)—has been admitted in evidence, the declarant's credibility may be attacked, and then supported, by any evidence that would be admissible for those purposes if the declarant had testified as a witness."). The defendants have informed the Government that they may wish to impeach each other's credibility by broaching certain topics that the Government would not itself raise.  For example, Kukushkin has stated that he believes that Parnas's participation in the Fraud Guarantee scam is relevant to the jury's assessment of Parnas's credibility, even though the Court severed that conduct from this trial.  (*See* Dkt. 200, at 4).  The Government expects Parnas to oppose any mention of Fraud Guarantee.  Parnas has also indicated that, at least if this Court allows use of the Fraud Guarantee allegations to impeach him, Parnas would cross-examine Government witnesses on litigation they had against Kukushkin, which involved allegations of unscrupulous business practices by Kukushkin, but which neither Kukushkin nor the Government believe are otherwise relevant to this case.

The law governing impeachment of a witness's credibility is generally discussed above. (*See supra* at 22-23).  When applying that law to resolve the competing interests of co-defendants, courts have broad discretion.  *See, e.g.*, *United States v. Bovain*, 708 F.2d 606, 613 (11th Cir. 1983) (affirming admission of defendant's prior bad acts to impeach his out-of-court statements offered against co-defendant, under Rule 806, with limiting instruction); *United States v. Robinson*, 783

F.2d 64, 68 (7th Cir. 1986) (affirming district court's decision not to follow *Bovain*, but rather to bar two co-defendants from using each other's prior convictions to impeach their out-of-court statements).

At this time, the Government takes no position on which extrinsic acts, if any, should be admitted to allow the defendants to impeach each other's out-of-court statements. It does, however, respectfully request that the Court resolve this dispute before trial. Because the Government bears the burden of proof, and because it will present its case first, it wishes to be able to inform the jury of all the evidence this Court finds admissible. Otherwise, the jury may feel the Government has "hidden" important facts. For example, the Government is comfortable discussing the Fraud Guarantee allegations against Parnas for the limited purpose of assessing the credibility of his out-of-court statements, or not discussing those allegations at all, as the Court deems appropriate. But the Government does not wish to offer Parnas's statements without apprising the jury of all the relevant evidence it can use to assess those statements, only to have the Fraud Guarantee allegations surface later in the case. The Government has raised this topic with the defendants' counsel, and expects that they will address any specific impeachment they wish to offer in their own motions *in limine*, or in their responses to the Government's motions.[21]

\* \* \*

---

[21] The Government has informed the defendants that the issue of two Government witnesses' litigation against Kukushkin may not be ripe, as the Government is not certain that it will call those witnesses. Nonetheless, the Government believes that the Court could rule on the Fraud Guarantee question and any other specific issues raised by the defendants, as well as giving general parameters on this subject.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court should grant

the above motions.

Dated:  New York, New York
        September 21, 2021

                                    Respectfully Submitted,

                                    AUDREY STRAUSS
                                    United States Attorney for the
                                    Southern District of New York


                          By:      _____/s/_____
                                    Aline R. Flodr
                                    Nicolas Roos
                                    Hagan Scotten
                                    Assistant United States Attorneys
                                    (212) 637-2410

Cc:     Defense Counsel
        (Via ECF)