

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 29, 2021

**BY ECF**

The Honorable J. Paul Oetken
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:    *United States v. David Correia,* **S1 19 Cr. 725 (JPO)**

Dear Judge Oetken:

    The Government writes in opposition to defendant David Correia's *pro se* motion for compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A), which seeks an order reducing his sentence to time served. The Government opposes Correia's motion because the sentencing factors set forth in 18 U.S.C. § 3553(a) weigh strongly against a reduction in sentence. Accordingly, Correia's motion should be denied.

**I.    Background**

    A.    The Charges Against Correia and His Guilty Plea

    Correia pled guilty to and was sentenced for two serious offenses. First, as charged in Count Seven of the S1 Indictment, between 2012 and 2019, Correia and co-defendant Lev Parnas defrauded seven different victims out of more than $2.3 million dollars. Beginning in late 2012, Correia and Parnas pitched their business, Fraud Guarantee, to potential investors as a company that would provide services to protect investors from fraud. (Presentence Investigation Report ("PSR"), dated January 20, 2021, at ¶ 27). Parnas and Correia marketed Fraud Guarantee as a company that would "help reduce the risk of fraud as well as mitigate the damage caused by fraudulent acts . . . by building products that protect investors in the private equity marketplace." They claimed that Fraud Guarantee would "provide[] . . . investors peace of mind through comprehensive intelligence, and insurance against losses due to fraudulent behavior, or defaults due to fraud." In their pitches to investors, they repeatedly made several false material statements: that funds would be used for Fraud Guarantee's purposes, that Correia and Parnas would not take a salary from investors' funds, and that Parnas had already invested millions in the company. (PSR ¶ 28-36). Correia played a critical role in the scheme by convincing investors that Fraud Guarantee was a legitimate and functioning business, when Correia knew that it was not operational and that the vast majority of the money investors put into the company was spent on purposes having nothing to do with Fraud Guarantee. Over the course of the scheme, Correia and Parnas conspired to defraud at least seven victims out of a total of approximately $2,322,500 through the

commission of wire fraud. (PSR ¶ 37). Despite the length of the scheme and the amount of money invested by victims, Fraud Guarantee never became operational. (PSR ¶ 27). At his guilty plea proceeding, Correia admitted that he gave "incorrect information" to potential investors in Fraud Guarantee and "knew this was wrong at the time that it was done." (Plea Tr., Oct. 29, 2020, at 18).

Second, as charged in Count Two of the S1 Indictment, after a complaint was filed with the Federal Election Commission ("FEC") about straw donations made by Parnas and Igor Fruman, Correia submitted a materially false affidavit to the FEC and helped Parnas and Fruman modify their accounting records so that they were consistent with their false affidavits. Specifically, on July 25, 2018, the Campaign Legal Center filed a complaint with the FEC about a $325,000 contribution that was made in the name of "Global Energy Producers LLC" or "GEP" to the America First Action PAC, stating that it was an illegal straw donation. Correia took the lead on responding to the allegations in the FEC complaint. Correia contacted an accountant about recording the $325,000 contribution as coming from GEP and told the accountant to "update the GEP balance sheet to properly reflect the fact that the $325,000 donation is in-fact booked properly and will memorialize[] that GEP is the entity that made the donation (albeit via [Parnas's LLC])." Correia also told the accountant that they would "follow-up with [Parnas's] LLC's info so the numbers will properly jive" and it was their "intent all along, just need to show it on the financials." Correia further asked the accountant for "any insight as to any specific language that should be included with the loan documents that would memorialize the transaction." On October 11, 2018, GEP, Fruman, Parnas, and Correia filed a response with the FEC to the Campaign Legal Center's complaint. Attached to the response were sworn affidavits by Parnas, Fruman, and Correia. According to the Fruman, Parnas, and Correia affidavits, GEP "is a real business enterprise funded with substantial bona fide capital investments," "its major purpose is energy trading, not political activity," and the America First Action contribution "was made with GEP funds for GEP purposes." Those statements were false. (PSR ¶¶ 24-25). The funds used to make the America First Action PAC contribution came from a private real estate lending transaction that Fruman completed shortly before the contribution was made, and GEP had no business activity or revenues when it made the contribution. (*Id*.). At his guilty plea, Correia admitted that his FEC affidavit contained information "that [was] not correct" and he "knew that this was wrong at the time [he] did it." (Plea Tr. at 17).

