



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

**BY ECF**                                                   October 7, 2021
The Honorable J. Paul Oetken
United States District Judge
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square, New York, NY 10007

     Re:    *United States v. Lev Parnas and Andrey Kukushkin*, S3 19 Cr. 725 (JPO)

Dear Judge Oetken:

    The Government respectfully submits this letter requesting pre-trial rulings on the admissibility of certain Government exhibits. These exhibits form a key part of the Government's proof on the core issue of the defendants' mens rea, and the Government was not aware that the defendants objected to them until quite recently. Because, as set forth below, the disputed exhibits are relevant and far more probative than unfairly prejudicial, the Government respectfully requests that the Court rule that they are admissible prior to opening statements.

### 1. The Inaugural Committee Articles (GX 8-A-2 and 32-A-1)

    Several of the contested exhibits are WhatsApp chats in which the defendants and their co-conspirators shared news stories about political contributions made by straw or foreign donors, stating that such donations violate the law. (*See* GX 8-A-2, 30-A-1, 32-A-1). Each of these articles is offered not for its truth, but for its effect on the defendants who sent or received them. Two concern the same event: GX 8-A-2 is a link to a story about the investigation into foreign donations to the 2016 presidential inauguration sent to Parnas by Joseph Ahearn, a campaign fundraiser, on May 11, 2021—right before the inception of the foreign donor scheme. Ahearn also sent a story about legalizing marijuana, and Parnas replied "interesting." (GX 8). Then on August 31, 2018—while the foreign donor scheme was underway—Igor Fruman sent Parnas an article about a guilty plea resulting from that investigation. (GX 32). The story states that in addition to pleading guilty to "a lobbying crime," a defendant admitted "other crimes" including "causing foreign money" to be paid to the inaugural committee. (GX 32-A-1). The article further explains that the inaugural committee "couldn't accept money from foreign nationals because of Federal Election Commission rules" so to "get around that restriction" the defendant "enlisted a U.S. citizen to serve as a 'straw' buyer" of inaugural tickets. The straw buyer was then "reimbursed by a $50,000 wire from [a] Ukrainian oligarch's Cypriot bank account." (GX 32-A-1).

    These articles put Parnas on notice that his conduct here was criminal. The conduct they describe as illegal closely matches what he was then doing—using a straw to contribute a foreign national's money—right down to details such as the foreign national's money arriving as a reimbursement rather than an upfront payment, and even the use of a Cypriot bank account. (*Id.*). Because Parnas disputes his awareness that such acts are illegal, having received such plain statements that they are is highly probative. *See, e.g.*, *United States v. Moseley*, 980 F.3d 9, 27 (2d Cir. 2020) (prior complaints that defendant was acting illegally properly admitted to show defendant on notice that his acts were unlawful); *United States v. Ansaldi*, 372 F.3d 118, 130 (2d Cir. 2004) (Food and Drug Administration

paper circulated to defendants' employees and discussed in his presence properly admitted as evidence that defendant was on notice that his conduct was illegal).

Because Parnas's receipt of these articles tends to prove his guilt, they are relevant under Rule 401 and probative under Rule 403. And that they will make it difficult for him to deny that he knew what he was doing was illegal does not make them *unfairly* prejudicial—it only makes them especially probative: "All evidence introduced against a defendant, if material to an issue in the case, tends to prove guilt, but is not necessarily prejudicial in any sense that matters to the rules of evidence. Evidence is prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980) (internal citation omitted); *United States v. Vallee*, 304 F. App'x 916, 920 (2d Cir. 2008) (Unfair prejudice "does not mean the damage to the opponent's case that results from the legitimate probative force of the evidence; rather, it refers to the unfair advantage that results from the capacity of the evidence to persuade by illegitimate means." (quoting 22 C. Wright & K. Graham, *Federal Practice and Procedure* § 5215 at 274–75 (1978)); 2-404 Weinstein's Federal Evidence § 404.21 ("Unfair prejudice under Rule 403 does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence. That is hardly unfair. Rather, it refers to the tendency of certain evidence to provoke an emotional response in the jury or otherwise to suggest a decision on an improper basis."); *United States v. Levy*, 594 F. Supp. 2d 427, 440 (S.D.N.Y. 2009), *aff'd*, 385 F. App'x 20 (2d Cir. 2010) ("Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be *unfair*." (quoting *Costantino v. Herzog*, 203 F.3d 164, 174 (2d Cir. 2000))).

