UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X

UNITED STATES OF AMERICA,

      S3 19 Cr. 725 (JPO)

- against-

ANDREY KUKUSHKIN, *et al*.,

                 Defendants.

-------------------------------------------------------------------- X

**ANDREY KUKUSHKIN'S REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF HIS MOTION TO SET ASIDE THE VERDICTS AND
FOR A JUDGMENT OF ACQUITTAL, PURSUANT TO FED R. CRIM. P. 29(C) OR IN
THE ALTERNATIVE FOR A NEW TRIAL PURSUANT TO FED R. CRIM. P. 33(B)(2)**

January 13, 2022

GERALD B. LEFCOURT, P.C.
Gerald B. Lefcourt
Faith A. Friedman
1776 Broadway, Suite 2000
New York, N.Y. 10019
Tel: (212) 737-0400
Fax: (212) 988-6192
Email: lefcourt@lefcourtlaw.com
*Attorneys for Andrey Kukushkin*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION .................................................................................................... 1

ARGUMENT ........................................................................................................ 2

POINT ONE

    THE COURT SHOULD SET ASIDE MR. KUKUSHKIN'S CONVICTION AND ENTER
    A JUDGMENT OF ACQUITTAL ON COUNT ONE ........................................................ 2

    A. Applicable Law ........................................................................................... 2

      1. The Evidence was Legally Insufficient to Sustain a Conviction of Conspiracy ................. 4

        a.  The Evidence is Legally Insufficient to Establish the Existence of the Charged
            Conspiracy (Meeting of the Minds) ........................................................... 4

        b.  The Government Failed to Prove Any Plan to Reimburse Parnas and Fruman for
            Prior Campaign Contributions and Certainly None That Predated the Contributions . 7

        c.  The Political Utility of the Alleged Political Contribution Scheme is Relevant ........ 10

        d.  Parnas's Fraud is Relevant to Show that Kukushkin Lacked Agreement with his
            Alleged Co-Conspirators on the "Essential Nature" of any Plan ............................. 12

        e.  The Evidence is Legally Insufficient to Establish Kukushkin Willfully Joined the
            Charged Conspiracy ............................................................................ 15

        f.  Conclusion ...................................................................................... 18

POINT TWO

    THE COURT SHOULD SET ASIDE KUKUSHKIN'S CONVICTION AND ENTER A
    JUDGMENT OF ACQUITTAL ON COUNT THREE .......................................................... 18

POINT THREE

    THE COURT SHOULD ORDER A NEW TRIAL ON COUNTS ONE AND THREE
    UNDER RULE 33 ........................................................................................... 20

      A.  The Applicable Law ..................................................................................... 20

B. The Verdicts Should Be Set Aside Because They Are Against the Weight Of The Evidence.................................................................................................................21

C. The Court Should Grant a New Trial for Counts One and Three with a Proper Willfulness Instruction and a Good Faith Defense Charge ............................................22

1. The Willfulness Definition and Instruction Misled the Jury .......................................23

2. Kukushkin was Entitled to Have a Good Faith Defense Charge Included in the Jury Instructions.................................................................................................................25

D. The Court Should Grant a New Trial Because Erroneous Evidentiary Rulings Substantially Prejudiced Kukushkin...................................................................................26

1. A Privileged Communication (GX-137, DX B-6) Was Wrongly Admitted...............26

2. The Contribution Chart (GX 1403) and Summary Chart (GX 1402) Were Wrongly Admitted .......................................................................................................................28

E. The Court Should Grant a New Trial Based on the Prejudice to Kukushkin Resulting from the Denial of His Motions to Sever.......................................................................29

F. The Court Should Grant a New Trial Based on the Prejudice to Kukushkin Resulting from the Government's Improper Summation Arguments ............................................33

1. Bad Purpose............................................................................................................33

a.   Use of Andrey Muraviev's Profile Photo ...........................................................34

b.   Attendance at the Elko and Las Vegas Rallies ....................................................36

c.   Bribery Arguments................................................................................................37

POINT FOUR

KUKUSHKIN JOINS IN THE FURTHER ARGUMENTS OF HIS CO-DEFENDANT THAT INURE TO HIS BENEFIT ........................................................................37

CONCLUSION...........................................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Berger v. U.S.*,
    295 U.S. 78 (1935)................................................................................................33

*Bruton v. United States*,
    391 U.S. 123 (1968)..............................................................................................33

*Cheek v. United States*,
    498 U.S. 192 (1991)........................................................................................22, 23

*Direct Sales Co. v. United States*,
    319 U.S. 703 (1943)..............................................................................................18

*Ratzlaf v. United States*,
    510 U.S. 135 (1994)..............................................................................................23

*Siewe v. Gonzales*,
    480 F.3d 160 (2d Cir. 2007)....................................................................................4

*United States v. Ackert*,
    169 F.3d 136 (2d Cir. 1999)..................................................................................26

*United States v. Archer*,
    977 F.3d 181 (2d Cir. 2020)............................................................................24, 25

*United States v. Autuori*,
    212 F.3d 105 (2d Cir. 2000)..................................................................................22

*United States v. Avenatti*,
    19-CR-373 (PGG), 2021 U.S. Dist. LEXIS 125442 (S.D.N.Y. July 6, 2021)........................20

*United States v. Barrett*,
    496 F.3d 1079 (10th Cir. 2007) ............................................................................21

*United States v. Benton*,
    890 F.3d 697 (8th Cir. 2018) ................................................................................25

*United States v. Bonaventure*,
    646 Fed. Appx 73 (2d Cir. 2016)..........................................................................34

*United States v. Burse*,
    531 F.2d 1151 (1976)............................................................................................34

*United States v. Cassese*,
   290 F.Supp.2d 433 (S.D.N.Y. 2003).................................................................2

*United States v. Conlin*,
   551 F.2d 534 (2d Cir. 1977)...........................................................................28

*United States v. D'Agostino*,
   638 F. App'x 51 (2d Cir. 2016) ......................................................................25

*United States v. D'Amato*,
   39 F.3d 1249 (2d Cir. 1994)........................................................................2, 3

*United States v. Donnell*,
   608 F.3d 546 (9th Cir. 2010) .........................................................................19

*United States v. Doyle*,
   130 F.3d 523 (2d Cir. 1997)...........................................................................25

*United States v. Ferguson*,
   246 F.3d 129 (2d Cir. 2001)...........................................................................20

*United States v. Glenn*,
   312 F.3d 58 (2d Cir. 2002)...............................................................................3

*United States v. Jones*,
   393 F.3d 107 (2d Cir. 2004).............................................................................3

*United States v. Kosinski*,
   976 F.3d 135 (2d Cir. 2020)...........................................................................24

*United States v. Landesman*,
   2021 U.S. App. LEXIS 32945 (2d Cir. Nov. 5, 2021)......................................3

*United States v. Martinez*,
   54 F.3d 1040 (2d Cir. 1995).............................................................................2

*United States v. McGinn*,
   787 F.3d 116 (2d Cir. 2015)...........................................................................25

*United States v. Nurasty*,
   867 F.2d 759 (2d Cir. 1989)...........................................................................13

*United States v. Pauling*,
   924 F.3d 649 (2d Cir. 2019)....................................................................2, 3, 4

*United States v. Quattrone*,
   441 F.3d 153 (2d Cir. 2006).............................................................................3

*United States v Reinhold*,
    20 F. Supp. 2d 541 (S.D.N.Y. 1998)..................................................................29

*United States v. Rodriguez*,
    392 F.3d 539 (2d Cir. 2004)...................................................................2, 4

*United States v. Rosenblatt*,
    554 F.2d 36 (2d Cir. 1992)...................................................................12, 13

*United States v. Salameh*,
    152 F.3d 88 (2d Cir. 1998)...............................................................29, 30, 31

*United States v. Singh*,
    979 F.3d 697 (9th Cir. 2020) .................................................................23

*United States v. Stavroulakis*,
    952 F.2d at 690 ..............................................................................12

*United States v. Van Hise*,
    No. 2-CR-847, 2017 U.S. Dist. LEXIS 126004 (S.D.N.Y. Aug. 8, 2017) .............................29

*United States v. White*,
    7 F.4th 90 (2d Cir. 2021) ......................................................................3

**Statutes**

52 U.S.C. § 30122.............................................................................18

**Other Authorities**

Fed. R. Crim. P. 29 .................................................................... *passim*

Fed. R. Crim. P. 33 ................................................................1, 20, 21, 38

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

UNITED STATES OF AMERICA,

- against-

ANDREY KUKUSHKIN, *et al.*,

                                   Defendants.

------------------------------------------------------------- X

S3 19 Cr. 725 (JPO)

**ANDREY KUKUSHKIN'S REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF HIS MOTION TO SET ASIDE THE VERDICTS AND
FOR A JUDGMENT OF ACQUITTAL, PURSUANT TO FED R. CRIM. P. 29(c) OR IN
THE ALTERNATIVE FOR A NEW TRIAL PURSUANT TO FED R. CRIM. P. 33(b)(2)**

## <u>INTRODUCTION</u>

        Defendant Andrey Kukushkin submits this Reply Memorandum of Law in further support of his motion to set aside the jury's verdicts and for a judgment of acquittal pursuant to Fed. R. Crim. P. 29(c) or in the alternative for a new trial pursuant to Fed. R. Crim. P. 33(b)(2), and in response to the government's opposition. Once again, the government attempts to spin the facts and the defense's arguments beyond logic or reason.