    B. Correia's Sentencing and Compassionate Release Motion

On February 8, 2021, this Court sentenced Correia to a term of imprisonment of 12 months plus one day on Count Two and Count Seven to run concurrently. The Court also ordered that Correia pay $2,322,500 to his victims as restitution, as well as $43,650 as forfeiture. In imposing that sentence, the Court varied downward from the applicable sentencing guidelines range of 33 to 41 months' imprisonment. (Sent. Tr. at 5.) In urging the Court to impose a non-incarceratory sentence, the defendant's counsel repeatedly noted that Correia "has health issues that will make prison more difficult for him than an average person being incarcerated." Correia's sentencing submission also noted, in detail, his health issues, including those referenced in his motion for compassionate release. (Def. Unredacted Sent. Sub., dated Jan. 25. 2021.) The Court, however, concluded that "the purposes of just punishment, respect for the law, and deterrence call for a

significant punishment to reflect the seriousness of [the defendant's] crimes." (Sent. Tr. at 29.) That said, the Court concluded that a variance from the guidelines range was appropriate because Correia "received a relatively small portion of the proceeds of this fraud" and, as is particularly relevant here, because "Correia does have medical conditions that will make a term of imprisonment more difficult than it would be for a healthy person, particularly in light of the risks of COVID-19." (Sent. Tr. at 30.) The Court noted that while the defendant's medical conditions weigh in favor of a variance, the Bureau of Prisons "is equipped to handle [the defendant's] medical conditions." (*Id.*)

The defendant surrendered on or about March 22, 2021. He is serving his sentence at FCI Butner Medium, which is part of the Federal Correctional Complex, Butner, which includes the BOP's largest medical center in the country. He is due to be released on January 20, 2022. *See* https://www.bop.gov/mobile/find_inmate. On September 3, 2021, the defendant filed a *pro se* motion seeking release from incarceration and to serve the remainder of his sentence on home confinement. The defendant asks for relief on the grounds of the risk of COVID-19.

## II. Applicable Law

Under Section 3582, the Court "may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). A court may "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release," although "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." *United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020).

As the proponent of the motion, the defendant bears the burden of proving that "extraordinary and compelling reasons" exist under the above criteria to justify early release. *See United States v. Gotti*, 02 Cr. 743 (CM), 2020 WL 497987, at *5 (S.D.N.Y. Jan. 15, 2020); *United States v. Ebbers*, 02 Cr. 11443 (VEC), 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020); *see generally United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue."). "[T]he existence *vel non* of 'extraordinary and compelling reasons' determines only whether a defendant can be considered for release — the existence of such reasons does not mandate release." *United States v. Ebbers*, No. 02 Cr. 1144 (VEC), 2020 WL 91399, at *6 (S.D.N.Y. Jan. 8, 2020); *see also United States v. Israel*, 2019 WL 6702522, at *11 (S.D.N.Y. Dec. 9, 2019) ("A court is not required to reduce a sentence on compassionate release grounds, even if a prisoner qualifies for such reduction because of his medical condition. . . . [Section 3582] was drafted using the word 'may,' not 'must.'"). If a defendant can be considered for release, the 18 U.S.C. § 3553(a) factors are relevant to whether release is warranted. *See* 18 U.S.C. § 3582(c)(1)(A).