Nothing about these articles will unfairly prejudice Parnas or Kukushkin, because they will not "have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *Figueroa*, 618 F.2d at 943. Given that the inaugural donations did not involve the defendants or anyone connected to them, there is no risk that the jurors will infer that the defendants may have committed the charged crime just because some unrelated person committed a similar crime. That is particularly noteworthy because if the defendants were implicated, the inaugural donations would plainly be far more prejudicial, yet would still be admissible under Federal Rule of Evidence 404(b). *See, e.g.*, *United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993) (evidence that defendant previously engaged in similar conduct admissible to prove intent under Rule 404(b)). Because these articles have the probative value of proving Parnas's knowledge of illegality without the risk of showing a defendant's propensity to commit crimes that can accompany Rule 404(b) evidence, the Rule 403 balancing test heavily favors their admission.

Nor do the articles suggest that the type of conduct at issue here is particularly pernicious—their value is simply in identifying that the conduct as illegal.[1] And although the articles do evoke the broader issue of the Special Counsel's investigation of Russian meddling in the 2016 elections, the parties have agreed that issue must necessarily arise in this case: The parties have entered a stipulation that, "The investigation conducted by Special Counsel Robert Mueller into Russian meddling in the 2016 election began in 2017 and continued through March 2019. The investigation garnered extensive media attention and, at times, daily reporting." (GX S4). The disputed exhibits will thus not introduce any issue into

---

[1]     In their current version, the articles contain extraneous assertions about people unconnected to the defendants which the defendants could nonetheless view as unnecessary and inflammatory, such as that the inaugural donation was connected to someone "suspected of having ties to Russian intelligence." (GX 32-A-1). The defendants have not asked for redactions to this material, but the Government will redact it if requested.

the case that is not—somewhat inevitably, given the extensive coverage of the Special Counsel's investigation—already present.[2]

Finally, Kukushkin will not be prejudiced by the use of this article to prove Parnas's state of mind. "Where a defendant is a member of a conspiracy, all the evidence admitted to prove that conspiracy, even evidence relating to acts committed by co-defendants, is admissible against the defendant." *United States v. Salameh*, 152 F.3d 88, 111 (2d Cir. 1998). That Kukushkin's co-conspirator—with whom he regularly discussed their joint plan—knew he was acting illegally bears on the existence of the conspiracy. To the extent Kukushkin wishes to remind the jury there is no evidence that he saw the inaugural committee articles, the Government will not suggest otherwise. That makes these articles no different than the numerous other chat messages and emails on which only one of the two defendants is copied, but for which there is no colorable objection to admission against both defendants.

## 2. The FEC Complaint Article

On August 4, 2018—meaning during the early part of the charged conspiracy—Kukushkin forwarded Muraviev a link to a news article (the "FEC Complaint Article"). (GX 30). The article describes the FEC complaint against Parnas, Fruman, and GEP for the earlier straw donations that are the subject of Counts Four to Six in this case. (GX 30-A-1). Specifically, it summarizes the complaint as "alleging that GEP might be an illegal campaign-finance conduit created to mask the actual sources of its political contributions" and describes Parnas and Fruman as GEP officers. (*Id.*). If anything, this exhibit is even more probative than the inaugural committee articles, because it shows Kukushkin's awareness not only that straw donations are illegal, but that the very people he had agreed to arrange straw donations through were already under investigation for breaking the law in exactly that way. *See Moseley*, 980 F.3d at 27.