# ARGUMENT

## POINT ONE

## THE COURT SHOULD SET ASIDE KUKUSHKIN'S CONVICTION AND ENTER A JUDGMENT OF ACQUITTAL ON COUNT ONE

### A.   Applicable Law

Although Rule 29 of the Federal Rules of Criminal Procedure requires the Court to "view the evidence with all reasonable inferences drawn in the [g]overnment's favor", this requirement does not "displace the even more important rule that all elements of an offense must be proven beyond a reasonable doubt".  *United States v. Pauling*, 924 F.3d 649, 662 (2d Cir. 2019); *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) ("the government must introduce sufficient evidence to allow the jury to reasonably infer that each essential element of the crime charged has been proved beyond a reasonable doubt").  Specifically, where "a fact to be proved is also an element of the offense [such as intent], it is not enough that the inferences in the government's favor are permissible.  [The Court] must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element . . . is established beyond a reasonable doubt".  *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995).

Even in the face of a guilty verdict, "[w]here 'there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt' on 'each and every element of the charged offense', a judgment of acquittal is required pursuant to Rule 29".  *United States v. Cassese*, 290 F.Supp.2d 433, 447 (S.D.N.Y. 2003) (quoting *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984)); *see also United States v. Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2004) (noting that a judgment of acquittal is required when no "rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt") (quoting *Jackson v. Virginia*, 443 U.S. 307, 318 (1979)).

Where the totality of the evidence "viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain reasonable doubt", mandating acquittal.  *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (internal quotations omitted);[1] *accord United States v. Landesman*, 2021 U.S. App. LEXIS 32945, *49 (2d Cir. Nov. 5, 2021); *see also United States v. Pauling*, 924 F.3d at 656 ("[I]n a criminal case, the government must do more than just introduce evidence at least as consistent with innocence as with guilt") (quoting *United States v. D'Amato*, 39 F.3d at 1256)).

Further, the Court must defer only to those verdicts based on *reasonable* inferences by the jury.  *See United States v. D'Amato*, 39 F.3d at 1256 ("[A] conviction based on speculation and surmise alone cannot stand").  As the Second Circuit has stated, "[d]espite the deference owed to jury determinations, courts may not credit inferences within the realm of possibility when those inferences are unreasonable".  *United States v. Quattrone*, 441 F.3d 153, 169 (2d Cir. 2006).  While the Court may owe "defer[ence] to a jury's assessments with respect to …the jury's choice of the competing inferences that can be drawn from the evidence, specious inferences are not indulged",  (*United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004) (internal

---

[1] The government cites to *United States v. White*, 7 F.4th 90, 103 (2d Cir. 2021) for the proposition that the "equipoise rule" of *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) has "recently and repeatedly" been rejected by the Second Circuit.  This is entirely misleading. The Second Circuit even more recently in *United States v. Landesman*, quoted the very same language when setting forth the standard to be applied in evaluating a Rule 29 motion.  2021 U.S. App. LEXIS 32945, *49 ("If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt" *citing United States v. Hawkins*, 547 F.3d 66, 71 (2d Cir. 2008) (alteration omitted) (*quoting* United States v. Glenn, 312 F.3d 58, 70 (2d Cir. 2002))).  In fact, the language in both *White* and *Glenn* has been used by the Second Circuit.  Moreover, the *White* Court held that the rule applies in cases such as this where the evidence "is nonexistent or so meager" as to preclude the inferences necessary to a finding favorable to the government.  *United States v. White*, 7 F.4th at 103.

quotation marks and citation omitted)), because "'[it] would not satisfy the [Constitution] to have

a jury determine that the defendant is *probably* guilty'" (*United States v. Rodriguez*, 392 F.3d at

544 (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993)).

In the context of jury reasoning, "[a]n inference is not a suspicion or a guess.  It is a

reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that

is known to exist".  *Siewe v. Gonzales*, 480 F.3d 160, 168 (2d Cir. 2007) (quoting *Bickerstaff v.*

*Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999) (internal citations omitted).  The Court must grant

acquittal on a Rule 29 motion where impermissible speculation on the part of the jury has

occurred as to an element of the charged offense, even if such speculation is reasonable.  *United*

*States v. Pauling*, 924 F.3d at 656 ("Reasonable [but impermissible] speculation occurs when the

finder of fact concludes that a disputed fact exists that is within the realm of possibility, but the

conclusion reached is nevertheless unreasonable because it is not logically based on another fact

known to exist").

### 1.  The Evidence was Legally Insufficient to Sustain a Conviction of Conspiracy

#### a.  The Evidence is Legally Insufficient to Establish the Existence of the Charged Conspiracy (Meeting of the Minds)

The totality of the circumstantial evidence presented at trial failed to prove beyond a

reasonable doubt any meeting of the minds or agreement between the parties, much less one to

make illegal campaign contributions, an essential element of the conspiracy charged in Count

One.  As to whether there was any agreement between the parties, the government does not

address the argument at all, instead focusing solely on whether there were discussions about

contributions at the tail end of several months of text exchanges.  *See* Gov't Memo at 4.  As

detailed in Kukushkin's opening memorandum ("Kukushkin Memo"), the full scope of the text

exchanges spanning approximately five months when viewed **together** and, in the light most

favorable to the government, at best demonstrates a fluid discussion in which not even the participants were clear as to whether or when an agreement had been reached.  In other words, the mere existence of an agreement was conjecture, not "clear as day".

To be sure, statements such as "we **will** resolve it with you" (emphasis added) (GX 14, (June)), requiring "reminders" of purported agreements (GX 58 (October)), and disagreements about whether there were in fact agreements (GX 52 (September/October)), and, if so, misunderstandings as to the terms of any such agreements (GX 52 (September/October); GX 61 (October); GX 83 (late-October)), do not sufficiently establish a required meeting of the minds. Rather, they are equivocal statements made in the course of an everchanging dialogue regarding a lawful cannabis venture as to which the parties had vastly different goals and objectives and reflect the lack of clarity and understanding that existed throughout.

As Kukushkin pointed out, similar deficiencies abounded in the government's cherry-picked circumstantial evidence concerning the nature of the alleged agreement.  In response, the government asserts that Kukushkin seeks to "avoid" the evidence by improperly urging the Court to evaluate his texts "in isolation" and on that basis set aside the verdict.  Gov't Memo at 4.  On the contrary, Kukushkin has challenged *the government's* efforts to "isolate" several text messages out of thousands without considering context or timing in order to paint a distorted picture of guilt.  *See* Kukushkin Memo at 13-16.  To try and harmonize the disparate evidence that demonstrates the complete lack of agreement, the government attempts to piece together various text exchanges, again without proper context or timeframe.  Far from weaving a cohesive story and proving beyond a reasonable doubt the existence of the charged conspiracy, the government's patchwork narrative further illustrates the fundamental inadequacy of the trial proof.

For example, at times the government contends that Kukushkin's June 2, 2018 text messages, (GX 14), is evidence of the start of the charged conspiracy (*see* Tr. 1331:12-18; Tr. 1332:10-12 (Gov't Summation)), and at other times it relies upon the July 19 series of exchanges between Kukushkin and Fruman and Kukushkin and Parnas (*see* Tr. 1303:8-14 (Gov't Summation); GX 25; GX 28) to allege the start of the charged conspiracy. Later the government points to text exchanges from late October referring to discussions in September as "day 1" (GX 83), as evidence of agreement. *See* Gov't Memo at 7. In each instance, the government asserts that the existence (from June 2018) and nature (to make illegal contribution) of the alleged agreement is crystal clear. *See* Gov't Memo at 5. Putting aside the obvious inconsistencies, the messages do not support the government's assertions.

As detailed, the June 2 and July 19 texts make no mention of an agreement to make political contributions. *See* GX 14; GX 25; GX 28; Kukushkin Memo at 14-15. Indeed, the June 2, 2018, message provides no obvious context at all. GX 14. Despite the government's assertions to the contrary, there were no text exchanges throughout June or July in which mention was made of any agreement to pay for political contributions made or intended to be made by Parnas, Fruman or GEP. While the undated and unspecified messages from months later the government cites do reference generally "contributions" or "donations", they do not provide the full picture nor properly place events into context. To be sure, arrayed against these selections were many messages about retaining legal and other professionals, implementing core operational structures, and licensing matters, and other investment opportunities, all of which are legal business objectives that *they* thought they were agreeing to, which the government conveniently ignores. *See e.g.,* GX 25; GX 28; DX A-3; A-8; A-9; DX B-1; B-2; *see also* Kukushkin Memo at 14-15. It is also notable, that all or nearly all of the messages referencing

"contributions" or "donations" are provoked by contrived texts from Parnas, Furman and their associates, often during heated exchanges designed to elicit (or keep) money under false pretenses.