Hon. J. Paul Oetken
September 29, 2021
Page 4 of 5

**III.    Discussion**

The defendant's motion does not meet the statutory standard for release. He argues that he should be released due to his risk of severe illness from COVID-19, and he cites the fact that he has a medical condition putting him at greater risk (which is described in detail in the sealed portions of the defendant's sentencing submission and compassionate release motion). To be sure, this condition, as well as the other medical ailments cited by the defendant, have been identified by the Center for Disease Control as a potential risk factor for serious illness from COVID-19. More importantly, however, the defendant's BOP medical records reveal that he has received the Pfizer COVID-19 vaccine and is fully vaccinated. As several courts have concluded, the risk of COVID-19 for a vaccinated individual is substantially reduced to the point that a defendant will typically not be able to demonstrate extraordinary and compelling reasons after he has been vaccinated. *See, e.g.*, *United States v. Mena*, No. 16 Cr. 850 (ER), 2021 WL 2562442, at *3 (S.D.N.Y. June 23, 2021) ("Access to an approved COVID-19 vaccine generally counsels against compassionate release based on COVID risk, due to the strong evidence of the effectiveness of each of the vaccines."); *United States v. Santana*, No. 18 Cr. 865 (VEC), 2021 WL 1819683, at *2 (S.D.N.Y. May 6, 2021) (finding no extraordinary circumstances due to "the efficacy of the COVID vaccines, and specifically the Pfizer vaccine" and citing data showing Pfizer vaccine is 94% effective against COVID-19 hospitalization); *United States v. Orlandez-Gamboa*, No. 99 Cr. 654 (CM), 2021 WL 2582077, at *3 (S.D.N.Y. June 23, 2021) (finding defendant had failed to demonstrate extraordinary and compelling circumstances, even though he was in high-risk age group, because he was "fully vaccinated against COVID-19"). "Indeed, recent data confirms that the COVID-19 vaccines dramatically reduce the risk of death or serious illness from the various variants of COVID-19, even the dreaded Delta Variant." *United States v. Jones*, No. 17 Cr. 214 (CM), 2021 WL 4120622, at *2 (S.D.N.Y. Sept. 9, 2021). Accordingly, the fact that the defendant is vaccinated is alone a basis for the denial of his motion.

Additionally, the bulk of the defendant's argument focuses on the sufficiency of the BOP's broader response to COVID-19. However, granting release based on this sort of generalized concern flies in the face of the limited and extraordinary nature of compassionate release. And while the defendant claims that he is significantly more likely to contract COVID-19 in BOP custody, according to the BOP's data, in fact there are currently zero inmate or staff at FCI Butner Medium who have COVID-19. Thus, while that institution may have had serious outbreaks of COVID-19 in the past, the recent data demonstrates that the risk to the defendant "has been substantially reduced." *DiNapoli v. United States*, No. 17 Cr. 89 (CS), 2021 WL 4084183, at *2 (S.D.N.Y. Sept. 8, 2021) (noting the low positivity rate at FCI Butner Medium as a reason to deny the defendant's motion).

Even assuming the defendant's medical conditions, coupled with conditions in the BOP, amount to "extraordinary and compelling" reasons that satisfy the requirement for compassionate release, the factors set forth in § 3553(a) weigh against shortening his sentence. The Court's sentence already carefully calibrated the defendant's crime, his personal history, his medical condition, and his culpability. None of those facts have changed, and the defendant still has a substantial portion of his sentence remaining—indeed, he has served only about half his sentence.

    A continuation of the term of incarceration is necessary to reflect the seriousness of the offense and the character of the defendant. As the Court commented at sentencing, the wire fraud and false statements are serious offenses with, particularly in the case of the fraud, real victims. Requiring the defendant to serve out the remainder of his sentence in BOP custody is necessary to reflect the seriousness of the offense conduct. Additionally, as the Court emphasized at sentencing, there is also a need to deter others from engaging in this type of criminal behavior. Releasing the defendant after only roughly six months of imprisonment would send the wrong signal about the nature of the defendant's conduct. Indeed, it would represent only a small fraction of the period of incarceration had he received a sentence within the applicable guidelines range. Requiring the defendant to serve out the remainder of his sentence is necessary to sending a strong message that individuals who commit fraud will face serious penalties.

    Furthermore, in imposing the defendant's sentence, the Court already sentenced the defendant below the applicable guidelines, noting his medical condition and the risk of COVID-19 to him. As another court in this district has observed, "a further reduction in [a defendant's] already significantly reduced sentence would tend to undermine the sentencing goals set forth in Section 3553(a)" and therefore, "[a]s long as the BOP is capable of caring for [a defendant's] medical needs, [the defendant] should serve out the balance of [his or her] sentence." *United States v. Goode*, No. 14 Cr. 810-07 (CM), 2020 WL 58272, at *7 (S.D.N.Y. Jan. 6, 2020). The defendant already received a sentence shorter than what he might have otherwise received because of his medical condition. A reduction now when nothing has changed would be inconsistent with the section 3553(a) factors.

## IV.    Conclusion

    For the foregoing reasons, the Government respectfully submits that the defendant's motion should be denied.

    Respectfully submitted,

    AUDREY STRAUSS
    United States Attorney

by: *Nicolas Roos*
    Aline R. Flodr
    Nicolas Roos
    Hagan C. Scotten
    Assistant United States Attorneys
    (212) 637-2421

Cc: David Correia (by mail)