Kukushkin has suggested that the article is prejudicial because "[t]here's no evidence that he had any knowledge of what was in it." (10/5/21 Tr. at 85). But the inference that someone who forwarded a news story read the story first is powerful—otherwise he would have no reason to forward it. Indeed, it would make no sense for Kukushkin to have forwarded this article to Muraviev if he *hadn't* read it: The link Kukushkin forwarded reads only "pro-trump-megadonors-look-to-cash-in-on-trumps-plan-to-undercut-russian-energy." (GX 30). Neither Kukushkin nor Muraviev appear to have had general interest in the energy sector or contributions to President Trump. Only by reading this short article could Kukushkin have learned that it concerned political contributions by their partners, Parnas and Fruman (GX 30 A-1, at 1-3), a subject of obvious interest to Muraviev. That more than suffices to support the probable inference required. *See, e.g.*, *Ansaldi*, 372 F.3d at 131; *United States v. Briguet*, 2020 WL 6945929, at *1 (E.D.N.Y. Nov. 25, 2020) (admitting newspaper articles to show defendant's awareness where defendant acknowledged that he regularly read the newspaper section in which the articles

---

[2]     The parties unsurprisingly hold different views of *why* the publicity around the Special Counsel's investigation is relevant: The Government believes that it would be very difficult for anyone following the news in 2018 not to know that donating Russian money to U.S. political candidates was illegal. The Government understands that the defendants will argue that the publicity surrounding the investigation gave them a non-criminal motive to conceal Muraviev's involvement—that is, that they wished merely to avoid the notoriety associated with Russian involvement, without necessarily knowing that such involvement also broke the law.

appeared, and the articles' headlines were "likely to catch Defendant's eye given their relevance to him.").[3]

This article also does not unfairly prejudice Parnas. Although it discusses an allegation of wrongdoing on his part, it introduces no new evidence on that score. Parnas has not objected to the Government offering the more detailed complaint on which the article is based (GX 90-A-1)—as it must, given that Parnas's responses to that complaint are the conduct charged in Counts Five and Six. Nor does a one-sentence summary expressly describing the complaint as an allegation constitute any proof of Count Four, as the Court can instruct the jury. Indeed, the submission of this article may place before the jury an exculpatory statement that Parnas himself could not himself offer: Kukushkin has requested that the Government offer a portion of the article in which a GEP "spokesman" denies the allegations, not because Parnas has any ability to offer such self-serving statements for their truth, but because the article is offered for Kukushkin's state of mind, and GEP's denial arguably forms a relevant part of that state of mind.[4] Moreover, even if this article did in some way add to the proof against Parnas on Counts Four to Six—which it does not—its probative value on the central issue of Kukushkin's state of mind far outweighs any marginal effect from summarizing a complaint already in evidence.

### 3. The Time Cover (38-A-29)

GX 38-A-29 is part of the long-running WhatsApp chat between Parnas, Kukushkin, Muraviev, Fruman, and Felix Vulis. (GX 38). On September 21, 2018—four days after he transferred the first $500,000 for political contributions—Muraviev sent the chat group a picture of a Time Magazine cover, with the title "All the Czar's Men" and the subtitle "How Putin's Oligarchs Got Inside the Trump Team." (GX 38-A-29). Fruman responded with two "emojis," the "okay" hand sign and the "we're number one" finger gesture familiar from sports events. (GX 38 at 3). Parnas responded with four emojis, alternating the okay sign with a thumb's up symbol. (*Id.*).

The Time Cover and Parnas's and Fruman's response to it constitute probative evidence on the core issue of intent. As the Government understands it, the defendants deny both that the purpose of the money transferred by Muraviev was to make political contributions, and that to the extent that was the purpose, they knew the purpose was wrong. (*See, e.g.*, Dkt. 224, at 7 (Kukushkin characterizing his defense)).[5] Yet four days after a wealthy Russian businessman sent $500,000 in answer to their request

---

[3]      Kukushkin has also noted that he received the article from Fruman. (10/5/21 Tr. 84-85). That only makes it more probative—that more co-conspirators were passing around news reports describing their conduct as illegal shows a more widespread agreement to break the law.