> **b.  The Government Failed to Prove Any Plan to Reimburse Parnas and Fruman for Prior Campaign Contributions and Certainly None That Predated the Contributions**

As Kukushkin previously pointed out, the most glaring weaknesses in the government's case was the timeline itself. *See* Kukushkin Memo at 4-7, 26.  The illegal contributions at issue were made in June 2018 (*see* GX 203; S-11); however, Muraviev did not provide any business loans to Parnas and Fruman – or even discuss them in earnest – until September 2018.  *See* GX 33; GX 48; GX 203.  To account for this fatal flaw, and the fact that upon receiving the money Parnas and Fruman did not make a single contribution, the government devised the "reimbursement" theory.  *See* Gov't Memo at 7.  The gravamen of that theory is that "Kukushkin and Muraviev agreed to reimburse Parnas and Fruman for the political donations they made in June – after the initial agreement for Muraviev to support the group's plan with money, but before his money actually arrived".  *Id*.  The evidence is to the contrary.

First, Parnas and Fruman never told Kukushkin and Muraviev about the contributions. There was never a text message or email.  Nor was there any evidence of a single conversation regarding the same.  Indeed, as noted, none of the contributions Parnas and Fruman had made in June 2018 were identified on the SIG Contribution list.  GX 61-A-5; S-11; *see also* Kukushkin Memo at 15.  In fact, all of the entries on the SIG contribution list were fake, but even the fake entries were all dated from September and October 2018, not June.  *Id.*  The only reasonable inference to be drawn is that Parnas and Fruman knew Kukushkin and Muraviev had not agreed to reimburse them for the June contributions.  To this, the government has provided no response.

Instead, the government contends that it "identified a specific message from Fruman to Muraviev, later forwarded to Kukushkin and Parnas, showing Parnas's and Fruman's understanding that they had promised reimbursement for the donations" citing to GX 58-A-84-T and in particular Fruman's false claim that "[w]e handed out a lot…We had no doubt that the funds would come according to the set schedule". *See* Gov't Memo at 7.  However, that text had nothing whatsoever to do with the June contributions.  The message was sent **October 9, 2018**, as part of Fruman's efforts to pressure Muraviev for a second $500,000 loan.  *See* GX 58. Notably, it was sent after the fraudulent SIG contribution list, purportedly reflecting expenditures in September and October exceeding the initial $500,000 in business loan funding provided by Muraviev.  *See* GX 58 and GX 58-A-70.  It bore no connection to Parnas's and Fruman's activities in June and did not purport to.  In other words, placed in proper context GX 58-A-84-T, is not evidence of an agreement to reimburse Parnas and Fruman dating back to June 2018, quite the opposite.

Similarly, the government relies on GX 83 as evidence of an agreement to reimburse from "day 1", with "day 1" being in June 2018.  GX 83 does not mention reimbursing Parnas and Fruman for any political activities, and certainly none in June.  Moreover, the evidence indicates that "day 1" refers to discussions had in September 2018, not June.  *See* GX 83.  Further, the statement is directly followed by a detailed discussion of Kukushkin's understanding of the business arrangement with Parnas, Fruman, and Muraviev, in which Kukushkin states that "the Nevada company has been formed, the operating agreement signed and bank account opened", and tells Parnas and Fruman that "the ball is in [their] court to continue with planned licensing". *Id.*  In other words, the message demonstrates that the "clear plan" pertained to the legitimate business purpose of obtaining licensing for the cannabis venture – not reimbursing Parnas and

Fruman for political contributions made months earlier.  The next day, Muraviev wrote to Kukushkin, Parnas, and Fruman that he "suggest[s] taking a business-like approach" to the opening of a Las Vegas office for the cannabis venture, noting "particularly, we need to define goals, find employees, and give them clear-cut tasks… Our goal is to get licenses, and to build a business based on them…".  GX 83.  This message provides further evidence that Muraviev and Kukushkin facilitated the business loan to Parnas and Fruman for the sole purpose of advancing their legitimate cannabis business, not with the intention to reimburse Parnas's and Fruman's prior contributions.

Finally, the government's claim of similarities between the SIG contribution list and actual contributions made by Parnas and Fruman (Gov't Memo at 6), belies the evidence and does not provide proof of the government's claimed reimbursement theory.  The SIG contribution list is a complete fabrication by Parnas and his associates.  *See e.g.,* GX 61-A-5 vs. S-11.

In short, try as the government might, there is no evidence – direct or otherwise – of any agreement to reimburse Parnas and Fruman for contributions they made months before receiving the first $500,000.  There were no cooperators or accomplice testimony in this case.  There is only disconnected circumstantial evidence that falls apart when brought together.  It was simply happenstance that the nearly $500,000 outstanding balance on the credit card bill that Fruman paid off immediately upon receiving the business loan proceeds from Muraviev in September 2018 had included $136,000 in charges for old contributions Fruman and Parnas had made in their names, for their benefit, and for the benefit of their fledgling energy company, GEP – nothing more.  To be sure, the remaining balance included charges for groceries, luxury travel, educational expenses, jewelry, clothing, entertainment, car service, lodging, dining, and the like.

The fact that Parnas and Fruman lied to obtain the money and lied about how they intended to use it demonstrates there was never any meeting of the minds.

### c.   The Political Utility of the Alleged Political Contribution Scheme is Relevant

The government argues that the "utility of the contributions is irrelevant". *See* Gov't Memo at 5-7.  The government is wrong.  It was significant that none of the contributions at issue – not those made by Parnas and Fruman in June or those later made by Fruman in November – were made for or designed to benefit the joint cannabis venture.  This shows (1) that Kukushkin lacked unlawful intent; (2) that there could not have been an agreement between the parties; and (3) how Kukushkin was prejudiced by having his trial jointly with Parnas.

As an initial matter, the government's attack on the legal relevancy of the contributions misconstrues Kukushkin's argument.  Gov't Memo at 6.  Rather than asserting that the language of the FECA requires any successful or likely aid to the donor, as the government implies, Kukushkin argues that the lack of utility of the political contributions shows that he lacked intent to violate federal election laws.  Kukushkin Memo at 16-17.  Parnas and his actual accomplices saw Kukushkin as an unsophisticated simpleton and not a co-conspirator.  Parnas viewed Kukushkin as merely a means to gain access to even more funds from a perceived "big fish" like Muraviev who they could reel in and trick into giving them money to start a legal cannabis business but instead used those loaned funds to pay off their personal credit card debt.  *See. e.g.,* DX A-4; B-4.  For his part, Kukushkin did not know that he was the mark, and instead thought he was legally pursuing the acquisition of cannabis licenses with new business partners with experience in the industry and with deep, legitimate connections and credibility with high profile and then-reputable government officials.  *See* DX A-3; A-4; DX A-9; DX B-4.

Further, the government argued that the contributions were made for the benefit of the joint cannabis venture with the express understanding that it had been agreed that Muraviev's

money would be used to fund, i.e., reimburse, those contributions. *See* Gov't Memo at 4. The contributions were made by Parnas, Fruman and GEP, their fledging energy company, with no connection to cannabis, the cannabis industry, licensing, or the like. *See* S-11; GX 108; GX 112; GX 113; GX 114; GX 117; GX 120; GX 121; GX 124; GX 155; GX 156; GX 160. That the contributions were made to politicians and candidates either who did not support the legalized cannabis industry or were vehemently opposed to it but who were well-connected Republicans that supported policies favorable to GEP or had access to a network of energy industry executives further puts the lie to the government's narrative and is wholly relevant. *See also* Kukushkin Memo at 16-17.

The government's assertion that there was "ample evidence that Kukushkin and Muraviev believed their contributions would help them obtain cannabis licenses", it is a mischaracterization of Kukushkin's actions and irrelevant. Gov't Memo at 6. Kukushkin thought he was obtaining cannabis licenses through lawful means rather than through disguised campaign contributions, as evidenced by the fact that he sought and advocated for advice from lawyers as part of his business plan given the dynamic and evolving legal landscape in the nascent U.S. cannabis industry. *See* DX B-1; *see also* GX 45. The evidence the government references in its reply certainly pertains to politicians and cannabis broadly but makes no mention of illegal contributions or even campaign contributions specifically. As such, this evidence does nothing to challenge Kukushkin's assertion that he believed the money was being used to fund a lawful cannabis venture, using lawful means, that any contributions made by Parnas and Fruman had nothing to do with Kukushkin and the joint cannabis venture, and to the extent those contributions were illegal or part of an illegal scheme, he had no knowledge of, hand in creating, or involvement in or with that.