[4]      It is not entirely clear that GEP's denial should be admitted: The primary purpose of offering the article is not to show that Kukushkin knew Parnas or Fruman committed the wrongs alleged in the complaint, but to show that Kukushkin knew that this type of conduct is illegal. Secondarily, reading that Fruman and Parnas had recently broken the law by allegedly doing what Kukushkin was now doing with them would put him on notice even if the original allegation was false. Perhaps for this reason, Kukushkin, Parnas, and the Government each disagree on which portions of the article should be redacted. For now, the Government requests a ruling on the most probative part of the article—the paragraph reflecting that a "campaign-finance conduit" used to "mask the actual source of its political contributions" is "illegal." (GX 30-A-1 at 3-4). After the Court rules, the Government will attempt to crystalize any remaining disputes about redactions through further discussion with defense counsel.

[5]      To the extent either defendant does not wish to contest these issues, they must offer a formal stipulation, or some other declaration of equal clarity, to forestall the Government from offering the evidence necessary to meet its burden here. *See United States v. Colon*, 880 F.2d 650, 659 (2d Cir. 1989).

that he fund political contributions, that same businessman sent a magazine cover focused on the influence of wealthy Russian businessmen in U.S. politics, and carrying an obvious connotation that such influence was disturbing. Parnas and Fruman responded with neither surprise nor confusion, but rather enthusiastic affirmations. That provides powerful evidence that they—and Kukushkin, who was an active participant in this chat—understood both the purpose of the conspiracy and that such a purpose was widely understood to be wrongful, at least by Americans. As such, it constitutes direct proof of the requisite mens rea. *See United States v. George*, 386 F.3d 383, 394-95 (2d Cir. 2004) (describing "an improper purpose" as sufficient to show willfulness even under the heightened standard rejected in that case).

This exhibit also does not unfairly prejudice the defendants. To be sure, it reflects Parnas and Fruman ratifying what appears to be Muraviev's celebration of Russian meddling in American politics. But that is inherent in the nature of the charged conduct: The foreign donor ban exists to prevent such meddling. That co-conspirators enthused about this conduct is direct proof of their guilt. Courts have previously admitted evidence of far more inflammatory anti-American sentiment where, as here, it served as proof of a charged conspiracy to commit crimes against this country. *See, e.g.*, *Salameh*, 152 F.3d at 111 (evidence of "sulphurous anti-American sentiment," including a video of "a man driving a truck into a building that was flying an American flag" had greater probative than prejudicial value in proving conspiracy to commit first World Trade Center bombing); *see also United States v. Monsalvatge*, 850 F.3d 483, 496 (2d Cir. 2017) (collecting cases).

### 4. The Russian Roots Emails (GX 136 and 137)

GX 136 and 137 contain an exchange of emails between Kukushkin and Correia about the formation of a corporation, which they refer to as "NewCo," to conduct the group's planned marijuana venture. In these emails, Kukushkin states that he is "trying to establish . . . how transparent should Andrey [Muraviev] be exposed for the benefits of NewCo Transparency, his Russian roots, and current political paranoia about it." (GX 137). Less than three weeks later, Kukushkin would help incorporate NewCo as Strategic Investment Group, or "SIG." (GX 141). Although formed with Muraviev's capital to conduct his business, the corporate documents nowhere mention him. (*Id.*).