11

Lastly, the government argues that funding Republicans who opposed legislation could have somehow aided Kukushkin and Parnas in obtaining cannabis licenses through a supposed "softening" of "their stance".  Gov't Memo at 7, n.2.  This argument lacks weight particularly in the face of witnesses such as Wes Duncan and Adam Laxalt who testified at trial that they found marijuana "degrading" and continued to oppose its legalization.  *See* Tr. 546:2-4 (Laxalt); Tr. 155:18-24 (Duncan).  While, as the government stated, "Parnas plainly had a motive to donate Muraviev's money to Republicans", in order to increase his own profile as a big political donor which afforded him close proximity and access to powerful government officials like President Trump, Vice President Pence, and former U.S. Attorney Rudy Giuliani – which burnished his legitimacy and bona fides as a successful and respected business man – Kukushkin had no such motive because his goal was far more simple – to obtain cannabis licenses.  Gov't Memo at 7, n.2.  Kukushkin stood to gain nothing from providing money to candidates who had moral disagreements with this goal and were unable to aid in the acquisition of cannabis licenses to begin with.  This shows that there cannot have been a meeting of minds between Kukushkin and Parnas sufficient to sustain a conviction for conspiracy.

### d.  Parnas's Fraud is Relevant to Show that Kukushkin Lacked Agreement with his Alleged Co-conspirators on the "Essential Nature" of any Plan

While the government need not prove agreement among co-conspirators on the "details of their criminal undertaking" to sustain a conviction for conspiracy (Gov't Memo at 9), the government must prove that the co-conspirators agreed to the "essential nature" of the unlawful plan.  *United States v. Stavroulakis*, 952 F.2d at 690 (citing *Blumenthal v. United States*, 332 U.S. 539, 557 (1947)) (internal quotations omitted); *see also United States v. Rosenblatt*, 554 F.2d 36, 38-41 (2d Cir. 1992) (internal quotations omitted).  As detailed *supra,* the government's opposition glosses over the fundamental lack of agreement among the purported co-conspirators

in this case, which is the critical underpinning of the conspiracy charge.  Kukushkin's alleged agreement to make illegal donations, the government asserts, renders Parnas's and Fruman's fraud entirely irrelevant.  Gov't Memo at 9-10.  But this is wrong and an overly simplistic reading of the facts of this case.  The evidence failed to establish that Kukushkin entered into any such agreement to make illegal donations.  Kukushkin facilitated the transfer of funds from Muraviev in the form of a business loan to Parnas and Fruman who he believed would use those funds to lawfully help obtain licenses for a cannabis business venture and start a legitimate business.  Where one party believes that he is helping to fund a lawful cannabis venture, and the other parties intend to perpetrate a fraud by diverting this money instead to pay for past personal debts and their own self-serving purposes (*see* GX 203), there is no agreement on the "essential nature" of the plan.  *See United States v. Rosenblatt*, 554 F.2d at 38 ("When one of two persons merely pretends to agree, the other party, whatever he may believe, is in fact not conspiring with anyone."); *see also United States v. Nurasty*, 867 F.2d 759, 762 (2d Cir. 1989) (noting that "mere association with those implicated in an unlawful undertaking is not enough to prove knowing involvement.").

Parnas had a long history of defrauding wealthy investors to fund his expensive lifestyle, and Kukushkin's defense was hamstrung by its inability to present evidence of this history to the jury.  *See* Kukushkin Memo at 44.  The facts and methods of Parnas's fraud were fully explained in a government sentencing letter used against his associate, David Correia, but Kukushkin was precluded from introducing this critical evidence at trial.  *See id.*; Tr. 62:6-15 (Final Pretrial Conference); Dkt. No. 224 at 12-14.  This evidence would have bolstered Kukushkin's assertion that he was victimized by a team of long-time fraudsters who from the outset of their association with Kukushkin viewed him as a mark to be swindled rather than a partner in any unlawful

scheme.  As we have argued throughout these proceedings, Kukushkin was not a co-conspirator, but a victim of this well-worn scheme.  *See* DX B-4.

Understanding the relevance, the government asserts that the issue of Parnas's and Fruman's obvious fraud is moot because even if Kukushkin did not reach a meeting of the minds with them as to illegal political contributions, he "plainly agreed" with Muraviev to make such contributions.  Gov't Memo at 10.  Once again, the government mischaracterizes the nature of Kukushkin's and Muraviev's venture.  Any agreement between Kukushkin and Muraviev pertained to the advancement of their lawful cannabis business through what they believed and had understood to be legal methods, not through illegal political contributions.  Their intent was to transfer funds from Muraviev as a business loan to Parnas and Fruman to secure what both Kukushkin and Muraviev believed were legitimate lobbying, legal, and business expenses in pursuit of a lawful goal.  They thought they were business partners, not co-conspirators.  Kukushkin and Muraviev may have agreed to transfer funds to Parnas and Fruman in pursuit of licensing, but to sustain a conviction for conspiracy, the agreed upon objective must be an *unlawful* one.  The government ultimately provided no evidence that Kukushkin and Muraviev entered into an agreement to achieve anything other than a business objective both believed to be entirely lawful.  The intent of Parnas and Fruman to make illegal contributions does not transfer to Kukushkin and Muraviev.

Moreover, even assuming *arguendo* the evidence sufficiently established that Kukushkin and Muraviev agreed to make unlawful political contributions – which is denied – as detailed *infra,* the evidence failed to prove beyond a reasonable doubt that either, much less both, knowingly and willfully entered into that agreement which is fatal to the conspiracy charge.

### e. The Evidence is Legally Insufficient to Establish Kukushkin Willfully Joined the Charged Conspiracy

The evidence introduced by the government at trial was insufficient to prove that Kukushkin willfully joined the conspiracy with Parnas and his associates. *See* Kukushkin Memo at 17-24. There was simply no direct evidence that Kukushkin engaged in any of the relevant conduct with the requisite knowledge that he was violating any law, or that he acted with the purpose of disregarding or disobeying any law.

The government cites to a single piece of purportedly "direct" evidence of Kukushkin's knowledge of federal election law – the Daily Beast article forwarded by Kukushkin to Muraviev alleging that Parnas and Fruman were under investigation by the FEC for making straw donations. Tr. 1315:5-17 (Gov't Summation); Tr. 1446:5-9 (Gov't Rebuttal); GX 30-A-1. The government asserts, that Kukushkin obviously read the article, and that it clearly put him on notice that what he was doing broke the law and he intentionally continued to do it. *Id.*; *see also* Gov't Memo at 11. However, there was no evidence Kukushkin read the article, and if so, how much of it he read or understood. The government simply made and requested that the jury, and now that the Court, infer Kukushkin did so based solely on the fact that he forwarded the article. *Id.* Yet, there was not a single comment made about or discussion of the article either by Kukushkin or by Muraviev evincing any knowledge or understanding of its contents.

Even when viewed in the light most favorable to the government, the article does not put Kukushkin on notice that "what he was doing was illegal". To be sure, the article describes an FEC complaint alleging that GEP was set up for the sole purpose of making political contributions. It does not describe or even mention contributions by foreign nationals or even explain the concept of contributions made in the names of others. *See* GX 30-A-1. That is not what was alleged to have occurred here. There is no suggestion that the proposed joint venture

was intended to be anything other than a legitimate cannabis business.  Nor is it alleged that a shell company was established to make political contributions.  Indeed, the monies were never provided to GEP or contemplated as going to GEP (even if Kukushkin at some point misspoke and mistakenly said so).  The monies were loaned to a United States business corporation that had legitimate business interests.  *See* Tr. 569:20-25 (Van Rensburg).  These monies were to be used to fund their lawful cannabis venture, including to pay for lawyers, lobbyists, licensing fees applications or purchases, for leases on retail locations, and other overhead.  *See e.g.,* GX 25; GX 28; GX 83; GX 83-A-5-T.  There is nothing in that article that would have put Kukushkin on notice that such a structure, even if it involved making political contributions on behalf of their new, legitimate, cannabis venture, would be unlawful.  But more to the point, and an argument the government wholly ignores, the article makes entirely clear that the author had uncovered evidence that the allegations that GEP was a shell company created to make illegal political contributions were false.  *See* GX 30-A-1 at 4-6.  In short, even assuming *arguendo* the evidence demonstrated Kukushkin read the article – it did not – there is nothing whatsoever contained therein that puts Kukushkin on notice that any conduct in which he was engaged or which he contemplated as part of the joint cannabis venture was unlawful.

Without any direct proof, the government was left with the argument that Kukushkin acted with "bad purpose" not with the intent to "disobey or disregard the law" but by being a bad American.  *See* Tr. 1317-1318:19 (Gov't Summation).  Specifically, the government attempted to prove Kukushkin's "bad purpose" by arguing he was (1) embracing Muraviev's unamerican profile picture (Tr. 1317:25-1318:8 (Gov't Summation); (2) engaging in uncharged bribery (Tr. 1317:24-1318:3 (Gov't Summation)); and (3) attending Trump-associated political rallies under false pretenses (Tr 1317:12-15 (Gov't Summation)).  Such evidence was legally insufficient to

establish beyond a reasonable doubt that Kukushkin knowingly and willfully joined the charged conspiracy.  With respect to its bribery and political rallies arguments, the government contends they were appropriate but does not address how either sufficiently or properly establishes willfulness.  *See* Gov't Memo at 27.  As to the profile picture, the government doubles down arguing – without a single legal citation in support – that it somehow "showed that Kukushkin knew he was acting illegally when he facilitated Muraviev's secret contributions to U.S. political campaigns, and … indicated Kukushkin's willful involvement in that scheme".  *See id*.  The government's position borders on the absurd.