The Russian Roots Emails are probative because they show that the decision to avoid mentioning Muraviev in the formation of his corporation was undertaken deliberately, and with Kukushkin's involvement. The Government understands that Kukushkin will argue that the emails also contain an innocent explanation: That Muraviev's role was concealed not due to any consciousness of illegality, but merely to avoid the controversy that Russian involvement could carry given the "current political paranoia about it." (GX 137). That does not, however, defeat the emails' probative value, for at least two reasons:

*First*, Muraviev elsewhere did business openly in the United States, supposed concerns about "political paranoia" notwithstanding. The Government expects that documents and witness testimony will establish that Muraviev participated publicly in at least two legalized cannabis businesses, including in 2018. He had no reason to avoid doing so, because it was not (so far as the Government is aware) unlawful for foreign nationals to participate in those businesses. It is, however, unlawful for foreign nationals to make campaign contributions in U.S. elections. It is therefore telling that the only legalized cannabis business in which Muraviev's name was concealed is the one that the defendants intended to ground in a million dollars in campaign contributions that would be obviously illegal if traced to him.

*Second*, the conspiracy charged in Count One alleges three unlawful objectives: (1) illegal foreign contributions, (2) illegal straw donations, and (3) defrauding the FEC. Even if accepted on its own terms, the political paranoia explanation defeats only the first objective, and tends to suggest guilt of the remaining two. That is, if Kukushkin hid Muraviev's role in SIG solely to avoid political transparency,

then doing so does not necessarily imply knowledge that donations by a foreign national was illegal.  But if Kukushkin had a motive to conceal Muraviev's involvement because he feared the political consequences of transparency, then he had a motive to agree to the other two charged objectives.  Concealing the use of a Russian donor by using Parnas and Fruman as straws would avoid the feared consequences of transparency.  It would also, however, unlawfully deprive the voters and the FEC of their right to know whether a Russian oligarch was contributing to American political campaigns.

In any event, regardless of which interpretation of the Russian Roots Emails the Court finds more plausible, there is nothing unfairly prejudicial about them.  They do not imply any conduct more wrongful than what Kukushkin is already accused of doing: concealing Muraviev's involvement here because Muraviev is a Russian national.  Given that, whether the defendant's exculpatory explanation of the emails holds weight should be left to the jury.

* * *

Because each of these exhibits is highly probative on the central issue of intent, the Court should admit them.  *See Montsalvage*, 850 F.3d at 498 ("This Court has in the past declined to second-guess a district court's admission of relevant video or media evidence where the evidence bears an identifiable connection to an issue or defendant in the case."); *Ansaldi*, 372 F.3d at 131 (FDA paper properly admitted, despite possible prejudicial effect, as "key element of the prosecution's case" on issue of intent).  As to each exhibit, the defendants can identify no unfair prejudice, let alone unfair prejudice that would "substantially outweigh" the significant probative value of these exhibits.  Fed. R. Evid. 403.  With respect to the media exhibits, the Government consents to a limiting instruction that none are offered to establish the truth of their contents, but solely for their effect on the defendants' state of mind.  In addition, should the articles containing any assertion of facts not present in this case which cannot be removed by redaction, the Court should instruct the jury that such facts are not alleged here and that they will see no such evidence.  *See Montsalvage*, 850 F.3d at 498 (movie clips properly admitted as probative of intent, with similar limiting instructions).[6]

Respectfully submitted,

AUDREY STRAUSS
United States Attorney
Southern District of New York

By: /s_____
Aline Flodr / Nicolas Roos / Hagan Scotten
Assistant United States Attorneys
(212) 637-2418/2423/2410

Cc:    Defense counsel (by ECF)

---

[6]    At the pretrial conference, the Government also indicated that it may move to exclude certain defense exhibits, after discussions with the defense to narrow the issues.  Those conversations have not been completed, but the Government does not believe it will need to request rulings on the defense exhibits prior to opening statements, and so will submit a letter at a later date if necessary.  The Government has, however, reiterated to the defendants its position—which it believes the Court endorsed—that if the defense intends to offer anything under the rule of completeness, it should file a submission attempting to meet its burden on that issue now.  (*See* 10/5/21 Tr. at 90-91).