First, it attributes a meaning to the picture that, as detailed in Kukushkin's Memo at 46-47, the government had no good faith basis to ascribe.  Second, Kukushkin had no role in choosing or say in which profile picture Muraviev used.  Nor did Kukushkin comment upon it or adopt it any manner.  Nor does the government allege he affirmatively did so – other than by communicating with Muraviev.  In fact, there was no evidence that Kukushkin knew or was able to make out the details of the profile picture.  But more to the point, even assuming for purposes of this motion Muraviev intended to thumb his nose at the laws of the United States it had no bearing on Kukushkin's state of mind.  Still the government improperly argued and to this day maintains that it did.  To be sure, that an individual communicates with someone who has opted for an "I love soccer" image as their profile picture does not mean they too love soccer.  Nor does the fact that a contact represents himself with a Republican elephant mean that you subscribe to or adopt by association their Republican ideals or beliefs.  Yet that is exactly what the government is arguing.  What is more, for the government to make this argument to the jury, particularly given the lack of good faith or legal basis to do so and the number of instances where this very issue – the admissibility of state of mind evidence as to one defendant against another -

arose during this trial was, as detailed *infra,* flagrant abuse.  But more significantly, it was legally insufficient to establish Kukushkin's alleged willfulness.

Finally, the government does not address Kukushkin's contentions with respect to its attempts to characterize the Russian Roots email as a cover.  *See* Tr. 1320:13-19 (Gov't Summation); *see also* Kukushkin Memo at 48-49.  As the government's summation made clear, contrary to every position taken and argument made prior thereto, the Russian Roots email was irrelevant and not evidence of willfulness.

### f.   Conclusion

In short, the government's case required the impermissible "piling of inference upon inference" by the jury, *Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943), and failed to establish beyond a reasonable doubt the requisite (1) meeting of the minds; and (2) knowledge of the unlawful nature of the objective of the purported conspiracy ("willfulness").  Accordingly, Kukushkin's conviction on Count One should be set aside and a judgment of acquittal entered.


**POINT TWO**

**THE COURT SHOULD SET ASIDE KUKUSHKIN'S CONVICTION AND ENTER A JUDGMENT OF ACQUITTAL ON COUNT THREE**

As detailed *supra* and in Kukushkin's Memo at 24-27, there was insufficient evidence of Kukushkin's intent to support the aiding and abetting charge.  The government's responses thereto were, as noted, unavailing.

In addition, the evidence failed to establish that political contributions were made by a foreign national which totaled at least $25,000 for the calendar year 2018 as required by 52 U.S.C. § 30122; *id*. at 26.  To meet its burden, the government relied principally upon the $136,000 in credit card charges for the contributions made by Parnas and Fruman in June 2018 – months prior to receiving the proceeds from the first $500,000 loan.  However, the evidence

clearly established that these contributions had been made without any expectation that Muraviev would reimburse for them and were simply part of the nearly $500,000 in outstanding credit card debt that Fruman used the first loan proceeds to pay, without Kukushkin's or Muraviev's knowledge or consent.  GX 203; GX 408.  *See supra* at 9; *see also* Tr. 1332:22-1333:6 (Gov't Summation); Kukushkin Memo at 16, 20.  In other words, that the $136,000 in contributions were included in that outstanding credit card balance and paid off through business loan proceeds provided by Muraviev was happenstance.  Accordingly, none of these contributions may support a conviction on Count Three.  *See* Tr. 1488:23-1489:19 (Jury Charge) (promise of reimbursement must be a causal factor in the intermediary's decision to make the unlawful contribution); *see also United States v. Donnell*, 608 F.3d 546 (9th Cir. 2010).

Without the $136,000 in charges from June the government cannot meet the $25,000 threshold.  That is so because even if some portion of the second $500,000 loan paid for all or a portion of the Duncan and Laxalt contributions (something the government's own witness could not testify to), the aggregate amount of those donations was less than $25,000.  GX 203; GX 408.  The government's only response is that financial tracing of these contributions is irrelevant since the June contributions satisfy the threshold and, in any event, there is no requirement to use financial tracing.  *See* Gov't Memo at 8-9.  As detailed *supra,* the June contributions cannot support a conviction on Count Three, leaving only the Laxalt and Duncan contributions.

As to the lack of necessity of funds tracing, the government's argument belies common sense.  The government takes the position that the fact that its expert cannot trace the funds is not fatal because Parnas and Fruman requested the funds to make the contributions, at some point the money was provided, and at some later point a contribution was made.  *See* Gov't Memo at 8-9.  The offense charged in Count Three is the substantive offense of aiding and abetting the making

of contributions by a foreign national - not the planning or conspiring to do so.  Thus, at a

minimum, a contribution or donation must actually have been made by a foreign national (with

the requisite criminal intent of course).  If the funds of a foreign national were not used in

making a donation, then there was no crime.  Thus, it was essential for the government to prove

that the monies belonged to a foreign national.  The evidence at trial was insufficient to meet that

burden (*see* Tr. 1043:1-9; 1032:12-1033:5; 1066:2-25 (Espinoza)), thus the contributions made

to Laxalt and Duncan cannot support a conviction under Count Three (or frankly Count One).


**POINT THREE**

**THE COURT SHOULD ORDER A NEW TRIAL ON COUNTS ONE AND THREE
UNDER RULE 33**

In the alternative, the Court should vacate the judgment and grant a new trial in the

interest of justice.  *See* Fed. R. Crim. P. 33(a); *see also* Fed. R. Crim. P. 29(d)(1) ("If the court

enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine

whether any motion for a new trial should be granted if the judgment of acquittal is later vacated

or reversed.").

A.      **The Applicable Law**

Rule 33 of the Federal Rules of Criminal Procedure "gives the trial court 'broad

discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of

justice'".  *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (quoting *United States v.

Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992)).  In the words of the Second Circuit, "[t]he

ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest

injustice".  *Id*. at 134.  Courts have more leeway to grant a motion under Rule 33 compared to

Rule 29.  *United States v. Avenatti*, 19-CR-373 (PGG), 2021 U.S. Dist. LEXIS 125442 (S.D.N.Y.

July 6, 2021) ("in contrast to the analysis under Rule 29, a district court considering a Rule 33 motion need not view the evidence in the light most favorable to the [g]overnment").

Courts have granted Rule 33 motions for a wide variety of reasons, including cumulative error resulting from multiple different errors.  *See* Kukushkin Memo at 27-28; *United States v. Barrett*, 496 F.3d 1079, 1121 (10th Cir. 2007).  The government argues that a new trial is not warranted "even in situations where a trial court errs in its evidentiary rulings" if the evidence provided supports the jury's finding beyond a reasonable doubt.  Gov't Memo at 19.  In the instant case, however, the evidence was not "competent, satisfactory and sufficient" and does not support the jury verdict.  Kukushkin Memo at 28-30.

### B.  The Verdicts Should Be Set Aside Because They Are Against the Weight of the Evidence

For the reasons set forth in Kukushkin's motion for a judgment of acquittal *supra* (*see also* Kukushkin Memo at 27-30), no reasonable jury could find the charged offenses proven beyond a reasonable doubt.  But even if the evidence were sufficient, the jury's verdicts were against the weight of the evidence.  *See* Kukushkin Memo at 27-30.

The evidence clearly established that the agreement was a joint cannabis venture, not an illegal contribution scheme.  *See* Kukushkin Memo at 29.  The theory advanced by the government is illogical and is belied by the evidence.  The loan proceeds provided by Muraviev were used to pay the debts of Parnas, Fruman, and their energy business GEP.  GX 203; GX 408; *see also* Kukushkin Memo at 5-7; *see also infra* at 24.  None of the loan proceeds benefitted the joint cannabis venture.  *See* Kukushkin Memo at 30; *see also supra* at 9.  While it turned out these debts included approximately in $136,000 in credit card charges for political contributions Parnas and Fruman had made months earlier in June 2018 (GX 203), all of those contributions were made for the benefit of GEP (GX 108; GX 112; GX 113; GX 114; GX 117; GX 120; GX

121; GX 124; GX 155; GX 156; GX 160), and without the knowledge or consent of Kukushkin.
*See* GX 203; GX 408; *see also* Kukushkin Memo at 26; *supra* at 10-11.

Likewise, the contributions made by Fruman to Laxalt and Duncan on November 1, 2018, were made for the benefit of Parnas, Fruman, and GEP (Tr. 155:18-24 (Duncan); Tr. 546:2-4 (Laxalt); GX 155; GX 156)), at a time when the loan proceeds from Muraviev had already been dissipated (GX 408), and when there was no expectation that more funds would be forthcoming (GX 83).  *See also* Kukushkin Memo at 20; *supra* at 19.  And of course, Parnas and Fruman took the money without any intention of pursuing a joint cannabis venture but instead paying their bills, advancing their own personal and separate professional interests, and living a very posh lifestyle.  Kukushkin Memo at 16.  They were running a con.

Under these circumstances, "the soundness of the verdict is highly doubtful" and this Court should exercise its discretion to order a new trial. *See United States v. Autuori*, 212 F.3d 105, 121 (2d Cir. 2000) (affirming grant of new trial based on weight of the evidence).  To the extent the government replied to these points we have addressed those responses *supra.*

### C.  The Court Should Grant a New Trial for Counts One and Three with a Proper Willfulness Instruction and a Good Faith Defense Charge

Key to Kukushkin's defense was that he lacked the "willful" intent to conspire to violate or to aid and abet a violation of the FECA.  Consistent therewith, Kukushkin argued that the jury should have received a heightened willfulness charge consistent with *Cheek v. United States*, 498 U.S. 192 (1991).  Tr. 1237:7-25 (Charging Conf.).  Kukushkin also requested a good faith defense charge "consistent with Sand Instruction 8-1".  *Id.* at 1287:14-19 (Charging Conf.).  The Court rejected the heightened willfulness argument and did not include a good faith defense charge.

### 1. The Willfulness Definition and Instruction Misled the Jury

Though the Second Circuit has not yet decided the meaning of "willful" in the context of this statute, it is well-established that cases involving technical statutes that present a danger of ensnaring individuals engaged in apparently innocent conduct. *See, e.g.*, *Cheek*, 498 U.S. 192; *Ratzlaf v. United States*, 510 U.S. 135 (1994). Indeed, where the conduct involved "is not inevitably nefarious", the Supreme Court has left open the possibility of applying this heightened standard. *Ratzlaf*, 510 U.S. at 144.

Many of the complexities and nuances of the FECA were addressed at length during the trial and supported the use of a heightened standard charge in this case under the persuasive logic applied in *Cheek* and *Ratzlaf*. In response, the government cites to *United States v. Singh*, 979 F.3d 697, 712 (9th Cir. 2020). The *Singh* Court reasoned that unlike in *Ratzlaf* the line between lawful and unlawful conduct under § 30121 was not so narrow as it simply prohibits foreign nationals from contributing to candidates or political parties. *Id.* at 712-13 (citing *Ratzlaf*, 510 U.S. at 145); *see* Gov't Memo at 16. That rationale, however, fails to consider and appreciate the nuances and scope of conduct covered by § 30121 and the FECA.

For example, while a United States subsidiary of a foreign corporation may make political contributions in certain situations without running afoul of § 30121, in other situations it may not. https://www.fec.gov/updates/foreign-nationals/. Indeed, in certain instances a foreign corporation can establish political action committees that are permitted to make political contributions without violating § 30121, in others it may not. *Id.* Similarly, foreign nationals may volunteer for political campaigns and in some instances volunteer their professional services, while in other circumstances, they cannot without violating § 30121. *Id.* In other words, the very same conduct, by the very same entities or individuals can violate § 30121, as

23

well as other provisions of the FECA, based on a technical difference – green card status, residence status, funding source, decision maker, adequacy or availability of other funds, obligation to repay, understanding and expectations at the time the contribution was made, etc. Neither the government nor any of the cases upon which it relies addresses these points which heavily support application of a heighted standard of willfulness in the instant case.

Alternatively, the just should have been required to find that Kukushkin at least knew he was violating *election* law generally. The government argues that Kukushkin's reliance on the *Archer* and *Kosinski* cases is misplaced with regard to willfulness. Gov't Memo at 17-18. While the court in *Kosinski* does state that defendants in securities cases need to be aware of "the general unlawfulness" of their actions, the court also states that this is due to the inherently fraudulent (and therefore not innocent) nature of insider trading. *United States v. Kosinski*, 976 F.3d 135, 154 (2d Cir. 2020). Compared to insider trading, making political contributions on behalf of another is not as apparently illegal. Had the cannabis entity been formed and operational, Muraviev could have made a business loan directly to the entity, and Parnas and Fruman – with the same latitude to use the loan proceeds for general business purposes – could have chosen to make political contributions on behalf of the entity. While this behavior would not have violated campaign finance laws, to the extent the loan was directed to Parnas and Fruman instead makes their independent decision to use the loan proceeds to make political contributions if on behalf of or to benefit the business illegal. As such, the court should elect to heighten the standard under the FECA and require at the very least that criminal defendants know they are in violation of election law generally. Furthermore, while it is true that the trial court's decision in *Archer* providing the language requiring "criminal intent necessary for the substantive offense itself" was overturned, the case was remanded due to the overwhelming

weight of the evidence against the defendant rather than because the jury instruction was flawed. *United States v. Archer*, 977 F.3d 181, 190 (2d Cir. 2020).

> **2. Kukushkin was Entitled to Have a Good Faith Defense Charge Included in the Jury Instructions**

Although good faith is a complete defense to Counts One and Three and although Kukushkin requested that the Court incorporate a good faith instruction in its jury charge, it was not given. This was erroneous. *See, e.g.*, *United States v. Benton*, 890 F.3d 697, 715 (8th Cir. 2018) (despite rejecting heightened willfulness standard, the district court issued a good faith defense instruction with respect to the FECA count). In response, the government contends that the Circuit has "repeatedly blessed willfulness instructions 'that do not reference the good faith defense at all'". Notably, the government relies upon the Second Circuit's decision in *United States v. D'Agostino*, 638 F. App'x 51, 54 (2d Cir. 2016) which itself cites to *United States v. McGinn,* 787 F.3d 116, 126 (2d Cir. 2015). Ironically, the *McGinn* Court held that a good faith instruction was not required because the standard jury instruction on willfulness in a **tax evasion case** generally encompasses a good faith defense. As detailed *supra*, the willfulness charge in a tax evasion case uses a heightened standard and thus is not analogous to the definition used here, albeit it should have been. Moreover, in *United States v. Doyle,* 130 F.3d 523 (2d Cir. 1997) the Second Circuit held the district court did not commit reversible error by refusing to give the jury a requested "good faith" defense charge since the district court had already explicitly incorporated a specific "good faith" definition into its charge on the element of willfulness. *See id.* at 540-541. And, while the cases do not turn on the use of the term "good faith", they do involve more than the language of the standard willfulness instruction that was used here. *See e.g., id.* at 540-541.

### D. The Court Should Grant a New Trial Because Erroneous Evidentiary Rulings Substantially Prejudiced Kukushkin

#### 1. A Privileged Communication (GX-137, DX B-6) Was Wrongly Admitted

The email chain regarding the formation of a corporate entity in Nevada and legal advice pertaining to that formation, GX 137, is protected by attorney-client privilege and should not have been admitted into evidence.  Contrary to the government's argument, the involvement of attorneys in the chain was for the purpose of providing legal advice pertaining to the entity's formation.  One of the attorneys added Kukushkin to the exchange because his answers pertaining to the entity's structure and ownership would be instrumental to providing legal advice regarding its formation.  Further, Kukushkin discusses his views about the legal advice received and a lawyer's "argument about personal liability protection under C corp formation." This was understood by other participants in the email chain.  For example, Correia wrote to Kukushkin that one of the attorneys "made a good argument for a c-corp".  GX 137.

The inclusion of John Sinadinos in the chain did not waive the privilege, despite the government's assertions to the contrary.  The presence of a third party does not destroy privilege "if the purpose of the third party's participation is to improve the comprehension of the communications between attorney and client".  *United States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999).  The government's contention that the trial record shows that Sinadinos had no involvement in the defendants' venture is irrelevant, as Sinadinos is an advisor of the corporate entity, and his inclusion in the email chain was in aid to communications between Kukushkin and the lawyers about entity formation.  That Sinadinos' involvement did not feature during the criminal trial is no indication that his inclusion in the email chain waived the attorney-client privilege when the communication at issue was taking place.  That said, his involvement was not

without mention.  Bradley Hirsch, Esq. testified that Sinadinos replaced him as counsel to two entities with which Kukushkin and Muraviev were associated.  *See* Tr. 196:11-16 (Hirsch).

The email chain was also not probative of Kukushkin's intent.  As detailed in Kukushkin's Memo at 36-38, the Court was seemingly misled as to the probative value of GX 137.  To be sure, although initially arguing that the email demonstrated that its participants formed the corporate entity in a way that nefariously avoided naming Muraviev, the government abandoned that argument in its summation.  Rather than respond, the government reverts back to its original position even though it did not argue that to the jury or use GX 137 for those purposes.

Either way, at best the email chain demonstrates Kukushkin's consideration of various factors necessary to determine the appropriate structure of a corporate entity for an anticipated business venture in a highly regulated field in light of comments and questions from corporate counsel.  It was the entity's lawyers that raised the questions about Muraviev's "transparency" – a question that corporate lawyers regularly discuss with their clients during the formation of various corporate forms to lawfully disguise ownership of businesses and real estate. Kukushkin's response to the lawyers' questions was communication that clients have with their lawyers every day.  While the government flip flops and argues that the email is relevant on the issue of intent because it shows that "the decision to avoid mentioning Muraviev in the formation of his corporation was undertaken deliberately, and with Kukushkin's involvement", the government's position ignores completely, that (1) neither Parnas nor Fruman, both United States citizens and both actual political donors, are not identified owners of the corporation per the email; and (2) the corporation discussed in the email does not, had not, and, according to the

government's own theory of the case, never intended to make a contribution.  Thus, Muraviev's interest is wholly irrelevant to the charged scheme.  Once again, the government has no response.

Finally, the admission of the email chain into evidence was not harmless.  Though the government cites other evidence that was admitted at trial, it is this email chain that was emphasized during the government's summation and allowed the government to characterize Kukushkin's explanation as "cover", leaving the jury with a misimpression of Kukushkin's defense theory.  Tr. 1320:13-19 (Gov't Summation).

### 2. The Contribution Chart (GX 1403) and Summary Chart (GX 1402) Were Wrongly Admitted

The admission of the two government summary exhibits, GX 1402 and GX 1403, particularly without a limiting instruction, was unfairly prejudicial to Kukushkin, as the exhibits did not fairly represent competent evidence already before the jury.  *United States v. Conlin*, 551 F.2d 534, 538 (2d Cir. 1977) (citation omitted).

In response the government asserts that the defense was permitted to, and indeed did, argue to the jury the inferences to be drawn from and the weight that should be afforded the evidence presented.  *See* Gov't Memo at 23.  The government's argument proves Kukushkin's point.  As the jury was instructed, the defense's arguments were not evidence.  On the contrary, the summary charts, particularly GX 1402 which was comprised of excerpts from text messages and phone records weaved into the government's narrative and presented to the jury by a witness with no knowledge of the underlying facts, were admitted as evidence and the jury was instructed to consider them as such.  Thus, it is not that the jury considered and weighed competing evidence as is its purview.  The jury was expressly told that the government's arguments, masked as summary charts, were to be given more weight – to be treated as evidence – than the defense's which were not evidence.  Therein lies the undue prejudice.

The prejudice was compounded by the failure to instruct the jury that it should decide whether the charts and summaries "accurately, completely, and objectively reflect the content of the underlying documents". *Id.* Instead, the jury was merely told that the charts were prepared by the prosecution team and refer to the exhibits and was later instructed to consider the charts as any other evidence, (*see* Tr. 1470:4-6 (Jury Charge)), without an instruction to consider whether the charts adequately reflect the content of the exhibits they purport to summarize. Finally, while the defense was given limited time to review the revised version of GX 1403, it remains that the government's position on a fundamental issue – the source of funds to pay the Laxalt and Duncan contributions – changed at the last minute and the defense had limited time to prepare.

### E. The Court Should Grant a New Trial Based on the Prejudice to Kukushkin Resulting from the Denial of His Motions to Sever

It is beyond cavil that when the denial of severance results in prejudicial spillover, a new trial should be granted. *United States v Reinhold*, 20 F. Supp. 2d 541, 555 (S.D.N.Y. 1998). Nor is there any dispute that "substantial prejudice may be found where evidence admissible against jointly-tried co-defendants 'in some way affected the jury's ability fairly and rationally to evaluate the evidence of . . . guilt'". *United States v. Van Hise*, No. 2-CR-847, 2017 U.S. Dist. LEXIS 126004 at *128-129 (S.D.N.Y. Aug. 8, 2017) (citing *United States v. Hernandez*, 85 F.3d 1023, 1029 (2d Cir. 1996)). The government, however, contends that severance was not required because (1) "at no point did the Government argue that new articles sent to or by Parnas were also sent to Kukushkin"; and (2) relying on *United States v. Salameh,* 152 F.3d 88, 111, (2d Cir. 1998), the evidence as to which Kukushkin complains was admissible regardless of whether Kukushkin was tried alone. *See* Gov't Memo at 25. The government is wrong.

There can be no question that the significant disparity in the amount and magnitude of intent evidence offered as to Parnas spilled over to Kukushkin. Nor can there be any doubt that

the government leveraged and relied on the spillover evidence to argue that Kukushkin knowingly and willfully became a member of the alleged conspiracy with the "intent of achieving its unlawful objective".  The prejudice was magnified immensely by the utter lack of evidence of Kukushkin's willfulness.

First, it was not just evidence of articles sent or received by Parnas, but rather evidence of Parnas's knowledge of, familiarity with, and experience in the area of campaign finance and federal election laws.  *See* Tr. 1310:21-24, 1311:4-19, 1312:2-8, 1313:2-4 (Gov't Summation); *see also* Tr. 1165:14-1167:1 (Ahearn).  Second, while the government contends it did not argue Kukushkin received any of the news articles Parnas sent (Gov't Memo at 25), it did far worse. The government argued that "Parnas knew this rule so well he could teach others about it, doesn't matter just for Parnas.  Think about what it's going to tell you for Kukushkin".  Tr. 1313:5-7 (Gov't Summation); *accord* Tr. 1310:21-24 ("The second reason that you know the **defendants** acted willfully is that Parnas was told again and again that he couldn't donate someone else's money and he couldn't donate except from a citizen or legal permanent resident".).  Evidence of a co-conspirator's intent, knowledge, or state of mind cannot be transferred from one co-conspirator to another.  This type of prejudicial spillover is precisely what severance is intended to prevent.  *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998) ("'Prejudice' occurs in joint trials when proof inadmissible against a defendant becomes a part of his trial solely due to the presence of co-defendants as to whom its admission is proper".).  To this the government has no response.

Further, the government's repeated reliance on *Salameh* for the notion that articles which provide evidence of Parnas's state of mind would be admissible at a trial solely of Kukushkin is misplaced.  In *Salameh*, multiple defendants, tried together, accused of conspiracy and terrorism

related offenses for their roles in the World Trade Center bombing of 1993, appealed the district court's admission of certain evidence at a **joint** trial[2] on 403 grounds.  In finding that the district court did not abuse its discretion in admitting the evidence which included various instructions for making bombs, destroying buildings and manifestos containing strong anti-American sentiment and advocating violence, the Second Circuit pointed to the connections between the evidence and the various defendants.  For example, bomb making instructions seized from one defendant's home contained the fingerprints of multiple defendants, and traces of explosives identified in those instructions were found in the homes of and on objects linked to each of the defendants.  Thus, the Court reasoned this provided circumstantial proof of a connection among the conspirators and their familiarity with bomb making and the use of explosives.  Similarly, two other documents were found in the homes of two defendants (including the defendant challenging the admission of the evidence), and one of the documents bore a fingerprint of each defendant on the page containing the formula for destroying buildings with explosives.  Therefore, the Court reasoned the fact that both defendants possessed the same documents was probative of their relationship as co-conspirators.  Finally, the anti-American manifestos which also advocated violence against Americans were found in two of the defendants' homes while a third defendant was found to have other writings expressing the same sentiments.  The Court held this evidence established a link between the co-conspirators.  None of the circumstances relating to the highly prejudicial evidence admitted here is of apiece to *Salameh*.  Parnas was in possession of, had occasion to discuss, and had signed campaign forms explicitly forbidding donations by foreign nationals; he warned Joe Ahearn about foreign fundraisers; and he became

---

[2] The Circuit did not address the admissibility of the evidence in the event of separate trials.

a member of Trump's finance committee, which included receiving various materials outlining campaign finance laws, all without the knowledge of Kukushkin. Kukushkin did not. Nor did Kukushkin engage in similar or analogous conduct or possess similar or related materials.

Second, with respect to Kukushkin's antagonistic defense arguments, the government does not dispute that Kukushkin was limited in his ability to fully pursue his claim of fraud against Parnas due to Parnas's presence in the courtroom. Instead, the government argues that such a defense was not truly antagonistic to Parnas nor was it a defense. As to the latter, as detailed *supra*, there was no evidence presented – certainly none sufficient to establish beyond a reasonable doubt that Kukushkin knowingly and willfully joined any conspiracy to violate the FECA with Parnas, much less with Muraviev. Moreover, the government failed to present any evidence that Muraviev was a knowing and willful participant in any alleged conspiracy. This argument also ignores the obvious fact that the entire trial, including the witnesses and defense arguments, focused on the alleged conspiracy between Parnas and Kukushkin rather than any possible agreement between Muraviev and Kukushkin. Furthermore, while Kukushkin did attempt to raise an antagonistic defense at times throughout the trial, his arguments were hobbled due to Parnas's presence at the defense table. For instance, as noted *supra,* Kukushkin was not permitted to introduce the sentencing letter used against Correia, which would have demonstrated to the jury that Kukushkin lacked scienter with regard to the conspiracy count. *See* Final Pretrial Conference October 5, 2021, Tr. 62:6-15; Dkt No. 224 at 12-14.

Lastly, the Government argues that trial severance would have resulted in a waste of judicial resources due to witnesses having to testify twice. Gov't Memo at 26. Although judicial efficiency and economy are important considerations, they pale in comparison to the goal of providing and constitutional right to a fair trial. The Supreme Court has unequivocally expressed

that joinder of trials is "designed to promote economy and efficiency and to avoid a multiplicity of trials, *where these objectives can be achieved without substantial prejudice to the rights of the defendants* to a fair trial". *Bruton v. United States*, 391 U.S. 123, 131 n.6 (1968) (internal quotations omitted) (emphasis added).  Judicial economy may be a relevant concern, however, protecting the rights of criminal defendants is the priority.  Due to the substantial prejudice Kukushkin suffered from joinder, his trial should have been severed from Parnas's even if multiple witnesses would have had to testify twice at both trials.

### F.  The Court Should Grant a New Trial Based on the Prejudice to Kukushkin Resulting from the Government's Improper Summation Arguments

Presenting a theory of a case and asking a jury to make permissible inferences is one thing.  Suggesting theories of guilt and requesting the jury to make inferences that are impermissible as a matter of law, unsupported by the evidence, and for which there is no good faith basis is quite another.  It is that line between fair and foul, between just and unjust, between proper and improper that the government crossed.  It is for that reason that the government's summation arguments should result in a new trial.  *See Berger v. U.S.,* 295 U.S. 78, 86 (1935), overruled on other grounds by *Stirone v. U.S.*, 361 U.S. 212 (1960).

#### 1. Bad Purpose

As detailed *supra,* the government lacked sufficient – indeed any – evidence of Kukushkin's willful participation in the conduct forming the basis of the charged conspiracy. Argue as the government might, there was no direct evidence that Kukushkin was aware of any prohibition on contributions by foreign nationals or straw donors, or what either prohibition meant.  Nor was there sufficient evidence that Kukushkin had any belief that he was engaged in any unlawful conduct.  This was fatal to the government's case.  Instead, the government sought to inflame the jury relying on speculative and baseless inferences and conjecture as well as

misstatements of the law.  Worst of all, the government's summation was a call for patriotism and for protection against evil Russians.  To be sure, it was an improper emotional appeal to the jurors' generalized sense of patriotism and fear of Russian infiltration of and meddling with our country's free and fair elections, if not worse.

Specifically, the government argued to the jury that as to Kukushkin willfulness was established by proof of a "bad purpose", established here by the fact that Kukushkin was a Russian ally and bad American, associated with those who harbored disdain for our laws, attended Trump rallies and bribed public officials.  *See* Tr. 1317-1318:19 (Gov't Summation). In other words, guilt by Kukushkin's association with a bad Russian.  It was wholly improper, flagrant, meant to inflame the jury, and it caused substantial prejudice to Kukushkin particularly in light of the paucity of the evidence of willfulness and thus, guilt.  *See e.g., United States v. Burse,* 531 F.2d 1151 (1976).

### a.  Use of Andrey Muraviev's Profile Photo

As discussed *supra,* although the government may ask the jury to draw "fair – if aggressive – inferences" from the evidence (*United States v. Bonaventure*, 646 Fed. Appx 73, 88 (2d Cir. 2016)), the government's remarks about Muraviev's profile picture during summation and the inferences the government requested the jury to draw therefrom were hardly fair.  Nor did the government have a good faith basis to make them.  The government's standard response that Kukushkin had a copy of the profile picture for four weeks prior to trial but did not object to its admission is not the answer.  The profile picture was provided as part of Muraviev's contact card taken from a forensic image of Kukushkin's phone.  Muraviev was a central figure in this case, and he was someone with whom Kukushkin communicated.  That the government might offer evidence of his contact information in Kukushkin's phone was not surprising.  Of course, the government never previewed for the defense in any manner how it intended to use the contact

card. Nor that it intended to highlight the profile picture or blow it up on the large video screen in the courtroom to a size thousands of times larger than would be found on a mobile device and well beyond any fair or accurate representation.[3]  Nor did the government preemptively raise the issue with the Court by means of a motion *in limine* as it did many other issues. In other words, that the defense had a copy of the exhibit in advance of the trial is of no moment and does nothing to detract from the government's misconduct.

Finally, the government's argument that "Muraviev's contact picture demonstrated a lack of respect for this country's laws or elections" and that "Kukushkin knew he agreed with Muraviev to make political contributions with a bad purpose", (Gov't Memo at 28), were inferences unsupported by the picture at issue, its historic significance, or the artist that painted it (Kukushkin Memo at 46-47).  But more to the point, before making an argument the government was required to have a good faith basis to do so.  As detailed *supra* and in Kukushkin's Memo at 46, the government did not.  Nor were the inferences the government asked the jury to draw legally proper.  Indeed, even if the picture supported the government's inferences as to Muraviev's views, which it did not, it was wholly inappropriate for the government to argue that merely by associating, i.e. communicating with someone who uses this unamerican painting as his profile picture, Kukushkin was a threat to our American way of life, our country, a "bad guy" with a "bad purpose" and therefore guilty, which is exactly what the government did in its summation.  Lest there be any doubt, this is what the government said:

> The purpose behind this conspiracy was influence buying, and it's going to bet worse than that. Every time Kukushkin texted or spoke with Muraviev, every time Fruman forwarded one of Muraviev's chats to Parnas or the others, this is what they saw. This is Muraviev's chosen image for himself, a picture of someone mooning

---

[3] As a matter of practical knowledge, a profile picture in a messaging app is no more than a few centimeters in size; certainly nothing close to how GX 1212 was portrayed to the jury – blown up on an oversized television screen during the government's summation.

the Statue of Liberty, and Kukushkin is helping this guy put a million dollars into U.S. elections? There is no way Kukushkin doesn't know he's doing something with a bad purpose.

Tr. 1317:25-1318:8.

### b.   Attendance at the Elko and Las Vegas Rallies

As to the equally offensive and absurd argument that Kukushkin's appearance as a full fledge supporter at the Trump and Pence Elko and Las Vegas Rallies, even though he was "apolitical", further meant he was acting with "bad purpose" from which the jury should infer he was acting willfully and was thus guilty (Tr. 1317:12-15 (Gov't Summation)), the government now contends it was just "respond[ing] to Kukushkin's arguments that he was 'apolitical' and thus incapable of committing the crime with which he was charged".  Gov't Memo at 29.  More specifically, the government claims it was explaining that it did not matter whether Kukushkin was active in politics or not because "his mere attendance at these events with his co-conspirators was indicative of his involvement in the conspiracy and active participation in working towards its objectives".  *Id.*  That was not the argument made in the government's summation.  *See* Tr. 1317:1-14 ("Another way to define willfulness is that a person acts willfully when he acts with a bad purpose to disobey or disregard the law.  I'm going to start with something simple. This is the evidence that neither defendant ever voted. Now, that's not a crime…There are lots of good people …never make time to vote, but most of those people probably don't spend their time going to campaign rallies …. But that is exactly what Kukushkin …did… You see them here at the Elko rally, acting like they …are diehard partisans when, in fact, they couldn't care less about politics".).  In other words, plain as day – Kukushkin acted with bad purpose because he went to campaign rallies even though he did not care about the issues.  That was an improper argument (as well as insufficient evidence of willfulness).  Going

to a campaign rally despite being apolitical has nothing to do with one's intent to make illegal campaign contributions.

### c.  Bribery Arguments

Finally, to hammer home the point that Kukushkin was a bad guy who should be convicted because of the threat he posed to society, despite the lack of sufficient evidence of his guilt, the government argued that Kukushkin was engaged in a bribery scheme aimed at paying off politicians for cannabis licenses. *See* Tr. 1317:20-21 (Gov't Summation). The government claims it was proper because those were Kukushkin's own words. *See* Gov't Memo at 30. Of course, Kukushkin never made such statements. Moreover, even assuming *arguendo* he had, it is not evidence, certainly not proper or sufficient evidence, of his willful membership in a conspiracy to make illegal campaign contributions. Instead, it was a prejudicial argument that Kukushkin was an unseemly cannabis operator guilty of many offenses – even if not charged – and so you should find him guilty. Vigorous advocacy does not mean improper arguments or asking the jury to draw inappropriate inferences. Nor is accusing a defendant of uncharged crimes use of "colorful adjectives". Rather, it amounts to improper and highly prejudicial government misconduct and nothing the government argues supports a finding to the contrary.

### POINT FOUR

### KUKUSHKIN JOINS IN THE FURTHER ARGUMENTS OF HIS CO-DEFENDANT THAT INURE TO HIS BENEFIT

Kukushkin adopts, incorporates by reference, and joins in all further arguments of his co-defendant, Lev Parnas, that inure to his benefit and are not inconsistent herewith.

## CONCLUSION

For all of these reasons as well as those set forth herein in Mr. Kukushkin's moving papers, those enunciated at trial, and those contained in the motions of Parnas, the Court should set aside the verdicts and enter a judgment of acquittal, pursuant to Fed R. Crim. P. 29(c) on Counts One and Three or in the alternative order a new trial pursuant to Fed R. Crim. P. 33(b)(2) on each count, along with any other or further relief which to the Court seems just and proper.

Dated: January 13, 2022
New York, New York

Respectfully submitted,

GERALD B. LEFCOURT, P.C.

By /s/ Gerald B. Lefcourt
Gerald B. Lefcourt (GBL 5030)
Faith A. Friedman (FAF 6066)

1776 Broadway, Suite 2000
New York, N.Y. 10019
Tel: (212) 737-0400
Fax: (212) 988-6192 fax
Email: Lefcourt@lefcourtlaw.com
*Attorneys for Andrey Kukushkin*

38